IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ADAM KELLY WARD,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 3:10-cv-02101-N- BH |
| | § | |
| | § | *CAPITAL CASE* |
| | § | |
| **RICK THALER**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

_____

**PETITION FOR A WRIT OF HABEAS CORPUS**

_____

**THIS IS A DEATH PENALTY CASE**

David R. Dow
Texas Bar No. 06064900
University of Houston Law Center
100 Law Center
Houston, TX 77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131

Phillip C. Umphres
Texas Bar No. 20378300
The Law Office of Phillip C. Umphres
2600 State Street
Dallas, TX 75204
Tel. (214) 999-0035
Fax (214) 999-0037

*Counsel to Adam Kelly Ward, Petitioner*

# TABLE OF CONTENTS

TABLE OF EXHIBITS ........................................................................................ vi

PETITION FOR A WRIT OF HABEAS CORPUS ...................................................... 1

JURISDICTION ................................................................................................... 1

PRIOR PROCEEDINGS ....................................................................................... 2

STATEMENT OF THE CASE ................................................................................. 2

I.   MR. WARD WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT
     TO BE TRIED BY AN IMPARTIAL JURY WHEN A THIRD PARTY ENGAGED IN *EX*
     *PARTE* CONTACT WITH THE JURY. ................................................................ 6

     A.   The Legal Standard .............................................................................. 6

     B.   Relevant Facts ...................................................................................... 8

     C.   Mr. Ward's Right to Trial by an Impartial Jury Was Violated When Dr. Zelhart Talked
          with Several Jurors During Lunch. .................................................... 10

     D.   The Trial Court Erred By Failing to Hold an Evidentiary Hearing. .................................. 10

II.  MR. WARD WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT
     RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN THE SENTENCING PHASE
     BY TRIAL COUNSEL'S FAILURE TO CONDUCT A REASONABLE SENTENCING
     INVESTIGATION. ......................................................................................... 12

     A.   The Legal Standard ............................................................................ 12

     B.   Trial Counsel Failed to Conduct a Reasonable Sentencing Investigation. ........................ 23

          1.   Prevailing professional norms ...................................................... 23

2.   Trial counsel's performance fell below prevailing professional norms. ....................... 31

C.   Trial Counsel's Failure to Conduct a Reasonable Sentencing Investigation  Prejudiced Mr. Ward:  The Totality of the Mitigating Evidence "Might Well Have  Influenced the Jury's Appraisal" of Mr. Ward's Moral Culpability.................................................................... 36

1.   The sentencing case presented at trial .......................................................... 36

2.   The sentencing case that would have been presented had trial counsel conducted a reasonable sentencing investigation in accordance with prevailing professional norms in place at the time of Mr. Ward's trial ............................................................ 40

a.   The antisocial personality disorder diagnosis was the result of counsel's failure to conduct a thorough investigation. ................................................................. 40

b.   Because of his father's inability to hold down a job and reckless spending habits, Mr. Ward was raised in poverty.......................................................................... 41

c.   Mr. Ward was raised by his parents in isolation and taught to believe that the rest of the world intended to harm him. .......................................................................... 43

d.   Mr. Ward constantly sought but was unable to ever find the approval of his parents. .. 45

e.   The home in which Mr. Ward was raised was one in which violence was the norm. ... 46

f.   The home in which Mr. Ward was raised was an arsenal. ............................................ 48

g.   Mr. Ward's parents constantly ignored recommendations from mental health professionals. ................................................................................................... 49

C.   The Sentencing Case the Jury Would Have Heard Absent Counsel's Deficient Performance Undermines Confidence in the Outcome. ................................................... 50

III.   MR. WARD'S DEATH SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE HE IS SEVERELY MENTALLY ILL. ................................ 52

A.  The Eighth and Fourteenth Amendments Bar the Execution of the Severely Mentally Ill. ........................................................................................................................... 52

1.  Infliction of capital punishment upon individuals who were severely mentally ill at the time of the offense makes no measurable contribution to the acceptable goals of punishment. ................................................................................................................ 52

a.  Retribution is not served by executing those who were severely mentally ill at the time of the offense. ............................................................................................................ 53

b.  Deterrence is not served by executing those who were severely mentally ill at the time of the offense. ............................................................................................................ 55

2.   Like mental retardation, aspects of severe mental illness undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards. ..................... 56

B.  Mr. Ward is Severely Mentally Ill. ..................................................................................... 59

IV.  MR. WARD WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL BECAUSE EXTENSIVE PRETRIAL PUBLICITY RENDERED IT IMPOSSIBLE FOR AN IMPARTIAL JURY TO BE SEATED IN HUNT COUNTY ....... 61

A.  The Legal Standard ............................................................................................................. 61

B.  Relevant Facts .................................................................................................................... 63

C.  Pretrial Publicity Rendered it Impossible to Seat an Impartial Jury. ................................. 68

V.   BECAUSE COUNSEL FAILED TO MOVE FOR A CHANGE OF VENUE, MR. WARD WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL. ................................................................................................................... 70

A.  The Legal Standard ............................................................................................................. 70

B.  Mr. Ward's Trial Counsel was Deficient in Not Moving for a Change of Venue. ............. 70

C.  Counsel's Deficient Performance Prejudiced the Defense. ............................................... 71

VI.  MR. WARD'S RIGHT TO DUE PROCESS WAS VIOLATED WHEN THE STATE
     FAILED TO DISCLOSE MATERIAL EVIDENCE. ........................................................... 72

     A.  The Legal Standard ............................................................................................. 72

     B.  The State Failed to Disclose Material Impeachment Evidence in Its Possession. ............. 74

VII. MR. WARD'S SIXTH AND FOURTEENTH AMENDMENT RIGHT TO PRESENT A
     DEFENSE WAS VIOLATED WITH THE TRAIL COURT REFUSED TO ADMIT
     EVIDENCE PERTAINING TO HIS MENTAL HEALTH AND MENTAL STATE. ........ 75

     A.  The Legal Standard ............................................................................................. 75

     B.  Relevant Facts ...................................................................................................... 75

VIII. THE JURY'S CONSULTATION OF THE BIBLE DURING PUNISHMENT PHASE
     DELIBERATIONS VIOLATED MR. WARD'S RIGHTS UNDER THE SIXTH, EIGHTH,
     AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION. ....................... 76

     A.  The Legal Standard ............................................................................................. 76

     B.  Relevant Facts ...................................................................................................... 78

CONCLUSION AND PRAYER FOR RELIEF ......................................................................... 79

VERIFICATION ......................................................................................................................... 80

CERTIFICATE OF SERVICE ................................................................................................... 80

**TABLE OF EXHIBITS**

| Exhibit | Document |
| --- | --- |
| 1 | Children's Medical Center Records Excerpts |
| 2 | Tri-County Services Records Excerpts |
| 3 | Commerce ISD Records Excerpts |
| 4 | Affidavit of Buddy Jones |
| 5 | Affidavit of Randy Cannon |
| 6 | Randy Talley Billing Records |
| 7 | Paul Zelhart Billing Records |
| 8 | Affidavit of Lawanda Phelps |
| 9 | Team Concept in a Capital Case |
| 10 | Declaration of Sharon Crump |
| 11 | Declaration of Sharon Vice |
| 12 | Declaration of Billy Hyde |
| 13 | Declaration of Ken Hindman |
| 14 | Declaration of Trish King |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **ADAM KELLY WARD,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 3:10-cv-02101-N- BH |
| | § | |
| | § | *CAPITAL CASE* |
| | § | |
| **RICK THALER**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

_____

**PETITION FOR A WRIT OF HABEAS CORPUS**
_____

Petitioner Adam Kelly Ward asks this Court to issue a writ of habeas corpus and grant

him relief from his unconstitutional death sentence.

**JURISDICTION**

This court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Mr. Ward

was convicted in the 354th District Court in Hunt County, Texas.  Subject matter jurisdiction is

conferred by 28 U.S.C. § 2254.

## PRIOR PROCEEDINGS

Mr. Ward was convicted of capital murder and sentenced to death in June 2007. The conviction and death sentence were affirmed by the Texas Court of Criminal Appeals on February 10, 2010. *State v. Ward*, No. AP-75,750 (Tex. Crim. App. 2010). Mr. Ward filed an application for writ of habeas corpus in the state convicting court on November 30, 2009. The convicting court recommended that relief be denied and the Texas Court of Criminal Appeals accepted the recommendation, denying relief on October 6, 2010. *Ex parte Ward*, No. 70,651-02 (Tex. Crim. App. 2010) (unpublished).

## STATEMENT OF THE CASE

Adam Kelly Ward was diagnosed with bipolar disorder and placed on Lithium when he was four years old. Exhibit 1 (Children's Medical Center Records Excerpts), at 00006-11.[1] His parents had begun noticing his behavior changing when he was only eighteen months of age. Exhibit 1 at 000208; Exhibit 2 (Tri-County Services Records Excerpts), at 003442, 003540.[2] By the time he was three years old, his behavior had become very aggressive. Exhibit 1 at 000006. He was prescribed Mellaril (a drug used to treat symptoms of schizophrenia), Elavil (an anti-depressant), Dexedrine and Ritalin (drugs used to treat ADHD). Exhibit 1 at 00006, 000208; Exhibit 2 at 003442. When these medications failed to lead to any improvement in his condition, he was admitted to Children's Medical Center Psychiatric Unit for a two month stay only a month and a half after his fourth birthday. Exhibit 1 at 000006-11, 000022-23. During the third week of this stay, doctors began treating him with Lithium and, with the treatment, his

---

[1] Exhibit 1 page numbers are referenced by their Bates stamp number rather than sequential order.

[2] Exhibit 2 page numbers are referenced by their Bates stamp number rather than sequential order.

hyperactivity and aggressiveness improved.  Exhibit 1 at 00010.  He was diagnosed during this stay with bipolar disorder.  *Id.*  One of the recommendations that the doctor made while he was being discharged was that the family continue therapy sessions.  *Id.*  Adam's parents did not follow these recommendations and  his father, Ralph Ward, called these sessions "a waste of time".  R.R. Vol. 42: 47-48, 86-87.[3]

Adam's mental illness continued to plague him as he entered school.  Not long after being released from Children's Medical Center, Adam enrolled in an early childhood special education program at Commerce Independent School District.  Exhibit 3 (Commerce ISD Records Excerpts), at 004357.[4]  Adam once again began behaving very aggressively.  Exhibit 1 at 000041.  As tension in the family continued, Adam's doctors continued to stress the need for therapy.  Exhibit 1 at 000018, 000178-79.  By April 1987, four months shy of Adam's fifth birthday, his doctor increased the amount of Lithium he was taking in an attempt to help control his behavior.  Exhibit 1 at 000176.  Because the Lithium was no longer effective, Adam's doctor strongly recommended that Adam be treated with Tegretol.  *Id.*  Adam's father responded to this suggestion by saying, "There is no way in hell that you are putting him on Tegretol…."  Exhibit 1 at 000043.  On April 8, 1987, Adam was admitted to Children's Medical for a second stay; this stay lasted three weeks.  Exhibit 1 at 000026, 000100.  Following this stay, his doctors continued to stress the need for individual and family therapy, stating they were concerned about Adam being treated with Lithium alone.  Exhibit 1 at 000024-25.  His doctors stressed that multi-modal

---

[3] Citations to the Reporter's Record appear as R.R. Vol. [number]: [page number].‖ Citations to the Clerk's Record appear as C.R. Vol. [number]: [page number].

[4] Exhibit 3 page numbers are referenced by their Bates stamp number rather than sequential order.

care was necessary to produce any long-term positive changes.  *Id.*  However, the Wards continued not to follow these instructions from Adam's doctors.

In the fall of that year, Adam began kindergarten.  Adam's mother attended a conference with his teacher on September 17.  Exhibit 3 at 004355.  The purpose of the meeting was to discuss goals for Adam's behavior that year.  Exhibit 3 at 004355.  This seems to be the beginning of the confrontational posture with which Adam's parents would approach meetings at school through high school, as his teacher reported on that day that Mrs. Ward was not happy.  Exhibit 3 at 004355.  By the time Adam was in second grade, a box had been built inside the school to keep him in when he was out of control.  Teachers were instructed in different holds and restraints to use on him.  Exhibit 3 at 004320-35.  Adam began attending a different elementary school in third grade.  Prior to his arrival, a box similar to the one that had been used at his first school was built just for Adam.  Exhibit 4 (Affidavit of Buddy Jones), at 3.  When Adam was nine years of age, the confrontational nature with which his parents responded to suggestions from the special education program at his school had grown to the point that the director of the program requested the Texas Education Agency provide mediation in an attempt to find a program that would please his parents.  Exhibit 2 at 003756-57.  Around that time, the special education program provided funding for both individual therapy and family therapy sessions.  Exhibit 2 at 003011.  Though these services would be provided to them free of charge, the Wards continued to be resistant to therapy.  Exhibit 2 at 003011.  As Adam grew older, his parents' resistance to therapy continued.  Exhibit 1 at 000207-19.  Their confrontational attitude toward school officials trying to help him continued.  Exhibit 3 at 2039-40 (Ralph Ward telling the director of special education that she had gotten herself into a hornet's nest).  Their refusal to try different recommended medications continued.  Exhibit 1 at 000172.  As his parents refused

to follow these recommendations and accept help, Adam's illness worsened, and this was reflected in his behavior.

By the time he was in high school, his problems had escalated to the point that Adam finished high school at home taking classes on a computer.  Exhibit 2 at 002576-77.  His contact then with the outside world all but completely stopped as his life was now centered around the family home.  He spent the days there with his father who did not work, was verbally abusive, and was paranoid that the government was out to get him and his family.  He spent his days at their home which his parents had filled with guns.  He spent his days at home with his father who regularly threatened to use violence against his neighbors.  During this period, Adam's behavior took a severe turn for the worse and culminated in his shooting City of Commerce Code Enforcement Officer Michael Walker on June 13, 2005.

Though there existed many mental health professionals, teachers, and family friends with a great deal of knowledge about his mental illness and his family, the mitigation specialist appointed by the trial court to his case did not interview anyone outside of Adam and his parents.  This left his defense team woefully unprepared for both the guilt/innocence and punishment phases of his trial.  His jurors were unconstitutionally influenced by numerous sources including inflammatory pretrial reports in the media, contact during lunch with a person with ties to the prosecution, and Bibles that were consulted in the jury room.

Because of the constitutional violations that occurred in the prosecution of Mr. Ward, the jury's verdict rested on a wholly incomplete picture of Mr. Ward's background.  The evidence developed and presented herein was readily available had trial counsel adhered to prevailing professional norms for capital representation.  Unconstitutional external influences on the jury during deliberations place both the verdict and sentence they rendered in question.  Because of

5

the severity of his mental illness, Mr. Ward does not possess the culpability constitutionally required to sentence someone to death.

## CLAIMS

I. **MR. WARD WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO BE TRIED BY AN IMPARTIAL JURY WHEN A THIRD PARTY ENGAGED IN *EX PARTE* CONTACT WITH THE JURY.**

### A.    The Legal Standard

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed…."   U.S. Const. amend. VI. The Sixth Amendment is "'fundamental to the American scheme of justice,' and therefore applicable in state proceedings" through the Fourteenth Amendment.  *Sullivan v. Louisiana*, 508 US 275, 277 (1993) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968)).   "The primary purpose of the jury in our legal system is to stand between the accused and the powers of the State."  *Lewis v. United States*, 518 U.S. 322, 335 (1996) (Kennedy, J., concurring).  The right to a jury trial guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors, and the failure to accord an accused a fair hearing violates even the minimum standards of due process.  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citing *In re Oliver*, 333 U.S. 257 (1948); *Tumey v. Ohio*, 273 U.S. 510 (1927)); *Coleman v. Kemp*, 778 F.2d 1487, 1541 (11 Cir. 1986), *cert. denied*, 476 U.S. 1164 (1986).  A juror's verdict must be based upon the evidence developed at the trial, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.  *Irvin*, 366 U.S. at 722; *Coleman*, 778 F.2d at 1541.

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in

>pursuance of known rules of the court and the instructions and directions of the
>court made during the trial, with full knowledge of the parties.

*Remmer v. United States*, 347 U.S. 227, 229 (1954).  "It is vital in capital cases that the jury

should pass upon the case free from external causes tending to disturb the exercise of deliberate

and unbiased judgment.  Nor can any ground of suspicion that the administration of justice has

been interfered with be tolerated."  *Mattox v. U.S.* 146 U.S. 140, 149 (1892).

    *Ex parte* contact with jurors by the state or third parties violates the Sixth Amendment

guarantee of an impartial jury.  *Remmer*, 347 U.S. at 229; *see, e.g.*, *Gonzales v. Beto*, 405 U.S.

1052, 1055-56 (1972) (jurors inter-trial contact with bailiff who later testified for the State

violated right to impartial jury); *Parker v. Gladden*, 385 U.S. 363, 363-65 (1966) (bailiff's

comments to jury about defendant's guilt violated right to impartial jury); *Turner v. Louisiana*,

379 U.S. 466, 474 (1965) (jurors' inter-trial contact with two deputies who later testified as

witnesses for the State violated right to impartial jury).  Such interactions need not rise to the

level of the State or third party expressly attempting to influence jurors.  *See Brooks v. Dretke*,

418 F.3d 430, 435 (5th Cir. 2005) ("That there is no evidence that the District Attorney did

anything to exploit his power over juror Garcia is of no moment.  That the power presents an

intolerable risk of working its will without the raising of a hand or a nod is the vice here.")

Seemingly incidental or routine interactions may result in a constitutional violation.  *See, e.g.*,

*Gonzales v. Beto*, 405 U.S. 1052, 1053 (1972) (impermissible conduct with bailiff/witness

included walking jurors to lunch, talking with them on the way to lunch, eating lunch with jurors,

and bringing them soft drinks during deliberations).

    The *ex parte* interaction need not be with a member of the prosecution team.  Courts have

routinely found interactions with third parties to be prejudicial.  *See Remmer*, 347 U.S. at 229;

*see also Parker*, 385 U.S. 363, 363-65.  Moreover, there is no requirement that the contact be

instigated by the State.  *See United States v. Sylvester*, 143 F.3d 923, 933 n.6 (5th Cir. 1998) ("Although we are troubled by the possibility that, if the contacts were in fact instigated by the appellants, they are profiting from their own wrongdoing, this argument is expressly foreclosed by our caselaw."); *United States v. Forrest*, 620 F.2d 446, 458 (5th. Cir 1980) ("It makes no difference in this case that it was [the defendant] himself who initiated the contact that may have poisoned the jury.").

Ex parte contact with jurors is presumptively prejudicial.  *See Drew v. Collins*, 964 F.2d 411, 415 (5th Cir. 1992) (citing *U.S. v. Webster*, 750 F.2d 307, 338 (5th Cir. 1984)); *see also Brooks v. Dretke*, 418 F.3d 430, 435.

The Fifth Circuit has held that, when an instance of potential jury tampering is brought to the attention of the court, in the absence of a presumption of prejudice, a Court must hold a hearing to determine if the interaction was prejudicial to the defendant.  *U.S. v. Sylvester*, 143 F.3d 923, 932 (5th Cir. 1998) ("*Remmer* and its applications in this Circuit thus require a district judge, when confronted with credible allegations of jury tampering, to notify counsel for both sides and hold a hearing with all parties participating.")  Failure to hold such a hearing constitutes reversible error.  *Id.*; *see also U.S. v. Denman*, 100 F.3d 399, 405 (5th Cir. 1996); *U.S. v. Webster*, 750 F.2d 307, 338 (5th Cir. 1984).

### B.    Relevant Facts

During Mr. Ward's trial, a member of the prosecution team, Paul Zelhart was seen eating lunch and conversing with Mr. Ward's jury.

> On June 20 2007, during the lunch break from Adam's trial, I went to a coffee shop named Ruby's, which was down the street from the court house.  After I entered the coffee shop and got a booth, I was surprised to see Dr. Zelhart sitting at a table with several of the jurors.  He was sitting beside the jury foreman and talking to him and other jurors.

Exhibit 5 (Affidavit of Randy Cannon), at 5;  *see also* R.R.  Vol. 42: 79-80 ("It came to my attention through observing in the courtroom that we believe … there was an individual consulting with Mr. Thomas who was sitting with the jurors at lunch time.").

Upon learning that Dr. Zelhart had eaten lunch with the jurors and conversed with them, defense counsel notified the Court.  R.R. Vol. 42: 79-80.  The prosecution denied that Dr. Zelhart was a member of the prosecution team, and asserted that he was "a good friend … for  15 years" of prosecutor Duncan Thomas and a "personal friend" of Dick Walker, the father of the victim. *Id.* at 80-81.  The trial court ruled that because Dr. Zelhart was not working in an official capacity, and because there was no evidence of juror misconduct, no further action was required. *Id.* at 81.  The trial court denied Mr. Ward's motions for a mistrial and new trial.  *Id.*

Investigation subsequent to trial has shown that Dr. Zelhart was a member of the prosecution team.  Dr. Zelhart worked closely with the prosecution throughout Mr. Ward's trial. Prior to his interactions with the jury on June 20, 2007, Zelhart had been present throughout much of the trial, taking notes and consulting with the prosecution during breaks.  *See* Affidavit of Randy Cannon at 5; *see also* R.R. Vol. 42: 79-80.  Dr. Zelhart also communicated via email with the State's investigator regarding the case prior to trial.  *See* Exhibit 6 (Randy Talley Billing Records), at 1  ("6/28/05: Went over case information and Dr. Zelhart's E-Mail").  Shortly after Mr. Ward's trial, Dr. Zelhart began working as a "trial consultant" for the District Attorney's office, interviewing witnesses in capital murder cases.  *See* Exhibit 7 (Paul Zelhart Billing Records); *see also* Exhibit 8 (Affidavit of Lawanda Phelps), at 4 ("On November 12, 2008, after my son was arrested, I received a phone call from a man identifying himself as Paul Zelhart.  Mr. Zelhart stated he was working with the district attorney's office to obtain social history information concerning my son.").  That Dr. Zelhart's services were provided to the District

9

Attorney's office free of charge in Mr. Ward's case makes his contact with the jury no less prejudicial.

### C.   Mr. Ward's Right to Trial by an Impartial Jury Was Violated When Dr. Zelhart Talked with Several Jurors During Lunch.

Dr. Zelhart's contact with the jurors was inappropriate, even discounting his role on the prosecution team.  As the state offered at trial, Zelhart had been a friend of the lead prosecutor in this case, Duncan Thomas, for 15 years and was also a friend of the victim's father.  R.R. Vol. 42: 80-81.  The State described Zelhart as "an interested party".  *Id.* at 80.  Further, Zelhart had been interviewed by the prosecution regarding Mr. Ward's case.  *See* Exhibit 6.

This case presents facts much more troubling than those in which courts have presumed prejudice.  Here, a close friend of both the prosecutor and the victim's family consulted with the State throughout the trial and then had *ex parte* conversations with several members of the jury.

In *Turner*, the jury had been sequestered and "placed in the charge of the Sheriff." *Turner*, 379 U.S. at 467.  During the trial, two deputies in particular had close contact with the jurors, driving them to and from restaurants and their lodgings, as well as eating with them and running errands for them.  *Id*. at 468.  Although different, Mr. Ward's case is analogous.  Unlike *Turner*, the contact was less extensive.  What makes Mr. Ward's case more egregious, however, is that Dr. Zelhart's contact was not incidental to, or explained by his performing a valid or necessary service.  Moreover, unlike *Turner*, in which the contact was with a witnesses, Dr. Zelhart was a member of the prosecution team.  Under these circumstances, prejudice is established.

### D.   The Trial Court Erred By Failing to Hold an Evidentiary Hearing.

It is a well-established rule that when confronted with an allegation of *ex parte contact with jurors,* such as the one in this case, "the trial court is required to hold a hearing to determine

whether the incident complained of was harmful to the petitioner." *Remmer*, 347 U.S. at 230; *see also Sylvester*, 143 F.3d at 932.  However, despite this well established rule, the trial court failed to conduct such a hearing after being notified of the contact.  R.R. Vol. 42: 81-82.  The trial court accepted the prosecution's assertion that Dr. Zelhart was not a member of the prosecution team, and therefore concluded no further inquiry was required.  *See* R.R. Vol. 42: 81 ("If he's not official capacity, unless there's some evidence of misconduct on the part of the Jury - we've got it in the record, and that's all I think I need to do at this point.")  The trial court's reasoning was flawed for several reasons.

A defendant must make only a "credible allegation of" of jury tampering before a court is required to hold a hearing.  *Sylvester*, 143 F.3d at 932.  There is no requirement the defendant show the party conducting the unauthorized contact is a member of the prosecution team.  *See Remmer*, 347 U.S. at 229; *see also Parker*, 385 U.S. 363, 363-65.  Moreover, there is no requirement that the defendant present evidence that the jury acted inappropriately, or allowed the contact to influence their judgment.  Rather, determining this prejudice is the function of the hearing.  Such a showing would preclude the need for a hearing.

In state habeas proceedings, Mr. Ward was again denied a full and fair hearing regarding this claim, and the state court denied relief.  *Ex parte Ward*, No. 70,651-02 (Tex. Crim. App. 2010) (unpublished).  The state court's decision 1) was contrary to clearly-established federal law and 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state court.  28 U.S.C. § 2254(d)(1) (2006).

II. **MR. WARD WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN THE SENTENCING PHASE BY TRIAL COUNSEL'S FAILURE TO CONDUCT A REASONABLE SENTENCING INVESTIGATION.**

A. **The Legal Standard**

In determining whether trial defense counsel were ineffective in failing to adequately investigate and present available mitigating evidence during sentencing, this Court must apply the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the defendant first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." *Id*. at 688. In evaluating a claim that counsel failed to adequately investigate, *Strickland* states that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691.

Second, the defendant must satisfy the prejudice requirement by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The prejudice inquiry "finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution." *Strickland*, 466 U.S. at 694 (citing *United States v. Agurs*, 427 U.S. 97, 104, 112-13 (1976)). Consequently, to prove prejudice, "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

This test is not outcome determinative. The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself

12

unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."  *Id*.  Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.[5]  The Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court.  *Id*. at 405-06 ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that...the result of the proceeding would have been different.'").

    With respect to how a court should analytically conduct the prejudice inquiry in an individual case, several points require mentioning.  First, in making the determination whether counsel's errors resulted in the required prejudice, a court must presume that the jury acted according to law.  *Strickland*, 466 U.S. at 694.  In other words, "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."  *Id*. at 695.  Therefore, the law

---

[5] In *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit recognized that the prejudice prong imposes "a lower burden of proof than the preponderance standard."  *Id*. at 595.  Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard."  *Id*.; s*ee also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

itself, *i.e.*, "the standards that govern the [sentencing] decision," must be considered when determining whether a probability sufficient to undermine confidence in the outcome exists.

The prejudice inquiry is therefore case specific, in that it is an attempt to assess the effect that trial counsel's deficient performance had on the reliability of the outcome of a particular proceeding. In many death penalty states, sentencing laws require that the sentence in a capital case—life or death—be determined by weighing aggravating factors found to exist by the decisionmaker against mitigating factors found to exist by the decisionmaker. If the jury determines that the mitigating factors outweigh the aggravating factors, the jury is instructed to return a verdict of life. If, however, the jury determines that the aggravating factors outweigh the mitigating factors, then the jury is instructed to return a verdict of death.[6] In these cases, "the question is whether there is a reasonable probability that, absent the errors, the sentencer…would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

A Court reviewing a judgment imposing death from Texas, however, would not ask this question, because the sentencing laws that govern Texas capital trials do not require the decisionmaker to weigh aggravating factors and mitigating factors when deciding what penalty

---

[6] *See, e.g.,* Cal. Penal Code § 190.3 ("[T]he trier of fact…shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole"); Fla. Stat. ch. 921.141 (trier of fact must determine "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist"); Md. Code Ann., Criminal Law § 2-303(i)(1) ("If the court or jury finds that one or more of the mitigating circumstances…of this section exists, it shall determine by a preponderance of the evidence whether the aggravating circumstances…of this section outweigh the mitigating circumstances.").

to assess.  Instead, Texas asks jurors to answer two "special issues."[7]  The special issues are questions of fact that the jury must answer either "yes" or "no."  Depending upon how these questions are answered, the trial court sentences the defendant to either life without parole or death.

The first special issue a Texas jury is required to answer is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).  The second special issue a Texas jury is required to answer, and answers only if it answers "yes" to the first special issue, is "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."  *Id.* art. 37.071, § 2(e)(1).  If the jury answers the first special issue "yes" and the second special issue "no," the trial court must impose a sentence of death.  *Id.* art. 37.071, § 2(g).  For any other combination of answers—including the inability of the jury to unanimously agree on an answer for any question—the trial court must assess a sentence of life without the possibility of parole.  Tex. Code Crim. Proc. art. 37.071, § 2(g).  In light of these standards governing the sentencing decision in Texas, the question in this case is whether there is a reasonable probability that, absent counsel's errors, the jury would have answered the mitigation special issue differently or

---

[7] In a minority of cases, the sentencing jury must answer three questions.  The third question asks whether the defendant intended or anticipated loss of life.  The jury is given this third special issue only when the jury was charged in the guilt phase under Texas's law of parties.  *See* Tex. Code Crim. Proc. art. 37.071 ☐ 2(b)(2). The third special issue is not applicable to the instant case.

not at all.  *See Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003) (relevant question is whether totality of evidence "would have affected the sentencing decision of at least one juror").

Second, in making the prejudice determination, a court must consider the totality of the evidence before the jury and then assess the effect the errors might have had on any of the fact findings made by the sentencer.  As the *Strickland* Court observed:

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*. at 695-96.  Thus, a court reviewing how counsel's errors affected the punishment phase of a Texas capital sentencing proceeding must examine the relevant special issue (*i.e.*, the "factual findings") to determine whether and to what extent it may have been affected in light of the evidence before the jury.

Texas's Court of Criminal Appeals (CCA) affirmed the above analytical framework for reviewing the prejudice prong of an ineffective assistance claim in the punishment phase of a Texas capital trial in *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006).  There, the Court wrote:

> [T]he applicant must show that counsel's performance prejudiced his defense at trial.  In order to satisfy this prong, an applicant must show there was a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.  Texas' capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances.  It asks the jury to answer a mitigation issue.  We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the

mitigation issue differently.  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'

*Gonzales*, 204 S.W.3d at 393-94 (footnotes omitted).  In making the prejudice inquiry, the Court "consider[s] the totality of the evidence, 'both that adduced at trial, and the evidence adduced in the habeas proceeding.'"  *Id*. at 398 (citing *Wiggins*, 539 U.S. at 534).  The Court determined that Gonzales had suffered prejudice from his counsel's failure to locate and present mitigating evidence because "the applicant's mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability."  *Id*. at 399 (quoting and citing *Wiggins*, 539 U.S. at 538).

From 2000 to 2005, the Supreme Court decided three cases to address effective representation at the sentencing phase of a capital trial.  *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000).  This trio of decisions addressed death penalty cases tried in the 1980's, and the Supreme Court held in each instance that the clearly established law of *Strickland* mandated a finding of ineffective assistance of counsel.  These cases have considerably clarified the "clearly established law" applicable to capital cases adjudicated in state court after *Strickland*.  The following principles are inherent in *Strickland* and its progeny:

**<u>Performance</u>:**

•    Capital defense is sufficiently specialized and regulated to have a national standard, reflected both in the 8th Amendment and the ABA Guidelines.  *Rompilla*, 545 U.S.at 387; *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 397.

•    While there is no set of per se rules or checklist for capital representation, defense counsel must – in every case – engage in a thorough social history investigation.  *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009).  The ABA Guidelines are evidence of the "well-defined norms" of the national standard for mitigation investigation.  *Wiggins*, 539 U.S. at 524-25; *Rompilla*, 545 U.S. at 380.

- Termination of mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation. *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527-28.

- The fact that counsel performed some, or even extensive investigation, does not preclude a finding of deficient performance with respect to further investigation they reasonably should have done under the circumstances. *Rompilla*, 545 U.S. at 388-89; *Wiggins*, 539 U.S. at 527, 534.

- Federal courts, even under the deferential scheme of the AEDPA, should scrutinize claims of strategy in light of a close reading of the record and a state court finding of strategic purpose for an omission should be disregarded if it cannot withstand such scrutiny. *Wiggins*, 539 U.S. at 526-27.

**Prejudice:**

- Prejudice ensues whenever the totality of the mitigating evidence "might well have influenced the jury's appraisal" of the defendant's moral culpability. *Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.

- The operative question is whether there is a reasonable probability that one juror would have voted differently. *Wiggins*, 539 U.S. at 537.

- When assessing prejudice from counsel's error or omissions, reviewing courts must look at all of the mitigating evidence in the aggregate, including the evidence adduced at trial and the evidence adduced in post-conviction proceedings. *Wiggins*, 539 U.S. at 536; *Williams*, 529 U.S. at 397-98.

- Courts should not focus on trial counsel's post-trial statements regarding whether they would have used the mitigating evidence adduced in post-conviction proceedings; the relevant inquiry is whether a competent attorney would have introduced it. *Wiggins*, 539 U.S. at 535.

- The failure to discover mitigation undermines the outcome even in highly aggravated cases. The failure to provide any context or explanation for an aggravated case may render the proceeding unreliable. The idea that considerable aggravation is a *per se* bar to finding prejudice is no longer viable after *Williams* and *Rompilla*, both of which were highly aggravated cases.

- Prejudice inures even if the omitted evidence does not rebut the State's case for death eligibility. *Williams*, 529 U.S. at 398.

- Courts must look at all consequences that would have flowed from competent performance, including the impact on the work of expert witnesses. *Rompilla*, 545 U.S. at 592-93.

- When assessing prejudice federal courts need not make the state-law evidentiary findings that would have been at issue at sentencing, courts merely evaluate the totality of the evidence adduced at trial and in the habeas proceedings. Thus, a petitioner can use reliable hearsay to prove prejudice. *Wiggins*, 539 U.S. at 536.

### *Walbey v. Quarterman*, 309 F. App'x 795

Proper application of these principles to a capital case arising from Texas is demonstrated by the Fifth Circuit's decision in *Walbey v. Quarterman*, 309 F. App'x 795 (5th Cir. 2009) (unpublished). Tried in Texas in 1994, Gaylon Walbey murdered Marionette Beyah by breaking into her home and strangling, beating, and stabbing her to death with an extension cord, fire extinguisher and several different knives. *Walbey v. State*, 926 S.W.2d 307, 308-09 (Tex. Crim. App. 1996). When police arrived at the scene, they discovered a barbecue fork and a butcher knife still protruding from the victim's back. *Id.* at 309. In preparation for the punishment phase of the case, trial counsel had obtained and reviewed documents relating to Walbey's background. *Id.* at 796. Trial counsel had also retained and presented the testimony of two psychologists during sentencing. *Id.* Counsel, however, did not begin his sentencing investigation or retain his primary expert until a week before trial, and did not thoroughly review the documents he had obtained. *Id.* at 796, 801.

At sentencing, Walbey's trial counsel presented evidence of Walbey's "tumultuous childhood and background of abuse, as well as expert testimony that Walbey would not be a future danger to society." Brief of Respondent-Appellee, at 12-21. *Walbey v. Quarterman*, 309 F. App'x 795 (5th Cir. 2009) (available at 2008 WL 5972180). This evidence included testimony from Walbey's maternal grandmother that Walbey had been kidnapped by his father when he was five years old and that his mother only discovered him six years later in an orphanage in Corpus Christi, after which Walbey was no longer the same child. *Id.* The evidence also included testimony that Walbey had often run away from his father, hiding in

abandoned houses, to escape frequent physical beatings by his father, and that after his discovery in the orphanage, Walbey had been placed by his mother in a mental institution in Florida. *Id*. When Walbey was 14 years old, his mother concluded she could no longer care for him and gave him up for foster care. *Id*. Trial counsel also presented the testimony of two foster parents with whom Walbey had lived for two years. *Id*. They testified that Walbey's placement with them indicated he had a history of severe abuse and neglect, but that Walbey never caused problems either at school or at home during his stay with them. *Id*.

After his conviction and death sentence, post-conviction counsel for Walbey discovered additional mitigating evidence of cruelty and neglect. 309 F. App'x at 797. The evidence indicated, *inter alia*, that Walbey was exposed to beer and marijuana by ages two and a half to three and was left alone with unexplained marks on his body during the same time; was found wandering alone along a highway service road at age five; was kidnapped by his father—who abused his mother and had a drug and alcohol addiction—and hidden from his mother from ages five to ten; was physically and mentally abused by his father and paternal grandmother, including a beating with a doubled over belt that lasted for forty-five minutes and broke the buckle; ate out of trash bins while living in abandoned houses when he was locked out by (or ran away from) his father during the period of his kidnapping; was reunited with his mother after being discovered in an orphanage; took to petty theft; was hospitalized with a possible diagnosis of schizophrenia at age twelve, but did not receive the recommended follow-up care for that diagnosis because his mother "did not have the time;" and was abused by his mother when she drank. *Id*. The evidence also indicated that Walbey had known the victim through a foster parent program. *Id*. at 798. After initially accepting Walbey, the victim had returned him to the

youth center several months later with the explanation that she was going on vacation; she never returned for him, and Walbey was told that she did not want him back. *Id.*

The Fifth Circuit first held that there was "little room for debate" that trial counsel's mitigation investigation was deficient, calling it "severely limited." *Walbey*, 309 F. App'x at 800. In light of the "case law that firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history," the *Walbey* Court faulted trial counsel because he did not (1) interview Walbey's mother or people who worked with him as a youth, (2) hire a mitigation expert, (3) reach an independent conclusion about the viability of a mitigation defense, instead delegating that task to an expert, which expert understood his role as limited to assessing only future dangerousness and spent two hours preparing the case, *or* (4) investigate the history of Walbey's relationship with the victim. *Id.* at 800, 801. Despite counsel's investigation into and presentation of Walbey's maternal grandmother, two former foster parents, and two psychological experts, "[t]here was essentially no effective investigation of the mitigation issue." *Id.* at 801. Moreover,

> [g]iven the Texas law establishing that the facts of Walbey's crime are themselves legally sufficient to support a finding of future dangerousness, the virtually impossible battle that Ezell faced on future dangerousness makes all the more unreasonable Ezell's failure to investigate a mitigation defense thoroughly. … Neither can there be any contention that the facts of Walbey's childhood were hidden or difficult to find; in fact, many were contained in a box delivered to Ezell by the district attorney that Ezell elected only to skim. Ezell's mere possession of "some information with respect to petitioner's background … [did not put him] in a position to make a tactical choice not to present a mitigation defense."

*Id.* (quoting *Wiggins*, 539 U.S. at 527). The Court further held that the Texas Court of Criminal Appeals' conclusion that counsel did not perform deficiently was an objectively unreasonable application of *Williams*. *Id.*

As to prejudice, the district court had held that there was none because Walbey's trial counsel had "outlined the same mitigating factors for the jury as Walbey now contends should have been presented." *Id*. at 802. Despite counsel's presentation of a substantial part of Walbey's abusive and neglectful childhood, however, the Fifth Circuit disagreed. The *Walbey* Court again relied on *Williams*, characterizing the decision as "stand[ing] for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony." *Id*.

> The fact that the presentation of some mitigation evidence does not necessarily defeat a prejudice showing is also clear from the test that *Williams* establishes. There, the Court held that it is an unreasonable application of Supreme Court precedents for a state court not to "evaluate the totality of the available mitigation evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding." This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.

*Id*. (emphasis in original).

Finally, the *Walbey* Court rebuffed two additional arguments made by Texas in support of the district court's determination that Walbey was not prejudiced. First, it rejected "the State's stereotypical fall-back argument" that the heinous and egregious nature of the crime itself would have ensured assessment of the death penalty even absent the deficiency. *Id*. at 804 (quoting *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001)). That argument "eviscerat[es] the Supreme Court-approved Texas 'special issues' scheme" and "would be to return to the days of inflicting capital punishment based on emotion and revenge, supplanting altogether the questions of deliberateness and future dangerousness which make the Texas scheme constitutional."[8] *Id*. Moreover,

---

[8] Additionally, jurors are allowed to take into consideration the facts of the crime under the theory that the evidence is relevant to the future dangerousness special issue. *Muniz v. State*,

> Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief ... would virtually never be available, so testing for it would amount to a hollow judicial act.

*Id*. Second, the *Walbey* Court noted that Texas's argument that prejudice could not be shown because the mitigating evidence contained both helpful and aggravating was foreclosed by *Williams*. Ultimately, the mitigating evidence Walbey's trial counsel's deficient investigation failed to discover was "sufficient to create a reasonable probability that one juror would have voted for life in prison rather than death," and "[i]t was unreasonable under *Williams* for the TCCA to conclude otherwise." *Id*. at 806.

### B.   Trial Counsel Failed to Conduct a Reasonable Sentencing Investigation.

#### 1.   Prevailing professional norms

In capital sentencing, the United States Supreme Court has held that the Eighth and Fourteenth Amendments require that sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (plurality opinion), while also allowing "the particularized consideration of relevant aspects of the character and record" of the individual defendant, *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976). Because "an individualized decision is essential," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), the Eighth Amendment mandates that the sentencer "not be precluded from considering as *a mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death,"

---

573 S.W.2d 792, 795 (Tex. Crim. App. 1978). However, as explained above, the future dangerousness special issue and mitigation special issue are ***entirely distinct*** questions. Aggravation and mitigation are not weighed by a Texas capital sentencing jury. Consequently, the question of aggravation is not a legally relevant consideration to the prejudice component of an IAC claim for failing to conduct a reasonable mitigation investigation.

*Id.* at 604 (emphasis in original). Likewise, the sentencer may not "refuse to consider *as a matter of law*, any relevant mitigating evidence," *Eddings v. Oklahoma* 455 U.S. 104, 114 (1982), such as a "troubled youth." *Id.* at 107.[9]

Relevant mitigating evidence is not limited only to evidence that would "relate specifically to petitioner's culpability for the crime he committed." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Likewise, there is no requirement that mitigating evidence have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004). Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5 (quoting *Lockett*, 438 U.S. at 604*); see also Lambright v. Schriro*, 490 F.3d 1103, 1115 (9th Cir. 2007) ("If evidence relating to life circumstances with no causal relationship to the crime were to be eliminated, significant aspects of a defendant's disadvantaged background, emotional and mental problems, and adverse history, as well as his positive character traits, would not be considered, even though some of these factors, both positive and negative, might cause a sentencer to determine that a life sentence, rather than death at the hands of the state, is the appropriate punishment for the particular defendant").

In essence, the fundamental Eighth Amendment premise is that if the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of

---

[9] In *Eddings*, the sentencing judge believed that he was legally prohibited from considering as mitigation that: the defendant was "raised without proper guidance;" his parents were divorced; he lived "without rules or supervision" with a mother who was possibly an alcoholic and a prostitute; when he stayed with his father he was subjected to "excessive physical punishment" and "physical violence;" he was "emotionally disturbed;" and "his mental and emotional development" were less than his 16-years-of-age. *Eddings v. Oklahoma*, 455 U.S. 104, 107 (1982).

humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson*, 428 U.S. at 304. A jury can consider evidence in mitigation, however, only if defense counsel at trial reasonably investigates and presents the available evidence.

The American Bar Association's (ABA) revised *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, published in 2003, articulate professional norms for capital defense counsel, ensuring that constitutionally-relevant evidence necessary to a reliable individualized assessment of the defendant's moral culpability is presented to the sentencing jury for consideration. ABA, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1027 (2003) [hereinafter ABA Guidelines]. The ABA's standards for capital defense work have long been referred by the Supreme Court as "guides to determining what [performance] is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)); *see also Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (relying on the ABA Guidelines).[10] The State Bar of Texas has likewise issued guidelines that "articulate the statewide standard of practice for the defense of capital cases" in Texas, the nation's most active death penalty state. State Bar of Texas, *The State Bar of Texas Guidelines and Standards for Texas Capital Counsel*, 69 Tex. Bar J. 966 (2006) [hereinafter SBOT Guidelines].

These guidelines provide that the "core" defense team that lead capital defense counsel should immediately assemble upon appointment includes (1) at least one co-counsel; (2) an

---

[10] While the ABA Guidelines are only guides and not "inexorable commands," *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009), the standards remain "valuable measures of the prevailing professional norms of effective representation." *Padilla v. Kentucky*, No. 08-651, slip op. at 20 (2010).

investigator; and (3) a mitigation specialist.  ABA Guideline 10.4(C); SBOT Guideline 10.1(B).

"Lead counsel bears overall responsibility for the performance of the defense team, and should

allocate, direct, and supervise its work in accordance with [the ABA] Guidelines and

professional standards."  ABA Guideline 10.4(B); SBOT Guideline 10.1(A).  Capital counsel's

duty to use his or her assembled defense team to conduct a thorough sentencing phase

investigation is well established:

> The duty to investigate exists regardless of the expressed desires of a client.  Nor
> may counsel "sit idly by, thinking that investigation would be futile."  Counsel
> cannot responsibly advise a client about the merits of different courses of action,
> the client cannot make informed decisions, and counsel cannot be sure of the
> client's competency to make such decisions, unless counsel has first conducted a
> thorough investigation with respect to both phases of the case.

ABA Guideline 10.7 cmt.; SBOT Guideline 11.1(A) ("Counsel ... have an obligation to conduct

thorough and independent investigations relating to the issues of both guilt and penalty."); *see*

*also Porter v. McCollum*, 130 S. Ct. 447, 452 (2009) ("It is unquestioned that under the

prevailing professional norms at the time of [the petitioner's] trial, counsel had an 'obligation to

conduct a thorough investigation of the defendant's background.'") (quoting *Williams v. Taylor*,

529 U.S. 362, 396 (2000)).

*Mitigation Specialists*

The use of a qualified mitigation specialist has become part of the well-established

standard of care, and ensures that a reasonable mitigation investigation is conducted.  ABA

Guideline 4.1(A)(1) cmt. (citing Subcomm. on Federal Death Penalty Cases, Comm. on

Defender Services, Judicial Conference of the United States, *Federal Death Penalty Cases:*

*Recommendations Concerning the Cost and Quality of Defense Representation* (1998)

[hereinafter *Federal Death Penalty Cases*] (discussing federal death penalty cases), available at

http://www.uscourts.gov/dpenalty/1COVER.htm); SBOT Guideline 10.1(B)(2)(b).

Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

*Id.*

These professional norms with respect to sentencing investigation in capital cases are reflected by continuing legal education seminars. Legal education seminars further delineate the constitutionally-mandated duties of capital defense counsel described by the courts, the ABA, and the SBOT. For example, materials distributed at a February 2001 seminar in Austin, Texas, explain that every capital defense team must include a mitigation specialist hired at the earliest possible moment after designation:

In a death case, the ultimate goal is the preservation of the client's life. The entire preparation of the case must be directed to that end. Because of this all-important goal, these cases are, in essence, prepared in reverse order. Regardless of guilt, the attorneys must aim their efforts ***from the beginning*** at saving the client's life. For this reason and because the death penalty is, in part, a sociological issue, counsel must include human service professionals on the defense team. ***The mitigation specialist is the first,*** and usually most important, expert that should be

27

consulted in every capital case.  They should have both sound, clinical skills for interviewing and assessment and a thorough working knowledge of the court system.[11]

Exhibit 9 (Team Concept in a Capital Case), at 2 (emphasis added).

The seminar materials emphasize the important preparatory role that mitigation specialists play in capital defense, including development of the accused's social history, which will be heavily relied upon by the trial attorneys and mental health experts:

> The largest role of the mitigation specialist is that of a psycho-social investigator. The **complete** social investigation compiled by the mitigation specialist is the base upon which a successful mitigation is built.
>
> * * * *
>
> The social history helps the attorney understand the client and what happened and aids the attorney in explaining to the court and jury what the client is about and why.  *The social history also contains invaluable information for other team members, such as the psychologists and psychiatrists.  This material guides the lawyers and mental health experts in determining what to test for and why.*

Exhibit 9 at 4 (emphasis added).

Finally, the Texas Court of Criminal Appeals decision in *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006), is another source from which professional norms in Texas may be

---

[11] Because the mitigation specialist plays such a critical role in preparing for sentencing, the standard of care as reflected by continuing legal education requires entrusting the social history investigation only to someone with the appropriate expertise and training:

> The lawyer must also take care in hiring the mitigation specialist.  This is not someone who will just go out and talk to people.  This should be a professional who is trained in conducting mitigation investigations.  This can be a licensed social worker with an MSW or Ph.D.  This is an expert.  Someone who can testify at trial as to her findings, conclusions and opinions.
> * * * *
> A mitigation specialist should possess an understanding of the psycho-social aspects of human development, human relations skills, and management skills. Try to select a mitigation specialist with a background in any combination of clinical social work, counseling other human service professions coupled with some sort of forensic or criminal justice knowledge.

Exhibit 9 at 2-3.

discerned.  Gonzales's capital murder trial occurred in 1997.  *Id*. at 393.  After trial, post-conviction counsel discovered, through interviews with Gonzales's family, that Gonzales had been physically and sexually abused as a child.  *Id*. at 394.  Although Gonzales's trial counsel had interviewed both Gonzales's mother and sister about Gonzales's background—the latter of whom even testified at punishment to Gonzales's difficult childhood and his borderline mental retardation—Gonzales's counsel never specifically inquired into whether Gonzales had been abused with these potential witnesses and thus did not present evidence of abuse at sentencing. *Id*. at 394-95.  The CCA held that this failure to investigate and inquire into the subject of abuse when interviewing the client and relevant witnesses fell below an objective standard of reasonableness for Texas capital trial counsel in 1997 and rendered trial counsel's mitigation investigation unreasonable.[12]  *Id*. at 397.

---

[12]  Judge Cochran wrote a concurring opinion, in which she expanded upon the professional norms in place in Texas capital sentencing proceedings in 1997:

> The underlying message of *Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) is that defense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty. The failure to investigate will not be excused simply because the defendant failed to mention such evidence himself. Indeed, under *Rompilla v. Beard*, defense counsel may be required to investigate potential mitigating facts even when the defendant is "uninterested in helping" or is "even actively obstructive" in developing a mitigation defense.

> Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the "circumstances of the offense, the defendant's character and background, and [any evidence that lessens] the personal moral culpability of the defendant[.]"…Like a doctor, defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic. Such topics might include:

> - Childhood accidents and injuries;
> - Trips to the emergency room;
> - Serious illnesses at any time;
> - Physical abuse to the defendant or any other member of the family;

At the time of Mr. Ward's trial, the prevailing professional norms required counsel to conduct a thorough mitigation investigation. *See Porter v. McCollum*, 130 S.Ct. 447, 454 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's [1988] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.") (quoting *Williams v. Taylor,* 529 U.S. 362, 396 (2000)); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), 93 (1989) (investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor"); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (citing to 1989 ABA Guidelines to establish prevailing professional norms in 1989 capital trial).

---

- Any sexual abuse to the defendant or any other member of the family;
- Size of the immediate family, and a history of the physical, educational, and emotional background of each member;
- The defendant's relationship with and attitudes toward every member of the family;
- Drug or alcohol use or abuse by himself and any or all members of the family;
- Any mental health treatment of any member of the family, including the defendant;
- The cohesiveness of the family;
- The family's standard of living and living conditions;
- Any and all available school records;
- Any record of learning disabilities;
- Childhood and adult social relationships with members of the same and opposite sex;
- Any marriage, divorce, children, step-children, or surrogate family relationships, and their positive or negative influence upon the defendant;
- Any and all awards, honors, or special accomplishments, as well as any and all convictions, arrests, expulsions or suspensions from school, job firings, etc.;
- Any and all traumatic experiences; …

*Gonzales*, 204 S.W.3d at 400-01 (Cochran, J., concurring).

Counsel's duty to conduct a reasonable sentencing phase investigation "is not discharged merely by conducting a limited investigation." *Lambright*, 490 F.3d at 1120.  Counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial." *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006).  The collection of records is recognized as essential in conducting a mitigation investigation. *See* ABA Guideline 11.4.1; *see also* Jeff Blum, *Investigation in a Capital Case: Telling the Client's Story*, Champion, Aug. 1985, at 27, 30 ("Whereas memory can be faulty or subjective, documents from schools, hospitals, drug programs, military records, community programs and other agencies, programs, and organizations can offer a concrete record of the individual's past.").

### 2.    Trial counsel's performance fell below prevailing professional norms.

Mr. Ward was arrested on June 13, 2005.  C.R. Vol. 1: 19.  After the attorney that initially represented Mr. Ward withdrew, the court, on September 8, 2005, appointed counsel that would represent him at trial.  C.R. Vol. 1: 29.  Trial counsel retained Shelli Schade as a mitiagion specialist, and, on October 10, 2005, the court authorized trial counsel to expend up to $9,000.00 for her services.  C.R. Vol. 1: 78.  According to Ms. Schade's billing records, she met with Mr. Ward and his parents for the first time on October 21, 2005.  C.R. Vol. 1: 110.  This was the only time her records reflected that she met with Mr. Ward or any of his family during her first month on the case.  *Id.*  In December, Ms. Schade visited twice with defense counsel and Mr. Ward's parents.  C.R. Vol. 2: 182.  These were the only contacts Ms. Schade had with any of Mr. Ward's family.  C.R. Vol. 2: 191-94, 2: 200-02, 2: 236-37, 2: 247-48, 2:253-54, 2:263-64, 2: 265-66, 2: 298-99, 3: 311-12, 3: 324-25, 15:2150, 16:2310-11, 22: 3212, 25: 3641-42 (reflecting that the mitigation specialist spent no time interviewing or even attempting to contact members of Mr.

31

Ward's family or anyone else from January 2006 through his trial in June 2007).  These were, in fact, the only attempts Ms. Schade made to speak with any of the many people who possessed invaluable information about Mr. Ward's psycho-social history.

The state court paid Ms. Schade $14,199.51 for her work on this case, but she spent virtually no time speaking with Mr. Ward's parents and made no attempt to speak with any other members of Mr. Ward's family, any friends of the family, any doctors or mental health professionals that had treated him throughout his life, or any teachers.  As the Guidelines recognize, "It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others."  ABA Guideline 10.7 cmt.  No one from the defense team interviewed any members of Mr. Ward's family other than his parents.  Trial counsel's files reveal that the only mental health professional that was interviewed by the defense was a psychologist who did not remember Mr. Ward.  Most of the central figures that prevailing professional norms in place at the time of Mr. Ward's trial stressed needed to be interviewed were never interviewed.

While most of the time that Ms. Schade billed the court was for reviewing records and compiling a timeline based on records, a review of the record and of trial counsel's files reveals that the defense team did not gather most of these records but instead relied upon records provided by the prosecution.  Professional norms in place at the time recognized that records collection was essential to conducting a reasonable sentencing investigation.  *See* ABA Guideline 11.4.1

The bulk of the interviews that were conducted by the defense team were conducted by Mr. Randi Ray, who was appointed as a fact investigator in Mr. Ward's case. C.R. Vol. 1: 92. Moreover, Mr. Ray did not speak with nearly all of the people that were necessary for the defense team to speak with to compile an adequate psycho-social history of Mr. Ward. Mr. Ray's records reveal that he spoke with students who knew Mr. Ward during his semesters at Junior College, family friends, persons that knew him during his time with the Boy Scouts, at least one of Mr. Ward's elementary school teachers, and a former principal. The only family member that Mr. Ray spoke with was Ralph Ward, Mr. Ward's father. While Mr. Ward had been seen by many psychologists, psychiatrists, and other mental health professional over the course of his life, Mr. Ray's records reveal only one interview of a single psychologist that did not remember treating Mr. Ward.

> The investigation into a client's life history must survey a broad set of sources and includes … medical history; complete prenatal, pediatric and adult health information; … mental health history; history of maltreatment and neglect; trauma history; educational history; … multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior….

*Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases* Guideline 10.11(B), *in* 36 Hofstra L. Rev. 677, 689 (2008) [Supplementary Guidelines]. "[A]n understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning…." ABA Guideline 10.11 cmt. This is especially so for clients, such as Mr. Ward, that are mentally ill. "A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." ABA Guideline 10.7 cmt. Other members of the defense team rely on the complete psycho-social history that the sentencing investigation should produce. The

defense team believed that Mr. Ward's father also suffered from mental illness.  *See* R.R. Vol. 44: 197 (defense expert testifying that Mr. Ward had paranoid delusional beliefs that were shared with his parents).  The fact that trial counsel believed that Mr. Ward's father was mentally ill makes their failure to speak with members of Mr. Ward's family outside of his father and mother inexcusable.

While the fact investigator is an essential person in the defense team, he is a person who fulfills a different role and possesses a different skill set than the mitigation specialist.  *See* ABA Guideline 4.1(A)(1).  The declaration Mr. Ray made to the court prior to being appointed does indicate he has experience as a private investigator, it demonstrates that he does not possess the skills and training needed by a mitigation specialist.  *See* C.R. Vol. 1: 93-94.  A mitigation specialist possesses "clinical and information-gathering skills and training that most lawyers simply do not have" and has "the ability to elicit sensitive, embarrassing and often humiliating evidence."  ABA Guideline 4.1(A)(1) cmt.  Mitigation specialists know that interviews should be conducted in the field at the house of the interviewee if possible because it is there that one would be able to observe things about the subject that would not otherwise be visible.  Sean D. O'Brien, *When Life Depends on it:  Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 693, 746 (2008); *see* Supplementary Guideline 10.11(C) ("Team members must conduct in-person, face-to-face, one-on-one interviews….).  Mitigation specialists conduct interviews in person because as much as 65% of communication is nonverbal and a telephone interviewer would not be able to pick up on these nonverbal cues.  O'Brien, *supra*, at 747.  Many of the interviews that were conducted by Mr. Ray were done on the telephone.  Similarly, mitigation specialists realize the importance of conducting interviews one-on-one because the subject of the interview often involves traumatic

34

and sensitive areas.  *Id.* at 746; *see* Supplementary Guideline 10.11(C).  However, Mr. Ray's records reveal that at least two of the interviews that he conducted in-person were with couples being interviewed together and persons being interviewed by Mr. Ray on the telephone were regularly around others.  Mr. Ray was being used as a migration specialist, but he was not qualified to perform such a role, and, as a result, the investigation was inadequate and was not the investigation required by prevailing professional norms. Defense counsel was deficient in relying upon Mr. Ray to perform the services of a mitigation specialist.

The psycho-social history that a mitigation specialist is to provide is relied upon by other members of the defense team.  "The mitigation specialist must be able to furnish information in a form useful to counsel and any experts though methods including … social histories…." Supplementary Guideline 5.1(D).  Without a comprehensive psycho-social history from the mitigation specialist, experts are not able to arrive at accurate diagnoses and opinions.  Trial counsel's deficiency in preparing a psycho-social history report is demonstrated by the amount to which defense experts had to rely of the psycho-social history report compiled by the district attorney's office.  *See* R.R. Vol. 44: 169-71 (Dr. Price, expert for defense, relied on report and defense counsel admitted the report into evidence); 44: 159-60 (Dr. Price found the report from the district attorney's office to be more extensive than the other documents he looked at); C.R. Vol. 31: 4559 (list of documents Dr. Compton reviewed in her competency to stand trial evaluation listing the district attorney's social history report as a document she reviewed but listing no such document prepared by the defense team).

Defense counsel bears the responsibility for the performance of all members on the defense team.  ABA Guideline 10.4(B); Supplementary Guideline 4.1 (C) ("All members of the defense team are agents of defense counsel.").

35

C.   **Trial Counsel's Failure to Conduct a Reasonable Sentencing Investigation Prejudiced Mr. Ward:  The Totality of the Mitigating Evidence "Might Well Have   Influenced the Jury's Appraisal" of Mr. Ward's Moral Culpability**

1.   **The sentencing case presented at trial**

During the sentencing phase of his trial, Mr. Ward's defense counsel presented testimony from his mother and father, sheriff's office and jail employees, the owner of a daycare he attended, special education personnel, a teacher, neighbors, a probation officer, and police officers.   Mr. Ward testified against counsel's advice.   Defense experts J. Randall Price, a forensic psychologist, and S.O. Woods, a classification expert, also testified.

The jury heard Mr. Ward's father had been laid off from a few jobs and was unemployed for long periods.  R.R. Vol. 42: 22-23.  His father stayed at home with him.  R.R. 42: 34.  The Wards did not socialize.  R.R. Vol. 42: 29-30.

The jury heard that Mr. Ward first began throwing tantrums around the age of two and was initially prescribed medications that made the tantrums worse.  R.R. Vol. 42: 35-36, 41-42. His tantrums were so bad that he was asked to leave the daycare he attended.  R.R. Vol. 42: 157-58.   He was twice hospitalized at Children's Medical Center, was diagnosed with bipolar disorder, and took Lithium.  R.R. Vol. 42: 45-46, 53, 64; 43: 106.  Lithium helped control his tantrums.  R.R. Vol. 43: 116.  His parents did not follow the recommendations of his doctors. R.R. Vol. 42: 45-48, 50-51, 86-87.  His father thought family counseling was a waste of time. R.R. Vol. 43: 39.  Individual therapy for Mr. Ward was inconsistent due largely to the family's lack of money.  R.R. Vol. 42: 51.  After his father sacrificed his career and quit work to stay home and take care of Mr. Ward, Mr. Ward only occasionally exhibited uncontrollable behavior. R.R. Vol. 43: 119, 121.

Mr. Ward was a discipline problem at school and would kick, hit, bite, and attack other students and one of his teachers. R.R. Vol. 42: 181, 187. At school, one of the punishments his teachers used was putting him in a closet, sometimes called a time out room. R.R. Vol. 42: 97-98, 194-95. His father testified that he would often show up at Mr. Ward's schools unannounced to catch teachers and administrators in the act of misusing the time out room. R.R. Vol. 43: 144-45.

Mr. Ward's parents disagreed with the discipline program used by his teachers and frequently voiced their complaints. R.R. Vol. 42: 95-96, 106-07. His parents also objected to the education and behavior plans that were developed by school personnel during ARD meetings. R.R. Vol. 42: 165-66. These disagreements became so heated that mediation through the Texas Education Agency was requested by the director of special education. R.R. Vol. 42: 166-67. Mr. Ward's father was very confrontational, would scream and curse, and would often threaten people during the ARD meetings. R.R. Vol. 43: 29, 38. Mr. Ward's mother would occasionally yell. R.R. Vol. 43: 29-30. His father threatened to sue the school district when he was frustrated about measures not being taken to address his son's dyslexia. R.R. Vol. 43: 145.

Mr. Ward's father tried to control his mother. R.R. Vol. 42: 23-27. His father was verbally abusive during their marriage and there were three or four times that he physically abused his wife, but she testified that it was "nothing major." R.R. Vol. 42: 30. Once, after a baseball game, his father took him down and pinned him to the ground. R.R. Vol. 43: 200-01. Mr. Ward spoke disrespectfully to his mother like his father did. R.R. Vol. 42: 113.

The jury heard that there were some guns in the Ward's house when Mr. Ward was a child and that his parents both had concealed handgun licenses. R.R. Vol. 42: 19-22, 136. On average, his father kept a dozen guns in the house; the guns were locked in a safe, and the longer

37

ones were in a cabinet.  R.R. Vol. 43: 125-26.  His father made ammunition and traded guns.

R.R. Vol. 43: 126.  His father shot birds with a pellet gun, and the dead birds would land in a

neighbor's yard.  R.R. Vol. 42: 174.  Two officers testified that in 2006 they observed Mr.

Ward's father make a gesture with his fingers as if he were pointing a gun at city workers.  R.R.

Vol. 43: 98-99, 101.

Two neighbors testified that Mr. Ward occasionally did chores for them and was never

disrespectful toward them.  R.R. Vol. 43: 17-22.  Three jail employees testified that Mr. Ward

had never been disrespectful to them, but one testified she had seen him be disrespectful to other

officers on two occasions.  R.R. Vol. 42: 67-71, 76-77.  Mr. Ward was released from probation

early because he had completed all the conditions of probation, including completing 350 hours

of community service.  R.R. Vol. 43: 66.  His father once argued with a probation officer.  R.R.

Vol. 43: 68-69.

Commerce police officers were dispatched to respond to an incident in which Mr. Ward

threatened someone with a knife because the person was parked in such a way that his

grandmother's driveway was blocked.  R.R. Vol. 43: 83.  One of the officers testified that it was

not typical for a person to react this way to a parking violation.  R.R. Vol. 43: 85-86.  Later that

evening, Mr. Ward assaulted one of the officers and was tackled by another.  R.R. Vol. 43: 86-

87, 91-92.  R.R. Vol. 43: 91-92.  Mr. Ward was injured that evening after charging again at the

officers and was taken to the hospital where he had to be restrained.  R.R. Vol. 43: 92-93.

Adam Ward testified against counsel's advice.  R.R. Vol. 44: 4.  Mr. Ward testified about

the time-out rooms he was placed in at school as a child.  R.R. Vol. 44: 20-29.  He sustained

numerous injuries from being forced into the room, but his parents did not take him to the

hospital because they lacked the money to pay medical bills.  R.R. Vol. 44: 26.  Mr. Ward then

testified about extraneous offenses that had been brought out during punishment.  R.R. Vol. 44: 30-48.  He testified about shooting Mr. Walker on June 13, 2005.  R.R. Vol. 44: 49-70.  Mr. Ward also testified about the conspiracy he thought existed among city employees against him and his family.  R.R. Vol. 44: 71-76.  Mr. Ward then explained different incidences that he had been involved in while incarcerated at the Hunt County Jail awaiting trial.

Dr. Price testified that he performed a neuropsychological evaluation on Mr. Ward to determine if there was any brain damage or brain dysfunction or any abnormalities of thinking, intelligence, or memory.  R.R. Vol. 44: 166.  Dr. Price's neuropsychological evaluation was admitted into evidence.  R.R. Vol. 44: 194.  Dr. Price concluded that Adam Ward's clinical picture was consistent with a shared delusional type psychosis, bipolar mood disorder, obsessive-compulsive and narcissistic personality traits, severe learning disabilities, and antisocial behaviors.  R.R. Vol. 64: 2J.  Dr. Price characterized Mr. Ward's delusions as shared because they were similar to those of his father.  R.R. Vol. 44: 196.

The district attorney focused on the Dr. Price's diagnosis of antisocial behaviors.  Dr. Price agreed that very similar to a sociopathic personality.  R.R. Vol. 44: 198.  A sociopath is someone that does not have empathy for others and thinks the rules do not apply to them.  *Id.*  Dr. Price agreed that attempts to treat antisocial personality disorder are not effective.  *Id.*  On redirect, Dr. Price testified that persons with antisocial personality disorder usually "mellow out" after the age of forty.  R.R. Vol. 44: 199.

    2.    **The sentencing case that would have been presented had trial counsel conducted a reasonable sentencing investigation in accordance with prevailing professional norms in place at the time of Mr. Ward's trial**

        a.    **The antisocial personality disorder diagnosis was the result of counsel's failure to conduct a thorough investigation.**

*This defendant has forced you by his – to give him a death penalty by his actions on June 13, 2005, and by his antisocial personality that cannot be treated and can't be cured. All I ask that you do is go and do your duty.*

R.R. Vol. 46: 48. With these words the prosecutor ended his closing argument of the punishment phase of Mr. Ward's capital murder trial. The state had focused in on that aspect of Dr. Price's diagnosis immediately. *See* R.R. 44: 198. Had counsel researched antisocial personality disorder prior to presenting Dr. Price's diagnosis to the jury, they would have realized that this is the typical response of prosecutor's upon learning that a defendant has been diagnosed with antisocial personality disorder. *See* John H. Blume & David P. Voisin, *Capital Cases: Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder*, Champion, Apr. 2000, at 69, 69.

One of the four criteria of antisocial personality disorder is that there is a history of symptoms of conduct disorder before the age of fifteen. DSM-IV-TR, *supra*, at 705-06. A diagnosis of Conduct Disorder requires that the subject manifest three of a list of criteria in the previous twelve months and at least one of the listed criteria in the previous six months. *Id.* at 98-99. Determining whether Mr. Ward exhibited the criteria required for a diagnosis of conduct disorder would have required that a thorough psycho-social history been completed. *See* Blume & Voisin, *supra*, at 69 (antisocial personality disorder "is erroneously diagnosed because of an over-reliance on personality tests, a failure to consider the defendant's culture and background, or an inaccurate or incomplete factual basis"). However, as noted above, Mr. Ward's counsel failed to conduct the necessary psycho-social history investigation, so the defense team and its

experts were not aware of the characteristics displayed by Mr. Ward prior to his fifteenth birthday.

"An APD diagnosis by a defense expert almost always results from a lack of diligent and through investigation into the client's social history."  Blume & Voisin, *supra*, at 73.  A proper psycho-social history would have included interviewing the myriad of mental health professionals that had treated Mr. Ward throughout the course of his life.  Counsel failed to interview any of these mental health professionals.  As his mental health records reveal, Mr. Ward has a long history of being diagnosed as bipolar.  Interviewing these mental health professionals and understanding the bases of their diagnoses would have allowed defense counsel to fully inform their expert about the evidence throughout Mr. Ward's life of bipolar disorder, an Axis I disorder.

> In addition, as a general rule, experts generally may not diagnose APD if there is evidence of other disorders.

> APD should not be diagnosed if antisocial acts result from organic causes, occur exclusively during an episode of an Axis I or Clinical Disorder, or are not typical of the individual's long-term functioning.

Blume & Voisin, *supra*, at 72.  If counsel had performed a proper mitigation investigation, they would have been able to fully inform their expert of Mr. Ward's history and a diagnosis of antisocial personality disorder would never have been made.

>         b.      **Because of his father's inability to hold down a job and reckless spending habits, Mr. Ward was raised in poverty.**

Though Mrs. Ward testified during the punishment phase of Adam Ward's trial that his father, Ralph Ward, was unemployed for large period of Adam's life, this testimony only scratched the surface of the evidence about the impoverished conditions in which Mr. Ward was

raised that could have been presented to the jury had a reasonable mitigation investigation been conducted about the impoverished conditions in which Mr. Ward was raised.

Had counsel conducted a thorough investigation, they would have learned that Ralph Ward insisted he not work and stay home with Adam.  Exhibit 10 (Declaration of Sharon Crump), at 10; Exhibit 11 (Declaration of Sharon Vice), at 11.  The last steady employment Ralph Ward had ended when Adam Ward was around ten years of age.  After that time, the family lived solely on Nancy Ward's paycheck of about $1700 - $1800 a month.  Exhibit 11 at 11.  Nancy Ward carried an envelope that contained what little cash was left after she paid bills.  Exhibit 11 at 11.  This envelope typically contained as little as $50 and represented the entire amount of money the family had to buy food for the month.  Exhibit 10 at 11; Exhibit 11 at 11.  Running the air conditioner was a luxury that the family usually could not afford.  Exhibit 11 at 11.  The family relied on Mrs. Ward's parents to help them buy groceries and the vehicles that they drove.  Exhibit 11 at 11.

Though the family had little money with which to meet their needs, Ralph spent a great deal of money with Adam buying goods at pawn shops using credit cards.  Exhibit 11 at 12.  Ralph claimed these purchases were investments that he would later sell to finance his retirement, but he never sold anything.  Exhibit 12 (Declaration of Billy Hyde), at 6.  Nancy once told her friend Sharon Crump that she had over $50,000 in credit card debt because of Ralph's spending.  Exhibit 10 at 12.  Ken Hindman, who lived a block away from the Wards, remembered an occasion when Ralph Ward bought 150 chairs from the university because he thought he could make money by selling them and another occasion when he bought 55 gallon drums, but as Ken and other neighbors observed, Ralph did not get rid of much, if anything, that he bought.  Exhibit 13 (Declaration of Ken Hindman), at 7.  On one occasion, Ralph bought a

large scale.  Because there was no room at the Ward's home for the scale, it was stored in Sharon

Crump's garage.  Exhibit 10 at 12.  Nancy Ward's brother, William Hyde, and Ken Hindman

both observed that the family's home looked more like a warehouse than a home because of all

the things that Ralph had accumulated.  Exhibit 12 at 7; Exhibit 13 at 6.

It often seemed that these purchases were more important to Ralph than his family.  For

example, after Mr. Ward was arrested, Sharon Crump suggested to Nancy Ward that they sell

some of Ralph's things to pay for Adam's defense.  Exhibit 10 at 23.  Nancy replied that selling

his things would be too traumatic for Ralph.  Exhibit 10 at 23.  Nancy told her brother the same

thing.  Exhibit 12 at 6.

<blockquote>

**c.**      **Mr. Ward was raised by his parents in isolation and taught to believe that the rest of the world intended to harm him.**

</blockquote>

Though both Ralph and Nancy Ward testified at trial that the family did not socialize

much, this testimony did not come close to describing the extent of the isolationist beliefs the

couple possessed and instilled in their son.

Far from the picture presented at trial of a family who just preferred not to go out, the

Wards shunned almost all social contact.  Sharon Crump stated that she was the only friend of

Nancy Ward's that ever went in the Ward's home.  Exhibit 10 at 17.  When Ms. Crump hosted a

graduation party for Adam, Nancy Ward could not think of any friends of either she and Ralph or

Adam to invite.  Exhibit 10 at 8.

The Wards believed that most people were against them.  According to Trish King,

principal of the high school Adam attended, Ralph blamed the school system for everything that

went wrong with Adam and fought the faculty's attempts to help Adam.  Exhibit 14 (Declaration

of Trish King), at 12, 14.  ARD meetings, designed to develop an educational and behavioral

plan for Adam, were held at least once a year.  While these meetings for other students typically

only lasted about thirty minutes, meetings held about Adam lasted six or seven hours because his parents were so belligerent.  Exhibit 14 at 14.  Ms. King recalls that Nancy entered these meetings already angry.  Exhibit 14 at 15.  According to Nancy's brother, William Hyde, Ralph was paranoid and did not trust the government.  Exhibit 12 at 15.

The isolationist attitude from his parents found a home in Adam's psyche at an early age. Buddy Jones, Adam's principal at A.C. Williams Elementary School, observed that instead of playing with other children at recess, Adam preferred to stay inside.  Exhibit 4 at 5.  Adam's parents did not allow him to participate in most school activities.  Exhibit 10 at 7.  His high school principal observed that Adam did not have any friends and was alienated from all of the other students.  Exhibit 14 at 6.  Adults at the school were the closest thing Adam had to friends. Ms. King had gone to high school with Mr. Ward's father and remembered that he also had no friends when he was in high school.  Exhibit 14 at 4.

After Adam graduated from high school, he became friends with Ken Hindman, a man old enough to be his father.  Exhibit 13 at 3.  Mr. Hindman believes that he was Adam's only friend at the time.  Exhibit 13 at 3.  The degree to which isolationist attitudes had taken hold of Adam by that time was made clear to Mr. Hindman when Adam would say things such as "My dad and I think the government should stay out of people's lives" and "My dad and I think the U.S. government is getting too big."  Exhibit 13 at 9.  As Mr. Hindman observed, when Adam made statements such as these, he was just repeating things that he had heard his father say. Exhibit 13 at 9.  Sharon Vice also recognized that when Adam said things such as this, he was repeating things he had heard from Ralph.  Exhibit 11 at 22.  Even after he had graduated, the Wards continued to take actions seemingly with the purpose of keeping Adam isolated.  For

example, they did not allow him to get his driver's license until he was nineteen or twenty years old.  Exhibit 10 at 6.

As a result of these actions by Ralph and Nancy Ward, Adam did not know how to conduct himself in social situations.  At the graduation party that Sharon Crump hosted for him, the guests of which were all family members of Ms. Crump's because the Wards could not think of anyone to invite, Adam did not know how to react when people gave him gifts.  Exhibit 10 at 2.  To Ms. Crump, it appeared that this was likely the first time people outside of his family had ever given Mr. Ward gifts.  Exhibit 10 at 8.  Sharon Vice stated she could not recall Adam ever spending the night at a friend's house, having a friend spend the night at his house, going to the prom, or socializing in any capacity with friends.  Exhibit 11 at 20.

The isolated environment created by Adam's parents would have been harmful to any child, but the effects were particularly compounded in Mr. Ward because of his mental illness.  Throughout the course of his life, mental health professionals had recommended he have contact with others – whether in the form of individual therapy, family therapy, or group therapy.  Any of these professional, none of which were interviewed by the defense, could have testified to the need for Mr. Ward to have this outside contact.  The environment created by his parents certainly was far from what these clinicians had recommended.

### d.   Mr. Ward constantly sought but was unable to ever find the approval of his parents.

In this isolated world that Mr. Ward's parents created, it was crucial that he receive a sense of approval and self-worth from them.  However, Mr. and Mrs. Ward did not provide this for Adam Ward.

Elementary school principal Buddy Jones remembers that Ralph Ward typically brought Adam to school.  Exhibit 4 at 7.  Ralph would just drop his son off and walk away.  Exhibit 4 at

7.  He observed none of the expressions of love and warmth by Ralph towards Adam that other parents typically showed their children; Ralph never told Adam good-bye or to have a good day. Exhibit 4 at 7.   Adam's uncle, William Hyde, also observed that Ralph Ward was never affectionate with Adam.  Exhibit 12 at 14.  Mr. Hyde never saw Mr. Ward's father hug him or display any outward affection at all toward him.  Exhibit 12 at 14.  Nancy Ward was also cold toward her son.  As her friend Sharon Vice observed, "Nancy has a harsh personality and can be blunt."  Exhibit 11 at 18.  Ms. Vice said that Ms. Ward did not have a good relationship with Adam and talked more at him than to him.  Exhibit 11 at 18.

According to Ken Hindman, Adam thought he disappointed his father.  Mr. Hindman recalls a time when Adam told him that his father had gotten angry with him because he lacked the physical strength to move 55-gallon drums from one side of the yard to the other.  Exhibit 13 at 12.  When Ralph got home he tipped one of the drums over and rolled it across the yard. Exhibit 13 at 12.  According to Mr. Hindman, Adam was embarrassed because he did not know how to move the drums.  Exhibit 13 at 12.

### e.  The home in which Mr. Ward was raised was one in which violence was the norm.

While Nancy Ward testified about three instances in which Ralph had been physically abusive toward her, the testimony did not paint an accurate picture of the pervasive violence occurring in the Ward home.   Had a thorough psycho-social investigation been conducted, witnesses would have been found that could have painted an accurate portrait of the violence inside the Ward home.

Sharon Vice worked near Nancy.  Exhibit 11 at 2.  She observed that Ralph often called Nancy at work.  Exhibit 11 at 7.  He yelled so loudly that Ms. Vice could hear him through the phone even as she sat at her desk.  Exhibit 11 at 7.  She heard Ralph yell things such as "you

46

god-damned stupid motherfucking idiot" to his wife.  Exhibit 11 at 6.  If not that, Ralph yelled at her about how stupid she was.  Exhibit 11 at 7.  Nancy told Ms. Vice not to worry about Ralph's screaming because it happened all the time.  Exhibit 11 at 9.

Just like Adam had learned so many other things from his father, Adam also learned this behavior from his father.  According to Ms. Vice, Adam also called his mom at work and yelled at her loudly enough that she could hear him through the phone.  Exhibit 11 at 6.  There were days when Nancy left for home early because she did not want them to continue calling her at the office.  Exhibit 11 at 6.  Other times, she would stay at work until 8:00 or 9:00 at night to avoid having to go home.  Exhibit 11 at 5. Sharon Crump, who worked in the same area as Ms. Ward and Ms. Vice also observed the phone calls Ms. Ward received at work from both Ralph and Adam.  Exhibit 10 at 13-14.  Ms. Crump thought it "obvious that Adam [had] learned to act this way from watching his father."  Exhibit 10 at 14.

It was unusual that Nancy Ward ever joined the other women who worked in the office for lunch.  Exhibit 11 at 14.  Her usual custom was to go home to make lunch for Ralph.  Exhibit 11 at 13.  On one occasion in which she went with coworkers to lunch, she tried to reach Ralph on the phone before she left work but was unable to do so.  Exhibit 11 at 14.  While the group ate, Ralph stormed into the restaurant and yelled at Nancy, accusing her of caring more about her friends than she did him.  Exhibit 11 at 14.  Ralph was very controlling.  Exhibit 10 at 21.  He complained about everything she did that he did not control.  Exhibit 10 at 21.  Nancy was afraid of Ralph and did what he instructed her to do.  Exhibit 12 at 12.

Before Nancy married Ralph, she had gone to Six Flags with a male cousin.  Exhibit 12 at 9.  When Ralph found out, he was furious that Nancy had gone to Six Flags with "another man" – her cousin.  Exhibit 12 at 9.

47

Ralph was also controlling of Adam.  Exhibit 11 at 16.  Ralph attempted to control his son even after Adam had graduated high school and was attending classes at Paris Junior College, about forty miles away from the Ward home in Commerce.  Exhibit 11 at 17.  Because the Wards had not allowed Adam to get a driver's license, Ralph drove Adam to school.  Exhibit 11 at 17.  Some days, Ralph sat in the parking lot and waited for Adam to get out of class, but other days he went into Adam's classes and confronted his teachers.  Exhibit 11 at 17.

Ken Hindman recalled a time when Adam came over to his house without a shirt on.  Exhibit 13 at 10.  Adam told Mr. Hindman that he was "tired of putting up with his dad's shit."  Exhibit 13 at 10.  Mr. Hindman perceived that Adam was upset because he was breathing heavily and talking rapidly and observed a red hand print on Adam's arm or shoulder.  Exhibit 13 at 10.

### f.       The home in which Mr. Ward was raised was an arsenal.

While Mrs. Ward testified that Ralph Ward kept about a dozen guns in the house and made his own ammunition at times, a thorough mitigation investigation would have revealed that this depiction inaccurately reflected the role that firearms played in the Ward household.

William Hyde could have provided testimony about the role of guns in the Ward household.  According to Mr. Hyde, there were about forty-five to fifty guns in the house at any one time.  Exhibit 12 at 16.  An entire room of the house, the room that was across from Adam's bedroom, was devoted to storing the family's arsenal.  Exhibit 12 at 16.  Ralph and Nancy Ward each kept a loaded .38 lying on top of their nightstands.  Exhibit 12 at 17.  There were at least three other guns in their bedroom closet.  Exhibit 12 at 17.  The space under the stairs in their house was filled with gunpowder.  Exhibit 12 at 18.  After November 2000, Nancy began carrying two handguns with her at all times, a .38 and a .22 mini revolver.  Exhibit 12 at 20.  Nancy kept guns in her car and her purse.  Exhibit 10 at 24.

Ralph used machines at his work to craft a silencer for one of his rifles.  Exhibit 12 at 21.

With his son in his arms, Ralph Ward shot the gun out of the window and hit a trashcan down the

street.  Exhibit 12 at 21.  Ralph bragged about shooting dogs down the street from his window.

Exhibit 12 at 21.

Ken Hindman recalls a time when Ralph told him that he was mad at the "nigger drug

dealers" that lived next to him and that he was going to go home and "blow up their fucking

house."  Exhibit 13 at 5.

> **g.     Mr. Ward's parents constantly ignored recommendations from
> mental health professionals.**

Nancy Ward testified at trial that the Wards did not follow the recommendations that

Adam's doctors gave them upon his being discharged from Children's Medical Center.  She also

testified that Ralph did not have a positive outlook about counseling.  Nancy Ward would not be

the best witness to testify about the content of those recommendations.  Aside from the obvious

hearsay issue, Nancy Ward is not a trained or licensed mental health professional.  She does not

possess the knowledge that such professionals would have about neither the reasons the

recommendations they made were necessary for Adam Ward's treatment nor the explanation of

why treatment with medication alone was not recommended.

A thorough mitigation investigation would have produced the testimony that would have

informed the jurors of exactly what recommendations were made and why these treatments were

vital to the treatment plan they had prescribed for Adam Ward.  Dr. Prema Manjunath could have

testified that family therapy sessions were recommended and why these were necessary.  Exhibit

1 at 000006-11.  Dr. Manjunath could have also testified about the fact that she and the other

doctors had always cautioned against treatment with lithium alone and could explain to the jury

why medication by itself was not a desirable treatment plan for Adam Ward.  Exhibit 1 at 000024-25.

Ann Mills of the Tri-County Special Services Cooperative could have testified about the fact that individual and family therapy sessions were made available to the Wards through their agency but that the Wards did not use all of the services that were provided to them.  Exhibit 2 at 003011.

Throughout Adam's childhood, recommendations were made as to the proper treatment for his mental illness.  Throughout Adam's childhood, the special education services at his school made available counseling sessions that his doctors identified as an essential element of his treatment.  Throughout Adam's childhood, his parents were often refused these services.

### C.     The Sentencing Case the Jury Would Have Heard Absent Counsel's Deficient Performance Undermines Confidence in the Outcome.

The Supreme Court in *Strickland* noted that "[s]ome errors [by trial counsel] will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture…"  *Strickland*, 466 U.S. at 695-96.  This is such a case.  As the foregoing demonstrates, the picture of Mr. Ward and his moral culpability for the crime that would have emerged had a reasonable sentencing investigation been undertaken by counsel is a drastically different one from what counsel presented to Mr. Ward's sentencing jury at trial.

A reasonable sentencing investigation would have resulted in a wealth of mitigating evidence.  Instead, the jury heard very little of the mitigating evidence that was available.  Defense counsel relied on Nancy Ward to testify about the history of Adam's mental illness, its severity, of how it affected his childhood.  Nancy Ward is not a trained or licensed mental health professional and should not have been relied upon to present this information to the jurors.  While some testimony was offered regarding the Wards' confrontational attitude in ARD

meetings and their reluctance to accept counseling, the evidence presented to the jury was infinitesimally small when compared to the great wealth of evidence that was available in this area had a proper mitigation investigation been conducted.  The incorrect diagnosis of antisocial personality disorder that was presented to the jury was one of the major themes used by the state in its closing argument.   The prosecutor argued to the jury that a person with antisocial personality disorder had no regard for others, does not believe the rules apply to him, only cares about himself. R.R. Vol. 46: 40.  The prosecutor argued that there was no treatment for antisocial personality disorder – that it could not be cured.  R.R. Vol. 46: 40.  Arguing that antisocial personality disorder could not be cured seems to have been the prosecutor's favorite argument that Mr. Ward was a future danger as he used penultimate sentence to the jurors to remind them that the disorder could not be cured.  R.R. Vol. 46: 48.  A proper mitigation investigation would have prevented this incorrect diagnosis from being made.  A proper mitigation investigation would have informed the jurors about Mr. Ward's correct diagnosis – one that can be treated.  A proper mitigation investigation would have presented the evidence to the jurors that Mr. Ward's parents were responsible for his illness not being properly treated.  A proper mitigation investigation would quite likely have led to a different decision by the jurors on either of the special issues they had to answer during deliberations.

In state habeas proceedings, Mr. Ward was denied relief on his claim that counsel was ineffective for failing to adequately investigate and present mitigating evidence.  *Ex parte Ward*, No. 70,651-02 (Tex. Crim. App. 2010) (unpublished).   The state court's decision 1) was contrary to clearly-established federal law and 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state court.  28 U.S.C. § 2254(d)(1) (2006).

### III.   MR. WARD'S DEATH SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE HE IS SEVERELY MENTALLY ILL.

#### A.   The Eighth and Fourteenth Amendments Bar the Execution of the Severely Mentally Ill.

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of the mentally retarded.  *Atkins*, 536 U.S. at 321.  The Court's rationale in *Atkins* applies with equal force to persons with severe mental illness, such as Mr. Ward.

#### 1.   Infliction of capital punishment upon individuals who were severely mentally ill at the time of the offense makes no measurable contribution to the acceptable goals of punishment.

The United States Supreme Court has held that the death penalty violates the Eighth Amendment when "it 'makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering.'" *Penry v. Lynaugh*, 492 U.S. 302, 335 (1989) (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977)).  The Court has identified "'two principal social purposes'" served by capital punishment: "'retribution and deterrence of capital crimes.'"  *Penry*, 492 U.S. at 335-36 (quoting *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)).  In *Enmund v. Florida*, 458 U.S. 782 (1982), the Court held that, "unless the death penalty when applied to those in [the defendant's] position measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment."  *Enmund*, 458 U.S. at 798.  In *Atkins*, the Court held that the death penalty, when applied to the mentally retarded, advances neither of these goals.  *Atkins*, 536 U.S. at 319-20.

The Court's reasoning in *Atkins* dictates that capital punishment inflicted on individuals who were mentally ill at the time of the offense is nothing more than the purposeless and needless imposition of pain and suffering.  It makes no measurable contribution to the acceptable goals of punishment and fails to serve any legitimate penal purpose more effectively than a less severe penalty.

> **a.      Retribution is not served by executing those who were severely mentally ill at the time of the offense.**

The Supreme Court has recognized that "'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse.'" *Penry*, 492 U.S. at 319 (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring));  *see also Eddings v. Oklahoma*, 455 U.S. 104, 113-15 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (plurality opinion).

The Court has also stated that "retribution as a justification for executing [offenders] very much depends on the degree of [their] culpability."  *Enmund*, 458 U.S. at 800.  Moreover, culpability is not based solely upon the magnitude of harm resulting from the offense.  "[F]or purposes of imposing the death penalty . . . punishment must be tailored to [a defendant's] personal responsibility and moral guilt."  *Id.* at 801.  The rationale of the Court's acceptance in *Atkins* that mentally retarded murderers are so lacking in moral blameworthiness as to be ineligible for the death penalty dictates that the severely mentally ill should likewise be ineligible:

> Because of their impairments ... [mentally retarded persons] have diminished
> capacities to understand and process information, to communicate, to abstract
> from mistakes and learn from experience, to engage in logical reasoning, to

> control impulses, and to understand the reactions of others ... .  Their deficiencies
> do not warrant an exemption from criminal sanctions, but they do diminish their
> personal culpability.

*Atkins*, 536 U.S. at 318.  These characterizations apply with equal force to those who suffered

from severe mental illness at the time of the offense.  Those suffering from Bipolar disorder, like

Mr. Ward was, may suffer from delusions, hallucinations, impulsivity and extreme impairments

in judgment. DSM-IV-TR, *supra*, at 359, 414; *see also Bigby v. Dretke*, 402 F.3d 551, 571 (5th

Cir. 2005) (Petitioner's "history of mental illness was relevant to whether he acted deliberately

[and] also spoke to his moral culpability" where mental illness caused defendant to suffer

delusions with respect to the actions and motivations of the people around him, could not be

adequately treated, and significantly impacted his interpersonal relationship abilities.")

Moreover, lessened maturity and volitional control was a central component of the

Court's determination that the execution of juvenile offenders violates the Eighth Amendment.

*Thompson v. Oklahoma*, 487 U.S. 815, 834 (1988) ("Crimes committed by youths may be just as

harmful to victims as those committed by older persons, but they deserve less punishment

because adolescents may have less capacity to control their conduct and to think in long-range

terms than adults.") *see also Roper v. Simmons*, 543 U.S. 551, 571 (2005) ("Retribution is not

proportional if the law's most severe penalty is imposed on one whose culpability or

blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity").

By the same token, often persons experiencing symptoms of mental illness have cognitive

impairments and distortions of reality that reduce their culpability in ways that are arguably even

more substantial than the developmental shortcomings of 16 and 17 year olds.  If juveniles  and

the mentally retarded warrant exemption from capital punishment due to their cognitive and

behavioral limitations, so, too, do persons who were seriously mentally ill at the time of their

offense.  Because of their significantly reduced moral culpability, the execution of the severely

mentally ill does not advance the goal of retribution.

>           **b.      Deterrence is not served by executing those who were severely
>                     mentally ill at the time of the offense.**

In *Atkins*, the Court said that, for mentally retarded offenders, the "cold calculus" of cost and

benefit is "at the opposite end of the spectrum from behavior."  *Atkins*, 536 U.S. at 319 *see also*

*Roper*, 543 U.S. at 571 (noting that "it is unclear whether the death penalty has a significant or

even measurable deterrent effect on juveniles" and that "the absence of evidence of deterrent

effect is of special concern because the same characteristics that render juveniles less culpable

than adults suggest as well that juveniles will be less susceptible to deterrence"); *Thompson v.*

*Oklahoma*, 487 U.S. at 837 (observing that "the likelihood that the ... offender has made the kind

of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to

be virtually nonexistent").  As Justice Powell observed, "the death penalty has little deterrent

force against defendants who have reduced capacity for considered choice."  *Skipper v. South*

*Carolina*, 476 U.S. 1, 13 (1986) (Powell, J., concurring) (citing *Eddings v. Oklahoma*, 455 U.S.

104, 115 n.11 (1982)).  The same is true for those who were severely mentally ill at the time of

their offenses.  As with juveniles and the mentally retarded, the severely mentally ill are not

meaningfully deterred by the threat of capital punishment.

The fear of execution, even if it deters some, cannot plausibly be thought to deter

severely mentally ill persons.  For example, those suffering from bipolar disorder may suffer

from delusions or hallucinations, resulting in actions or decisions based on distorted perceptions

of reality.  DSM-IV-TR, *supra,* at 414.  Moreover, they may engage in action "with a high

potential for painful consequences," DSM-IV-TR, *supra*, at 357, and often suffer from markedly

impaired judgment as a result of their condition.  DSM-IV-TR, *supra*, at 358.  Given the

distorted perceptions, disregard for consequences and impaired judgment from which one afflicted with Bipolar Disorder might suffer, it is unlikely the threat of capital punishment would act as a deterrent.

The death penalty can serve no legitimate purpose when applied to defendants who are seriously mentally ill at the time of the offense. In such circumstances, the death penalty amounts to the purposeless infliction of needless pain and suffering because it fails to advance either retribution or deterrence.

> ### 2. Like mental retardation, aspects of severe mental illness undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards.

In *Atkins*, the Court pointed to "the reduced capacity" of mentally retarded offenders as a justification for a categorical bar against their execution.  "The risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty is enhanced" in part by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation. *Atkins*, 536 U.S. at 320 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605). "Mentally retarded clients defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id*.

Moreover, mental retardation as a mitigating factor can act as a "two-edged sword" by increasing the likelihood the defendant will be found a future danger by the jury.  This concern is equally applicable to mentally ill defendants.  *Id*. at 321.

> Juries and judges, like people generally, harbor hostile attitudes toward people with mental disability.  Numerous studies  document that capital sentencing juries tend to devalue evidence of significant mental disorder, often treating it as an aggravating circumstance rather than a mitigating one.  And prosecutors routinely play to this bias.

Christopher Slobogin, *Mental Disorder as an Exemption from the Death Penalty: The ABA-IRR Task Force Recommendations*, 54 Cath. U. L. Rev. 1133, 1150-51 (2005); *see also* John Parry, *The Death Penalty and Persons with Mental Disabilities: A Lethal Dose of Stigma, Sanism, Fear of Violence, and Faulty Predictions of Dangerousness*, 29 Mental & Physical Disability L. Rep. 667, 667 n.7 (2005) (criticizing the "misconception that persons with mental illness are inherently violent and generally dangerous to themselves or others") (citing John Monahan & Jean Arnold, *Violence by People with Mental Illness: A Consensus Statement by Advocates and Researchers*, 19 Psychiatric Rehabilitation J. 67 (1996); Patrick W. Corrigan *et al.*, *Implications of Educating the Public on Mental Illness, Violence, and Stigma*, 55 Psychiatric Services 577 (2004); John Junginger & Lynanne McGuire, *Psychotic Motivation and the Paradox of Current Research on Serious Mental Illness and Rates of Violence*, 30 Schizophrenia Bull. 21 (2004)).

In its Position Statement on Diminished Responsibility in Capital Sentencing,[13] the American Psychiatric Association voiced its concern that juries commonly misapply evidence of severe mental illness:

> Even though defendants with mental illness are entitled to introduce mental health evidence in mitigation of sentence, commentators on capital sentencing have often observed that juries tend to devalue undisputed and strong evidence of diminished responsibility in the face of strong evidence in aggravation. Indeed, such evidence is often a double-edged sword, tending to show both impaired capacity as well as future dangerousness.

Am. Psychiatric Ass'n, Position Statement: Diminished Responsibility in Capital Sentencing (2004) (citing Phyllis Crocker, *Concepts of Culpability and Deathworthiness: Differentiating between Guilt and Punishment in Death Penalty Cases*, 22 FORDHAM L. REV. 21 (1997); Richard J. Bonnie and C. Robert Showalter, *Psychiatrists and Capital Sentencing: Risks and*

---

[13] *available at* http://www.psych.org/Departments/EDU/Library/APAOfficialDocuments andRelated/PositionStatements/200406.aspx

*Responsibilities in a Unique Legal Setting*, 12 Bull. of the Am. Acad. of Psychiatry & L. 159-67 (1984)).[14]

The Supreme Court has held that a state may not "attach[] the 'aggravating' label . . . to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness." *Zant v. Stephens*, 462 U.S. 862, 885 (1983).  The *Zant* Court cited *Miller v. Florida*, 373 So. 2d 882 (Fla. 1979), which found a constitutional violation where it was "clear from the trial judge's sentencing order that he considered as an aggravating factor the defendant's allegedly incurable and dangerous mental illness." *Id*. at 885-86.  The risk that juries treat evidence of mental illness as an aggravating factor based on a misunderstanding of future dangerousness, due process, and the Eighth Amendment requires that such decisions be removed from the purview of the jury.

Capital juries are likely to treat mental illness as aggravating because they incorrectly assume that mental illness increases future dangerousness.  Lay persons are ill-equipped to appreciate the role of mental illness in behavior.  Misuse of mental illness evidence unbalances the process by which mitigating and aggravating factors are weighed and impermissibly increases the chances that a mentally ill offender will receive the death penalty.  As with juvenile offenders and the mentally retarded, only a categorical ban on executing offenders who were

---

[14] *See also* Amnesty International, *The Execution of Mentally Ill Offenders* 69, *available at* http://web.amnesty.org/library/pdf/AMR510032006ENGLISH/$File/AMR5100306.pdf (Jan. 31, 2006) (citing Lawrence T. White, *The Mental Illness Defense in The Capital Murder Hearing*, 5 Behav. Sci. & L. 411 (1987) (suggesting that the available research indicates that a mental illness defense at a capital penalty phase will be ineffective because 1) death qualified jurors do not respond favorably to psychological explanations of criminal behavior, and 2) such a defense may mislead jurors into believing the defendant has a high probability of future dangerousness); Joshua N. Sondheimer, *A Continuing Source of Aggravation: The Improper Consideration of Factors in Death Penalty Sentencing*, 41 Hastings L.J. 409, 420 (1990); Stephen P. Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. Rev. 26 (2000)).

severely mentally ill at the time of the crime can adequately protect their constitutional rights. Indeed, mentally ill offenders require more such protection than other groups, precisely because of the stigma and misunderstanding surrounding their impairments.

In short, it is not enough to allow jury consideration of mental illness as mitigation. Rather, as with mental retardation, the Court must read the Eighth Amendment to contain a categorical exemption for those who were mentally ill at the time of their offense.

### B.     Mr. Ward is Severely Mentally Ill.

Adam Kelly Ward was diagnosed with bipolar disorder and placed on Lithium when he was four years old. Exhibit 1  at 00006-11.  His parents had begun noticing his behavior changing when he was only eighteen months of age.  Exhibit 1 at 000208; Exhibit 2  at 003442, 003540.  By the time he was three years old, his behavior had become very aggressive.  Exhibit 1 at 000006.  He was prescribed Mellaril (a drug used to treat symptoms of schizophrenia), Elavil (an anti-depressant), Dexedrine and Ritalin (drugs used to treat ADHD).  Exhibit 1 at 00006, 000208; Exhibit 2 at 003442.  When these medications failed to lead to any improvement in his condition, he was admitted to Children's Medical Center Psychiatric Unit for a two month stay only a month and a half after his fourth birthday.  Exhibit 1 at 000006-11, 000022-23.  During the third week of this stay, doctors began treating him with Lithium and, with the treatment, his hyperactivity and aggressiveness improved.  Exhibit 1 at 00010.  He was diagnosed during this stay with bipolar disorder.  *Id.*  One of the recommendations that the doctor made while he was being discharged was that the family continue therapy sessions.  *Id.*  Adam's parents did not follow these recommendations and Ralph Ward called these sessions "a waste of time".  R.R. Vol. 42: 47-48, 86-87.

59

Adam's mental illness continued to plague him as he entered school. Not long after being released from Children's Medical Center, Adam enrolled in an early childhood special education program at Commerce Independent School District. Exhibit 3 at 004357. Adam once again began behaving very aggressively. Exhibit 1 at 000041. As tension in the family continued, Adam's doctors continued to stress the need for therapy. Exhibit 1 at 000018, 000178-79. By April 1987, four months shy of Adam's fifth birthday, his doctor increased the amount of Lithium he was taking in an attempt to help control his behavior. Exhibit 1 at 000176. Because the Lithium was no longer effective, Adam's doctor strongly recommended that Adam be treated with Tegretol. *Id.* Adam's father responded to this suggestion by saying, "There is no way in hell that you are putting him on Tegretol…." Exhibit 1 at 000043. On April 8, 1987, Adam was admitted to Children's Medical for a second stay; this stay lasted three weeks. Exhibit 1 at 000026, 000100. Following this stay, his doctors continued to stress the need for individual and family therapy, stating they were concerned about Adam being treated with Lithium alone. Exhibit 1 at 000024-25. His doctors stressed that multi-modal care was necessary to produce any long-term positive changes. *Id.* However, the Wards continued not to follow these instructions from Adam's doctors.

In the fall of that year, Adam began kindergarten. Adam's mother attended a conference with his teacher on September 17. Exhibit 3 at 004355. The purpose of the meeting was to discuss goals for Adam's behavior that year. Exhibit 3 at 004355. This seems to be the beginning of the confrontational posture with which Adam's parents would approach meetings at school through high school, as his teacher reported on that day that Mrs. Ward was not happy. Exhibit 3 at 004355. By the time Adam was in second grade, a box had been built inside the school to keep him in when he was out of control. Teachers were instructed in different holds

and restraints to use on him.   Exhibit 3 at 004320-35.   Adam began attending a different elementary school in third grade.   Prior to his arrival, a box similar to the one that had been used at his first school was built just for Adam.   Exhibit 4  at 3.   When Adam was nine years of age, the confrontational nature with which his parents responded to suggestions from the special education program at his school had grown to the point that the director of the program requested the Texas Education Agency provide mediation in an attempt to find a program that would please his parents.   Exhibit 2 at 003756-57.   Around that time, the special education program provided funding for both individual therapy and family therapy sessions.   Exhibit 2 at 003011.   Though these services would be provided to them free of charge, the Wards continued to be resistant to therapy.   Exhibit 2 at 003011.   As Adam grew older, his parents' resistance to therapy continued.   Exhibit 1 at 000207-19.   Their confrontational attitude toward school officials trying to help him continued.   Exhibit 3 at 2039-40 (Ralph Ward telling the director of special education that she had gotten herself into a hornet's nest).   Their refusal to try different recommended medications continued.   Exhibit 1 at 000172.   As his parents refused to follow these recommendations and accept help, Adam's illness worsened, and this was reflected in his behavior.

By the time he was in high school, his problems had escalated to the point that Adam finished high school at home taking classes on a computer.   Exhibit 2 at 002576-77.

IV.   **MR. WARD WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL BECAUSE EXTENSIVE PRETRIAL PUBLICITY RENDERED IT IMPOSSIBLE FOR AN IMPARTIAL JURY TO BE SEATED IN HUNT COUNTY.**

A.   **The Legal Standard**

The right to a jury trial guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors, and the failure to accord an accused a fair hearing violates even the minimum standards of due process.  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citing *In re Oliver*, 333 U.S. 257 (1948); *Tumey v. Ohio*, 273 U.S. 510 (1927)), *cert. denied*, 476 U.S. 1164 (1986).  A juror's verdict must be based upon the evidence developed at the trial, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.  *Id*.

Due process and the right to a fair trial are denied to the accused whenever prejudice or passion is allowed to undermine the impartial administration of justice.  *See Chambers v. Florida*, 309 U.S. 227, 236-37 (1940); *see also Moore v. Dempsey*, 261 U.S. 86 (1923) (mob dominated atmosphere is a denial of due process); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (extensive inflammatory publicity denied due process and a fair trial).  In fact, the essence of due process of law is that

> no man's life, liberty or property [may] be forfeited as criminal punishment for violation of that law until there had been a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement and tyrannical power. Thus, as assurance against ancient evils, our country, in order to preserve 'the blessings of liberty', wrote into its basic law the requirement, among others, that the forfeiture of the lives, liberties or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed.

*Chambers*, 309 U.S. at 236-37.

One of the primary procedural safeguards against the influence of "prejudice, passion, [and] excitement" is the change of venue.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Under certain circumstances only a change of venue is sufficient to ensure the kind of fair trial mandated by the Sixth and Fourteenth Amendments to the United States Constitution.  *See e.g. Rideau v. Louisiana*, 373 U.S. 723 (1963) (video of confession aired three times on television

mandated change of venue); *see also Pamplin v. Mason*, 364 F.2d 1, 5 (5th Cir. 1966) (where outside influences affecting the community's climate of opinion are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial).

Article 31.01 of the Texas Code of Criminal Procedure authorizes the trial court to order a change of venue if it is satisfied that the criminal defendant cannot be afforded a fair and impartial trial. Tex. Code Crim. Proc. Art. 31.01. A trial court should, on its own motion, order a change of venue to remove "even the probability of unfairness" resulting from pretrial publicity. *See Martin v. Beto*, 397 F.2d 741, 749 (1968) (citing *Sheppard v. Maxwell,* 384 U.S. at 353).

Prejudice may be presumed from all the circumstances. For example, a defendant can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury. *Murphy v. Florida*, 421 U.S. 794, 798-99 (1975); *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532, 542-43 (1965); *Mayola v. Alabama*, 623 F.2d 992, 996-997 (5th Cir. 1980). Proof of such poisonous publicity raises a presumption that the defendant's jury was prejudiced, relieving him of the obligation to establish actual prejudice. *Mayola*, 623 F.2d at 997; *see also Estes*, 381 U.S. at 444 (prejudice was presumed where "videotapes of hearings clearly illustrate that the picture presented was not one of that judicial serenity and calm to which petitioner was entitled).

## B.    Relevant Facts

Michael Walker died on June 13, 2005. The following day, June 14, 2005, the Herald-Banner of Greenville, the town in which Mr. Ward's trial was held, published two stories under

the front page headline "Commerce code officer killed." *Commerce code officer killed*, Herald-Banner, June 14, 2005, at A1.  A color photograph of the crime scene was printed beneath the headline.  *Id.*  A story about Mr. Ward was printed on the left side of the picture.  Jay Strickland, *Official shot while performing duty; suspect in custody*, Herald-Banner, June 14, 2005, at A1.  The picture of Mr. Ward taking at the police department while he was being booked was printed with the story.  *Id.*  On the right side of the photograph of the scene, a story about Michael Walker with a photograph of him was printed.  Milton Babb, *Walker loved new job; eager to learn, help*, Herald-Banner, June 14, 2005, at A1.  The article featuring the picture of Mr. Ward stated "it was especially sad to see something so tragic happen to a man like Walker" while describing Mr. Walker as "always [having] a smile on his face" and "one of those people who just loved life."  Strickland, *supra*.

The following day, June 15, 2005, the headline of the Herald-Banner informed Hunt County of the district attorney's desire to seek the death penalty against Mr. Ward.  Brad Kellar, *Suspect could face capital murder:  District attorney may use little-known provision in state law for charge in death of Commerce code officer*, Herald-Banner, June 15, 2005, at A1.  This article was the first to suggest that Mr. Ward was retaliating against Mr. Walker.  Kellar, *Suspect could face capital murder*, at A10.  Also on June 15, the Commerce Journal reported on the murder in a similar fashion to the way the Herald-Banner had done the day before – a story with a picture of Mr. Ward and a story with a picture of Mr. Walker surrounding a color photo of the crime scene.  Jay Strickland and Brad Kellar, *Code officer shot to death*, Commerce J., June 15, 2005, at 1A; Milton Babb, *Walker loved his job with city*, Commerce J., June 15, 2005, at 1A.  The Commerce articles referred to Mr. Ward as Walker's accused killer while describing Walker as someone who would "put a smile on your face even if you were down" and "very outgoing."

Strickland and Kellar, *supra*, at 1A; Babb, *supra*, at 1A, 13A.   These articles also suggested to the community that the murder was a capital offense by offering a definition of "retaliation" to the readers and quoting Walker's supervisor as saying "Who would have thought that in a hundred years that he'd be shot for taking pictures?"  Strickland and Kellar, *supra,* at 13A; Babb, *supra*, at 13A.   The articles also attempted to rally the community against Mr. Ward stating that the city had shown what a great community it was as it grieved this loss.   Babb, *supra*, at 13A.   Strickland and Kellar's article was also printed in the Herald-Banner.   Jay Strickland and Brad Kellar, *Code officer shot to death*, Herald-Banner.

On August 30, 2005, the Herald-Banner repeated the allegations Mr. Ward was facing while announcing that he had been indicted by the grand jury.   Brad Kellar, *Grand Jury indicts two Commerce men in separate fatal shootings*, Herald-Banner, Aug. 30, 2005, at A1.   The following day, the Commerce Journal repeated that Mr. Ward had been indicted while also describing Walkers funeral as being attended by more than 400 people.   Brad Kellar, *Two men indicted in separate Commerce murder cases*, Commerce J., Aug. 31, 2005, at 1A.

On September 23, 2005, believing that articles already printed in the Herald-Banner had "placed an opinion in the community at large that he is a person of unsavory character and a person of criminal intent," defense counsel filed an ex parte motion to limit pretrial publicity. C.R. Vol. 1: 34-35.   The motion was set to be heard on September 26, 2005.   C.R. Vol. 1: 39. However, the motion hearing was postponed and reset for September 29, 2005.   C.R. Vol. 1: 40. In a September 27, 2005 article describing defense counsel's efforts to obtain a gag order, the Herald-Banner again reprinted the allegations against Mr. Ward even while noting that pretrial publicity from the paper had made it difficult to seat a jury in a murder trial the previous year. *See* Brad Kellar, *Defense counsel seeks gag order in Commerce capital murder case*, Commerce

J., Sept. 27, 2005, at 1A; C.R. Vol. 1: 46-47.   In its first amended motion to limit pretrial

publicity, defense counsel noted that the September 27 article spread "a version of the events of

[June 13] to the public at large in an effort to confirm to the public that [Mr. Ward] is guilty of

capital murder."   C.R. Vol. 1: 40.   However, despite the realization that the stories had already

contaminated the jury pool, defense counsel did not file a motion seeking a change of venue.

Though the trial court's ordered defense counsel and the prosecution not to

"communicate with the media about the evidence or facts of [Mr. Ward's] case until further

order of the court," news stories of the type that would inflame potential jurors against Mr. Ward

continued to be printed in the local media.   The year-in-review edition of the Commerce Journal

featured a color picture of the crime scene on its front page and reported that in June Mr. Ward

had shot Mr. Walker several times.   Jay Strickland, *Year in Review:  A look back at the biggest

news of 2005*, Commerce J., Dec. 28, 2005, at 1A, 10A.   On April 19, 2006, the Commerce

Journal printed a letter from Mr. Walker's adoptive father on its second page which described the

effect that Mr. Walker's murder had on him and his grandchildren.   Dick Walker, Letter, *To all

of our Commerce, Greenville, and Hunt Co. Friends*, Commerce J., Apr. 19, 2006, at 2A.   The

same picture was printed in the Herald-Banner on June 13, 2006 with the caption "It's been 1

year since we lost you.  We think of you every day.  We love and miss you."

Voir dire began on April 2, 2007.   When initially asked by the court whether they had

heard something about the case prior to reporting for jury duty, thirty-six members of the panel

answered that they had heard about the case.   R.R. Vol. 11: 32-39.   When the prosecutor began

questioning the panel, two additional potential jurors admitted having previously heard about the

case.   R.R. Vol. 11: 46.   Defense counsel used at least six of its peremptory strikes removing

members of this group of potential jurors that had been exposed to pretrial publicity.   R.R. Vol.

12: 39 (Underhill); 15: 115 (Bowen); 24: 110 (Rex); 25: 61 (Huffines); 29: 90 (Duke); 32: 48 (Morrison).  One of the six, Elizabeth Rex, in addition knew the Wards and Walkers.  R.R. Vol. 11: 46-47.  Because defense counsel had used all of its peremptories, they were forced to accept as a juror a member of the venire, Carmas Robinson, which they otherwise would have stricken. R.R. Vol. 33:71.  Three members of the venire that had been admitted to being exposed to pretrial media during general voir dire were seated on the jury.  R.R. Vol. 12: 106 (Scruggs); 16: 91 (Forbes); 30: 186 (Morris).  During individual voir dire, defense counsel failed to ask most of the veniremembers that were eventually seated on the jury whether they were exposed to pretrial publicity.  One juror, John Hosking, told the court during individual voir dire that he had begun receiving the Greenville Herald-Banner since general voir dire and had seen the headlines of the stories about Mr. Ward.  R.R. Vol. 28: 49.  Defense counsel failed to question Mr. Hosking about this.  Because it was unable to seat a complete jury, the court conducted a second round of voir dire on May 18 and May 22.  R.R. Vols. 34, 35.

As jury selection was taking place the City of Commerce Parks Project began publicizing a golf tournament being held on July 14, 2007 for the benefit of Mr. Walker.  Commerce Parks Project:      Michael      "PeeWee"      Walker      Benefit      Golf      Tournament, http://commerceparksproject.blogspot.com/2007/05/Michael-peewee-walker-benefit-golf.html. As defense counsel noted immediately before opening statements began, publicity in Commerce for the golf tournament was "rampant."  R.R. Vol. 36: 18.  However, defense counsel did not seek a change of venue.

On the Saturday before trial began, June 9, 2007, two articles about Mr. Ward ran in the Herald-Banner.  One announced the fact that earlier that week Mr. Walker's father had filed a wrongful death suit about Mr. Ward.  Brad Kellar, *Wrongful death suit filed in capital murder*

*case*, Herald-Banner, June 9, 2007, *available at*
http://heraldbanner.com/local/x400516113/Wrongful-death-suit-filed-in-capital-murder-case.
The second article repeated the allegations against Mr. Ward and reported two of Mr. Ward's
extraneous offenses including a 1999 charge of aggravated assault with a deadly weapon and a
2000 charge of two counts of assault on a public servant.  Brad Kellar, *Death penalty capital
murder case staring*, Herald-Banner, June 9, 2007, *available at*
http://heraldbanner.com/local/x400516115/Death-penalty-capital-murder-case-starting.    Again,
trial counsel was aware of this article and the potential effect he might have had on the already
seated jury.  R.R. Vol. 36: 19.   However, rather than move for a change of venue, defense
counsel merely requested that the court poll and admonish the jurors.  *Id.*  Throughout the trial,
the Herald-Banner ran front page stories about Mr. Ward.  *See, e.g.*, Brad Kellar, *Psychiatrist
claims Ward psychotic, delusional*, Herald-Banner, June 15, 2007, at A1;  Brad Kellar,
*Sentencing hearing to begin for murderer:  Jurors to decide life in prison or death penalty*,
Herald-Banner, June 18, 2007, at A1; Brad Kellar, *Father, son remember murdered Commerce
man*, Herald-Banner, June 19, 2007, at A1; Brad Kellar, *Killer takes the stand in sentencing
trial: Capital murder defendant claims he doesn't remember much of incident*, Herald-Banner,
June 23, 2007, at A1.

### C.    Pretrial Publicity Rendered it Impossible to Seat an Impartial Jury.

From June 13, 2005 through Mr. Ward's trial, Hunt County was saturated with
inflammatory reports from the media.  Beginning with the front page stories about Mr. Ward and
Mr. Walker with pictures of each that ran in the Herald-Banner on June 14, 2005, the potential
pool of jurors became contaminated.   The articles printed in the Herald-Banner and the
Commerce Journal were designed to inflame individuals in the community, convince the

community that capital murder was the correct charge, and rally the community together against Mr. Ward. The additional publicity in the community on the eve of trial regarding the golf tournament benefit for Mr. Walker served to fan the flames.

Mr. Ward was certainly prejudiced by the pretrial publicity in the community. Three of his twelve jurors admitted during general voir dire that they had been exposed pretrial publicity. Defense counsel was forced to use at least six of its peremptory strikes to remove a handful of the thirty-seven veniremembers that admitted during general voir dire that they had been exposed to pretrial publicity. Because they had used all of their peremptory strikes, defense counsel was forced to accept Juror Carmas Robinson as a juror. Though Juror Robinson was not one of the thirty-seven who had admitted to being exposed to media reports during general voir dire, she listed the Greenville Herald-Banner as one of the three publications to which she subscribed or regularly read. C.R. Vol. 28: 4192. Juror Robinson, in her juror questionnaire, admitted that she had been exposed to media about the case, claiming that there was an article on the front page of a newspaper on her kitchen table when she arrived home after general voir dire on April 2 though she claimed that she did not read it. C.R. Vol. 28: 4203. The previous day, April 1, 2007, an article about Mr. Ward was printed in the Greenville Herald-Banner. Brad Kellar, *Man faces execution for killing officer*, Herald-Banner, Apr. 1, 2007, *available at* http://heraldbanner.com/local/x400514807/Man-faces-execution-for-killing-officer/print. The article again repeated allegations that Mr. Ward shot Mr. Walker several times, credited the district attorney as saying that Walker was acting as a public servant when he was killed, and quoted the indictment that Mr. Ward had killed Walker in the course of or attempting to commit obstruction or retaliation. *Id.* On a scale of one to ten, with ten being the strongest, Juror Robinson rated her belief in the death penalty as a ten. C.R. Vol. 28: 4208. Though he is not

identified in the Reporter's Record as having answered that he had been exposed to pretrial media about the case during general voir dire, Juror Larry Bryant indicated on his questionnaire that he thought he "saw something about it on TV."  C.R. Vol. 26: 3912.  Though she is not identified in the Reporter's Record as having answered that she had been exposed to pretrial media about the case during general voir dire, Juror Montez Prince answered in her questionnaire that she had been exposed to media reports about the case and that this was a fact that she "started to remember about … in the courtroom."  C.R. Vol. 28: 4174.

Because it was impossible to seat an impartial jury due to publicity in the media, Mr. Ward was denied his Sixth and Fourteenth Amendment right to a fair trial.

## V.   BECAUSE COUNSEL FAILED TO MOVE FOR A CHANGE OF VENUE, MR. WARD WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

### A.   The Legal Standard

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United State Supreme Court held that to establish a claim ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  To prove that counsel was deficient requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*.  To show prejudice, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*.

### B.   Mr. Ward's Trial Counsel was Deficient in Not Moving for a Change of Venue.

As early as September 23, counsel realized that articles already printed in the Herald-Banner had "placed an opinion in the community at large that he is a person of unsavory character and a person of criminal intent," defense counsel filed an ex parte motion to limit pretrial publicity.  C.R. Vol. 1: 34-35.  Counsel believed that articles in the Herald-Banner had denied a 2004 defendant his right to an impartial jury and feared that articles printed in that publication would have the same effect in Mr. Ward's trial.  C.R. Vol. 1: 34.  Counsel was aware of the article printed on the eve of trial in the Herald-Banner reporting Mr. Ward's extraneous offenses and of the publicity for the upcoming golf tournament and realized that both had the potential of denying Mr. Ward his right to an impartial jury.  R.R. Vol. 36: 18-19.  Asking the judge to poll the jury was not sufficient in this situation, however that was the only relief counsel sought.  R.R. Vol. 36: 19.  Realizing the likelihood that Mr. Ward's case would not be tried to an impartial jury in Hunt County, counsel was deficient in not moving to change the venue of trial.

### C.      Counsel's Deficient Performance Prejudiced the Defense.

Absent a motion to change venue, Mr. Ward's trial occurred in Hunt County.  Absent a motion to change venue, Mr. Ward's jury was chosen from the pool that defense counsel realized had been contaminated.  Absent a motion to change venue, five of Mr. Ward's jurors admitted to being exposed to pretrial publicity.  Absent a motion to change venue, defense counsel used all of its peremptory strikes and was forced to accept Juror Robinson on the jury.  As defense counsel had feared when filing its motions to limit pretrial publicity, media reports in Hunt County had made it impossible to seat an impartial jury.  Counsel was deficient in failing to move for a change of venue and the defense was prejudiced as a result.

## VI.    MR. WARD'S RIGHT TO DUE PROCESS WAS VIOLATED WHEN THE STATE FAILED TO DISCLOSE MATERIAL EVIDENCE.

### A.    The Legal Standard

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.  It has long been the rule that *Brady* is violated even if the prosecutor is unaware of favorable evidence in the possession of another arm of the state which aids in the investigation or prosecution of the offense.  *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (lack of knowledge of witness's criminal record was no excuse for *Brady* violation); *Martinez v. Wainwright*, 621 F.2d 184 (5th Cir. 1980) (*Brady* violation found although prosecutor was unaware of the deceased's criminal history, which was in possession of the medical examiner); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973) (for *Brady* purposes, prosecution was in constructive possession of information in the files of the United States Postal Service), *overruled on other grounds*, *United States v. Henry*, 749 F.2d 203 (5th Cir. 1984).

The broad scope and affirmative nature of the State's obligation under *Brady* was made clear in *Kyles v. Whitley*, 514 U.S. 419 (1995).  *Kyles* held that, aside from the duty merely to provide the defense with known favorable evidence in its possession, the prosecutor is also under an affirmative duty to seek out and learn of favorable evidence in the possession of those acting on the government's behalf.  The *Kyles* Court wrote:

> [T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable

> evidence known to the others acting on the government's behalf in the case, including the police.

*Id.*, at 437; *see also United States v. Coppa*, 267 F.3d 132 (2nd Cir. 2001) (citing *Kyles* for proposition that "the Government should actively seek *Brady* material in its files and in the files of related agencies reasonably expected to have possession of such information"); *United States v. Miranne*, 688 F.2d 980, 988 (5th Cir. 1982) (noting that "the basic import of *Brady* is that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness," and "[t]here is little question that there are occasions where the prosecution has an affirmative duty to seek out evidence to which it has access and which may be beneficial to the defense").

The Supreme Court has rejected any distinction between impeachment and exculpatory evidence for purposes of *Brady* analysis. *Giglio v. United States*, 405 U.S. 150, 154 (1972). Under *Brady* and its progeny, a proceeding is rendered fundamentally unfair if: (1) the prosecution failed to disclose favorable evidence; and, (2) the evidence was material to either guilt or punishment. *See Banks v. Dretke*, 540 U.S. 668 (2004); *Kyles*, 514 U.S. at 432; *United States v. Bagley*, 473 U.S. 667, 683 (1985); *Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006); *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir. 1994).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles*, 519 U.S. at 432; *Bagley*, 473 U.S. at 682. The *Kyles* decision clarifies four significant aspects of materiality analysis under *Brady*. First, one is not required to demonstrate that the favorable evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence. *Kyles*, 514 U.S. at 434. The inquiry is more properly whether the suppressed evidence undermines confidence in the jury's decision. *Id.* at 1566. Second, materiality analysis "is not a sufficiency

73

of the evidence test." *Id.*.  "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35.  Third, harmless error analysis is not applicable to *Brady* violations. *Id.* at 435.  The *Kyles* Court stated, "Once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless error review." *Id.*  Finally, materiality must be assessed "in terms of the suppressed evidence considered collectively, not item by item." *Id.*, at 436.

### B.     The State Failed to Disclose Material Impeachment Evidence in Its Possession.

The State failed to disclose several pieces of evidence relating to criminal charges and convictions of Dick Walker, Michael Walker's father.  The State relied on Mr. Walker's testimony in both the guilt and punishment phases of Mr. Ward's trial.  There is a "reasonable probability, that, had [this] evidence been disclosed, the result of the proceeding would have been different." 473 U.S. at 682.  At Mr. Ward's trial, the prosecution relied on the testimony of Dick Walker, the father of Michael Walker.  During the guilt phase of Mr. Ward's trial, Dick Walker testified.  The state presented testimony that Dick Walker had spent the morning with his son before he was shot, and that the two typically spent their mornings together, joking with each other as they prepared for work.  R.R. Vol. 36: 41-52.  The state also presented testimony regarding the panic and grief that Dick Walker felt as he responded as a volunteer EMT to his own son's shooting.  *Id.*  During the punishment phase, Dick Walker testified, in part, regarding how his adopted son Michael came to live with him after Michael ran away from home and his biological parents would not let him return.  R.R. Vol. 41: 106.

In the closing argument, the State played recordings of Mr. Ward calling Dick Walker "a child molester.  A rapist.  I hope he burns in hell." R.R. Vol. 46: 97.  The State then specifically

74

instructed the jury to take these records into account in determining his sentence.  R.R. Vol. 46: 13 ("These are the kind of character traits I want you to take into consideration when you decide whether or not his character warrants mitigation.")

By not disclosing Dick Walker's charge, the State was able to exploit Mr. Ward's comments and portray him as hateful and remorseless.  However, had the evidence been disclosed and made available to the jury, the negative impact of Mr. Ward's comments would have been reduced greatly.

## VII.   MR. WARD'S SIXTH AND FOURTEENTH AMENDMENT RIGHT TO PRESENT A DEFENSE WAS VIOLATED WITH THE TRAIL COURT REFUSED TO ADMIT EVIDENCE PERTAINING TO HIS MENTAL HEALTH AND MENTAL STATE.

### A.   The Legal Standard

The Sixth and Fourteenth Amendments guarantee the accused the opportunity to present 'a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); *Washington v. Texas*, 388 U.S. 14 (1967) (striking down Texas rule prohibiting entire categories of witnesses from testifying on the basis of their untrustworthiness).

### B.   Relevant Facts

At trial, Mr. Ward attempted to call Dr. Kristi Compton, Ph.D., a clinical and forensic psychologist, as a witness at the guilt phase of the trial to show that he lacked the culpable

mental state required by the charged offense of capital murder by obstruction or retaliation.  Trial counsel proffered a copy of Dr. Compton's report as a summary of her expected testimony.  R.R. Vol. 38: 142.   Dr. Compton's report summarizes Ward's background, including his family, medical and mental health history.  The defense also attempted to call Dr. Heidi Vermette, a forensic psychiatrist, to testify as to Mr. Ward's mental state at the time of the offense.  R.R. Vol. 38: 78.  Like Dr. Compton, Dr. Vermette's report was proffered by trial counsel as a summary of her expected testimony.  After considering the proffer, the trial judge ruled: "I'm going to seal 1G, 3G and 4G to indicate they were proffered and not accepted by the court as being relevant to any issue in the guilt/innocence phase of the trial."  R.R. Vol. 38: 138.  The trial court excluded Dr. Compton's testimony entirely, and limited Dr. Vermette's testimony, precluding her from testifying regarding any specific delusions or symptoms Mr. Ward exhibited.  R.R. Vol. 39: 86-106.

By excluding the evidence contained in Dr. Compton's report, and much of the evidence contained on Dr. Vermette's report, the trial court violated Mr. Ward's Sixth and Fourteenth Amendment rights to present a defense.

## VIII.   THE JURY'S CONSULTATION OF THE BIBLE DURING PUNISHMENT PHASE DELIBERATIONS VIOLATED MR. WARD'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.

### A.   The Legal Standard

The right to a fair trial and an impartial jury guaranteed by the Sixth Amendment is violated when the jury is subjected to external influences.  *See, e.g.*, *Parker v. Gladden,* 385 U.S. 363, 364–65 (1966) (stating that "the evidence developed against a defendant shall come from

the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" (internal quotation marks omitted)); *Turner v. Louisiana,* 379 U.S. 466, 472 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."); *Remmer v. United States,* 347 U.S. 227, 229 (1954) (stating that "private communication, contact, or tampering" with the jury is presumptively prejudicial); *Mattox v. United States,* 146 U.S. 140, 149 (1892) ("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment.").

In *Oliver v. Quarterman*, 541 F.3d 329 (2008),  the U.S. Court of Appeals for the Fifth Circuit, reviewing these cases, described the difference between "external" and "internal" influences:

> [C]ourts have distinguished between external influences, which a defendant can use to impeach a jury's verdict, and internal influences, which are not presumptively prejudicial.  A juror is exposed to an external influence when the juror reads information not admitted into evidence, such as a newspaper article about the case, or hears prejudicial statements from others, as in *Parker* and *Remmer*.  In contrast, internal influences, which provide no basis for relief, include allegations of physical or mental incompetence of a juror, such as claims that a juror was insane, could not sufficiently understand English, or had a severe hearing impairment.

*Oliver,* 541 F.3d at 336 (internal citations omitted) (discussing *Tanner v. United States,* 483 U.S. 107 (1987)).  Based on this distinction, the Fifth Circuit ruled that the prohibition of external influences from *Remmer, Turner*, and *Parker* applies to a scenario in which members of the jury consult the Bible during deliberations.  *See id.* at 336.

 Case law from other circuits confirms that juror consultation of the Bible during deliberations constitutes an unconstitutional external influence.  In *United States v. Lara-*

*Ramirez*, 519 F.3d 76, 88 (1st Cir. 2008), a district court declared a mistrial after it learned the jury had consulted the Bible, and the First Circuit agreed that the Bible represented an external influence. *Lara-Ramirez,* 519 F.3d at 88. Similarly, in *Coe v. Bell,* 161 F.3d 320, 351 (6th Cir. 1998), the Sixth Circuit, while permitting a prosecutor to discuss Biblical passages during closing arguments, noted that a different problem would arise were the jury to consult the Bible during deliberations. *Coe*, 161 F.3d at 351. As the Sixth Circuit put it, the "there is error in [the cases involving a Bible in the jury room] not because the book was the Bible, but because the book was not properly admitted evidence." *Id*.

### B.    Relevant Facts

Counsel for Mr. Ward has reason to believe that several external influences reached his jury at trial, including, but not limited to, the presence and consultation of two bibles in the jury room.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Ward prays that this Court:

1.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

2.      If necessary to resolve disputed factual issues, schedule an evidentiary hearing during which Mr. Ward may present evidence in support of his claims;

3.      Grant such other relief as law and justice require.

Respectfully submitted,


s/ David R. Dow

_____

David R. Dow
Texas Bar No. 06064900
University of Houston Law Center
100 Law Center
Houston, TX  77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131

Phillip C. Umphres
Texas Bar No. 20378300
The Law Office of Phillip C. Umphres
2600 State Street
Dallas, TX 75204
Tel. (214) 999-0035
Fax (214) 999-0037

*Counsel to Adam Kelly Ward, Petitioner*

## VERIFICATION

I, David R. Dow, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set for in this Petition are true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on Thursday, October 6, 2011.

s/ David R. Dow

_____

David R. Dow

## CERTIFICATE OF SERVICE

On Thursday, October 6, 2011, I electronically filed the forgoing pleading with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  A copy of the foregoing pleading was sent to Thomas Jones, attorney of record for Respondent Thaler, at his e-mail address: thomas.jones@oag.state.tx.us.

s/ David R. Dow

_____

David R. Dow