# Petitioner's Exhibit 1

Children's Medical Center Record Excerpts

 CHILDREN'S MEDICAL CENTER OF DALLAS
1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

DISCHARGE SUMMARY

WARD, ADAM K.
# 434474
ADMITTED 9-29-86
DISCHARGED 11-25-86

3cc:Psychiatry Dept.
cc:Dr.W.Weinberg

IDENTIFICATION: This is the first CMC Psychiatric in-patient unit admission for this 4-year-old white male who lives with his parents in Commerce, Texas. He was referred by Dr. Warren Weinberg.

PRESENTING PROBLEMS AND DETAILED HISTORY: Adam was admitted for the evaluation and treatment of his severe behavior problem and his difficult temperament - never wanting to do what people wanted him to do and being very oppositional. Adam had a significant period of worsening in April of 1986 for a 3-week period with extremely aggressive behavior, including biting, kicking, throwing things, etc. He showed some improvement after that time, and then had a recent worsening for the last 5-6 weeks. He was unable to be contained at home or in pre-school, where he was asked to leave 2 weeks prior to admission. Adam had been failing to learn anything at home and had been unable to follow any limits at home. Attempts to set limits on him were met with extreme rages where he would have to be held and temper tantrums, lasting up to 45 minutes.
Adam's parents had tried numerous strategies to cope with his behavior, including physical punishment, but with little change in his overall behavior.
Since May of 1986 Adam had also been treated with Dexadrine, Ritalin, Mellaril and Elavil but with no improvement.

FAMILY AND DEVELOPMENTAL HISTORY: Adam is an only child. His mother's pregnancy was normal, except for some preeclampsia, leading to one week hospitalization just prior to the delivery. Adam was born after a normal labor and an easy delivery and weighed 6 lbs. 2 oz. There were no post-delivery problems. Adam was an easy, engageable infant and had few problems with his behavior until he was 18 months of age. Around 18 months he had numerous ear infections leading to the insertion of tubes in his ears when he was 2 years old.
Adam's parents have been married 11 years and have significant marital discord. There is a family history of depression in the maternal grandfather. A maternal and second cousin on the mother's side had Wilson's disease. There are some alcohol problems on the father's side.

MEDICAL HISTORY: Not significant, except for repeated ear infections during the first 4 years of life.

HOUSE STAFF: ________________ MD or DDS PRIVATE OR ATTENDING STAFF: ________________ MD or DDS

CMC 18002



CHILDREN'S MEDICAL CENTER OF DALLAS

1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

DISCHARGE SUMMARY

WARD, ADAM K.
# 434474
ADMITTED 9-29-86
DISCHARGED 11-25-86

3cc:Psychiatry Dept.
~~cc:Dr.W.Weinberg~~

MENTAL STATUS EXAMINATION ON ADMISSION: Adam is an average labeled white male who was casually dressed, appearing his stated age. He readily responded to direct questions but would occasionally volunteer information spontaneously. His behavior was engaging when he was doing what he wanted to do, however, any attempts to make him do anything he did not want to do were met with extreme resistance which required him to be held. His speech was noted to be of about average level for his age. His mood and affect were generally cheerful, except when he became frustrated, then he became tearful, angry and hostile. He was overly aggressive in his play, particularly toward his parents where he often made attempts to bite them, and in fact, his mother had significant bruises on her arm from previous bites. His parents' response to his aggressive behavior was somewhat ambiguous in that they made attempts to stop it, but also tried to joke him out of it at the same time.
Adam's mood was labile. His thinking seemed fairly well organized, though tangential at the same time. His judgment and insight were limited. He seemed to be of about average intelligence.

ADMISSION PHYSICAL EXAMINATION: Was essentially negative.

LABORATORY DATA: On admission, urinalysis, CBC and differential, fasting blood sugar, creatinine and electrolytes, ceruloplasmin, magnesium were all within normal limits.
Thyroid function tests were all within normal limits.
An EEG done on 10-22-86 was within normal limits.
There was no focal, lateralizing or epileptiform feature seen.
CT scan of the head without contrast done on 10-13-86 was within normal limits.
An Ophthalmology consult obtained to rule out color blindness and evidence of Wilson's disease was negative.
An Audiology consult obtained on 10-1-86 was normal. There was no evidence of middle ear dysfunction.
A Behavioral Neurology consult by Dr. Warren Weinberg revealed the following:
A chronic developmental behavioral pattern of opposition, aggressiveness, undersocialized hyperactivity, demanding, ordering, and often anger of a hostile nature with suggestive cyclical component, most likely an affective disorder, hypomanic states with many manic moments.
Psychological evaluation was performed by Miss Carolyn Lohman on 10-10-86.
The tests administered were:

HOUSE STAFF: ______ MD or DDS    PRIVATE OR ATTENDING STAFF: ______ MD or DDS

CMC 18002



CHILDREN'S MEDICAL CENTER OF DALLAS
1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

DISCHARGE SUMMARY

WARD, ADAM K.
# 434474
ADMITTED 9-29-86
DISCHARGED 11-25-86

3cc:Psychiatry Dept.
~~cc:Dr.W.Weinberg~~

1. Standford-Binet Intelligence Scale, 4th Edition
2. Wineland Adaptive Behavior Scales
3. Child behavior check list.

On the Stanford-Binet, 4th Edition, Adam achieved the following standard age scores in each of the 4 areas:

1. Verbal reasoning 104
2. Abstract through visual reasoning 87
3. Quantitative reasoning 84
4. Short term memory 94

These scores compiled to a test composite of 94. This placed Adam in an average range of intellectual functioning.
He appeared to demonstrate some variability in assessed skills, although these had to be interpreted with caution due to the difficulty of assessing a child and considering the normal variations in development when assessing young children.
On the child behavior check list, as completed by his parents Adam appeared to have problems in the area of aggressive behavior. Adam's parents endorsed items which suggested that Adam was demanding, destructive, overly active, and demonstrated temper outbursts.
They reported that his involvement in activities was appropriate for his age, but that his social relationships were significantly limited, apparently related to his prominent behavior problems.

On the Wineland, Adam demonstrated delays in most of the adaptive behavior domains. In the area of daily living skills, he appeared to have mastered age-appropriate behavior, but in the areas of communication and motor skills, his abilities seemed less well established for his age.

SUMMARY OF PSYCHOLOGICAL TESTING: Adam appeared to have the potential to function solidly in the average range. Some skills, such as quantitative reasoning demonstrated some delays, but Adam is young and these skills may catch up over time. Of particular concern was his limited mastery of socialization skills.

RECOMMENDATIONS:

1. Adam appears to have the intellectual potential to act in age-appropriate ways, yet, his mastery of behavioral demands is delayed. This suggests that treatment focusing on his active interaction with a highly structured environment will provide him the opportunity to advance his skills.

2. Family treatment to ensure that his home environment will provide the same structure - experience balance is recommended.

HOUSE STAFF:__________ MD or DOS PRIVATE OR ATTENDING STAFF:__________ MD or DOS

CMC 18002



CHILDREN'S MEDICAL CENTER OF DALLAS
1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

DISCHARGE SUMMARY

WARD, ADAM K.
# 434474
ADMITTED 9-29-86
DISCHARGED 11-25-86

3cc:Psychiatry Dept.
cc:Dr W.Weinberg

3. Adam's school progress should be monitored to see if the signs of problems in the quantitative reasoing area would develop into learning problems.

HOSPITAL COURSE:

MILIEU:
Within the unit milieu Adam initially exhibited considerable problems. He was hyperactive, very aggressive, had severe temper tantrums, had a short attention span, was frustrated easily and had great difficulty accepting limits. He settled to a certain extent after 2 weeks and formed group attachments with the staff members. He learned to accept limits and interacted appropriately with other children on the unit. He continued to be hyperactive, irritable at times and had good and bad days. During the good days he was easily manageable and responded to limit setting well. During his bad days he tended to be hyperactive, irritable at times and had an elated mood at other times, and it was difficult to set limits on his behavior. He was started on Lithium carbonate at the beginning of the 3rd week of his stay. At about the same time his mother became involved in a behavioral management program on the unit. Adam's behavior gradually improved thereafter and he had a series of overnight passes with his parents during the weekends. Just before discharge Adam was rather irritable and had some problems separating from the staff members on the unit with whom he had formed attachments.

INDIVIDUAL THERAPY:
Within his individual therapy Adam was initially very aggressive, hyperactive, controlling and dominant. With time this behavior abated and Adam was able to play cooperatively. In these sessions, Adam was able to relate to the therapist well, and there was no evidence of psychotic behavior. During the sessions it was also obvious that there were important parent figures in the patient's life (especially his mother), and that the patient was attached to his parents.

FAMILY THERAPY:
Mr. and Mrs. Ward were seen on the unit several times. During these sessions, the parents were helped to talk about their emotional conflicts, their life stressors, and their problems dealing with a very active, aggressive child. They were also helped with some behavioral management techniques. They were also helped to improve their relationship.

HOUSE STAFF: ______________________ MD or DDS    PRIVATE OR ATTENDING STAFF: ______________________ MD or DDS

CMC 18002



CHILDREN'S MEDICAL CENTER OF DALLAS
1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

DISCHARGE SUMMARY

WARD, ADAM K.
# 434474
ADMITTED 9-29-86
DISCHARGED 11-25-86

3cc:Psychiatry Dept.
~~cc:Dr. W. Weinberg~~

Both Mr. and Mrs. Ward visited the unit and spent time on the unit, parenting the patient with the help of the staff. During these sessions the parents were able to follow staff instructions appropriately and set limits effectively without losing control, or beginning power struggles.

MEDICATIONS:
During the 3rd week of his hospitalization, Adam was begun on Lithium, 150 mg. b.i.d., and this was then increased to 150 mg. t.i.d. With a dose of 150 mg. t.i.d. Adam had serum Lithium levels of .8.
With treatment with Lithium, Adam's hyperactivity, aggressiveness, mood swings, abated to a certain extent, his attention span improved and he was more manageable to limit setting.

FINAL DIAGNOSES: Axis I - Bipolar disorder, of the manic type
Axis II - Deferred
Axis III - No diagnosis
Axis IV - Severe, with marital disharmony
Axis V - Poor

CONDITION AT THE TIME OF DISCHARGE: Significant improvement in hyperactivity and aggressive behavior. Mild anger separating from the staff on the in-patient unit.

RECOMMENDATIONS:
1. It is highly recommended that the patient be allowed to return to his parents, Mr. and Mrs. Ward.
2. It is recommended that the patient's parents, Mr. and Mrs. Ward continue with weekly or bi-monthly family therapy sessions on an out-patient basis until such time that their marital conflicts are resolved.
3. It is highly recommended that the patient continue treatment with Lithium carbonate 150 mg. p.o. t.i.d.
   Medication follow-up could be carried out on an out-patient basis, either at CMC or with a local pediatrician.
   Serum Lithium estimations once in 3 months would be recommended (therapeutic range .8-1.2).
   An EEG and an evaluation of the thyroid functions done once in 6 months would also be recommended.
4. It is also recommended that the patient be placed in a very structured educational program with self-contained classrooms for behaviorally disturbed children.

HOUSE STAFF:______________ MD or DDS PRIVATE OR ATTENDING STAFF:______________ MD or DDS

CMC 18002



CHILDREN'S MEDICAL CENTER OF DALLAS
1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

DISCHARGE SUMMARY

WARD, ADAM K.
# 434474
ADMITTED 9-29-86
DISCHARGED 11-25-86

3cc:Psychiatry Dept.
cc:Dr.W.Weinberg

5. A follow-up developmental neurological evaluation by Dr. Warren Weinberg is also highly recommended.

Prema Menguanth, M.D.
Child Psychiatry Fellow
Children's Medical Center

PM:eb

HOUSE STAFF: ______________ MD or DDS PRIVATE OR ATTENDING STAFF: ______________ MD or DDS

CMC 18002



Children's Medical Center of Dallas

DR. WEINBERG'S EVALUATION CENTER

PATIENT'S NAME Adam Ward DATE OF BIRTH: 8-11-82

EXAMINATION DATE: 2-17-87 CMC# 43-44-74

PRESENT CLINICAL STATUS: Looks super, good interaction and cooperative but "on the go" in free field; no agitation, oppositional acts or tantrums evident.

1. Manic disorder much improved on Lithium but hyperactivity continues - functioning seems adequate in a bright young male - excellent speech in the office today and no apparent side-effects from his Lithium.

2. Family stress and issues continue.

TREATMENT:

1. Discussed with Margie Steinler and Dr. Manjaneth to call Mrs. Ward immediately and arrange follow-up visits on a continuous basis for Adam with his parents - I do believe both individual and family interactive counseling a "must" - if Children's Medical Center not convenient, parents will start active counseling with Dr. McKeon.

2. Lithium level plus complete laboratory work-up in one to two weeks by Dr. Bill Toms. A list of blood chemistries to be obtained was given to Mrs. Ward to give to Dr. Toms.

3. Continue Lithium carbonate, 150 mg three times a day.

4. Call in two weeks and, depending upon the Lithium level, it may be indicated to increase the Lithium dosage -

5. Return 4-28-87 to obtain EEG at that time.

COMMENT: Adam is doing much better but Adam and family in need of continuous clinical care utilizing a multi-modal approach.

Sincerely,

[signature]

Warren A. Weinberg, M.D.
Director
Pediatric Behavioral Neurology Program

cc/ Dr. Bill Toms
Ralph Ward

1935 Motor Street • Dallas, Texas 75235 • (214) 920-2000



**CHILDREN'S MEDICAL CENTER OF DALLAS**
1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

**CONSULTATION**

ADAM WARD

Date ______

Department Requesting Consultation ______

Department Giving Consultation ______

Tentative Diagnosis ______

Reason for Consultation ______

SIGNATURE OF REQUESTING DOCTOR

Date 9-29-86 — NEUROLOGY —

Findings and Opinion of Consultant: I ADVISED THAT ADAM BE ADMITTED FOR FURTHER WORK-UP, OBSERVATION + TRIAL ON LITHIUM - SEE ATTACHED NOTE + CMC CHART FOR DETAILS OF Hx - DURING PAST 6 WKS ADAM HAD A POOR (↑ HOSTILE ANGER) RESPONSE TO TOFRANIL + ELAVIL; STEADY ON MELLARIL + DYSPHORIC ON RITALIN - HAS REACTED VERY WELL, AFFECTIONATE + MATURE ON 3 OFFICE VISITS - RECENTLY EXPELLED FROM H/S - DAYCARE, ABUSIVE TO MOTHER + ANGRY/AGITATED [illegible] -
THERE IS A REMOTE MATERNAL FHx OF WILSON'S DISEASE -
LOOKS SUPER/CHEERFUL + AFFECTIONATE, TEENY-AGER WITH [illegible] — NEUROLOGIC FINDINGS ARE UNREVEALING — EEG → NORMAL

OVER

[signature] MD

SIGNATURE OF CONSULTANT

CMC 18020/02010 Continue on the reverse if needed

20

000022

**CONSULTATION**

IMP/ CHRONIC HYPOMANIC STATE c̄
↑↑↑ MANIC PERIODS —
BRIGHT / DELIGHTFUL CHILD —

SUGGEST: 1) SERUM COPPER + CERULOPLASMIN

2) HAVE OPHTHALMOLOGY EVALUATE FOR K-F RINGS —

3) CT SCAN — (IF POSSIBLE + WITHOUT SEDATION —

4) TRIAL ON LITHIUM c̄ OBSERVATIONAL PERIOD —

— PROGNOSIS: GOOD —

MANY THANKS —

[signature] MD



REC
6-1-87

Children's Medical Center
of Dallas

May 27, 1987

Mr. and Mrs. Ward
P.O. Box 85
Commerce, Texas 75428

Dear Mr. and Mrs. Ward:

As a follow up to my telephone conversation with Mrs. Ward on May 19, I am writing to express some of our concerns about your son Adam.

Drs. Weinberg, Emslie, Pole, and I are of the opinion that your son's problems are significant and serious and are probably caused by a number of factors. Accordingly, we think a prudent treatment approach to your son's problems would be one with:

a. a medication like lithium,
b. weekly or biweekly family therapy sessions,
c. weekly or biweekly individual therapy sessions,
d. a consistently applied behavior management program and
e. a structured and supportive educational program with a self contained classroom and a high staff pupil ratio.

Anyone of the above approaches alone would probably be insufficient to treat your son's problems. We are particularly concerned about the use of lithium alone. While you are continuing this medication your son should be monitored on a regular basis by a physician familiar with the use of lithium in children. Any changes in the dosage of the medication should only be made on the recommendation of such a physician. And we are of the opinion that although lithium might produce some improvement in your son's behavioral difficulties, this would be only temporary and to produce longstanding positive changes, medication would have to be combined with other treatment approaches. It is not standard psychiatric practice to treat complex symptoms with medication alone.

We would be pleased to offer you the above outlined treatment at Children's Medical Center. If this is acceptable to you please feel free to contact me within the next 2 weeks.

If it is not convenient for you to work with us, comprehensive psychiatric services are available nearer to your home at the Hunt County Family Services Center, telephone 214-455-3987. If you would like to explore the services available in Greenville and if I could be of any assistance in providing information for Adam's assessment there, please feel free to contact me.

Whatever you decide, it is important that Adam receive ongoing psychiatric treatment as soon as possible.

I have enjoyed working with both of you and with your son Adam. Adam is a bright, charming boy with considerable potential for change. I look forward to hearing from you, but if I do not, my best wishes go with you both and with Adam as he continues in psychiatric treatment.

Yours Sincerely,

Prema Manjunath MD

Prema Manjunath, M.D.
Child Psychiatry Fellow
Children's Medical Center

cc: Dr. Graham J. Emslie
Dr. Rekha Pole
Dr. Warren Weinberg

**CHILDREN'S MEDICAL CENTER OF DALLAS**
1935 MOTOR STREET • DALLAS, TEXAS 75235 • (214) 920-2000

**INPATIENT ADMISSION**

DISCHARGE DATE/TIME: 5/7/87

PATIENT
NAME & ADDRESS: WARD, ADAM K.
P.O. BOX 85
COMMERCE TX 75428
PHONE/COUNTY/S.S. NO.: 214/886-7666
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
PATIENT ACCT. NO.: 3252459
PRE-NO.: 1095
MED. RECORD NO.: 000434474
ADMIT DATE/TIME: 4/08/87 12:17
TYPE/SEX/RACE: I M W
AGE: 4Y
DATE OF BIRTH: 8/11/82
N/S: PSY
ROOM/BED: 518 2
ADM BY: SR
RELIGION/CHURCH: NOT KNOWN
PUB: YES
PREV. ADM.: YES
WHERE: CMC
DATE: 9/29/8

PARENT
NAME & ADDRESS: WARD NANCY
P.O. BOX 85
COMMERCE TX 75428
MAIDEN NAME: HYDE, NANCY
REL/PHONE/SS NO.: MOTHER
214/886-7666
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
AGE: 34
EMPLOYER NAME & ADDRESS: SECURITY STATE BANK
1312 WASHINGTON
COMMERCE TX 75428
OCCUPATION/EMP. PHONE: SECRETARY
214/886-2126

GUAR
NAME & ADDRESS: WARD RALPH B
P.O. BOX 85
COMMERCE TX 75428
REL/PHONE/SS NO.: FATHER
214/886-7666
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
EMPLOYER NAME & ADDRESS: FIBERITE CORP
4300 JACKSON
GREENVILLE TX 75401
OCCUPATION/EMP. PHONE: ENGINEER
214/454-2004

NEXT OF KIN
NAME & ADDRESS:
REL/PHONE/S.S. NO.:
EMPLOYER NAME & ADDRESS:
OCCUPATION/EMP. PHONE:

NOTIFY
NAME & ADDRESS:
RELATIONSHIP:
PHONE:

INS

| FIN. CLASS / NO. OF PLANS | | |
|---|---|---|
| 1 | ~~BANKERS LIFE~~ | ~~I.B.A.A.~~ |
| | 1919 S. HIGHLAND | P.O. BOX 708 |
| | LOMBARD IL 60148 | COMMERCE TX 75428 |
| | 39259-13 | 37>550 48989 |
| | FATHER | MOTHER |

PHYS/DIAG
ATTENDING PHYSICIAN: POLE, REKHA MD
MEDICAL SERVICE: PSY
REFERRING PHYS. NAME & ADDRESS: 000 TX 00000
DIAGNOSIS/COMPLAINT: BIPOLAR

PRIMARY DIAGNOSIS

SECONDARY DIAGNOSIS OR COMPLICATIONS:

DATE.

OPERATIONS OR PROCEDURES.

DISCHARGE STATUS:
○ ALIVE ○ AUTOPSY
○ EXPIRED ○ MED. EXAMINER

HOUSE STAFF

M.D.
DDS

PRIVATE OR ATTENDING STAFF

CHART COPY

CHILDREN'S MEDICAL CENTER OF DALLAS
1935 Amelia Street
Dallas, Texas 75235
(214) 920 2000

PROGRESS RECORD

3252459 PSY.
WARD, ADAM K.
MR 434474 DR. R. POLE
08/11/82 MHP 1

INTAKE

| Date and Time | |
|---|---|
| | Adam Kelly Ward |
| 4/8/87 1015 | Mr & Mrs Ward |
| | This is the 2nd admission to PIPU for this 4 year old white male. |
| | CHEIF COMPLAINTS: |
| | "He slowly went down hill. I think he needs a tune-up. He was doing sit-outs up till X-Mas but $\bar{p}$ that he wouldn't do it. He's gone steadily down hill. |
| | He's doing good in school. He's only had 4 major sit-outs in the last 3 weeks they keep a real close chart... |
| | There's a sequence $\bar{c}$ the episodes 1st you ask him to stop something 2nd His eyes dilates. 3rd Hostile talk "I hate you" 4th Verbally Aggressive "I'm going to hit you, I'm going to kick you." 5th He goes thru movements hitting kicking, biting. Now when you let him up he comes up swinging." Mom |
| | "He don't respond to restraints as he used to." Dad |
| | "It's not the frequency it's the timing 2-3 in the afternoon 5-6 afternoon you can count on it!" Mom |
| | "Biggest problem is his temper tantrums & not following parental requests." Mom |
| | "When he has one of these tantrums he gets a ring of sweat in their head & he gets a headache & $\bar{p}$ you restrain him he fires up." Mom |
| | "The 1st 6 weeks he had 10 major sit-outs. 5 in the 2nd 6 weeks & 4 in the last 6 weeks." Mom (cont) [illegible] |

10

**PROGRESS RECORD**

| Date and Time | |
|---|---|
| | "I think things have been better @ home. I mean Jan + Feb were hard but now it's peachy... At home Ralph + I are really at our wits-end. He doesn't get the attention he does @ school or @ the babysitters. I'm gone on Tues + Wed 7-10" Mom |
| | "I don't usually have problems c̄ him. I've always had less problems c̄ him + I've been able to get him to do things she (pointing to wife). Usually we have a good time on Tues + Wed nights." Dad. |
| | "The only thing that keeps him from getting any attention he needs is the real world. I have 2 jobs + am working on a degree, she is working + going to school. We are very busy + we can't be at his beckon call. This is reality, he's gotta face it. Other kids have made it through and so will he... At times I feel like he competes c̄ us for attention. He does fine if there's just one of us around. The problems begin when we're both around. It's as if he competes for us + won't mind anyone" Dad |
| MEDICAL: | Scheduled for EEG in end of April. |
| | Bactrum - alone gets a rash |
| | Easily gets Bronchitis. Coughs @ night + gives phenergan + codine |
| | Chicken Pox ~ 2 yrs ago. |
| | "He fell out of his toy box + got a black eye. He also complains of a sore ear I think it's his Ⓡ ear but he will tell you. You could put him on amoxicill if he needs it" Mom |
| | cont [signature] |



**CHILDREN'S MEDICAL CENTER OF DALLAS**
1935 Amelia Street
Dallas, Texas 75235
(214) 920 2000

**PROGRESS RECORD**

3252459 PSY
WARD, ADAM K.
MR 434474 DR. R. POLE
08/11/82 MHP 1

INTAKE

| Date and Time | |
|---|---|
| | EXPECTATIONS: |
| | "I think alot has to ē a structured setting + having him accept sit-outs turned back up. One thing I want to make perfectly clear. There is no way in Hell that you are putting him on Tegretol and you will not increase his lithium. We all know that the blood level doesn't mean a damn thing. He can't tolerate an ↑ dose I must be given 48 hours notice of any medication you plan to put him on ~ if you even think of putting him on Tegretol you're looking @ a litigation, a law suit and want to make my self perfectly clear." Dad |
| | mom: "Just have him accept sit-outs + what we say." |
| | OBSERVATIONS: |
| | Adam is a 4 yr old white male who [has] appears his stated age. Adam climbed over furniture + pinched dad + mom occasionally. At ~~___~~ half way through intake Adam + Ms Elleston left intake due to Adams ↑ in activity level. D Trott RN |
| | Present @ Intake: Dr R. Manjunath |
| | S. Elliston CCW |
| | D Trott RN |

10

3252459 PSY
WARD, ADAM K.
MR 434474 DR. R. POLE
08/11/82 MHP 1

CHILDREN'S MEDICAL CENTER OF DALLAS
1935 AMELIA STREET
DALLAS, TEXAS 75235

Department of Nursing

SPECIAL DISCHARGE INSTRUCTIONS:

1) Discharge to parents Thursday 4/30/87 @ 7 pm

2) Discharge medication as follows:
Lithium Carbonate 150 mg – ~~1/2 tab~~ 1 capsule po three times a day
8am – 2pm – 8pm

3) Follow up with Dr Weinberg for medication follow up.

SIGNATURES: Parent [signature]
Nurse [signature] RN

DATE: 4-30-87

CMC 08074/02826

NEUROLOGY JAN 18 '88 — 3 y 3 mo.

1-18-88

MO/Fa/ADAM –

90/60 12-18-87

P: 80/12 Li = 0.6 –

— [illegible] — CHEMS – ?

— Presb / SP ED — Full Day School –

Lithane – 150 / Tid — out/of/control

Past 3-4 wks: Hyperactivity

Oppositional: Fa > Mo > School –

Has seen Dr Bell x 1 mo –

Dr Manner (?) c consultation called

Mo + Adv —> "Haldol — Then Release W" –

Fa will not [illegible] —> "Toxic" – o Present S.E. –

Mo will not try TEG at this time –

No apparent S.E. –

Fa —> no [illegible] past 2+ mo

PE: All smiles – + totally oppositional + unco-op – on – the go –

Speech is less clear –

Good [illegible] growth –

Cord [illegible]

No Tremor/No Findings.

Will not visit re Findings –

"I want only to do what I want"!

Imp: Manic Disorder / Oppositional " > Active past 1 mo –

Adv: 1) Long discussion re options to drug [illegible] – Protection for Adam –

2) Regular visits c Dr Bell –

3) Do not allow – do not be [illegible] –

4) Lithane 150 TID [illegible] > 150-150-300

5) [illegible] – 5 [illegible] – [illegible]/[illegible]/0/0

[illegible] > [illegible]/5/0/0 –

6) Call [illegible]

7) RV 3-17-88

[illegible] [illegible] [illegible] [illegible] [illegible] status and depending course [illegible]



**CHILDREN'S MEDICAL CENTER OF DALLAS**
1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

**PATIENT RECORD**

Adam Ward

AGE 5y/wk TEMP

NEUROLOGY AUG 1987

WT 18.5 kg HT 106 cm

Fa/ASA-1 90/60 P: 86/R—
4-16-87
— Adine Moth Li = 0.6
Gather— Daycare 1:3

Seen with/Attacks were from no—
Couts to improve — occurs at [illegible] —
hyperactive/but 0 rages —
— no S.E. —
(N) chems/thyroid — (N) EEG
— Fa seems in good control &
(+) re happenings/status &
looking for psychologist locally

PE/ looks super — affectionate —
hypomanic activity — good 1° att —
[illegible] smiles — 0 anger —
0 dysphoria — feels well —
clear speech — bright —
loud [illegible] [illegible]
no no tremor —

Imp/ Hypomania/improving/
adequate present status —
family issues seems improving —
good health —

Rec/ 1) Psych. care locally or they
CMC [illegible] clinic —
2) Lithium 150 mg TID
3) Li level 1 mo — call 1 mo
4) RT 11-4-87 — [signature]

**CHILDREN'S MEDICAL CENTER OF DALLAS**
1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

**PATIENT RECORD**

Clinic Chart Not Available —

Adam [illegible].

NEUROLOGY JUN 1 '87

18.5 kg 106 cm

Parents/Adam

— Daycare — 90/50 P: 82-6/R

CC/ Lithium refill — Dr M — Li/0.8

would not refill it/no —

Lithium Carbonate — 150 mg TID —

"Doing real well but abusing/biting peers/severe outbursts c [illegible]" → "better" — mostly involuntary/parents

— "Rage" → ? Sz —

— Sleep — Good appetite — fluctuates —

— only "mini" dysphoric/mostly anger —

— No FHx of epilepsy —

— Mo adamant that Dr M states: "no need for counseling" & totally refuses/rejects counseling c CMC:

we "only want to know cause of "?" rages vs Sz" — School principal stated: "Psychomotor Sz" —

Parents want 2nd opinion — refusing trial on Tegretol (if indicated) —

(+) MCG: Fa/PGM + ? Adam —

— No S.E —

[illegible] looks fine — [illegible] —

oppositional & basically unco-op —

but pleasant — mini hyperactive —

smiling — [illegible] —

N [illegible] — [illegible] —

Imp/ Manic disorder c oppositional behavior —

Family issues —

— over —

DISP 1) NEED FOR MULTIMODAL CARE STRESSED — PARENTS AGREED TO SEE DR BALL, PSYCHOLOGIST, IN GRANDVILLE, TX ON REG BASIS —

2) POTENTIAL SHORT TERM & LONG TERM EFFECTS OF LITHIUM +/or TEGRETOL DISCUSSED — H/O GIVEN TO PARENTS LISTING SIDE EFFECTS

3) EEG ON 8-6-87 ⓟ DC DISCONTINUING LITHIUM —

4) MAY DC LITHIUM ANYTIME — PARENTS DO NOT WANT TO DC LITHIUM AT THIS TIME — NOR ADD TEGRETOL —

5) NAMES OF DRS SPERRY, LINDER, RC THOMAS & CARLE OFFERED FOR 2nd OPINION —

6) LITHIUM CARBONATE (LITHANE TABS) 300 MG/TAB — # 100 + 2 ½ TAB TID — MAY WEAN OFF AT ANYTIME ¼ TAB TID x 1 WK → ⅛ TAB TID x 1 WK → 0 —

7) COMPLETE CHEMICAL W/UP & Li LEVEL IN ~1 MO IF ON LITHIUM —

8) CALL ⓟ LAB STUDIES —

9) RT: 8-19-87 —

[signature]

**CHILDREN'S MEDICAL CENTER OF DALLAS**
1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

**PATIENT RECORD**

Ward, Adam
43447

NEUROLOGY APR 2 '87 AGE ____ TEMP ____

WT ____ HT ____

VISIT c AMY/MO/AR M —
LOOKS SUPER — FINE @ SCHOOL
& BABYSITTER BUT OUT-OF-
CONTROL AT HOME —
FA WANTS TO RE-ADMIT / MOTHER
RESISTING SAME —
FHx NOW ⊕: MGF (DP (NOT Px'd)
PGA → "OVERDOSE" —
MAT Fx: "HIGH TEMPERED" —

A) HANDSOME / ON-THE-GO PASSER OF
SUBTLE/HOSTILE ANGER — AT
TIMES: LOVING & AFFECTIONATE —
"NO SAD — MAD FEELINGS" / ANY
SPEECH IS CLEAR —
LOOKS SUPER —

IMP/ FLUCTUATING MANIC BEHAVIOR:
MOSTLY @ HOME —
FAMILY ISSUES —

Rx/ 1) Li 150 - 150 - 225 4d →
225 - 150 - 225 PRN

2) RE-ADMIT CMC - 1 wk →
? TEGRETOL —

[signature]

CMC 18103

**CHILDREN'S MEDICAL CENTER OF DALLAS**
1935 Amelia Street
Dallas, Texas 75235
(214) 920-2000

**PATIENT RECORD**

Adam Ward
434474

NEUROLOGY SEP 16 '86

> 4 y / mo

OUT OF PLAY SCHOOL

ESCALATED WORSENING PAST 1 MO

TOF 10 y TID PAST 1 WK → LONGER

WORSE / MORE FREQ / TANTRUMS

IN PAST: DEX → "MAD - VICIOUS"

MELLARIL → "SCREAMY / STILL ANGRY"

ELAVIL - 10 y TID → CONT

ANGER / BITING / HITTING

? FAIR TRIAL - AT HOME

NO WORSENING @ HOME

PAST 2 WK + MGPS → ON TOF → NO BETTER / ? WORSENING

MO ARRIVED → CONT ANGRY PAST 1 WK

↓ APPETITE

MANIC STATE / PAST 2-3 MO

1) R/O WILSON'S OR XAN TOCHE

2) AC TOF 3)

4) CALL

5) TO GR ADM ASAP TO CMC

CMC 18103

NEUROLOGY FEB 17 '87

Mo/ADAM

DISCHARGED 11/26/86

1/87 (d [illegible])

Li = 0.8

LITHIUM CARBONATE - [illegible]

DR M - "WROTE Px" - NO FOLLOW-UP CARE - // - NO [illegible] ADD'T & [illegible] REFUSES TO [illegible] COUNSELING - REMARKS: "ALWAYS [illegible] ADM / THREATENS [illegible] TO [illegible]" / NO - MOTHER USING 'MODIFIED TIME-OUT' PROGRAM - CONSIDERING [illegible] DR/DR [illegible] FOR FAMILY MARRIAGE COUNSELING -

ADAM: "MUCH IMPROVED BUT [illegible] BACK - BAD LAST WK -> 45' RAGE" - BUT GENERALLY DOING WELL - ? OUTBURSTS [illegible] - OCCAS DAY TIME WETTING -

DOES FINE @ SCHOOL / [illegible]

[illegible] LOOKS SUPER - GOOD INTERACTION & [illegible] - BUT IN FREE FIELD -> "ON-THE-GO" - NO TANTRUMS - GOOD MOOD - CHEERFUL - [illegible] ABILITY TO INTERACT / NO OPPOSITIONAL BEHAVIOR - SPEECH - [illegible] - CORD [illegible] / BOTTOM [illegible] NO BRUISES - N/T [illegible] N: [illegible] F/C - NO TREMOR ATRs 2+ = Sym -

IMP (1) MANIC DISORDER / MUCH IMPROVED ON LITHIUM BUT HYPERACTIVITY CONTINUES - FUNCTIONING SEEMS [illegible] / [illegible] YOUNG ♂ - EXCELLENT SPEECH IN OFFICE TODAY - & NO APPARENT SIDE EFFECTS -

2) FAMILY STRESS & ISSUES CONTINUE -

CHILDREN'S MEDICAL CENTER
OUTPATIENT DEPARTMENT

Pediatric Neurology Outpatient Department

PATIENT RECORD

2-17-87
Visit (cont) —

A(sic) 1) Discussed c M. Stackland / Dr Hattaneth
to call parents tonight +
arrange f/up visit ASAP:
ind + family interactive
counselling is a "must" —
If CMC not convenient, parents
to start counselling c Dr McKoon —
→0.5
2) Li level ⊕ consider clonidine
w/up in 1-2 wks @ local
hospital —

3) Cont Li carbonate - 150 g tid

4) Call 2 wks → ? ↑ lithium

5) RT - 4-28-87 / EEG that
10:30 am — / to stay NPO @ noon —

Doing much better but
mom + family in need
of continuous care —

2/28/87 / Mo / ↑ Li - 150/150/300
lab to call in results + send
results —
Call 2 wks —



children's
MEDICAL CENTER OF DALLAS

134474

**CONFIDENTIAL**

**THIS REPORT IS NOT TO BE RELEASED WITHOUT THE EXPRESSED WRITTEN CONSENT OF THE PATIENT OR GUARDIAN**

NEUROPSYCHOLOGICAL EVALUATION

NAME: Adam Ward | DATES OF EVALUATION: 12-18-95, 1-2-96
DATE OF BIRTH: 8-11-82 | AGE: 13-4
SCHOOL: Commerce Middle School (Commerce Independent School District) | GRADE: 7 (Special Education)

Preface:

Several comments are offered as a preface to the following report of neuropsychological evaluation of Adam Ward. There appear to be a number of emotionally charged issues associated with his present school program and potential recommendations from this evaluation. Adam was referred for neuropsychological evaluation by Dr. Warren Weinberg, Director of Pediatric Behavioral Neurology at Children's Medical Center (CMC). According to Adam's parents, the evaluation is in part being driven by the school wanting to allow for police involvement in consequences for Adam's behavior as well as possible alternative school placement. There was not specific information supplied by personnel at Adam's school with regard to this. In addition to the selected battery of neuropsychological tests and review of medical records from CMC, the present report is largely based on information and records made available by Adam's parents and a discussion with Dr. Warren Weinberg. The present evaluation is an independent evaluation and is not meant to be construed as advocating for an agenda held by Adam's parents or Adam's school. It is also noted that the feedback session with Adam's parents was tape-recorded by them. This is not the usual procedure and this should only be for Adam's parents to review in its entirety. There is risk for statements to be misinterpreted if taken out of context or in isolation. The present written and signed document should be considered the official professional opinion regarding the synthesis of evaluation information, conclusions, and recommendations based on the evaluation.

Evaluation Procedures:

Interview with Adam and his parents, Mr. and Mrs. Ralph Ward
Review of records provided by Mr. and Mrs. Ward
Discussion with Dr. Warren Weinberg
Standardized behavior rating scales completed by parent and teacher
Administration of a selected battery of neuropsychological tests (see psychometric summary sheet at end of report)

Background:

According to his parents, Adam's gestation was complicated by maternal pre-eclampsia just prior to term. There were no complicating factors associated with his delivery or post-natal course. He experienced numerous ear infections as a young child. Developmental milestones in terms of language and motor functions were reportedly achieved within normal limits. When Adam was about two years old, his parents indicate that they began to recognize that his behavior was more intense and destructive than other children in that he had a severe temper, could become uncontrollable, and was destructive of property. The Wards indicate that Adam has experienced numerous allergies including red dye, sugar, mold, and milk. The Wards indicated that Adam's behavior can change drastically as a result of exposure to an allergen, and they also report that his behavior may change in response to weather and to seasonal cycles. Adam's parents indicated that he experienced a concussion last year as a result of being thrown head first into a Time Out Box at school. Another entry into the Time Out Box reportedly resulted in a tooth being knocked out. Adam currently takes Lithane 700mg daily as a result of a diagnosis by Dr. Warren Weinberg of Bipolar Disorder. Adam continues to be followed by Dr. Weinberg every 3-4 months.

Adam has had two previous psychiatric hospitalizations, both at age 4 years, because of behavioral difficulties. It was noted in records from that time that Adam was exhibiting significant aggressive behavior toward his mother. Numerous psychotropic medications had been tried without success prior to that hospitalization including Mellaril, Dexedrine, Elavil, and Ritalin. His parents indicated that he responded well to the hospitalizations, but they felt that the structure of that environment could not be duplicated outside of that environment.

The Wards describe numerous behavioral concerns regarding Adam and what follows is a summary of their report. In the past he has reportedly exhibited rage episodes during which he is unmanageable for an hour or more. He can be quite mouthy and tends to be very critical of people. He has exhibited significant aggression that has included hitting, kicking, and biting. He denies responsibility for his actions and will lie in order to get out of taking responsibility. His violence toward others is not always impulsive; rather, his parents stated that he will sometimes wait for an opportunity at a later time in order to retaliate against someone whom he feels has wronged him. His parents find it somewhat paradoxical that he can be quite respectful at times and seems to show a great respect for nature and the environment. He has extremely low tolerance for frustration. He tends to have what the Wards describe as "tunnel vision" in that he seems to get stuck on an idea or action and will pursue that without regard for obstacles. The Wards indicated that Adam's behavior has improved in recent years. As an illustration, they indicated that a teacher's concern about being told by Adam to "Go to hell" was unfounded in light of his history of aggressive and unmanageable behavior. Rather, they indicated that the teacher should recognize how far he has come given his potential for violent outbursts. To this point Adam has not had to interact with law enforcement. The Wards stated concern that if Adam has a negative experience with law enforcement that he may lose respect for them. Adam's parents indicated that behavioral and psychological therapies have been tried in the past but have been ineffective. They indicated that he can be motivated by the use of contingent privileges at home.

Adam is currently in the 7th grade at Commerce Middle School. He is classified as Seriously Emotionally Disturbed and as Learning Disabled. As noted above, the Wards are quite frustrated with certain school personnel expressed pointed animosity toward specific individuals. Their frustration includes both Adam's behavioral treatment as they feel he has been inappropriately managed in the past resulting in personal injury, as well as his academic program in that so much attention has been paid to his behavior that his academics have been sacrificed. Unfortunately, records were not provided by Adam's school even though the Wards indicated that the school was provided a cover letter indicating the utility of school records for such an evaluation. The Wards did provide copies of notes taken during an ARD meetings from the spring of 1995 and Dr. Ball's psychological evaluation. These indicate various modifications to be made within the classroom to assist with Adam's learning difficulties. Mr. and Mrs. Ward feel that Adam has shown some academic interest lately and feel that in some instances this has been related to the use of incentives for completion of specific tasks.

Results of two previous psychological evaluations were available for review. Adam was first evaluated at age 4 years during his psychiatric hospitalization. Cognitive evaluation at that time indicated average verbal abilities and low average nonverbal and quantitative abilities (SB-IV Verbal Reasoning SAS=104, Abstract/Visual Reasoning SAS=87, Quantitative Reasoning SAS=84, Short-term Memory SAS=94). Significant concerns were expressed regarding Adam's social interaction skills. The other evaluation available for review was an evaluation completed in 10/94 by psychologist Dr. Steven Ball. Intellectual evaluation reported by Dr. Ball (the test was administered by a diagnostician at Tri-County Coop) indicated average overall intelligence with generally average verbal and nonverbal functioning (WISC-III FSIQ=95, VIQ=101, PIQ=90). It was noted that there was a great deal of scatter among subtests. Dr. Ball concluded that Adam was exhibiting a depressive disorder as well as a personality disorder with strong narcissistic features. He recommended a behavioral management plan that included structure, consistent consequences, and care to not inadvertently reinforce manipulative or oppositional behavior. Dr. Ball also recommended psychiatric evaluation for possible medication evaluation given Adam's depressive disorder. Dr. Ball also outlined numerous specific modifications with regard to behavioral and academic goals. He also indicated the possible need for individual psychotherapy and systemic family therapy, though he acknowledged that the Wards felt these treatment modalities had not been successful in the past.

The Wards continue to be concerned about Adam's social functioning. They report that he has great difficulty getting along with peers and does not seem to have any close friends. He tends to be bossy and domineering in peer interactions. As noted above, he tends to be quite critical of others. The Wards indicated that Adam can be quite engaging with adults when he is in situations in which no demands are placed on him. It was reported that he has been a top salesperson in Boy Scouts and has exhibited good self-motivation.

Adam lives with his biological parents. Both parents hold advanced degrees and immediate family history is not significant for learning, behavioral, or psychiatric difficulties according to Adam's parents. In terms of stressors, Adam had a favorite dog that died about 3

years ago and he continues to talk about this. Aside from the conflict with the school and the difficulty managing Adam's behavior at times, no other acute or chronic stressors were reported that are significantly impacting Adam and his family.

Results of Behavior Rating Scales:

Adam's mother completed a Child Behavior Checklist which is a standardized multi-dimensional behavior rating scale tapping numerous aspects of children's behaviors. Ward's responses to the (CBCL) indicate that she views Adam as exhibiting levels of anxious and depressed behavior greater than 98% of boys his age. Her responses also indicate concern regarding aggressive and delinquent behavior at levels bordering on clinical significance (i.e., greater than 93% of boys his age).

On a teacher form of the CBCL completed by his 7th grade resource teacher, Ms. Mari Copeland, Adam is rated as exhibiting significant levels of aggressive behavior and peer interaction difficulties. Difficulties bordering on clinical significance were also noted in terms of sustained attention, delinquent behavior, and anxious and depressive behavior. Ms. Copeland rates Adam's academic performance as significantly below grade level in all academic areas except for band and physical education. In an accompanying note, Ms. Copeland indicates that she is most concerned with Adam's verbal and physical aggression toward others. She also notes that he can sometimes add insights to subjects that the typical student would not know about.

Test Behaviors and Interview Observations:

Adam was alert and well-oriented. Conversational speech was fluent, grammatically intact, and free from obvious word finding difficulties or paraphasic errors. He frequently expressed thoughts that were either tangentially related to the topic or task or unrelated altogether. It is noteworthy that at times he had difficulty with efficient verbal expression; that is to say, he frequently used numerous words and sentences without commensurate content. He was quite active and frequently fidgeted in his seat. He frequently manipulated objects in the office and on several occasions rifled through desk drawers until told to stop. He was easily distracted by irrelevant stimuli. He frequently placed responsibility for his difficulty and frustration with tasks on something or someone else. For example, he indicated that he had trouble on a drawing task because the desk was warped. When it was pointed out that the desk was perfectly flat, Adam had great difficulty responding. He also indicated several times that he had difficulty on tasks because his teachers were doing a poor job of teaching him. These observations are quite consistent with parent reports of Adam's style of interaction and lack of willingness to take responsibility at times.

During an interview with his parents, Adam was asked to wait in a waiting area. He was quite impatient and interrupted on two occasions. When it came time for him to work, he could not be found for 20 minutes and was finally discovered talking to a person in an office down the hall. Adam frequently talked back to and made insulting comments to the examiners during the evaluation. At one point quite early on, Adam stated to one of the examiners, "You know how badly I could hurt you if I wanted to." When further asled about this, Adam smiled and indicated his dislike for that examiner. He indicated that he did not like places like Children's because

everyone wants to "judge my intelligence." After discussing the purpose of the evaluation at length with Adam, he suggested that he start over and made an appropriate greeting. However he took the examiner's hand and squeezed apparently hoping to cause harm. He refused to let go until it became apparent that his effort to cause discomfort was not gaining his desired response. During conversation as well as an interview, Adam was extremely evasive regarding subjects in which he is weak. For example, he frequently talked in circles when asked about his reading skill compared to others his age. He frequently indicated that "it depends" or he would try to change the topic. His avoidance was raised as an issue all its own at one point and Adam simply refused to answer. On several occasions Adam indicated that other people think he is "weird." He was also interested in whether or not the examiner was upset with him. On one occasion he asked "Do I get you upset? I can't really tell if I can get you upset." Adam tended to respond best to very firm, consistent limits during the evaluation.

In spite of Adam's beligerent response style at times, it is felt that the present results are a reasonably reliable and valid sample of Adam's current level of functioning in the neurobehavioral domains measured. Motivational variations are noted in the text of the following section as appropriate.

Test Results and Interpretations:

On formal examination of intellectual abilities with the Wechsler Intelligence Scale for Children - Third Edition (WISC-III), Adam obtained an overall IQ score in the low end of the average range of global cognitive ability (Full Scale IQ=90). There was a statistically significant difference noted between low average verbal and average nonverbal abilities (Verbal IQ=80; Performance IQ=103). Among nonverbal subtests, Adam's performance was quite consistent and in the high end of the average range except for significant weaknesses on paper and pencil tasks requiring speeded visual processing. In the verbal domain, Adam exhibited a generally low average performance among subtests, with a more prominent weakness on a task measuring overall fund of knowledge and a task requiring the serial repetition of digits. These results are somewhat discrepant from previous intellectual findings and some comments can be offered regarding this. There has been an apparent significant decline in verbal abilities which had been previously measured in the average range. Part of this decline might be due to Adam's at times belligerent interaction style during testing in that he was not as willing to put forth as much verbal information. Another potential contributor is his language-based learning disability in that individuals with such learning problems often have difficulty benefiting from language-based information to which they are exposed, which has the net effect of decreasing verbal knowledge as the child is compared to normally developing peers. Finally, there may be some aspect of actual verbal decline that is not accounted for by these hypotheses.

In order to assess Adam's present level of academic skill, he was administered selected subtests from the Woodcock-Johnson Psychoeducational Battery-Revised, Tests of Achievement. His Broad Reading and Broad Written Language performances indicate that he is achieving at levels significantly below what would be expected given his intellectual status and current grade placement (Broad Reading SS=63, 2.4 grade equivalency; Broad Written Language SS=51, 1.6 grade equivalency). Specifically, Adam exhibited below average skill in decoding words and in

comprehending what he has read. He demonstrated [illegible] impaired [illegible] phonetic decoding. In the written language domain, Adam's knowledge and application of spelling, punctuation, and capitalization were measured as significantly below average, as was his skill in generating complete sentences when given a verbal and/or visual stimulus. Thus Adam is demonstrating performances in the reading and written language domains that are significantly below what would be expected given his measured intelligence and current level of training. These results are consistent with a developmental dysphonetic reading disability in that those skills are significantly lower than would otherwise be expected. His poor reading skills are also negatively impacting his written language abilities in that he has difficulty producing words and sentences that can be decoded by others.

Adam's Broad Math performance on the Woodcock-Johnson was within the mildly below average range, and somewhat less than would be expected given his overall intellectual abilities (Broad Math SS=77, 4.7 grade equivalency). He demonstrated performance in the low end of the average range on a task requiring the application of mathematical concepts to practical problems requiring knowledge of concepts such as money, time, and measurement, and below average performance in completing mathematical calculations.

In order to address memory function as it may contribute to his academic and behavioral functioning, Adam was administered tasks tapping both verbal and nonverbal memory functions. His immediate recall of orally presented stories on the Wide Range Assessment of Memory and Learning was within the below average range, and his ability to recall the elements of the stories following a delay was satisfactory (94% of initial recall). On the Verbal Selective Reminding Task, a verbal learning task requiring him to learn a list of words over repeated trials, Adam performed in the impaired range for long term storage of information and consistent retrieval. His recall of the list was satisfactory following a 30 minute well below average (25% of information in long term storage). On the Nonverbal Selective Reminding Task on which Adam was required to learn a series of dot patterns over repeated trials, his entry of information into long term storage was impaired as was his consistent retrieval of the material. His recall of the information that had been entered into long term storage was 25% after 30 minutes which is below average. His ability to reproduce complex geometric design patterns from memory was similarly impaired. Thus Adam exhibits significant difficulty with memory and learning of verbal and nonverbal information. It should be again noted that there may have been some influence of his belligerent interaction style on this task, though it is felt that Adam exhibits a true weakness in the acquisition of information which is not inherently interesting to him.

Further evaluation of language functions included measures of receptive vocabulary, confrontation naming, verbal fluency, and language comprehension. Adam's performance on the Peabody Picture Vocabulary Test-Revised was low average and consistent with measured intelligence. He performed in the average range on the Boston Naming Test, a measure of confrontation naming. His performance was average on the Controlled Oral Word Association Test which taps fluency. His performance on two subtests measuring language comprehension from the Clinical Evaluation of Language Fundamentals-Revised was below average and consistent with observations throughout testing which suggested difficulty in this area.

Adam completed a direct measure of sustained attention and impulse control. His performance on the Conners' Continuous Performance Task, a computerized measure of vigilance and impulse control, fell within the below average range for number correct and in the normal range for total number of commissions. His mean reaction time in terms of responding to stimuli was atypically slow.

Adam completed a measure tapping visuoperceptual and constructional skills. His performance on the Developmental Test of Visual Motor Integration, a task requiring the reproduction of increasingly complex geometric designs, was within the below average range for a child his age.

Adam's performance on measures of abstract concept formation, cognitive flexibility, and ability to inhibit pre-potent responses was generally average. Specifically, he performed in the average range on the Intermediate Booklet Category Test, a task requiring concept generation and problem solving. His performance on indices from the Wisconsin Card Sorting Test measuring concept formation and flexibility were average, while his performance on an index sensitive to consistency of responding was low average. He performed in the average range on the two parts of the Trailmaking Test which require visual scanning and increasingly complex sequencing.

Examination of fine motor functions indicated generally average and intact functioning bilaterally on measures of fine motor speed and strength. His performance on a measure of fine motor dexterity was slightly poorer on the left hand than would normally be expected, and he exhibited mild clumsiness with the left hand during this task. Adam had great difficulty learning a complex motor sequencing task with both hands, even after repeated verbal and visual cues. He also exhibited several perseverative errors during a go / no go task. These results are suggestive of difficulties with motor planning and learning, though motor execution seems generally intact.

Adam made numerous errors bilaterally on a measure of graphesthesis. He also made more errors bilaterally than would be expected on a measure of finger localization.

Summary and Conclusions:

This evaluation indicated that Adam functions within the low end of the average range of intellectual abilities. When compared to a previous intellectual evaluation completed a year and a half ago, these results indicate consistency in nonverbal functioning and a moderate decline in verbal functioning. It is likely that this decline is at least partly related issues related to Adam's belligerent response style as well as language-related learning difficulties. Speed of processing was noted as a weakness for Adam. Adam's academic functioning in the areas of reading and written language was measured as significantly below that which would be expected given his grade placement and cognitive abilities. Phonetic decoding skills were measured as significantly below average. Math skills were relatively stronger than language-based skills, though these are still somewhat weak when Adam's performance is compared to others his age. Memory functioning in the verbal and nonverbal modalities was measured as impaired. Visuoconstructional

skill was measured as below average. Adam demonstrated a slow response time and some difficulty maintaining focus on a computerized task of sustained attention and impulse control. Language comprehension was measured as below average. Fine motor examination suggested difficulty with motor planning and learning, though motor execution was generally intact. Adam made several errors bilaterally on measures of fine sensory functioning.

These results are consistent with a diagnosis of developmental reading disability (dyslexia) in that Adam is demonstrating a significant reading disability that is unexpected given his average level of cognitive functioning and his current level of academic training. His reading difficulties are of a mixed type of dysphonetic and dyseidetic features in that Adam has difficulties in both of the core reading processes of phonological processing and difficulty building a sight-word vocabulary. Memory difficulties also likely impede the learning process, as do fluctuations with attention and concentration. Motivation at school is clearly a major issue as Adam does not hold the school in high esteem at this point. There are also cognitive indicators that Adam may have greater difficulty self-monitoring his learning process such that he is not efficient in his use of time and resources. It appears that neuropsychological functions referred to as "executive" functions are also weak for Adam. Such things as extremely low frustration tolerance, difficulty planning, difficulty benefiting from the feedback of others, and poor self-monitoring are all areas in which Adam exhibits significant weakness which is likely a neurocognitive weakness of the executive functions which would be related to behavioral and emotional dyscontrol. There is also a strong relationship between Adam's learning and language difficulties and his emotional and behavioral problems in that these situations will set him up for frustration. Adam does not exhibit good problem solving or emotional coping skills in order to deal appropriately with stressful circumstances. The obvious remediation for this is twofold: first, avoid situations that are stressful when this is feasible and does not interfere with everyday life at home and school; second, teach Adam better coping and problem solving both directly and by exposing him to "supervised" stressful situations so that he has some opportunity to practice and hone skills by getting feedback and experiencing natural consequences. Not all of Adam's negative actions toward others are impulsive; his parents indicated that he could wait for later opportunities to react at times, and this is certainly of significant concern.

It is felt that Adam is at risk for a number of psychological difficulties as he grows older. It is felt that he is at significant risk for a depressive illness in that he has a significant insecurity which he defends by being insulting, aggressive, and obnoxious at times. This defense style leaves peers not wanting to interact with Adam, and it is likely that persons putting demands on Adam are likely to see the same defenses. This style of interacting also places Adam at risk for more significant difficulties such as being the victim of assault or assaulting someone himself. In other words, Adam's style of interaction places him in many situations in which a person may respond violently toward him, and this, combined with his low frustration tolerance, places him in numerous situations in which he may have the impulse to respond in kind. Further, as noted by Dr. Ball, Adam is developing personality features which are troubling in terms of his high level of insecurity and his tendency to interpret incoming information as persecutory. This latter feature may lead him at times to interpret neutral interactions as a personal attack.

Also of concern is Adam's parents level of frustration and the feeling that their son is not being adequately served. It is beyond the scope of this evaluation to determine how well-founded this report is, but it is clear that the Wards have been quite frustrated in the past. Adam himself has been another source of frustration for them, though [illegible] to improve. That the Wards are very emotionally invested with regard to their son and his programming should be recognized. The Wards feel very negatively toward specific school personnel, and they feel that Adam's not receiving appropriate services is related to a personal vendetta against them by certain school personnel. Clearly the Wards have struggled for many years with Adam's behavior and with the interaction of his behavior and the environment. It is felt that they have his best interests in mind and are seeking to do what is most appropriate for their child. What is in Adam's best interest would be for his school and parents to arrive at a mutually agreeable plan which all parties support and comply with.

Recommendations:

1. The Wards made numerous references to instances in which they felt that Adam's school has not been in compliance with federal law with regard to his programming and its implementation. Part B of the Individuals With Disabilities Education Act (IDEA) grants parents and the school the right to an impartial due process hearing on any matter regarding non-compliance with the educational program of the child. The hearing officer may not be an employee of the school, and no person having personal or professional interest in the outcome may serve as hearing officer. Given the significant number of complaints that the Wards voiced in regard to their opinion that the school has not complied with his Individual Education Program, it seems that this would be a logical step for settling differences which clearly exist. The school is obligated by IDEA-Part B to inform the parents of any free or low-cost legal services that may be available. There is also provision for the Wards to potentially recover attorneys' fees if they prevail in a hearing or judicial proceeding. In any event, the Wards are encouraged to consult an attorney with experience with legal issues regarding handicapped students in order to determine their best approach to their concerns.

2. Given the concerns of Adam's parents and their report of the school's potential intentions for Adam in terms of placement alternatives, it is assumed that input is being sought with regard to whether Adam's problem behaviors are a manifestation of his handicapping condition. It is felt that Adam's aggressive, disruptive episodes are a manifestation of his handicapping condition. Thus cessation of special education services is not recommended and is likely not legally permissible. However, this is not meant to imply that Adam is unable to distinguish right from wrong or that he should not be held accountable for assaultive behavior. Should alternative placements to Adam's current school be considered, these must reflect consideration of the Least Restrictive Environment doctrine put forth in IDEA.

3. A principal incentive for reducing animosity and forming a cohesive relationship between parents and school is Adam's increased respect and participation with regard to the

educational process. It is recommended that, as long as Adam is expected to participate in this district and with these personnel, his parents be aware that their derogatory statements may serve to fuel Adam's lack of respect for school and that this might generalize to the education process as a whole.

In a similar vein, it is recommended that those important to Adam be careful in how they describe Adam's behavioral difficulties so that he does not feel some sort of implicit permission for negative behavior. For example, his propensity for behavioral difficulties should recognized, though his behavioral expressions should be framed as largely within his control. The message to Adam should be that he can use the assistance of medication and behavioral interventions to help him manage his behavior, but he is ultimately responsible for negative behavior that is clearly out of proportion with environmental precipitants. As an adult, Adam will be increasingly held accountable for choosing an alternative to calling someone a derogatory name or exhibiting an explosive outburst. He will also be increasingly responsible for recognizing his difficulties and independently taking steps to help manage these.

4. Given Adam's level of language comprehension difficulty, which is likely to be somewhat subtle, it is recommended that those interacting with him frequently ask him to paraphrase directions that have been given to him. Adam may have a tendency to simply nod and/or say that he understands things when he may not understand at all or may have misunderstood in some manner. This language difficulty should also be taken into consideration if Adam enters into psychotherapy as recommended in that he will have difficulty with verbal, insight-oriented psychotherapy.

5. The Wards expressed much concern that behavioral interventions recommended from this evaluation would interfere with or be counter to the behavioral plan that is currently in place. Many of the principles that the Wards cited are certainly components of a good behavioral intervention. These include vigilance to possible escalation of a situation and intervention before escalation occurs (particularly as it is reported that he has such difficulty calming once upset), redirection before things get out of hand, ignoring those behaviors which are not disruptive, and offering a praise-rich environment. The obvious concern with regard to the present arrangement is that having his parents remove him from school each time he begins to escalate does not provide for optimal coping opportunities on Adam's part. His parents stressed that the current arrangement has resulted in decreased physical altercations with staff and improvements in academic performance. It was discussed with the Wards that as long as this arrangement is seen as temporary (based in part on Adam's academic, behavioral, and emotional performance) and as part of a larger long term plan for behavioral change, this may be a useful temporary adjunct while a more forward-reaching plan is being developed. It must be underscored that this should be temporary and there should be a specific plan to wean him from this arrangement such that he is expected to begin to exhibit more positive coping while at school.

In order to offer Adam a finely tuned behavioral intervention that is sensitive to each of the contributing factors to his behavioral difficulties, it is important to recognize the content and the process of Adam's behavioral difficulties. As noted above, a mood disorder does not make Adam tell a teacher to "Go to hell." However, he may be more likely to express such negative behavior based on within-child factors such as difficulty with impulse control and a tendency to interpret stimuli as persecutory. His parents feel that this can be driven by environmental factors such as exposure to allergens. It would be beneficial for a behavioral specialist with expertise in applied behavior analysis to complete a functional analysis of Adam's behavioral difficulties and for a comprehensive positive incentive based behavioral management program to be considered. Such a specialist might provide ongoing behavioral consultation at home and at school in order to address Adam's behavioral difficulties in a proactive manner that identifies and decreases risk factors wherever present while at the same time providing Adam with a consistent and structured environment.

The goal of the behavioral intervention must be to improve Adam's capacity for <u>self-control</u>. As noted above, he is at significant risk for behavior that would result in legal trouble down the line. Adam demonstrated capacity for self-control in the face of several frustrating cognitive tasks during the present evaluation. He also demonstrated satisfactory self-control when he was confronted and directly challenged when he made disrespectful comments. While the Wards felt that this was likely due to the "laboratory" conditions of the evaluation, what is clearly demonstrated is that there are conditions under which Adam can control his impulses in the face of frustration. It is likely that the structure, clear expectations, and consistency of consequences of the controlled evaluation environment contributed to Adam's self-control. Thus this pattern may also exist if these conditions can be mimicked in the outside environment to the greatest extent possible.

With regard to further behavioral suggestions and techniques, readers are referred to the recommendations offered by Dr. Ball in his psychological evaluation of 10/94. Dr. Ball's suggestions are quite appropriate and will not be duplicated here. Readers are also referred to suggestions offered by Dr. Weinberg as these are generally consistent with Dr. Ball's recommendations and are also quite appropriate for Adam. It is cautioned that a poorly designed behavioral plan, a plan which sets up an overly punitive environment, or a plan which is not consistently implemented and supported across environments is likely to fail and to possibly exacerbate Adam's behavioral difficulties.

6. It is recommended that the Wards consider individual psychotherapy for Adam to address issues of impulse control and anger control. This should be highly integrated with the behavioral approach across envirnments so that he has the opportunity to process events and solve problems in adapting to this paradigm. It might also be useful to include a focus on self-esteem and depressive feelings. It will be important for Adam to learn to self-monitor his feelings and continue to improve in his control of negative behavioral impulses.

7. Adam's reading difficulties are such that he will have difficulty relying either on sight-word recognition or phonetic decoding as a singular strategy for remediation. As such, a significant emphasis for Adam in terms of tutoring and assistance at school will need to focus on metacognitive strategies for knowing the steps he will need to follow in order to read. For example, he should be encouraged to say "blank" when he encounters a word he does not know in connected text. By not disrupting his fluent reading, he may be more likely to decode the word using context clues and he will be less likely to change the meaning of the passage by incorrectly substituting a word. Another example of a preparation strategy would be story mapping in which he can be taught to identify the central features of all stories such as identifying the main characters, the setting, the problem situation, and the resolution. Worksheets and isolated phonics exercises are less likely to be useful for him. Phonological awareness training might be useful if it is integrated with connected text reading and writing (e.g., journal writing with invented spellings, analytic phonics with word families). It will be important for Adam to increase his sight word vocabulary and make "automatic" his recognition of high frequency words. Teachers and tutors should think in terms of stressing survival words for Adam to facilitate things such as better following of written directions. One strategy for improving sight vocabulary include using flash cards for repetitive presentation until the word is automatic.

   Access to books on audiotape should be part of Adam's program since at this point he cannot be considered a functional reader. Using dictation to give his answers would also be appropriate in many cases.

   Again, Adam should be considered a non-functional reader at this point when expectations are made regarding his school performance. His level of reading disability is severe, and as noted above, this will likely continue to be the case in the coming years. It cannot be underscored enough to parents and teachers that reading will continue to be a slow, frustrating process for him. It will continue to be difficult for him to be motivated for reading tasks and other academic tasks which require significant reading and written expression components. He can be expected to make gains, though these will require much effort and patience from him and those working with him.

8. In terms of his expression of test answers and knowledge of information, it would be useful for Adam to be allowed whenever possible to provide oral responses. This could take the form of using a tape recorder to dictate his answers or by arranging a time for him to undergo oral examination by the teacher.

   Adam would also likely benefit from training in the use of a word processor with a spell checker. At this point, this should not be relied on because Adam's spelling skills are so poor that a spell checker would have difficulty recognizing his approximations of words. Rather, he can begin to gain skill in the use of these tools so that they can become a more prominent feature of his program in the future.

9. Evaluation of Adam's work should be highly based on content rather than details such as spelling or punctuation. At this point, oral expression is likely to provide the most accurate reflection of what Adam is capable of and what he has learned about a particular subject. It will be continually important for teachers to decide what they wish to know from Adam on a particular task (e.g., what he knows or how well he can read and write his responses). If he is required to read items on a test, he should be allowed extra time for this and he should also be allowed to have any difficult words clarified for him at his discretion.

I would be happy to discuss the results and recommendations from the present evaluation further with Adam, his family, physician, school personnel, or other professionals working with him.

Peter L. Stavinoha, Ph.D.
Pediatric Neuropsychology Service
Children's Medical Center of Dallas

Richard L. Fulbright, Ph.D.
Consulting Neuropsychologist

Betsy Kennard, Psy.D.
Supervising Psychologist and
Director of Psychological Services
Children's Medical Center of Dallas

cc: Mr. and Mrs. Ralph Ward