# Petitioner's Exhibit 2

Tri-County Services Records Excerpts

Name _Adam Ward_

Page _1_ of _2_

Date _10-19-95_

~~Additional Deliberations to the ARD Committee~~

Mr. Ward came in TRI-co and asked to speak with me about the scheduled ARD meeting on 10-24-95. Mr. Ward was visibly very angry and stated there would be no ARD meeting next Tuesday. Mr. Ward stated that Adam had made more progress in Reading this year than he ever had, & that nothing would be changed. When I stated that the ARD would be held to review assessment, progress & discipline, he stated that assessment had just been done in the Spring &, & didn't need to be done again. Mr. Ward stated that the discipline problem in which Mrs. Copeland was hurt was her fault because she confronted Adam about staying in his own desk. He stated that he'd buy the school district a desk if that was such a problem. He asked me had I seen Mrs. Copeland's alleged injuries & I told him I had not - He said "then you're reacting to hearsay" & that I had a phone & could talk directly to Mary about what had happened without an ARD. When I told him these issues would be addressed in the ARD, he stated that he'd talk informally but not in an ARD. He stated an ARD is legal, & we needed his consent to change anything & that he wanted nothing to change from the Spring ARD. I informed Mr. Ward that laws had changed since the Spring & needed to be reviewed (I gave him a copy of SENATE BILL I laws addressing assault). He stated

406312
002039

Page  2  of  2

Name  *Adam Ward*

Date  *10-19-95*

~~Additional Deliberations fo the ARD Committee~~

Adam is "Bipolar", and that no one (school personnel) had the expertise to work with him. Mr. Ward stated that Mary Copeland should not have touched Adam and stated that the incident was her fault. He also told me that school officials (various) had bruised Adam in the past, and that those incidents should have been reported to CPS. He stated several times that he would call Austin, & that I had "gotten myself into a hornet's nest." He told me that if I wanted to keep my job, I'd stay out of it because there would be a fight. During the conversation he told me how he disliked Anne Mills and would not ever meet with her to discuss anything (because of an incident 5 yrs. ago). He stated that he'd homeschool Adam before allowing an ARD to change his placement — but not without going to court.

Name _Adam Ward ARD_          Page __1__ of _____

Date _11-3-99_

### Additional Deliberations of the ARD Committee

Advise about taping

In attendance?

Trish King, principal

Cindy Chaney, counselor

Greg Williams, Ag Sci teacher, Voc Rep - one of Adam's teachers

Steve Ball, psychologist - counselor

Nancy Ward ⟩ parents

Mr. Ward

Paula Malocek - repres. Ward. senior legal counsel

Bill Glenn - investigator for Davis, attorney for the Wards

Laura English, representing Tri County, district coordinator

Chris Irwin - diagnostician

Susan Graham - CISD's lawyer

Dianne Lowe - note-taker

Jessie West - Sp. Ed. teacher

Elaine Stotts - business teacher, Reg. Ed., one of Adam's teachers

Darrid Welch, asst. principal

Doug McMillian - psychologist

002552

Name  Adam Word ARD

Page 2 of ____

Date  11-3-99

### Additional Deliberations of the ARD Committee

The purpose of this ARD is to conduct a
manifestation determination as required by
federal law when a student has been
accused of a level IV offense that calls
for a long-term disciplinary consequence.

Dr. Ward expressed the opinion that
there were more people here for CISD
than for Adam.

Adam qualifies to receive special ed.
services as an Emotionally Disturbed
and Learning Disabled Student. He
receives counseling.

Dr. Ward stated that the Herman
Reading program was used, and he
wants to know about the objectives of
that program and if they are still needed
for Adam. Dr. Ward stated that Adam
was dyslexic and has stated that Mr. Irwin
has been made aware of this - Mr. Irwin
stated no knowledge that any testing

002553

Name _Adam Ward ARD_     Page _3_ of ____

Date _____ 11-3-99 _____

### Additional Deliberations of the ARD Committee

in this area was called for by parent
to him (Mr. Irwin). He does not recall
this conversation about testing.

Dr. Ward feels that the Herman
program, not which is now completed,
was used for too long a period of time, over
several years according to parent.

As of now his (Adam's) grades are good.

Parent is requesting reading testing
as soon as possible. Student is to
be reassessed this school year. (3 yr. re-
evaluation).

Principal King did not know about
the testing (reading) that parent requested.
ARD committee discussed re-assessment
at this time. Testing will be done
in the following areas as soon as possible:
    1) criterian reading test which
       addresses reading skills relative
       to his dyslexic disability (parent's
       words. (within 30 days from
       this ARD date.)

Name _Adam Ward ARD_                Page _4_ of ____

Date _11-3-99_

### Additional Deliberations of the ARD Committee

By April 10, ~~99 at~~ 2000 a full re-assessment will be completed - as by stated in past PAARD.

Adam has been given his procedural safeguards (on Feb. 24, 98) to explain his rights at age 18.

A review, (of the B.I.P., functional behavioral assess.) was discussed. : The parent stated that he was not aware of any behaviors this year that affect Adam's education. He chooses not to fill out the papers concerning such that were mailed to him.

(Mrs. Bishop told Mrs. King) (Adam's was 5th-6th grade teacher)

The ~~school~~ Oh. states that Adam has not had any extreme behaviors (earlier in year) which need to be changed in B.I.P. The relationship of that math teacher said the IEPs and B.I.P. goals have worked well this year.

An incident (photograph shown) was brought up that happened years ago, not caused by Mrs. Bishop,

Name  Adam Ward ARD

Date  11-3-99

Page  5  of  ____

### Additional Deliberations of the ARD Committee

that Dr. Ward felt caused Adam to not wish to be in Mrs. Bishop's class at 1st of year now. ~~Mrs.~~ There was a small incident due to that then - A decision with the Wards was worked out and Adam was left in Mrs. Bishop's class and has been successful in that class - Parents agree. He is in ~~the~~ CM class for a minimum of 5 minutes a month. He has used that service

Mr. Williams stated that Adam was doing well in his class.

There are documents attached to ARD to show how Adam is doing in several of his classes.

McElroy reported that one incident occured (with another young man) but it was successfully remedied - IEPs and Mods. seem to be working well.

Mention was made that Adam had not been sent home this year for discipline reasons -

Name _Adam Ward ARD_          Page _6_ of ____

Date _____ _11-3-99_ _____

## Additional Deliberations of the ARD Committee

In Adam's prior disciplinary action, B.I.P. has been followed. Usually Adam is asked to remove himself from a situation before it escalates.

Behavioral goals, from Adam's IEP were reviewed / discussed. The only goal where Adam seems to need more improvement on is tardiness. There has been little confrontation due to tardies with Adam. Dr. Ward stated that Time management was one of Adam's main problems. Mrs. King feels there has been some improvement in this area. It is handled according to B.I.P.

Mrs. King tells Adam that foul language is not acceptable, but has not gotten confrontational or with Adam about it. Parents are or were called, and student did not have to be sent home.

Name _Adams Ward ARD_         Page _7_ of ____

Date _____11-3-99_____

**Additional Deliberations of the ARD Committee**

Dr. Ward feels that academics are dealt with more than minor discipline on things such as tardies. He suggested Adam come in on his own time (after school) to correct that problem when necessary. Dr. Ward stated that (Adam's) this time management and discipline are improving with puberty. Mrs. King stated that Adam will sometimes state that a teacher can't count his tardies against him "because his ARD says so." Tardies have not gone down, but his discipline reports from them have gone down. It is an improvement that the tardy is for a "shorter time" now per incidence. In some classes Adam has chosen never to be late.

Dr. Ball suggested setting a limit of "number of minutes late" in B.I.P. Use as a goal, and to help Adam realize what is not acceptable.

Dr. McMillian suggested Adam help set these goals. Dr. Ball said he'd work with Adam on this issue.

002558

Name  Adam Ward ARD

Date  11-3-99

Page 8 of ___

### Additional Deliberations of the ARD Committee

Mr. Welch (discipline reports):

9-28-99 - Mr. Eolray's class - incident with another student - physically grab other student lasted only a few seconds. No punishment was given. The other student apologized to Adam. Adam didn't respond to the student. B.I.P. followed. 1st wk or +...

Beginning of year Dena Hays - attendance monitor - was redirecting students to go into cafeteria using a different door - Adam pushed by Mrs. Hayes and went in door anyway when asked to go around. Adam was verbally abusive to Mrs. Hayes. Student was not sent home. B.I.P. followed.

One more altercation with some students occurred. A girl heard Adam supposedly say that he was going to "cut up the child and put him in a body bag". Parent called. The use of threats by Adam was discussed with parent. The police chief was contacted to talk to Adam about the seriousness of such threats. No discipline was taken other than the "talk". Student was not sent home. B.I.P. followed.

Name _Adam Ward ARD_          Page _9._ of ____

Date _____ 11-3-99 _____

### Additional Deliberations of the ARD Committee

No blame was ever given as to the fault of the original altercation. Only the use of threats was discussed with Adam as being his fault.

10-21-99 - Adam fought with two boys in a restroom and one boy was hurt -

(Incident report attached)

Committee is not acknowledging that this happened; only that if it did, whether or not the incident was a manifestation of Adam's disability.

A nurse's report is attached to describe the injury to the boy who was hurt.   No hospital report has been received by the school at this time.

Adam's side of the incident was also related to committee as told to Mr. Welsh (by Adam) (as stated to committee by Mrs. King and Mr. Welsh.)

Dr. Ward stated what Adam told him (dad) about the incident. Dr.

002560

Name  Adam Ward ARD

Page 10 of ____

Date  11-3-99

### Additional Deliberations of the ARD Committee

Ward did state that Adam did tell him that he was past the 1st two front doors. Dr. Ward felt that Adam may have gone on outside but not remember it since he was "hit in the head".

The knife was not recovered. The police and looked extensively for it according to Mrs. King. Mrs. King said all lockers on downstairs hall were searched.

Functional Behavioral Assessment was reviewed with new info information. One amendment was requested by Dr. Ward. That amendment was added. Parent agreed with amendment ( that student was muttering to himself – not to another student [the "cut up, body bag" remark ] ).

It was stated at this time again that this ARD is not to cast any blame – only to see about a manifestation determination.

002561

Name _Adam Ward ARD_                    Page _11_ of ____

Date _11-3-99_

**Additional Deliberations of the ARD Committee**

( Recess - 4:37 until 4:53 for a break )

Functional Behavioral Assessment - continued to be reviewed by Mr. Irwin.

Mrs. King gave an explanation to th the Ward's lawyer & investigator as to the definition of obscene / lang. or profanity, the explanation of the B.I.P. & functional behavioral assessment, and re-stated the reason for this ARD. It was restated about how Adam's discipline was managed and was progressing.

Events which precede behavior problems were discussed on F.B.A. (Funct. behavioral assessment ).

Dr. McMillian stated he had reviewed Adam's records and was here to give his perspectives on the records.

002562

Name Adam Ward ARD

Page 12 of ____

Date 11-3-99

**Additional Deliberations of the ARD Committee**

We reviewed incident + evaluations and other ~~reports~~ reports to see if a link exists between behaviors and Adam's disability. Typically a bi-polar reaction shows a build-up of a couple of days before a behavioral problem. This was not seen in Adam's incidents. Another way to see if there's a behavioral patterning, situational determinates, - There were some situational determinates - like confrontation with authority. Comparing those situations with the "bathroom problem" that occurred, this is not seen. Was he escalating due to self-defending himself. It does not seem to suggest that Adam was building up to the situation, but that it occurred quickly.

Did he understand cognitively the consequences of the event? It seemed he understood a planful act and had a level of understanding. It may seem that he planned some form of cover-up of the incident which means he was exercising some control over the situation.

Name _Adam Ward ARD_          Page _13_ of ____

Date _____ 11-3-99 _____

### Additional Deliberations of the ARD Committee

The Ward's lawyer seemed to feel that Adam may have felt the boys were an authority figure and were threatening him.

Dr. McMillian referred to the improvement of Adam's control over fear & anger at school (teachers' reports on behavior). He also quickly wanted to leave the bathroom which showed some control of the situation according to Dr. McMillian.

Dr. Ward did agree that Adam had improved over the years, but he feels that Adam can not be said to be improved by looking at two months improvement & does not indicate the over-all picture of Adam. He feels that some situations can cause people to escalate quickly.

Mrs. King stressed the improvement of Adam from his freshman year until now (discipline-wise).

002564

Name _Adam Ward ARD_          Page _14_ of _____

Date _11-3-99_

### Additional Deliberations of the ARD Committee

Dr. Ball felt that these incidents seem consistent with past manifestations of Adam's disability.

The Ward's lawyer and investigator wanted to know if the discipline history of the other boys showed them to be honest. Mrs. King said they had not been in trouble, but did not feel that this ARD was the place to discuss the other boys. "We are here to make a manifestation determination on Adam." She did feel she had an accurate incident report.

Mr. Glenn asked about the young man who just witnessed the incident. Mrs. King felt this young man would not have wanted to be involved in such a situation, was very quiet and well-behaved. She felt he gave her honest answers.

002565

Name _Adam Ward ARD_

Page _15_ of ____

Date _11-3-99_

### Additional Deliberations of the ARD Committee

Dr. Ball restressed that the behaviors might well be due to his disabilities. Further committee discussion followed this statement.

Dr. Ball said he felt that Adam would or perhaps feel so threatened that he would defend himself. He feels that Adam's behavior has still been consistent over a long period of time.

Mrs. King related that this incident was not the same as a past Aguilar (sp.?) incident, since Adam in that incident took a long time to get calm - but this incident showed no clenched fists, heavy breathing or any such reactions and Adam was calm within five minutes, talking calmly. Adam also seemed to try to cover his actions this time according to Mrs. King.

Mrs. King gave her eye-witness account of the Aguilar (sp.?) incident.

Name _Adam Ward ARD_         Page _16_ of ____

Date _____ _11-3-99_ _____

### Additional Deliberations of the ARD Committee

Adam  Dr. Ward feels this situation was different, reacting to it as a manifestation of his disability. He feels Dr. Ball knows how to evaluate Adam more than anyone else in this ARD.

Mrs. King read Dr Keene's psychiatric report that stated that Adam's condition could not be the cause of his not complying with logical consequences. (See handout of report - p. 5 of 6 #6)

Dr. Ward disagreed with Dr. Keene's report, stating it was incorrect and was not documented as true. He felt the report was infuriating and should not be discussed at any ARD where Dr. Ward was present.

It was noted that the ARD committee did agree with Dr. Keene's report at that past ARD according to Susan Graham. Dr. Ball was allowed to do another psychological report at parent request at that ARD.

Name _Adam Ward ARD_          Page _17_ of ____

Date _11-3-99_

### Additional Deliberations of the ARD Committee

Mrs. Ward feels Dr. Mc Millian is stating that Adam was in control of his actions by looking only at records. Dr. Mc Millian restated his views of only reviewing the reports.

Dr. Ward stated he had written letters of complaints to the School concerning Dr. Keene's report.

The three questions were read concerning the manifestation determination after the problem (incident) report was stated.

(Copy of M.D. attached)

Dr. Mrs. West reviewed IEPs of Adam. ~~in Math~~ The committee agreed on the fact that the IEPs, ~~placement~~ and other parts of question "one" were appropriate.

2nd questions was discussed - (ability to understand the consequences of the behavior at this time)

Name Adam Ward ARD

Page 18 of ____

Date 11-3-99

**Additional Deliberations of the ARD Committee** (consensus members)

The committee feels (D.L.) principal & staff feel he could understand the consequences of his actions. Parents feel and Dr. Ball feels that he could not understand the consequences at the time of the incident.

There was consensus of members except for the parents. The parents asked what the outcomes (hearing not yet meeting) the discipline of the discipline would be. If not a manifestation, he will be treated as a regular ed. student with his FAPE. If a manifestation is present, that will affect the disciplinary outcome. He is SP. ED. and will receive FAPE regardless of the outcome. With a weapon offense he could get a 45-day placement. Then another ARD would have to be held to determine further programming / placement options for the benefit of Adam. He could not be expelled if it is a manifestation of his disability.

002569

Name *Adam Ward ARD*

Page *19* of ____

Date ____ *11-3-99* ____

### Additional Deliberations of the ARD Committee

*Parents stated what they wanted:*

(1) Only Dr. Ball should state whether a manifestation occurred.

(2) Adam should not come back to regular classes this school year.

(3) We are not in favor of the school's physical AEP setting for this

(4) We want to keep Adam at home to do his work. Adam likes to stay at school, so it would be a consequence to keep him at home.

(5) We feel this is a manifestation of his disability.

(6) We want him educated at home by materials supplied by the school.

(7) We are not wanting Adam to be re-instated in this school this year. We would lessons sent home, tests sent home and maybe even

Name *Adam Ward ARD*

Page *20* of ____

Date *11-3-99.*

### Additional Deliberations of the ARD Committee

use of a computer to receive or help with services.

(8) We do not want him back in school. He will miss his Ag or FFA events now and this summer. He will not be able to work towards awards. These would be good consequences for him. They are not punative, but are major consequences he needs at this point.

These were the parents' requests.

Mrs. King mentioned the BAU, and whether or not it was appropriate. It could be appropriate if best for Adam. A spring ARD could meet later-determined needs, including results of assessment.

Name _Adam Ward ARD_          Page _21_ of _____

Date _____ _11-3-99_ _____

### Additional Deliberations of the ARD Committee

The third question was read.
(behavior relating to this incident)

Dr. Mc Millian discussed from
materials read that he could control
his behavior in this incident.

Parents feel that their consequences
are the best choice, but feel it
is still a manifestation of his
disability. They feel that the
manifestation would be needed
to, to keep Adam out of the
criminal justice system. He also
could be no-billed.

Mrs. King felt that the 3rd
question should be not a manifestation
of the disability in this incident. She
feels it is a "disjustice" to Adam to say
he couldn't control his behavior.

Parents feel he is bi-polar and
not capable of controlling his behavior.
Dr. Ward reminded Dr West that the
outcome could affect his criminal
justice outcome.

Name  _Adam Ward ARD_

Page _22_ of ____

Date  ___11-3-99___

### Additional Deliberations of the ARD Committee

Dr. West and Ms. Statts voted No. Mr. Williams voted No. Mr. Irwin was willing to vote No, so did Mrs. King to reach concensus.

The consensus was No — it was a manifestation of his disability in this incident.

Recess — 7:16 for a break until ~~7:16~~ ~~7:31~~ 7:40

Paula Makcel and Bill Glenn had to leave at 7:34 to see a client.

~~Continue~~ Placement will be discussed after IEPs are adopted/discussed/reviewed.

Placement should be more restrictive since more incidents (minor) could happen according to parents. Adam needs to be structured but not in any place where there are other students (Dr. Ward) -

002573

Name _Adam Ward ARD_    Page _23_ of _____

Date _____ _11-3-99_ _____

### Additional Deliberations of the ARD Committee

Adam (Dr. Ward states) should not be in communication with other students.

Mrs. King states that since his disability does affect his behavior, she also feels regular classes are not appropriate for Adam.

Dr. Ward stated that after the bond situation is over, then A-school might well be an alternative. Right now Adam needs the restrictive environment of home.

Dr. McMillian cautioned that Adam must be held responsible for school work each day. He must continue to perform school tasks.

Dr. Ward stated his wife is SP. ED. certified and Dr. Ward has had in-school suspension experience. "We" feel as parents he would spend a great deal of time on school work.

Name _Adam Ward ARD_          Page **24** of ____

Date _____ 11-3-99 _____

### Additional Deliberations of the ARD Committee

Mrs. King stated she feels the Wards could manage Adam's schoolwork.

Dr. McWilliam stressed structure. It was stressed that if Adam goes home, then a future ARD will determine further needs for services.

The WARDS do not feel Adam should go to the behavior unit. The quality of his education could best be served at home according to parents.

Mrs. King stated that the BAU might help change behaviors and continue his (Adam's) education. The school is determined to serve Adam's needs.

Dr. Ward feels only Dr. Ball's counseling will help Adam's behavior change, not a BAU.

Mrs. King stressed how restrictive a home placement would be compared to a BAU.

Parents request of home placement was discussed by committee.

Name _Adam Ward ARD_                        Page _25_ of ____

Date _____11-3-99_____

### Additional Deliberations of the ARD Committee

Committee does not feel any safety problems would be an issue at BAU. Mrs. King says Adam does refuse to work at school, and parents do see to it that the work is completed at home. -

Placement - There was concensus on this issue. Adam can best be served at home as the parents requested. Dr. Ball agreed also. The parents saw no problem in getting work and communicating with school.

All core courses now taken can be done by Nova Net for next semester. Work can be sent home for his lessons, and will be graded by business teacher for business course. Course content can be modified for Adam, meeting modified curriculum needs.

Name _Adam Ward ARD_

Date _11-3-99_

### Additional Deliberations of the ARD Committee

This will give him BC1 credit, if completed for a graduation requirement. Sports articles and/or reports plus physical activity (logged) can be given for P.E.

Adam will have 18½ credits at the end of this semester. The state asks for 22 hours to graduate. Commerce asks for 24. He needs 3½ credits to graduate at 22 if ARD so decides. Other needed credits were discussed. Nova Net (sp?) can be customized to Adam's needs. Gov./Econ. is on Nova Net — Other possible substitutes for speech class might be adopted by ARD committee. English IV is also available on Nova Net.

A brief ARD (with Reading Assessment results) can be held to determine graduation needs. This semesters courses will all continue at home.

002577

Name _Adam Ward ARD_          Page _27_ of ____

Date _____ 11-3-99 _____

### Additional Deliberations of the ARD Committee

Dr. Ward stated that early graduation at the end of this year might be too heavy a load —

Options — (Discussion of realistic goals)

(1) Reg. this year + Reg. next year

(2) Early graduation

a. end of this year

b. end of 1st semester next year.

Needs (22 credits)

Eng. 3

Math 3

Gov. (sem.)      Can be on

Econ. (sem.)     Nova Net if needed.

World Hist

BCIS 1

Phys. Ed. (both semesters /all courses)

He might be eligible for a $1000 scholarship if he graduates in 3 years total —

Grad. ceremonies are only held in May, but he can graduate without a ceremony.

002578

Name _Adam Ward ARD_          Page _28_ of ____

Date ____ _11-3-99_ ____

**Additional Deliberations of the ARD Committee**

Mrs. King would have to know by 5th 6 wks. in order for Adam to graduate the following 6 wks at that point of a semester. Many students across state of Texas are choosing to graduate in 3 years to get the scholarship chance.

The ARD committee reached concensus on requiring only 22 credits for Adam to graduate.

The ARD committee reached concensus on the option of reading improvement 3 replacing English IV.

ARD IEPs current will not change thru this semester. In January IEPs will be revisited. Spring courses will be decided on with English 3 lasting all year.
Same schedule as on schedule page for fall.

Name   _Adam Ward ARD_

Page _29_ of ____

Date   _11-3-99_

### Additional Deliberations of the ARD Committee

We are continuing previously adopted IEPs.

Adam will have use of a computer and printer ~~and~~ and software while Adam is doing this home course of high school study (modified NOVA reg. curriculum)

Modifications are in place through December as stated in past ARD.

If a personal "on-site" conference needs to be held it will be held at a specified place agreeable to school and parents.

Laura English, Tri County, and Jessie West, (high school) will be the contact persons that Dr. Ward will contact if a need arises.

ARD paperwork reviewed — Strengths & weaknesses reviewed — No significant weaknesses in mentioned areas. Social Skills

Name Adam Ward ARD

Page 30 of ____

Date 11-3-99

### Additional Deliberations of the ARD Committee

Adams present skills discussed — he does have a behavior plan in place. Social skills are a need and will be addressed in his counseling by Dr. Ball.

Vision/hearing - nurse rept. (passed)

There is a need for classroom mods, and modification of general curriculum and counseling.

See ARD for placement options and options tried. Considered Alternative and BAU —

Providing assistive technology through the computer, printer + software previously discussed.

Student will not need B.I.P. at this time due to home placement. BIEP Counseling IEP will be implemented thru counseling DL. needed - BIEP is not needed at this time

* Counseling goals addressing aggression will be addressed by Dr. Ball in counseling and were added to the counseling IEP. Committee agrees with this

· 002581

Name *Adam Ward ARD*

Page *31* of ____

Date *11-3-99*

*Least Restrictive Environment*

**Additional Deliberations of the ARD Committee**

*The committee agrees that placement will be in a home setting. (Appropriate)*

*No harmful effects are anticipated.*

*Counseling continues.*

*Committee agrees on no participation in Non-academic activities or extracurricular activities. except counseling. (Parent request)*

*FAPE will be followed at no cost to parent.*

*Student*

*Committee agreed on all proceeding on signature page.*

*Minutes accepted by committee*

*(Reminder of confidentiality of this meeting)*

002582

January 20, 1993

Mr. and Mrs. Ralph Ward
P.O. Box 85
Commerce, Tx 75429

Dear Mr. and Mrs. Ward:

We have been advised that we are to receive Non-educational Community Based funding for ~~Heath~~ This money allows services by Hunt Co. Family Services-Family Focus, the children's division, to Adam. These services are given outside school hours and will help Adam continue to improve. A case manager, Valerie Holdip will contact you, and will be in charge of coordinating the 30 family support and socialization sessions. Also, in my letter of 11-19-92, I notified you that Adam had received funding for 10 individual sessions and 10 family sessions with Dr. Stinnett. Dr. Stinnett has indicated that no appointments have been made with him to this date. These same services can be provided through Family Focus. I will make that request of them unless you contact me within the week that you have scheduled with Dr. Stinnett.

We are very excited about this funding and the benefit of the extra services to Adam and to your family.

If you have any questions, please contact me at Tri County Special Ed Cooperative, 903 886-3764.

Sincerely,

Anne Mills
Coordinator

003011



# chıldren's
### MEDICAL CENTER OF DALLAS

## CONFIDENTIAL

### THIS REPORT IS NOT TO BE RELEASED WITHOUT THE EXPRESSED WRITTEN CONSENT OF THE PATIENT OR GUARDIAN

### NEUROPSYCHOLOGICAL EVALUATION

NAME:  Adam Ward                     DATES OF EVALUATION:  12-18-95, 1-2-96
DATE OF BIRTH:  8-11-82              AGE:  13-4
SCHOOL:  Commerce Middle School     GRADE:  7 (Special Education)
    (Commerce Independent School District)

Preface:
    Several comments are offered as a preface to the following report of neuropsychological evaluation of Adam Ward.  There appear to be a number of emotionally charged issues associated with his present school program and potential recommendations from this evaluation.  Adam was referred for neuropsychological evaluation by Dr. Warren Weinberg, Director of Pediatric Behavioral Neurology at Children's Medical Center (CMC).  According to Adam's parents, the evaluation is in part being driven by the school wanting to allow for police involvement in consequences for Adam's behavior as well as possible alternative school placement.  There was not specific information supplied by personnel at Adam's school with regard to this.  In addition to the selected battery of neuropsychological tests and review of medical records from CMC, the present report is largely based on information and records made available by Adam's parents and a discussion with Dr. Warren Weinberg.  The present evaluation is an independent evaluation and is not meant to be construed as advocating for an agenda held by Adam's parents or Adam's school.  It is also noted that the feedback session with Adam's parents was tape-recorded by them.  This is not the usual procedure and this should only be for Adam's parents to review in its entirety.  There is risk for statements to be misinterpreted if taken out of context or in isolation.  The present written and signed document should be considered the official professional opinion regarding the synthesis of evaluation information, conclusions, and recommendations based on the evaluation.

Evaluation Procedures:
    Interview with Adam and his parents, Mr. and Mrs. Ralph Ward
    Review of records provided by Mr. and Mrs. Ward
    Discussion with Dr. Warren Weinberg
    Standardized behavior rating scales completed by parent and teacher
    Administration of a selected battery of neuropsychological tests (see psychometric
        summary sheet at end of report)

Background:

According to his parents, Adam's gestation was complicated by maternal pre-eclampsia just prior to term. There were no complicating factors associated with his delivery or post-natal course. He experienced numerous ear infections as a young child. Developmental milestones in terms of language and motor functions were reportedly achieved within normal limits. When Adam was about two years old, his parents indicate that they began to recognize that his behavior was more intense and destructive than other children in that he had a severe temper, could become uncontrollable, and was destructive of property. The Wards indicate that Adam has experienced numerous allergies including red dye, sugar, mold, and milk. The Wards indicated that Adam's behavior can change drastically as a result of exposure to an allergen, and they also report that his behavior may change in response to weather and to seasonal cycles. Adam's parents indicated that he experienced a concussion last year as a result of being thrown head first into a Time Out Box at school. Another entry into the Time Out Box reportedly resulted in a tooth being knocked out. Adam currently takes Lithane 700mg daily as a result of a diagnosis by Dr. Warren Weinberg of Bipolar Disorder. Adam continues to be followed by Dr. Weinberg every 3-4 months.

Adam has had two previous psychiatric hospitalizations, both at age 4 years, because of behavioral difficulties. It was noted in records from that time that Adam was exhibiting significant aggressive behavior toward his mother. Numerous psychotropic medications had been tried without success prior to that hospitalization including Mellaril, Dexedrine, Elavil, and Ritalin. His parents indicated that he responded well to the hospitalizations, but they felt that the structure of that environment could not be duplicated outside of that environment.

The Wards describe numerous behavioral concerns regarding Adam and what follows is a summary of their report. In the past he has reportedly exhibited rage episodes during which he is unmanageable for an hour or more. He can be quite mouthy and tends to be very critical of people. He has exhibited significant aggression that has included hitting, kicking, and biting. He denies responsibility for his actions and will lie in order to get out of taking responsibility. His violence toward others is not always impulsive; rather, his parents stated that he will sometimes wait for an opportunity at a later time in order to retaliate against someone whom he feels has wronged him. His parents find it somewhat paradoxical that he can be quite respectful at times and seems to show a great respect for nature and the environment. He has extremely low tolerance for frustration. He tends to have what the Wards describe as "tunnel vision" in that he seems to get stuck on an idea or action and will pursue that without regard for obstacles. The Wards indicated that Adam's behavior has improved in recent years. As an illustration, they indicated that a teacher's concern about being told by Adam to "Go to hell" was unfounded in light of his history of aggressive and unmanageable behavior. Rather, they indicated that the teacher should recognize how far he has come given his potential for violent outbursts. To this point Adam has not had to interact with law enforcement. The Wards stated concern that if Adam has a negative experience with law enforcement that he may lose respect for them. Adam's parents indicated that behavioral and psychological therapies have been tried in the past but have been ineffective. They indicated that he can be motivated by the use of contingent privileges at home.

Adam is currently in the 7th grade at Commerce Middle School. He is classified as Seriously Emotionally Disturbed and as Learning Disabled. As noted above, the Wards are quite frustrated with certain school personnel expressed pointed animosity toward specific individuals. Their frustration includes both Adam's behavioral treatment as they feel he has been inappropriately managed in the past resulting in personal injury, as well as his academic program in that so much attention has been paid to his behavior that his academics have been sacrificed. Unfortunately, records were not provided by Adam's school even though the Wards indicated that the school was provided a cover letter indicating the utility of school records for such an evaluation. The Wards did provide copies of notes taken during an ARD meetings from the spring of 1995 and Dr. Ball's psychological evaluation. These indicate various modifications to be made within the classroom to assist with Adam's learning difficulties. Mr. and Mrs. Ward feel that Adam has shown some academic interest lately and feel that in some instances this has been related to the use of incentives for completion of specific tasks.

Results of two previous psychological evaluations were available for review. Adam was first evaluated at age 4 years during his psychiatric hospitalization. Cognitive evaluation at that time indicated average verbal abilities and low average nonverbal and quantitative abilities (SB-IV Verbal Reasoning SAS=104, Abstract/Visual Reasoning SAS=87, Quantitative Reasoning SAS=84, Short-term Memory SAS=94). Significant concerns were expressed regarding Adam's social interaction skills. The other evaluation available for review was an evaluation completed in 10/94 by psychologist Dr. Steven Ball. Intellectual evaluation reported by Dr. Ball (the test was administered by a diagnostician at Tri-County Coop) indicated average overall intelligence with generally average verbal and nonverbal functioning (WISC-III FSIQ=95, VIQ=101, PIQ=90). It was noted that there was a great deal of scatter among subtests. Dr. Ball concluded that Adam was exhibiting a depressive disorder as well as a personality disorder with strong narcissistic features. He recommended a behavioral management plan that included structure, consistent consequences, and care to not inadvertently reinforce manipulative or oppositional behavior. Dr. Ball also recommended psychiatric evaluation for possible medication evaluation given Adam's depressive disorder. Dr. Ball also outlined numerous specific modifications with regard to behavioral and academic goals. He also indicated the possible need for individual psychotherapy and systemic family therapy, though he acknowledged that the Wards felt these treatment modalities had not been successful in the past.

The Wards continue to be concerned about Adam's social functioning. They report that he has great difficulty getting along with peers and does not seem to have any close friends. He tends to be bossy and domineering in peer interactions. As noted above, he tends to be quite critical of others. The Wards indicated that Adam can be quite engaging with adults when he is in situations in which no demands are placed on him. It was reported that he has been a top salesperson in Boy Scouts and has exhibited good self-motivation.

Adam lives with his biological parents. Both parents hold advanced degrees and immediate family history is not significant for learning, behavioral, or psychiatric difficulties according to Adam's parents. In terms of stressors, Adam had a favorite dog that died about 3

years ago and he continues to talk about this. Aside from the conflict with the school and the difficulty managing Adam's behavior at times, no other acute or chronic stressors were reported that are significantly impacting Adam and his family.

Results of Behavior Rating Scales:

Adam's mother completed a Child Behavior Checklist which is a standardized multi-dimensional behavior rating scale tapping numerous aspects of children's behaviors. Ward's responses to the (CBCL) indicate that she views Adam as exhibiting levels of anxious and depressed behavior greater than 98% of boys his age. Her responses also indicate concern regarding aggressive and delinquent behavior at levels bordering on clinical significance (i.e., greater than 93% of boys his age).

On a teacher form of the CBCL completed by his 7th grade resource teacher, Ms. Mari Copeland, Adam is rated as exhibiting significant levels of aggressive behavior and peer interaction difficulties. Difficulties bordering on clinical significance were also noted in terms of sustained attention, delinquent behavior, and anxious and depressive behavior. Ms. Copeland rates Adam's academic performance as significantly below grade level in all academic areas except for band and physical education. In an accompanying note, Ms. Copeland indicates that she is most concerned with Adam's verbal and physical aggression toward others. She also notes that he can sometimes add insights to subjects that the typical student would not know about.

Test Behaviors and Interview Observations:

Adam was alert and well-oriented. Conversational speech was fluent, grammatically intact, and free from obvious word finding difficulties or paraphasic errors. He frequently expressed thoughts that were either tangentially related to the topic or task or unrelated altogether. It is noteworthy that at times he had difficulty with efficient verbal expression; that is to say, he frequently used numerous words and sentences without commensurate content. He was quite active and frequently fidgeted in his seat. He frequently manipulated objects in the office and on several occasions rifled through desk drawers until told to stop. He was easily distracted by irrelevant stimuli. He frequently placed responsibility for his difficulty and frustration with tasks on something or someone else. For example, he indicated that he had trouble on a drawing task because the desk was warped. When it was pointed out that the desk was perfectly flat, Adam had great difficulty responding. He also indicated several times that he had difficulty on tasks because his teachers were doing a poor job of teaching him. These observations are quite consistent with parent reports of Adam's style of interaction and lack of willingness to take responsibility at times.

During an interview with his parents, Adam was asked to wait in a waiting area. He was quite impatient and interrupted on two occasions. When it came time for him to work, he could not be found for 20 minutes and was finally discovered talking to a person in an office down the hall. Adam frequently talked back to and made insulting comments to the examiners during the evaluation. At one point quite early on, Adam stated to one of the examiners, "You know how badly I could hurt you if I wanted to." When further asked about this, Adam smiled and indicated his dislike for that examiner. He indicated that he did not like places like Children's because

Case 2:10-cv-02101-v Document 24-2   Filed 10/06/11   Page 40 of 52   PageID 529

everyone wants to "judge my intelligence." After discussing the purpose of the evaluation at length with Adam, he suggested that he start over and made an appropriate greeting. However, he took the examiner's hand and squeezed apparently hoping to cause pain. He refused to let go until it became apparent that his effort to cause discomfort was not gaining his desired response. During conversation as well as an interview, Adam was extremely evasive regarding subjects in which he is weak. For example, he frequently talked in circles when asked about his reading skill compared to others his age. He frequently indicated that "it depends" or he would try to change the topic. His avoidance was raised as an issue all its own at one point and Adam simply refused to answer. On several occasions Adam indicated that other people think he is "weird." He was also interested in whether or not the examiner was upset with him. On one occasion he asked "Do I get you upset? I can't really tell if I can get you upset." Adam tended to respond best to very firm, consistent limits during the evaluation.

In spite of Adam's beligerent response style at times, it is felt that the present results are a reasonably reliable and valid sample of Adam's current level of functioning in the neurobehavioral domains measured. Motivational variations are noted in the text of the following section as appropriate.

Test Results and Interpretations:
On formal examination of intellectual abilities with the Wechsler Intelligence Scale for Children - Third Edition (WISC-III), Adam obtained an overall IQ score in the low end of the average range of global cognitive ability (Full Scale IQ=90). There was a statistically significant difference noted between low average verbal and average nonverbal abilities (Verbal IQ=80; Performance IQ=103). Among nonverbal subtests, Adam's performance was quite consistent and in the high end of the average range except for significant weaknesses on paper and pencil tasks requiring speeded visual processing. In the verbal domain, Adam exhibited a generally low average performance among subtests, with a more prominent weakness on a task measuring overall fund of knowledge and a task requiring the serial repetition of digits. These results are somewhat discrepant from previous intellectual findings and some comments can be offered regarding this. There has been an apparent significant decline in verbal abilities which had been previously measured in the average range. Part of this decline might be due to Adam's at times belligerent interaction style during testing in that he was not as willing to put forth as much verbal information. Another potential contributor is his language-based learning disability in that individuals with such learning problems often have difficulty benefiting from language-based information to which they are exposed, which has the net effect of decreasing verbal knowledge as the child is compared to normally developing peers. Finally, there may be some aspect of actual verbal decline that is not accounted for by these hypotheses.

In order to assess Adam's present level of academic skill, he was administered selected subtests from the Woodcock-Johnson Psychoeducational Battery-Revised, Tests of Achievement. His Broad Reading and Broad Written Language performances indicate that he is achieving at levels significantly below what would be expected given his intellectual status and current grade placement (Broad Reading SS=63, 2.4 grade equivalency; Broad Written Language SS=51, 1.6 grade equivalency). Specifically, Adam exhibited below average skill in decoding words and in

comprehending what he has read. He demonstrated very impaired skill in phonetic decoding. In the written language domain, Adam's knowledge and application of spelling, punctuation, and capitalization were measured as significantly below average, as was his skill in generating complete sentences when given a verbal and/or visual stimulus. Thus Adam is demonstrating performances in the reading and written language domains that are significantly below what would be expected given his measured intelligence and current level of training. These results are consistent with a developmental dysphonetic reading disability in that these skills are significantly lower than would otherwise be expected. His poor reading skills are also negatively impacting his written language abilities in that he has difficulty producing words and sentences that can be decoded by others.

Adam's Broad Math performance on the Woodcock-Johnson was within the mildly below average range, and somewhat less than would be expected given his overall intellectual abilities (Broad Math SS=77, 4.7 grade equivalency). He demonstrated performance in the low end of the average range on a task requiring the application of mathematical concepts to practical problems requiring knowledge of concepts such as money, time, and measurement, and below average performance in completing mathematical calculations.

In order to address memory function as it may contribute to his academic and behavioral functioning, Adam was administered tasks tapping both verbal and nonverbal memory functions. His immediate recall of orally presented stories on the Wide Range Assessment of Memory and Learning was within the below average range, and his ability to recall the elements of the stories following a delay was satisfactory (94% of initial recall). On the Verbal Selective Reminding Task, a verbal learning task requiring him to learn a list of words over repeated trials, Adam performed in the impaired range for long term storage of information and consistent retrieval. His recall of the list was satisfactory following a 30 minute well below average (25% of information in long term storage). On the Nonverbal Selective Reminding Task on which Adam was required to learn a series of dot patterns over repeated trials, his entry of information into long term storage was impaired as was his consistent retrieval of the material. His recall of the information that had been entered into long term storage was 25% after 30 minutes which is below average. His ability to reproduce complex geometric design patterns from memory was similarly impaired. Thus Adam exhibits significant difficulty with memory and learning of verbal and nonverbal information. It should be again noted that there may have been some influence of his belligerent interaction style on this task, though it is felt that Adam exhibits a true weakness in the acquisition of information which is not inherently interesting to him.

Further evaluation of language functions included measures of receptive vocabulary, confrontation naming, verbal fluency, and language comprehension. Adam's performance on the Peabody Picture Vocabulary Test-Revised was low average and consistent with measured intelligence. He performed in the average range on the Boston Naming Test, a measure of confrontation naming. His performance was average on the Controlled Oral Word Association Test which taps fluency. His performance on two subtests measuring language comprehension from the Clinical Evaluation of Language Fundamentals-Revised was below average and consistent with observations throughout testing which suggested difficulty in this area.

003446

Adam completed a direct measure of sustained attention and impulse control. His performance on the Conners' Continuous Performance Task, a computerized measure of vigilance and impulse control, fell within the below average range for number correct and in the normal range for total number of commissions. His mean reaction time in terms of responding to stimuli was atypically slow.

Adam completed a measure tapping visuoperceptual and constructional skills. His performance on the Developmental Test of Visual Motor Integration, a task requiring the reproduction of increasingly complex geometric designs, was within the below average range for a child his age.

Adam's performance on measures of abstract concept formation, cognitive flexibility, and ability to inhibit pre-potent responses was generally average. Specifically, he performed in the average range on the Intermediate Booklet Category Test, a task requiring concept generation and problem solving. His performance on indices from the Wisconsin Card Sorting Test measuring concept formation and flexibility were average, while his performance on an index sensitive to consistency of responding was low average. He performed in the average range on the two parts of the Trailmaking Test which require visual scanning and increasingly complex sequencing.

Examination of fine motor functions indicated generally average and intact functioning bilaterally on measures of fine motor speed and strength. His performance on a measure of fine motor dexterity was slightly poorer on the left hand than would normally be expected, and he exhibited mild clumsiness with the left hand during this task. Adam had great difficulty learning a complex motor sequencing task with both hands, even after repeated verbal and visual cues. He also exhibited several perseverative errors during a go / no go task. These results are suggestive of difficulties with motor planning and learning, though motor execution seems generally intact.

Adam made numerous errors bilaterally on a measure of graphesthesis. He also made more errors bilaterally than would be expected on a measure of finger localization.

Summary and Conclusions:
This evaluation indicated that Adam functions within the low end of the average range of intellectual abilities. When compared to a previous intellectual evaluation completed a year and a half ago, these results indicate consistency in nonverbal functioning and a moderate decline in verbal functioning. It is likely that this decline is at least partly related issues related to Adam's belligerent response style as well as language-related learning difficulties. Speed of processing was noted as a weakness for Adam. Adam's academic functioning in the areas of reading and written language was measured as significantly below that which would be expected given his grade placement and cognitive abilities. Phonetic decoding skills were measured as significantly below average. Math skills were relatively stronger than language-based skills, though these are still somewhat weak when Adam's performance is compared to others his age. Memory functioning in the verbal and nonverbal modalities was measured as impaired. Visuoconstructional

skill was measured as below average. Adam demonstrated a slow response time and some difficulty maintaining focus on a computerized task of sustained attention and impulse control. Language comprehension was measured as below average. Fine motor examination suggested difficulty with motor planning and learning, though motor execution was generally intact. Adam made several errors bilaterally on measures of fine sensory functioning.

These results are consistent with a diagnosis of developmental reading disability (dyslexia) in that Adam is demonstrating a significant reading disability that is unexpected given his average level of cognitive functioning and his current level of academic training. His reading difficulties are of a mixed type of dysphonetic and dyseidetic features in that Adam has difficulties in both of the core reading processes of phonological processing and difficulty building a sight-word vocabulary. Memory difficulties also likely impede the learning process, as do fluctuations with attention and concentration. Motivation at school is clearly a major issue as Adam does not hold the school in high esteem at this point. There are cognitive indicators that Adam may have greater difficulty self-monitoring his learning process such that he is not efficient in his use of time and resources. It appears that neuropsychological functions referred to as "executive" functions are also weak for Adam. Such things as extremely low frustration tolerance, difficulty planning, difficulty benefiting from the feedback of others, and poor self-monitoring are all areas in which Adam exhibits significant weakness which is likely a neurocognitive weakness of the executive functions which would be related to behavioral and emotional dyscontrol. There is also a strong relationship between Adam's learning and language difficulties and his emotional and behavioral problems in that these situations will set him up for frustration. Adam does not exhibit good problem solving or emotional coping skills in order to deal appropriately with stressful circumstances. The obvious remediation for this is twofold: first, avoid situations that are stressful when this is feasible and does not interfere with everyday life at home and school; second, teach Adam better coping and problem solving both directly and by exposing him to "supervised" stressful situations so that he has some opportunity to practice and hone skills by getting feedback and experiencing natural consequences. Not all of Adam's negative actions toward others are impulsive; his parents indicated that he could wait for later opportunities to react at times, and this is certainly of significant concern.

It is felt that Adam is at risk for a number of psychological difficulties as he grows older. It is felt that he is at significant risk for a depressive illness in that he has a significant insecurity which he defends by being insulting, aggressive, and obnoxious at times. This defense style leaves peers not wanting to interact with Adam, and it is likely that persons putting demands on Adam are likely to see the same defenses. This style of interacting also places Adam at risk for more significant difficulties such as being the victim of assault or assaulting someone himself. In other words, Adam's style of interaction places him in many situations in which a person may respond violently toward him, and this, combined with his low frustration tolerance, places him in numerous situations in which he may have the impulse to respond in kind. Further, as noted by Dr. Ball, Adam is developing personality features which are troubling in terms of his high level of insecurity and his tendency to interpret incoming information as persecutory. This latter feature may lead him at times to interpret neutral interactions as a personal attack.

003448

Also of concern is Adam's parents level of frustration and the feeling that their son is not being adequately served. It is beyond the scope of this evaluation to determine how well-founded this report is, but it is clear that the Wards have been quite frustrated in the past. Adam himself has been another source of frustration for them, though by their report his behavior continues to improve. That the Wards are very emotionally invested with regard to their son and his programming should be recognized. The Wards feel very negatively toward specific school personnel, and they feel that Adam's not receiving appropriate services is related to a personal vendetta against them by certain school personnel. Clearly the Wards have struggled for many years with Adam's behavior and with the interaction of his behavior and the environment. It is felt that they have his best interests in mind and are seeking to do what is most appropriate for their child. What is in Adam's best interest would be for his school and parents to arrive at a mutually agreeable plan which all parties support and comply with.

Recommendations:

1.  The Wards made numerous references to instances in which they felt that Adam's school has not been in compliance with federal law with regard to his programming and its implementation. Part B of the Individuals With Disabilities Education Act (IDEA) grants parents and the school the right to an impartial due process hearing on any matter regarding non-compliance with the educational program of the child. The hearing officer may not be an employee of the school, and no person having personal or professional interest in the outcome may serve as hearing officer. Given the significant number of complaints that the Wards voiced in regard to their opinion that the school has not complied with his Individual Education Program, it seems that this would be a logical step for settling differences which clearly exist. The school is obligated by IDEA-Part B to inform the parents of any free or low-cost legal services that may be available. There is also provision for the Wards to potentially recover attorneys' fees if they prevail in a hearing or judicial proceeding. In any event, the Wards are encouraged to consult an attorney with experience with legal issues regarding handicapped students in order to determine their best approach to their concerns.

2.  Given the concerns of Adam's parents and their report of the school's potential intentions for Adam in terms of placement alternatives, it is assumed that input is being sought with regard to whether Adam's problem behaviors are a manifestation of his handicapping condition. It is felt that Adam's aggressive, disruptive episodes are a manifestation of his handicapping condition. Thus cessation of special education services is not recommended and is likely not legally permissible. However, this is not meant to imply that Adam is unable to distinguish right from wrong or that he should not be held accountable for assaultive behavior. Should alternative placements to Adam's current school be considered, these must reflect consideration of the Least Restrictive Environment doctrine put forth in IDEA.

3.  A principal incentive for reducing animosity and forming a cohesive relationship between parents and school is Adam's increased respect and participation with regard to the

educational process. It is recommended that, as long as Adam is expected to participate in this district and with these personnel, his parents be aware that their derogatory statements may serve to fuel Adam's lack of respect for school and that this might generalize to the education process as a whole.

In a similar vein, it is recommended that those important to Adam be careful in how they describe Adam's behavioral difficulties so that he does not feel some sort of implicit permission for negative behavior. For example, his propensity for behavioral difficulties should recognized, though his behavioral expressions should be framed as largely within his control. The message to Adam should be that he can use the assistance of medication and behavioral interventions to help him manage his behavior, but he is ultimately responsible for negative behavior that is clearly out of proportion with environmental precipitants. As an adult, Adam will be increasingly held accountable for choosing an alternative to calling someone a derogatory name or exhibiting an explosive outburst. He will also be increasingly responsible for recognizing his difficulties and independently taking steps to help manage these.

4.  Given Adam's level of language comprehension difficulty, which is likely to be somewhat subtle, it is recommended that those interacting with him frequently ask him to paraphrase directions that have been given to him. Adam may have a tendency to simply nod and/or say that he understands things when he may not understand at all or may have misunderstood in some manner. This language difficulty should also be taken into consideration if Adam enters into psychotherapy as recommended in that he will have difficulty with verbal, insight-oriented psychotherapy.

5.  The Wards expressed much concern that behavioral interventions recommended from this evaluation would interfere with or be counter to the behavioral plan that is currently in place. Many of the principles that the Wards cited are certainly components of a good behavioral intervention. These include vigilance to possible escalation of a situation and intervention before escalation occurs (particularly as it is reported that he has such difficulty calming once upset), redirection before things get out of hand, ignoring those behaviors which are not disruptive, and offering a praise-rich environment. The obvious concern with regard to the present arrangement is that having his parents remove him from school each time he begins to escalate does not provide for optimal coping opportunities on Adam's part. His parents stressed that the current arrangement has resulted in decreased physical altercations with staff and improvements in academic performance. It was discussed with the Wards that as long as this arrangement is seen as temporary (based in part on Adam's academic, behavioral, and emotional performance) and as part of a larger long term plan for behavioral change, this may be a useful temporary adjunct while a more forward-reaching plan is being developed. It must be underscored that this should be temporary and there should be a specific plan to wean him from this arrangement such that he is expected to begin to exhibit more positive coping while at school.

In order to offer Adam a finely tuned behavioral intervention that is sensitive to each of the contributing factors to his behavioral difficulties, it is important to recognize the content and the process of Adam's behavioral difficulties. As noted above, a mood disorder does not make Adam tell a teacher to "Go to hell." However, he may be more likely to express such negative behavior based on within-child factors such as difficulty with impulse control and a tendency to interpret stimuli as persecutory. His parents feel that this can be driven by environmental factors such as exposure to allergens. It would be beneficial for a behavioral specialist with expertise in applied behavior analysis to complete a functional analysis of Adam's behavioral difficulties and for a comprehensive positive incentive based behavioral management program to be considered. Such a specialist might provide ongoing behavioral consultation at home and at school in order to address Adam's behavioral difficulties in a proactive manner that identifies and decreases risk factors wherever present while at the same time providing Adam with a consistent and structured environment.

The goal of the behavioral intervention must be to improve Adam's capacity for self-control. As noted above, he is at significant risk for behavior that would result in legal trouble down the line. Adam demonstrated capacity for self-control in the face of several frustrating cognitive tasks during the present evaluation. He also demonstrated satisfactory self-control when he was confronted and directly challenged when he made disrespectful comments. While the Wards felt that this was likely due to the "laboratory" conditions of the evaluation, what is clearly demonstrated is that there are conditions under which Adam can control his impulses in the face of frustration. It is likely that the structure, clear expectations, and consistency of consequences of the controlled evaluation environment contributed to Adam's self-control. Thus this pattern may also exist if these conditions can be mimicked in the outside environment to the greatest extent possible.

With regard to further behavioral suggestions and techniques, readers are referred to the recommendations offered by Dr. Ball in his psychological evaluation of 10/94. Dr. Ball's suggestions are quite appropriate and will not be duplicated here. Readers are also referred to suggestions offered by Dr. Weinberg as these are generally consistent with Dr. Ball's recommendations and are also quite appropriate for Adam. It is cautioned that a poorly designed behavioral plan, a plan which sets up an overly punitive environment, or a plan which is not consistently implemented and supported across environments is likely to fail and to possibly exacerbate Adam's behavioral difficulties.

6. It is recommended that the Wards consider individual psychotherapy for Adam to address issues of impulse control and anger control. This should be highly integrated with the behavioral approach across environments so that he has the opportunity to process events and solve problems in adapting to this paradigm. It might also be useful to include a focus on self-esteem and depressive feelings. It will be important for Adam to learn to self-monitor his feelings and continue to improve in his control of negative behavioral impulses.

7.      Adam's reading difficulties are such that he will have difficulty relying either on sight-word recognition or phonetic decoding as a singular strategy for remediation. As such, a significant emphasis for Adam in terms of tutoring and assistance at school will need to focus on metacognitive strategies for knowing the steps he will need to follow in order to read. For example, he should be encouraged to say "blank" when he encounters a word he does not know in connected text. By not disrupting his fluent reading, he may be more likely to decode the word using context clues and he will be less likely to change the meaning of the passage by incorrectly substituting a word. Another example of a preparation strategy would be story mapping in which he can be taught to identify the central features of all stories such as identifying the main characters, the setting, the problem situation, and the resolution. Worksheets and isolated phonics exercises are less likely to be useful for him. Phonological awareness training might be useful if it is integrated with connected text reading and writing (e.g., journal writing with invented spellings, analytic phonics with word families). It will be important for Adam to increase his sight word vocabulary and make "automatic" his recognition of high frequency words. Teachers and tutors should think in terms of stressing survival words for Adam to facilitate things such as better following of written directions. One strategy for improving sight vocabulary include using flash cards for repetitive presentation until the word is automatic.

Access to books on audiotape should be part of Adam's program since at this point he cannot be considered a functional reader. Using dictation to give his answers would also be appropriate in many cases.

Again, Adam should be considered a non-functional reader at this point when expectations are made regarding his school performance. His level of reading disability is severe, and as noted above, this will likely continue to be the case in the coming years. It cannot be underscored enough to parents and teachers that reading will continue to be a slow, frustrating process for him. It will continue to be difficult for him to be motivated for reading tasks and other academic tasks which require significant reading and written expression components. He can be expected to make gains, though these will require much effort and patience from him and those working with him.

8.      In terms of his expression of test answers and knowledge of information, it would be useful for Adam to be allowed whenever possible to provide oral responses. This could take the form of using a tape recorder to dictate his answers or by arranging a time for him to undergo oral examination by the teacher.

Adam would also likely benefit from training in the use of a word processor with a spell checker. At this point, this should not be relied on because Adam's spelling skills are so poor that a spell checker would have difficulty recognizing his approximations of words. Rather, he can begin to gain skill in the use of these tools so that they can become a more prominent feature of his program in the future.

9.  Evaluation of Adam's work should be highly based on content rather than details such as spelling or punctuation.  At this point, oral expression is likely to provide the most accurate reflection of what Adam is capable of and what he has learned about a particular subject.  It will be continually important for teachers to decide what they wish to know from Adam on a particular task (e.g., what he knows or how well he can read and write his responses).  If he is required to read items on a test, he should be allowed extra time for this and he should also be allowed to have any difficult words clarified for him at his discretion.

I would be happy to discuss the results and recommendations from the present evaluation further with Adam, his family, physician, school personnel, or other professionals working with him.


Peter L. Stavinoha, Ph.D.
Pediatric Neuropsychology Service
Children's Medical Center of Dallas

Richard L. Fulbright, Ph.D.
Consulting Neuropsychologist


Betsy Kennard, Psy.D.
Supervising Psychologist and
Director of Psychological Services
Children's Medical Center of Dallas


cc:    Mr. and Mrs. Ralph Ward

003453

( ) SPECIAL EDUCATION
( ) SPEECH THERAPY

SPE-APP-031
REVISED 2-88

## TRI COUNTY COOPERATIVE SPECIAL EDUCATION & SPEECH SERVICES
### REFERRAL TO SPECIAL EDUCATION
#### INFORMATION FROM PARENTS

### STUDENT INFORMATION

STUDENT: _Adam Ward_  DOB: _8-11-82_  AGE: _6_
SCHOOL: _(T. Day)_  GRADE: _K_  ETHNICITY: _W_  SEX: _M_

Have student's parents been contacted about the current problem? _____
Method of contact: _____ Letter _____ Phone Call _____ Conference

_____  _____  _____
Name of school contact person          Person          Date of contact

The following information was obtained from _____
                                              Name of Source

### GENERAL INFORMATION

_Ralph Ward_
NAME OF FATHER                         OCCUPATION

_Nancy Ward_                           _Secretary_
NAME OF MOTHER                         OCCUPATION

ADDRESS: _PO Box 85_
HOME TELEPHONE: _886-7666_  und.  WORK/EMERGENCY PHONE: _886-2126 (Nancy)_

If student does not live with parents, with whom does the student live?

                    Name                          Relationship
Other children in the home:
                    Name          Age          Relationship

_None_
_____
_____
_____

Do any of these children have learning problems? _____YES _____NO If YES, specify: _____

Other adults in the home:
                    Name          Age          Relationship
_None_
_____
_____

Have any other family members had learning problems? _____YES _____NO If YES, explain: _____

The primary language spoken at home is _English_
What time does the student go to bed at night? _8:10_  Does the student eat breakfast? _Yes_
What activities does the family do together? (For example, watch T.V., go camping, participate in hobbies or sports) _watch TV, once a year camping trip, workshop activities_
What does the student do when not in school? (For ex., watch T.V., read, part-time job, play with other children) _TV, play with his dog Max, not much time is spent with toys_

— OVER —

003539

Have there been any important changes within the family during the last three years? (For ex., job changes, moves, births, deaths, illnesses, separations or divorce) _____

At home the child is:

| | | |
|---|---|---|
| _____ Restless/overactive | _____ Cries easily | _____ Anxious |
| __✓__ Aggressive | _____ Shy | _____ Other: Describe |
| __✓__ Hostile | _____ Has nightmares | |
| _____ Fearful | _____ Unhappy/depressed | |
| _____ Withdrawn | __✓__ Overly sensitive to | |
| __✓__ Defiant | to criticism | |

The child's relationship with members of his/her family is _____ good _____ poor. this depends on Adams mood swing that he might be in due to bi polar prob.

The child's behavior at home _____ (is) __✓__ (is not) easy to control.

What methods of discipline are used with this student at home? (For ex., spanking, extra chores, early bedtime, rewards for good behavior) threatening to take something like TV, or playing outside keep from him.

What is your child's reaction to discipline? defiant, hostile

If student is having a problem in school, can you describe it? _____

When were you aware of a problem? 18 mo - 2 yrs) age

What do you think is causing the problem? bipolar prob.

Has your child mentioned problems with school? _____ How does he/she feel about the problem? _____

Does your child have a part-time job after school or on weekends? NA

Briefly discuss any other important information about your child. _____

## *HEALTH INFORMATION

☑Y ☐N Were there problems before, during, or immediately after birth? If YES, please explain. I had high blood pressure a week before he was born. Preeclampsia?

Compared to other children in the family, this child's development was:

☐ slower     ☑ about the same     ☐ faster

Briefly describe serious illnesses, accidents, or hospitalizations. Please give your child's age at the time of illness, accident, or hospitalization hospitalization in 86 & 87 for Bipolar problem to start him on Lithium & to teach him self control

☑Y ☐N Does the child appear to have any other physical health problems, including allergies? If YES, please explain. Some foods make him hyper & belligerent such as chocolate, some orange prob.

☑Y ☐N Is your child under the care of a physician for a medical problem? If YES, please explain. yes Dr. Warren Sternberg for his neurological prob.

☑Y ☐N If child is presently taking medication, please list medication and explain for what reason he/she is doing so. Lithium to help keep his anger under control

☑Y ☐N Do you know of any side effects the medicine might have? If YES, please explain. Many, diarrhea, trouble in talking or walking,

☑Y ☐N Has your child ever taken medicine for a long period of time? If YES, please explain. Lithium since Oct 86

_____          11-27-88
*Signature of Parent                              Date


_____     *Position _____   Date _____
*Signature of person completing
 if information was obtained by parent interview

003540



## Tri County Cooperative
### Special Education Services for
### Delta, Hunt, and Hopkins Counties

**Betty Chambliss**
*Director*

Phone:(903)886-3764
FAX: (903)886-6025

March 13, 1992

Ms. Susan Sellers
Division of Complaints & Administration
Texas Education Agency
1701 N. Congress Ave.
Austin, TX  78701

Dear Ms. Sellers,

I would like to formally request mediation by the Texas Education Agency in an effort to completely address all the concerns of Mr. & Mrs. Ralph Ward regarding their son's program.

We believe that the student, Adam Ward, will receive the greatest benefit from his educational program when both parents and the school district are able to work together in accord. It is hoped that mediation will be a positive experience for both the Wards and Commerce I.S.D.

The Ward's can be contacted at home (903) 886-7666, P. O. Box 85, Commerce, TX 75429.

We look forward to hearing from you.

Sincerely,

Betty Chambliss, Director
Tri County Cooperative

BC:nd
cc:   Mr. & Mrs. Ralph Ward
       Dr. Patricial Pope, Supt., Commerce ISD

HUNT-HOPKINS-DELTA COUNTY
SPECIAL SERVICES
AC 903-886-3764

BETTY CHAMBLISS, DIRECTOR
FISCAL AGENT
COMMERCE INDEPENDENT SCHOOL DISTRICT

### Tri County Cooperative
P.O. BOX 1251
COMMERCE, TEXAS 75428
March 13, 1992

Mr. and Mrs. Ralph Ward
P.O. Box 85
Commerce, Texas 75429

Dear Mr. and Mrs. Ward:

Since the beginning of the 91-92 school year, Adam has received assessment and behavioral consultation from a consultant outside of the district. There have been three ARD Committee meetings, one of which was recessed, and continued. There have been numerous conferences between you and your child's teacher, special education personnel, and other administrative personnel. You continue to contact the school expressing dissatisfaction with your child's program. The district has sought to address all of your concerns regarding your child's educational program. It has become apparent, however, that you still have many concerns regarding the school program. Therefore, I am requesting mediation through the Texas Education Agency in an effort to fully and completely address your concerns regarding your child's program.

We feel very strongly that Adam will receive the greatest benefit from his educational program when both parents and the school district are working together in harmony. I am hopeful that this mediation will be a positive experience for all parties concerned. If you have any questions, please do not hesitate to contact me.

Sincerely,

Betty Chambliss
Director
Tri-County Special Ed. Co-op

cc: Texas Education Agency
    Dr. Patricia Pope
    Dr. Anna Blohm

003757