# Petitioner's Exhibit 3

Commerce ISD Records Excerpts

PARENT-TEACHER CONFERENCE REPORT --A. L. DAY ELEMENTARY SCHOOL

STUDENT _Adam Ward_ GRADE _EC_ TEACHER _B. Whalen_

DATE OF CONFERENCE _9-17-87_ PARENT _Nancy Ward_

PURPOSE OF CONFERENCE _Inform Mrs Ward if Adam's current behavioral goals level._

RESULTS OF CONFERENCE _Mrs Ward was not happy and she reported Mr Ward would come to Meet the teacher night. I replied we would be pleased to Meet with him_

_I again reviewed their parent rights, and I suggested contacting the school for an additional or IEP if they wished._

004355

PARENT-TEACHER CONFERENCE REPORT -- A. L. DAY ELEMENTARY

STUDENT _____   GRADE _____   TEACHER _____

DATE OF CONFERENCE _____   PARENT _____

PURPOSE OF CONFERENCE _____

RESULTS OF CONFERENCE _____

004356

PARENT-TEACHER CONFERENCE REPORT -- A. L. DAY ELEMENTARY

STUDENT _Adam Ward_ GRADE _EC_ TEACHER _B. Whalen_

DATE OF CONFERENCE _12-1-86_ PARENT _Ralph & Nancy Ward_

PURPOSE OF CONFERENCE _ARD_

RESULTS OF CONFERENCE _Three Year Early Childhood_
_placement -- isolated with I-I ratio_
_at recommendation of CMC and committee_

004357

# Crisis Management Workshop

## RELEASES/RESTRAINTS

James E. Gilliam, Ph.D.
Department of Special Education
The University of Texas at Austin
Austin, Texas  78712
(512) 471-4161

Copyright © 1987

James E. Gilliam

004320

## I  RELEASES

Grip releases are used when the student is grasping the teacher's wrist.  Whenever a student grabs anyone, the first action should be a verbal request for the student to let go.  The message should be stated calmly but firmly.  If the teacher does not feel threatened, the best action is to do nothing, and wait for the student to release on his/her own accord.  If the teacher feels endangered, or the student begins to escalate into more threatening behavior, the following grip releases can be used.



One-hand grip release.  This release consists of three steps.

1.  Make a fist to tighten your forearm.
2.  Rotate your wrist toward the opening between the student's thumb and index finger (the point of release).
3.  Quickly, pull up or down in the direction of the point of release.

When the student is grasping both wrists, the same techniques described above are used.  The release is gained by quickly performing the movements with both hands.

Two-hand grip release. This release is used when the student is holding your wrist with both hands.

1. Make a fist on the arm being held.
2. With your free hand, reach through the student's arms and grasp your fist.
3. Pull upwards on your own fist using strength from your shoulders and arm muscles.



<u>Releasing others from wrist grasps</u>.   If the student is gripping another person's wrists, grasp his/her wrist with one of your hands.  Grasp the thumb and pull it back steadily until release is gained.



efenses against choke holds must be fast and successful because an effec-
ve choke hold can produce unconsciousness within five to seven seconds.
ee releases can be used depending on the type of choke hold.

owing actions.

indmill release.    If the student chokes from the front or rear take the
ollowing steps.

1. Quickly raise one arm above your head.
2. Pivot from your hips, swing one arm up and across the student's
   arm to break the hold with the force of your arm and shoulder
   action.



<u>Headlock choke release</u>.   This release is more complicated, consisting of seven steps that must be accomplished quickly in a smooth coordinated fashion.

1.  Tuck in your chin as tightly to the chest as possible.
2.  Turn your head toward the student's elbow.
3.  Grab the student's wrist with the hand that is on the same side.
4.  Grab the student's elbow with your other hand.
5.  Pull down on the student's wrist.
6.  Push up on the elbow.
7.  Duck your head out of the headlock.



004325

Hairpulls are common forms of attack that require immediate action to gain release with minimal pain, and loss of hair. The most important thing to remember is to <u>Not</u> pull away from the hairpull. While this might be your first impulse, it rarely works. Pulling away usually results in more pain and loss of hair. Always hold the student's hand or wrist as tightly to your head as possible, and ask the student to release you.

<u>Hairpull releases</u>.   If the student is pulling your hair, use the following techniques.

1. Reach up and place your hand over the student's hand and hold it firmly against your head.
2. Position this hand with the heel of your palm on the student's knuckles.
3. Place your other hand on top of your hand and press down with maximum pressure.
4. As the student's grip loosens, grasp his/her finger(s) and pull them off your head.
5. If this doesn't gain release, while holding the student's hand or wrist, insert a finger into the hand holding your hair. Grasp one of his/her fingers, and pull back in a slow, steady movement until the student releases his/her grip. Be sure to continue to hold the student's hand to prevent him/her from grabbing your hair again.
6. Use the same techniques for two handed hairpulls.

Note: Use the same techniques if the student is pulling another person's hair.




004326

Bites are serious and potentially dangerous.  Students who bite others will usually attempt to maintain the bite.  As with hairpulls, Do Not Pull Away. Several techniques can be used to gain release from a bite.

<u>Releases from bites</u>.

1. Push the body part being bitten into the student's mouth.
2. Extending an index or middle finger, push forcefully into the area between the jaw and ear.
3. Hold student's nostrils tightly together until release.
4. Use the same techniques when the student is biting another person.



004327

## II  BLOCKS

Blocks are the least intrusive physical management techniques.  Although intended for defensive purposes, they can be turned into holds or takedowns if necessary.  Blocks are used most frequently against punches, slaps, and kicks.

Prior to an attack, assume a non-threatening stance.  Do not make fists. Your hands should be open and at waist level.  Your feet should be directly under your shoulders; not spread wide-apart.  Attempt to move out of striking range.  Give a command to redirect the student.  For example, "Michael, sit!" The following techniques can be used if the student attacks.

<u>Simple blocks</u>.   The simplest block is to bring your hands up in front of your face, and block the blows with your hands or forearms, while backing away.



004328

<u>Deflections</u>.   Use your right hand to deflect right-hand punches to your right, and your left-hand to deflect left-hand punches to your left.   Deflect by using your hands to push the fist, wrist, or fore-arm away from you.   Back away.



Deflecting kicks. To minimize injury from a kick, turn slightly away from the kick, bend your knee and raise your leg. Absorb the kick on the thigh or calf. This protects the groin area, and allows the leg to give with the force of the kick.



### III  HOLDS

Holds should be used for temporary restraint  to minimize risk of injury to the student, teacher, and others.  They should be used to control hits and kicks, self-injurious behavior, and for preparing the student to be moved to a safer environment.  Properly employed holds may result in the student gaining self-control.  Holds should only be applied for short time-periods of less than two or three minutes.

<u>Rear-arm hold</u>.   This hold resembles a bear hug from the rear.  It can be effective in removing a student who is attacking another person.

1.  Approach the student from the rear.  Using both arms, reach around the student's body, over the arms, and tightly grasp the wrist of your other hand.
2.  Quickly lower your body and slide your arms down until you have the student's arms restrained tightly at the elbow or wrist.  This effectively decreases the student's ability to use upper body strength to break the hold.
3.  Place your head on or below the student's shoulder blade.  This minimizes the student's opportunity to butt you.
4.  Maintaining close contact with the student's back, pull the student backwards until he/she is off balance.



<u>Baskethold.</u>   This hold is used to control students in a standing, sitting or lying down position.  Securing this hold is complicated.  Applying it requires speed and agility.

1.  Cross the student's arms in front of his/her body.  Grasp the student's left-wrist with your right-hand and his/her right-wrist with your left-hand.
2.  Pull the wrists backwards and secure them tightly to the student's sides.
3.  Holding the student's body close to you, turn slightly. Maintain contact with your shoulder and hip with the student's back and hip.
4.  Keep your head as low as possible on the back to minimize the student's ability to butt you.
5.  Your feet should be kept apart in case the student should kick backward or try to stomp on your feet.
6.  If the student struggles and attempts to turn you from side to side, do not resist, but turn with the student.  This will save your energy, while still allowing you to control the student.  The student will quickly tire and be easier to move.

From a secure baskethold, it is possible to move the individual to a chair, or more desirable location.  This can be accomplished by lifting the student slightly while pulling backwards.



<u>Chair-hold</u>.   The chair-hold is a one-person control technique which is effective with small students who are not as strong as the teacher.  This hold can be safely maintained for extended periods of time without injury to the student or teacher.

1.  Grasp the student's arms from behind and move to a chair.
2.  Sit down in the chair while forcing the student to sit on your lap, facing away from you.
3.  Place your feet in between or around the student's legs.
4.  Grasp the student's wrists and pull his/her arms down over his/her waist.



Floor-hold.   This restraint is most effective and least restrictive for small students.

.  Once the student has been lowered safely to the floor, sit behind him.  Place your back against a wall, if possible, for support, maintaining the criss-crossed arm hold.

a)  Draw closest leg up, and place it flat against the student's back to avoid head-banging and kicking.



004334

or

b) Position the student between your legs.  Bring your legs
   forward and scissors-cross them between or over the student's
   upper legs.



# Petitioner's Exhibit 4

Affidavit of Buddy Jones

**STATE OF TEXAS**      )
                        )
**COUNTY OF HUNT**      )

### Affidavit of Buddy Jones

1.      My name is Buddy Jones. I am over the age of eighteen years and am otherwise competent to give this affidavit.

2.      I was the principal of A.C. Williams Elementary School in Commerce during the years that Adam Ward attended the school. Adam went to A.C. Williams from the time he was in third grade until either fifth or sixth grade.

3.      As part of the plan for Adam developed by the ARD committee, a padded area was built inside of the school. The area was 10' X 12' in size. Its walls and floors were padded with carpet and layers of foam. It was ventilated and had a two-way window so that Adam could see out and teachers could see in.

4.      The room was built just for Adam. No other students were kept there, and it was disassembled after Adam left A.C. Williams Elementary School.

5.      As the principal of the school, I would observe teachers taking their students to recess. If given a choice, Adam would rather stay inside with his teacher than go outside with the students.

6.      I also lived in the same neighborhood as the Wards. My house was one block away from theirs. I never saw Adam out playing with the neighborhood children.

7.      I would often observed Adam being dropped off at school. Ralph Ward was usually the person that would bring Adam to school. Ralph would just drop Adam off and walk away. I don't remember Ralph ever telling Adam "goodbye" or "have a good day." I never observed any warmth being exchanged between the two.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _24th_ day of _August_, 2011.

_Buddy Jones_
Buddy Jones

Signed and sworn before me this _24th_ day of _August_, 2011.

_____
Notary Public, State of Texas

JEFFREY HUBERT NEWBERRY
Notary Public, State of Texas
Commission Expires 04-04-2015

# Petitioner's Exhibit 5

Affidavit of Randy Cannon

STATE OF TEXAS          }
                        }
COUNTY OF Dallas, TEXAS }

## AFFIDAVIT OF RANDY CANNON

BEFORE ME, the undersigned authority, personally appeared Randy Cannon, who being by me duly sworn and disposed and said:

1.  "My name is Randy Cannon.  I am a resident of Hunt County, Texas.  I am over the age of eighteen and fully competent to make this affidavit.  All the facts stated here are within my personal knowledge.

2.  I currently reside at 1819 Park, Commerce, Texas, 75428. My telephone number is (903) 456-7153. My date of birth is March 25, 1954.

3.  I have lived in Commerce for over twenty years.   In approximately 1994, I was a volunteer assistant coach for the Parks and Recreation baseball team.   I coached for about ten years and the ages of the team members ranged from about 8 to 10 years old. Adam Ward was on the team I was coaching.   I had heard various comments about Adam and Ralph Ward over the years prior to this while living in Commerce.   My mother, Edna Cannon, had previously worked at a day care center, Draughn's Playschool. She told me about incidents with Adam who attended Draughn's Playschool in approximately 1984 to 1986.  Adam was about three or four at the time he was attending the school.  Adam's behavior would get out of control and he would hit, kick and bite other children and staff.

4.  Adam did not have a relationship with other teammates on the baseball team.  The other team members treated Adam like an outsider and did not include him.  Adam also did not respond well to the coach of the team when he would give him coaching type directions. However, I had a good relationship with Adam as I was often joking and cutting up with him and he seemed to respond well to me because of that.  Adam would follow my

directions and we did not have any problems. I felt sorry for Adam because he did not

seem to "fit in". I did notice that Adam seemed to respond well to any kindness shown

him.

5.     I do not know the exact circumstances, but during one of the baseball games, I saw Adam

out by the pitching mound. It was apparent from watching Adam, that he was getting

angry and I witnessed his "loss of control" behavior. I do not know if Adam had wanted

to pitch or what started the incident, but the next thing I saw was Adam's out of control

behavior during the middle of the game out by the pitching mound. As Adam's behavior

escalated, he threw himself on the ground and was kicking, screaming and crying. The

coach and everyone else were at a loss as to what to do as Adam was unapproachable.

Adam's father, Ralph, then came out of the stands to try and get Adam off the field so the

game could continue and get his behavior under control. Adam was so aggressive, Ralph

had a difficult time trying to get him up off the ground and then off the field. Adam was

fighting him and biting him. Ralph eventually had to try to get him into a type of head

lock under his arm to avoid Adam biting him. It was as though Ralph was attempting to

catch a wild dog that was biting. He would frequently have to withdraw his arm quickly

as Adam was biting him. Ralph was eventually able to get Adam off the field. There

were comments made by many parents about their concern in the way that Ralph had

man-handled Adam, but I did not believe he could have got control of him in any other

way under the circumstances. If Ralph had not be able to get control of Adam, I believe

the police might have been called. No one else was willing to try and help Ralph control

Adam and risk getting bit or hurt.

Affidavit – Randy Cannon
Page 3 of 7

6.    I had never really talked with Ralph Ward prior to that time.  I ran into him later

somewhere around town and we began to talk.  I told Ralph I felt sorry about what had

happened with Adam and we started talking about general things.

7.    My relationship with Adam and Ralph developed over the years.  I also knew Nancy

Ward as I grew to know the family better.  I would stop by occasionally to visit with

Adam and Ralph.  Adam and I had a good relationship and I felt great empathy for Adam

because I knew he had been picked on at school.  My son, who was a year younger than

Adam, told me that most of the kids at school thought Adam was "weird" and he was

picked on frequently.  Adam didn't really associate with any of his school mates.

8.    As the years progressed, I realized that Adam was a "miniature" Ralph.  Adam spent all

of his time with Ralph as he had few friends that I was aware of.  In my discussions with

Ralph over the years, he frequently talked about the same themes of conspiracy among

the police, city officials and school board.  I realize there was some truth to some of what

Ralph talked about, but much of it did not make any sense to me.   Ralph would tell me

the same stories over and over.  Adam dressed and wore his hair in the same manner as

his father, although he was a young man and I am sure that this may have contributed to

one of the reasons he was picked on at school.  Listening to Adam was like listening to a

recording of Ralph.  If Ralph had made statements about certain people and conspiracies

going on, I would hear the same thing from Adam.  It was apparent to me that Ralph had

a strong influence over Adam.

9.    After the shooting of Michael Walker, I attempted to be as much support as I could be to

Adam, Ralph and Nancy Ward.  Although Ralph and I have maintained contact over the

years, my main concern was for Adam.   Prior to Adam's trial, I accompanied Ralph and

Nancy to the attorney's office to review the report by Dr. Kristi Compton.  Adam's

attorney, Jay Burnett, was attempting to get Ralph and Nancy to sign some type of

release related to the report.  Ralph was very angry about the report because he stated

there were errors in the report.  Mr. Burnett assured Ralph that he could take out any

portion of the family history that was not correct, but Ralph did not want that to happen.

Ralph would not sign the release and Nancy would not sign it either.  I later told Ralph I

thought it was a mistake not to sign the report and I could not understand his reasoning.

Ralph denied that he had told Dr. Compton certain things, but I recognized what he was

talking about as stories that he had also told me previously.

10.   I could not understand why Ralph and Nancy were unwilling to cooperate with Adam's

attorney.  I did not pursue this with Ralph as I have found over the years that it is really

not possible to change Ralph's mind about an issue.  When Ralph told me stories, I would

frequently go along even if it did not make sense to me and I did not believe it was real

because I did not want to make him angry.  I would occasionally confront him about

things that did not make sense, but it did not make any difference to Ralph.

11.   During the trial, I attended each day as a source of support for Adam.  I was aware that

the wife of one of the jurors was in the courtroom most days.  She was an older woman.

12.   I knew Dr. Zelhart from Commerce and I was surprised to see him at the court each day.

Dr. Zelhart's wife had been on the City Council in Commerce.  Dr. Zelhart has held

various positions out at Texas A&M University of Commerce.  I am not exactly sure

what his doctorate degree is in, but I believe it is in psychology.  I initially believed Dr.

Affidavit – Randy Cannon
Page 5 of 7

Zelhart was working with the district attorney in some capacity because he was taking notes during the trial each day.   As soon as the testimony would begin, he would start writing notes.   One day I sat beside him in the court and he put his notes away and moved away from me.   In the early days of the trial, during recess, Dr. Zelhart would take his notes up to the district attorney and they would discuss them during the breaks.

13.   On June 20, 2006, during the lunch break from Adam's trial, I went to a coffee shop named Ruby's, which was down the street from the court house.   After I entered the coffee shop and got a booth, I was surprised to see Dr. Zelhart sitting at a table with several of the jurors.   He was sitting beside the jury foreman and talking to him and other jurors.   This concerned me as it did not seem appropriate for him to be talking with the jurors after he had been taking notes and consulting with the district attorney.

14.   I went up to one of the waitresses at the cash register and asked her to please look over at that table and make a mental note of who was sitting at the table.   I wanted to have a witness, if needed, about Dr. Zelhart being at the table with the jurors.

15.   When I returned to the court room, I informed both of Adam's attorneys that I had seen Dr. Zelhart down at the restaurant having lunch with the jurors.   I also informed Adam's attorneys that Dr. Zelhart had been consulting during the breaks with the district attorney.

16.   It appeared Adam's attorneys brought this matter up before the judge, but it was a situation where the attorneys were talking with the Judge up at the bench and I could not hear what they were saying.   I did hear the judge say he "would let it go for now", which surprised me.   After this, I noticed that Dr. Zelhart did not consult with the district attorney in the court during breaks.

Affidavit – Randy Cannon
Page 6 of 7

17. After this discussion by Adam's attorneys with the judge, I observed Dr. Zelhart leaving
the courtroom and going into a back hall. I was curious where he was going because the
hall did not seem to go anywhere. After I saw Dr. Zelhart go down the hall, I went down
the hall and the only place to go from that back hall was up a set of stairs. I went up the
stairs and found they were a back entrance through the county clerk's office into the
district attorney's office. I did not see Dr. Zelhart consulting with the district attorney,
but during the trial, the district attorney would leave the court room and disappear down
this same hall. In a few minutes, I would see Dr. Zelhart disappear down that same hall
and there was no where to go other than up those stairs.

18. On the day that the verdict was read, Ralph Ward was not in the court room. He had told
me the previous day that he was not sure if he was going. I was there to support Adam
and after the verdict was read, Nancy Ward fell apart. She was crying and saying "they
are going to kill my son" and I tried to console her. Later she pleaded with me to go and
tell Ralph as she did not want to. I did go over and tell Ralph about the verdict.

19. I have heard the harsh way that Adam talks to his mother and I believe this is also a result
of Ralph's influence. I have gone with Ralph several times to visit Adam. Listening to
Adam talk while visiting; it does not seem he is in touch with reality concerning the
severity of his situation. Additionally, the issues that Ralph continues to focus on appear
to be more related to him than Adam. It seems at times he is more concerned about what
people will think about him than what happens to Adam. As a father myself, I feel anger
at times toward Ralph about this, but I want to continue to be a support to Adam."

Affidavit – Randy Cannon
Page 7 of 7


I declare under penalty of perjury under the laws of the State of Texas that the foregoing

is true and correct.

_Randy Cannon_

_____
                Randy Cannon

Subscribed and sworn to before me this __23__ day of __September__, 2008 in

_Garland_ Texas.


_Toni Knox_

_____
Notary Public, State of Texas

TONI KNOX
Notary Public,
State of Texas
Comm. Exp. 04-22-12

_TONI KNOX_

_____
Notary's Printed Name

# Petitioner's Exhibit 6

Randy Talley Billing Records

16 miles @ $.25.00 = $400.00
38 miles @ .324 a mile = $12.
$412.1

Randy Keith (Talley) Social Investigator
2333 Holsum Circle
Greenville, TX 75401
903-217-2885

Case: Adam Kelly Ward    - D.A.# 0506056

**RECEIVED**

JUL 13 2005

APPROVED BY:
_____

06/27/05
Contact Dr. Ball's office at Texas A&M Commerce and Ms. Ball's office in Paris, TX
Spoke with Adult Probation Jim Mckenzie and Case Manager
Contacted CPS and Juv. Probation with no records found

10:00-12:00 and 12-1pm                                    3hrs

6/28/05
Spoke with Officer Chris Vaughn at Commerce about the Ward Case
Went over case information and Dr. Zelhart's E-Mail
Sent off for US Army Records for Byron Trent Bayer
Sent to Huntsville for Records on two cases

Meeting with Jack's family                         JUL 25 2005

8-12 and 3:30-4:30                                    5hrs

6/29/05
Interview with Ann Mills and Staff at Tri-County Co-op Commerce
Interviewed Carol Dodd at Texas A&M-Commerce       V-75207
Paul Zelhart PHd at Texas A&M-Commerce        10-621-2800-2133
Dr. Ball's Staff Interview at A&M-Commerce
Interview with Mother Nancy Ward at Texas A&M-Commerce

8-12 and 1-4                                          8hrs

Mileage to Commerce        ( 38 )                  Total Hrs. 16

7-1-05

Mitigation
Investigation $400 +                capital murders
Mileage $12.16                      OK FDT
$412.16

# Petitioner's Exhibit 7

Paul Zelhart Billing Records

VOUCHER NO.   0205641

WARRANT NO.   0205641

12-18-2008 02:37 PM

ACCOUNT PAYABLE VOUCHER

ALL FUNDS

HUNT COUNTY

TO:    01-75368  ZELHART, PAUL, PH.D
ADDRESS: 3021 ARAPAHO ROAD
         COMMERCE, TX 75428

VOUCHER DATE: 12/22/2008

AMOUNT OF WARRANT:    2,655.06

| GL ACCOUNT | ACCOUNT DESCRIPTION | AMOUNT |
|---|---|---|
| 10  621-2800-2133 | CAPITAL MURDER EXPENSES | 1,085.02 |
| 10  621-2800-2133 | CAPITAL MURDER EXPENSES | 1,570.04 |
| | TOTAL: | 2,655.06 |

| INVOICE DATE | INVOICE NUMBER | ITEM DESCRIPTION | AMOUNT | PO NO. |
|---|---|---|---|---|
| 12/10/2008 | 24,916 | PRO SVCS JOHN W TROTMAN III | 1,085.02 | |
| 12/10/2008 | CR0808973 | PROF SVCS JERRY LYNN PHELPS | 1,570.04 | |
| | | CHECK TOTAL: | 2,655.06 | |

I hereby certify that the attached invoice(s), or bill(s), is(are) true and correct and that the materials or services
itemized thereon for which charge is made were ordered and received except _____.


DATE _____20_____          _____          _____
                                              SIGNATURE                                TITLE


I hereby certify that the attached invoice(s), or bill(s), is(are) true and correct and I have audited same in
accordance with IC 5-11-10-1.6.


DATE _____20_____          _____          _____
                                              OFFICER                                 TITLE

*New*

# PAUL ZELHART, PH.D

## TRIAL CONSULTANT

3021 Arapaho Road

Commerce, Texas 75428

903-366-1239

Billing Period: October – December 10, 2008



P A I D
DEC 2 2 2008
By_____

Invoice for Professional Services

Social History

In Case Number: 24,916    State of Texas vs John William Trotman, III   – *Capital Murder*

| Item | Rate/HR | Hours | Amount |
|------|---------|-------|--------|
| **Interviews and Case Materials** | | | |
| 1.  Review case materials – print and DVS | $150 | 4.5 | $ 675.00 |
| 2.  Meeting with Kelli Aiken | $150 | 1.0 | $ 150.00 |
| 3.  Meeting with Officer Mitchell | $150 | 0.5 | $   75.00 |
| 4.  Interview with Glenishaia Rhoden | $150 | 1.0 | $  150.00 |
| | | Subtotal | $ 1,050.00 |
| **Travel** | | | |
| 5.  Two return trips: Commerce to Greenville | 64 miles at .55 per/mile | | $    35.02 |
| | | Balance Due | $ 1,085.02 |

V75368

10621-2800-2133

OK 12-5-08

RECEIVED

DEC 17 2008

APPROVED BY:

_____

For F. Duncan Thomas

**Copied**

*New*

# PAUL ZELHART, PH.D

## TRIAL CONSULTANT

3021 Arapaho Road

Commerce, Texas 75428

903-366-1239

Billing Period: October – December 10, 2008

### Invoice for Professional Services

Social History

In Case Number: 0808973     State of Texas vs Jerry Lynn Phelps     *Cap Murder*

PAID
DEC 22 2008
By _____

| Item | Rate/HR | Hours | Amount |
|---|---|---|---|
| **Interviews and Case Materials** | | | |
| 1.  Review case materials – print and DVS | $150 | 1.5 | $ 225.00 |
| 2.  Meetings (2) with Kelli Aiken | $150 | 2.0 | $ 300.00 |
| 3.  Meeting s (3)with Officers Snead  $ Simpson | $150 | 1.5 | $ 225.00 |
| 4.  Interviews (8) with Hoover Family | $150 | 3.0 | $ 450.00 |
| 5.  Interviews (2)with Phelps Family | $150 | 1.0 | $ 150.00 |
| 6.  Interviews (5)with witnesses | $150 | 1.0 | $ 150,00 |
| | | Subtotal | $ 1,500.00 |

**Travel**

| | | | |
|---|---|---|---|
| 7.  Four return trips: Commerce to Greenville | 128 miles at .55 per/mile | | $   70.04 |
| | | Balance Due | $ 1,570.04 |

V75368

10-621-2800-2133   V

12/5/08

RECEIVED

DEC 17 2008

K.l M□□□
For F Duncan Thomas

**Copied**

APPROVED BY: _____

VOUCHER NO. _____0206278_____                                    WARRANT NO. _____0206278_____ ✓

1-22-2009 01:19 PM                          ACCOUNT PAYABLE VOUCHER
                                            ALL FUNDS


                                            HUNT COUNTY


TO:     01-75368  ZELHART, PAUL, PH.D
ADDRESS: 3021 ARAPAHO ROAD
         COMMERCE, TX 75428        ✓
VOUCHER DATE: 1/26/2009                                  AMOUNT OF WARRANT:    2,315.50 ✓

| GL ACCOUNT | ACCOUNT DESCRIPTION | AMOUNT | |
|---|---|---|---|
| 10  621-2800-2133 | CAPITAL MURDER EXPENSES | 350.00 | |
| 10  621-2800-2133 | CAPITAL MURDER EXPENSES | 1,965.50 | |

                                    TOTAL:    2,315.50
                                           ===========

| INVOICE DATE | INVOICE NUMBER | ITEM DESCRIPTION | AMOUNT | PO NO. |
|---|---|---|---|---|
| 1/21/2009 | 24,916A | *24,916A JOHN WILLIAM TROTMAN | 350.00 | |
| 1/21/2009 | WRIT04863 | *WRIT04863 JERRY LYNN PHELPS | 1,965.50 | |

                                    CHECK TOTAL:   2,315.50
                                                ===========


I hereby certify that the attached invoice(s), or bill(s), is(are) true and correct and that the materials or services
itemized thereon for which charge is made were ordered and received except _____.


DATE _____20_____          _____          _____
                                         SIGNATURE                         TITLE


I hereby certify that the attached invoice(s), or bill(s), is(are) true and correct and I have audited same in
accordance with IC 5-11-10-1.6.


DATE _____20_____          _____          _____
                                         OFFICER                           TITLE

# PAUL ZELHART, PH.D

## TRIAL CONSULTANT

3021 Arapaho Road

Commerce, Texas 75428

903-366-1239

*stub*

INVOICE# 24,916A

Billing Period: December 11 to December 31, 2008

### Invoice for Professional Services

### Social History

In Case Number: 24,916          State of Texas vs  John William Trotman, III

| Item | Rate/HR | Hours | Amount |
|------|---------|-------|--------|
| **Interviews and Case Materials** | | | |
| 1.   Interview (2) R. Turner | $150 | 1.3 | $ 200.00 |
| 2.   Computer search | $150 | 1.0 | $ 150.00 |
| | | Balance Due | $ 350.00 |

V75368

10·621·2800·2133

PAID JAN 26 2009

RECEIVED

JAN 21 09

APPROVED BY:

1-21-09

1/21/09

Capital Murder Fund

# PAUL ZELHART, PH.D

## TRIAL CONSULTANT

3021 Arapaho Road

Commerce, Texas 75428

903-366-1239

Billing Period: December 11, 2008 – December 31, 2008    *stub*    INVOICE# WRIT 04863

### Invoice for Professional Services

### Social History

In Case Number: 0808973    State of Texas vs Jerry Lynn Phelps

WRIT04863

| Item | Rate/HR | Hours | Amount |
|------|---------|-------|--------|
| **Interviews and Case Materials** | | | |
| 1. Computer searches | $150 | 2.0 | $ 300.00 |
| 2. Meetings (2) with Kelli Aiken | $150 | 1.5 | $ 225.00 |
| 3. Meeting s (3)with Officer Snead | $150 | 1.5 | $ 225.00 |
| 4. Interview (2) with B. Roseberry | $150 | 3.3 | $ 500.00 |
| 5. Interview (1)with C. Phelps | $150 | 1.0 | $ 150.00 |
| 6. Interview (1)with J. Davidson | $150 | 1.0 | $ 150.00 |
| 7. Interview (1) with D. Simmons | $150 | 1.0 | $ 150.00 |
| 8. Interview (1) with M. Lowrey | $150 | 1.0 | $ 150.00 |
| | | Subtotal | $ 1850.00 |

**Travel**    P A I D  JAN 26 2009

| | | |
|---|---|---|
| 9. Two return trips: Commerce to Greenville | 64 miles at .55 per/mile | $ 35.20 |
| 10. One trip: Ammo Depot | 50 miles at .55 per/mile | $ 27.50 |
| 11. One trip: Terrell& return | 96 miles at .55 per/mile | $ 52.80 |
| | Subtotal | $ 115.50 |

V 75368

10·621·2800·2133    Balance Due    $ 1,965.50

RECEIVED    *[signature] 1-21-09*    *[signature]*    1/21/09 Capital murder fund

JAN 21 2009    COPY

APPROVED BY:
_____

VOUCHER NO.    0207943                                                    WARRANT NO.    0207943

4-23-2009 02:43 PM                           ACCOUNT PAYABLE VOUCHER
                                             ALL FUNDS

                                             HUNT COUNTY

TO:    01-75368  ZELHART, PAUL, PH.D
ADDRESS: 3021 ARAPAHO ROAD
         COMMERCE, TX 75428
VOUCHER DATE: 4/27/2009                                      AMOUNT OF WARRANT:    1,125.00

| GL ACCOUNT | ACCOUNT DESCRIPTION | AMOUNT |
|---|---|---|
| 10  621-2800-2133 | CAPITAL MURDER EXPENSES | 300.00 |
| 10  621-2800-2133 | CAPITAL MURDER EXPENSES | 825.00 |
| | TOTAL: | 1,125.00 |

| INVOICE DATE | INVOICE NUMBER | ITEM DESCRIPTION | AMOUNT | PO NO. |
|---|---|---|---|---|
| 4/22/2009 | 04.22.09 | *24,916 JOHN TROTMAN III | 300.00 | |
| 4/22/2009 | 25,433 | *25,433 JERRY LYNN PHELPS | 825.00 | |
| | | CHECK TOTAL: | 1,125.00 | |

I hereby certify that the attached invoice(s), or bill(s), is(are) true and correct and that the materials or services
itemized thereon for which charge is made were ordered and received except _____.

DATE _____20_____          _____          _____
                                             SIGNATURE                           TITLE

I hereby certify that the attached invoice(s), or bill(s), is(are) true and correct and I have audited same in
accordance with IC 5-11-10-1.6.

DATE _____20_____          _____          _____
                                             OFFICER                            TITLE

# PAUL ZELHART, PH.D

## TRIAL CONSULTANT

15025 E. Ridgeway Drive

Fountain Hills, AZ 85268

903-366-1239

Billing Period: January 1 to April 31, 2009

Invoice for Professional Services

Social History

In Case Number: 24,916          State of Texas vs  John William Trotman, III

| Item | Rate/HR | Hours | Amount |
|------|---------|-------|--------|
| Review  Case Materials and Summary | $150 | 2 | $300.00 |
| | | Balance Due | $ 300.00 |

**RECEIVED**

APR 2 2 2009

**APPROVED BY:**

Paul Zelhart, Ph.D                              Date:

V- 75368
10-621-2800-2133

**P A I D**

APR 2 7 2009

By

4/20/09
Capital Murder
24,916

4-20-09

**Copied**

# PAUL ZELHART, PH.D

## TRIAL CONSULTANT

15025 E. Ridgeway Drive

Fountain Hills, AZ 85268

903-366-1239

Billing Period: January 1, 2009 to April 31, 2009

### Invoice for Professional Services

### Final Report - Social History

In Case Number: 0808973          State of Texas vs Jerry Lynn Phelps

| Item | Rate/HR | Hours | Amount |
|---|---|---|---|
| Summary of Interviews and Case Materials | $150 | 5.5 | $ 825.00 |



Balance Due          $ 825.00

APPROVED BY:

Signed _____          Date _____

Paul Zelhart, Ph.D

V- 75348

10-621-2800-2133          



PAID

APR 27 2009

By _____

# Copied

4-20-09

4/20/09
Capital murder
25,433

# Petitioner's Exhibit 8

Affidavit of Lawanda Phelps

STATE OF TEXAS                        }
                                      }
COUNTY OF DALLAS, TEXAS               }


## AFFIDAVIT OF LAWANDA PHELPS


BEFORE ME, the undersigned authority, personally appeared Lawanda Phelps, who being by me duly sworn and disposed and said:

1.   "My name is Lawanda Phelps.  I am a resident of Dallas County, Texas.  I am over the age of eighteen and fully competent to make this affidavit.  All the facts stated here are within my personal knowledge.

2.   I currently reside at 720 Red Mill Lane, Mesquite, Texas, 75149-3445.  My telephone number is (972) 285-4654.  My date of birth is January 27, 1937. _✻_

3.   My son was arrested in October 2008 and he was later charged with Capital Murder.  He is currently incarcerated in Hunt County in the Greenville County Jail.

4.   On November 12, 2008, after my son was arrested, I received a phone call from a man identifying himself as Paul Zelhart.  Mr. Zelhart stated that he was working with the district attorney's office to obtain social history information concerning my son.  I was hesitant to talk with him, but he continued to talk and I did not see any harm in giving him social history information.  I furnished him basic information about my son, such as where he went to school and marriages.  When he found out my son had been in the military, the conversation did not continue much longer for some reason.  I did take notes of our conversation and his questions.  Mr. Zelhart was calling from telephone number 903/886-8837.

5.   Later when I spoke with my son's attorney, Toby ~~Wilkinson~~, he advised me that I should _Wilkerson ✻_ probably not talk with Mr. Zelhart again.  I am not very knowledgeable about the legal system as I have not previously had a close family member arrested and incarcerated for a serious crime.  At the time I spoke with Mr. Zelhart, I thought I was required to furnish him information because he identified himself with the DA's office.  I did not see any harm in furnishing my son's social history as there was nothing in his history that I felt would be harmful for his case."

Affidavit – Lawanda Phelps
Page 2 of 2

I declare under penalty of perjury under the laws of the State of Texas that the foregoing

is true and correct.

_Lawanda Phelps_
Lawanda Phelps

Subscribed and sworn to before me this __7th__ day of __April__, 2009 in Mesquite,

Texas.

_Toni Knox_
Notary Public, State of Texas

TONI   KNOX
Notary's Printed Name

TONI KNOX
Notary Public,
State of Texas
Comm. Exp. 04-22-12

# Petitioner's Exhibit 9

The Team Concept in a Capital Case

THE TEAM CONCEPT IN A CAPITAL CASE

TEXAS  DEFENDER SERVICE
CAPITAL TRIAL  PROJECT
DEATH PENALTY  MITIGATION SEMINAR
AUSTIN, TEXAS
FEBRUARY 8TH & 9TH, 2001

## The Mitigation Specialist and the Team Approach

In a death case, the ultimate goal is the preservation of the client's life. The entire preparation of the case must be directed to that end. Because of this all-important goal, these cases are, in essence, prepared in reverse order. Regardless of guilt, the attorneys must aim their efforts from the beginning at saving, the client's life. For this reason and because the death penalty is, in part, a sociological issue, counsel must include human service professionals on the defense team. The mitigation specialist is the first, and usually most important, expert that should be consulted in every capital case. They should have both sound, clinical skills for interviewing and assessment and a thorough working knowledge of the court system.

The mitigation specialist has become accepted as a basic tool for the defense of a capital case and trial judges need to be educated in the need to approve funding for this vital resource. The lawyer must convince the judge that this is different from the guilt/innocence investigation. Generally, more time will be required and it will cost more. If the attorney is not sure if a funding order will be signed, the *ex parte* request should be approached as if the funding request will be denied, so that a record can me made for mandamus or appellate review.

The lawyer must also take care in hiring the mitigation specialist. This is not someone who will just go out and talk to people. This should be a professional who is trained in conducting mitigation investigations. This can be a licensed social worker with an MSW or Ph.D. This is an expert. Someone who can testify at trial as to her findings, conclusions and opinions. The higher esteem the lawyers have for the mitigation specialist the more regard the judge will have for the lawyer's funding request.

This article discusses the foundation for an interdisciplinary team approach to death penalty defense and offers guidelines for utilization of the mitigation specialist on the defense team.

### The Team Approach

*Team approach* refers to a team of two or more people coordinating their activities to accomplish a common task–saving the client's life. Because of the nature of these cases and a finite amount of available resources, the attorney must start with mitigation and at the same time that the investigation into guilt phase issues is begun. With a multitude of tasks facing the attorney, it is essential that the team approach be used to coordinate strategies throughout the case's investigative, guilt, and mitigation phases.

The team approach has proven to be the best method of increasing the chances of a life sentence; the collective efforts of the team heighten productivity and lead to a better defense for the client. Benefits of the team approach include: *(1) increased efficiency,* since tasks can be delegated to appropriate team members, allowing attorney time to be devoted to legal-oriented problems; *(2) expanded knowledge* of various disciplines and backgrounds, providing for more informed decision-making and strategy planning; (3) *reduced duplication* since each team member has specific tasks; and *(4) increased support* to attorneys to help combat the extreme physical and mental stresses of death penalty litigation.

In short, team support can help combat case-related stresses, allow for ventilation of problems and provide strength and encouragement against bleak odds (5) *better relationship with the client and family* as there are more people, with more time and often better ability to communicate.

The size of the team will vary from case to case depending upon the specific services needed. Every member of the team is an expert in his/her own sub-specialty. Generally, the defense team should be composed of, *inter alia*, attorneys, a mitigation specialist, a criminal investigator, one or more psychologists, and other mental health professionals that are indicated. In addition, specific problem areas like alcoholism, neuropsychological deficiencies, etc., are addressed by other appropriate professionals. The role of the mitigation specialist is a relatively new area of expertise and is unfortunately poorly understood. This article will take an in-depth look at the mitigation specialist, including roles and responsibilities, and will define potential problems and their management.

**The Mitigation Specialist**
The mitigation specialist investigates the psycho-social history of the client and works toward developing that history into a viable strategy for mitigation. The specialist can provide coordination between the experts, lawyers and lay witnesses and preparation of witnesses for testimony. Although the mitigation specialist's primary focus is the development of mitigation, his/her assistance and expertise can be invaluable in planning and coordinating a cohesive trial strategy throughout the guilt and mitigation phases.

Since the penalty phase is always a possibility and the entire case strategy needs to be planned and prepared around mitigation, the mitigation specialist should be obtained as soon as the attorney is retained or assigned. The professional needs not only the appropriate skills, but also the temperament needed to effectively work with the attorneys, client and client's support group throughout the case. A mitigation specialist should possess an understanding of the psycho-social aspects of human development, human relations skills, and management skills. Try to select a mitigation specialist with a background in any combination of clinical social work, counseling other human service professions coupled with some sort of forensic or criminal justice knowledge.

Since most attorneys rarely handle cases that require the use of such professionals, it may be difficult to target and secure the service of professionals with these skills. This may be especially true in smaller counties with minimal human service systems. Texas Defender Service's Capital Trial Project, 510 South Congress Avenue, Austin, Texas, 78704, (512) 320-8300 is always available to offer assistance in capital cases including help in finding a mitigation specialist and other experts.

**Role and Responsibilities**
The mitigation specialist is essential to the team in many areas, and brings to it a multitude of skills that can be used to perform numerous roles and their related responsibilities. It is important for attorneys to recognize these roles and responsibilities in order to utilize the mitigation specialist to maximum potential.

*Social Investigation*

The largest role of the mitigation specialist is that of a psycho-social investigator. The complete social investigation compiled by the mitigation specialist is the base upon which a successful mitigation is built. Since the purpose of mitigation is to explain how the client reached the point of being involved in the type of crime with which he is charged, it is imperative that this explanation grow out of the client's life history. This social history, or psycho-social investigation. will provide the attorneys and mitigation specialist with the information needed to begin construction of the mitigation, and perhaps strategies that can be used in the guilt/innocence phase.   Interviewing and preparation of the psycho-social history is something that the graduate social worker has been trained to do.

The psycho-social investigation culminates in a written social history, a compilation of all pertinent information about the client organized in a concise, cohesive form.  It should be a chronicle of the client's life history, including all significant life events from birth (or before) to the present, including but not limited to: (1) the basic history of the client and his family as well as social relationships; (2) medical history, including head injuries and drug and alcohol usage; (3) mental health history; (4) educational history; (5) employment history; (6) military history (if applicable) and (7) legal involvement.

The client, and often his family, is not always an accurate historian.  The facts about the client should be based on information received not only from the client but also from family, friends, teachers, employers, counselors or agency personnel the client has had contact with. Reviewed should include any and all available records pertaining to the client, and any other valid source of information.  **LEAVE NO STONE UNTURNED.**  The social history should contain both good and bad information about the client, only an accurate, well-substantiated history will ultimately be of value.

As the social history is developed, plotting significant life events on a time line can be a helpful tool just as it can be for the fact investigator who is investigating the guilt/innocence phase of the trial.  Because there will frequently be a pattern of events corresponding with a pattern of behavioral changes, the time line can be a useful tool for the team's understanding of the client and why he does what he does.  A time line can take numerous forms depending on the case and the chart's intended uses.

The social history helps the attorney understand the client and what happened and aids the attorney in explaining to the court and jury what the client is about and why.  The social history also contains invaluable information for other team members, such as the psychologists and psychiatrists.  This material guides the lawyers and mental health experts in determining what to test for and why.  The records supplements their examinations, supports their diagnostic conclusions, and lends substance and credence to the psychological testimony.

The mitigation specialist will begin immediately establishing a rapport with the client and family, obtaining records that are indicated by the psycho-social history, summarizing those records for the lawyers.  The records of your client's life cannot be put in a box in the corner of the office when received.  They should be reviewed immediately to (a) make sure you have received  everything requested and (b) to see what other information is suggested.  They

4

should be summarized immediately with the summaries given to the attorneys for needed follow up.

In many respects the mitigation specialist is a jack-of-all-trades, having a range of roles with numerous responsibilities. Three of the more administrative roles that the mitigation specialist can perform for the team include that of coordinator, liaison, and information disseminator, all three being closely related and intertwined.

As a *coordinator,* the mitigation specialist assists in and organizes the selection, contacting and working with other professional experts, especially those in the mental health field. Because mitigation specialists have professional knowledge and experience that often overlaps the knowledge bases of potential experts, they will be able to coordinate the professional experts' experience, expertise, and understanding of mitigation with the needs of the team and the client. The emphasis is on coordinating--not telling another expert what to do. Politics is important in team work and the specialist must be attentive to this. She cannot be the source of friction. She is a friction reducer.

The role of *liaison* is one of the most important administrative roles a mitigation specialist can have; keeping the lines of communication open between all participants is crucial. This means acting as a liaison when necessary, between the client and attorneys, client and family, client's family and attorneys, expert witnesses and attorneys. and among other team members and the deceased's family..

Very closely related to acting as a liaison among participants is the role of *information disseminator.* This task insures that attorneys, experts, team members, client, client's family, and other lay witnesses have the information needed to fulfill their responsibilities and tasks. To insure consistency in the overall mitigation strategy, information dissemination is a responsibility of all team members; however, it is a function that can be efficiently carried out by the mitigation specialist because of his/her wide-ranging contacts.

Another preparation task that the mitigation specialist can perform is helping the attorney prepare for the trial itself by exchanging ideas and being available to help test arguments. The mitigation specialist can give the attorney helpful suggestions about what might work and what might not, providing support and encouragement. The lawyer is in charge and ultimately responsible for the quality or representation. However, the best results are achieved when team members feel that their opinions are valued and will be considered in the overall strategy.

### Preparing for Mitigation

The mitigation specialist can be invaluable at the time of trial while the attorney is dealing with courtroom tasks of the guilt/innocence phase. Because the mitigation specialist knows the themes and strategies of the mitigation case, s/he can be organizing the witnesses and preparing an information sheet about each individual that details who each witness is and what contribution can be made through testimony. The witness sheets can also note cautions regarding all witnesses, suggestions about effective ways to elicit the most beneficial

testimony, and a suggested witness order.

If a conviction is returned in the guilt/innocence phase and the attorney has reviewed the witness sheet package, the attorney will want to conduct his own interview with each witness to familiarize himself with the witness, discuss the testimony, assess potential difficulties, and develop a rapport with the witness. Inclusion of the mitigation specialist in these interviews is valuable not only in helping to put the lay witness at ease. but also in clarifying problem areas for either the attorney or witness.

The mitigation specialist can see that subpoenas are served and that the witnesses appear when they are needed, holding the frightened witness's hand during those unavoidable delays.

### *Witness* Preparation

On the unfortunate occasions when time does not permit the attorneys to meet with each witness prior to their mitigation testimony, the mitigation specialist can prepare the witnesses, review the information needed, and 'role play' testimony in an effort to acquaint witnesses with courtroom procedures and style.   Stressing the importance of telling the truth, going over the questions that will be asked and the responses that are anticipated based on prior interviews.

### *The Client*

The most important person the mitigation specialist can prepare is the client. This preparation should not wait until mitigation. but should be an ongoing process beginning prior to the guilt/innocence phase. There are several aspects to preparing the client for trial. First, the mitigation specialist can make arrangements for the client to have appropriate, tattoo covering clothes for trial, help the client decide on an appropriate appearance for court and educate the client about body language for the courtroom. He will be watched throughout the trial by the jurors. The lawyers will be especially courteous to the client, smiling, talking, pulling the chair out for him. This helps to show that they like this guy. If the team likes this guy, so can the jury. These are important details because appropriate appearance and demeanor help make the client human to the jury and judge and help reduce their preconceived ideas of a cold-hearted monster. If the client sulks or stares at witnesses, it will be easier to not like him.

The next preparation involves discussing with the client the testimony that will be heard in court, especially during mitigation. The client needs to be told in detail what will be presented, as a great deal of the testimony may deal with unpleasant or disturbing childhood experiences, drug and alcohol problems, psychological problems, and possibly information not previously known to the client. The client needs to be prepared that he will hear unexpected testimony so that there are not outbursts or other unwanted conduct. Signs of surprise, anger, or embarrassment exhibited by the client, if wrongly appreciated by the jury, may seriously impair the chances for a successful mitigation.

The final, and probably the most important area of client preparation for the mitigation

specialist, is working with the client for his own testimony in mitigation, be it sworn or unsworn. Some clients are initially unwilling to make statements in court and convincing them that making a statement is critically important is often a difficult task. Once the client has agreed to make a statement, the mitigation specialist can work with the client, find out what the client wants to say, discuss with the client what should or should not be included and rehearse the statement with him. Past experience indicates that a short statement expressing remorse about occurrence of the crime, apologies to the victim's family and his own family, and asking the jury to spare his life are crucial elements to be included in this statement. Because the sentence could very possibly hinge on what the client says or does not say, it is imperative that the client feel comfortable with the statement and be able to speak to the jury and court in a convincing manner.

Another team member that should be considered is an experienced criminal defense lawyer who will agree, *pro bono*, to conduct a realistic cross-examination of the client. It is the client who will decide if he is to testify or not. Defense counsel should provide the client with their opinion on this issue. A sound decision cannot be made until the client's version of the facts, and his demeanor under cross-examination, are tested by an adversarial examination.

Texas Defender Service can help the trial team in this area. It is important for a lawyer who is not a regular member of the defense team to conduct this cross examination. Obtaining the client's trust is difficult. The cross-examination, if it is to be effective must be adversarial and usually heated. The client is likely to become mad at and lose any trust that he had for the lawyer that conducts the cross. The trial team cannot afford to "lose" one of its members by conducting this cross-examination. An outside person can also provide some perspective to the team's defense strategy. It is very easy to "get too close to the forest to see the trees." When this happens, objectivity and perspective are often lost.

## Experts

The mitigation specialist will have likely been working throughout the case with the professional experts, keeping them informed on new developments, and consulting with them about impressions and opinions. The specialist can help to insure that the expert testimony will be appropriate, that the expert's testimony will "fit" into the overall theory of mitigation, and that the testimony will be well organized and cohesive. The mitigation specialist can work with the attorneys and the expert(s) to formulate questions that most effectively elicit the information needed.

## Lay Witnesses

Lay witnesses who will be testifying about the client are, in their own right, also experts. in that they have specific knowledge and expertise about the client and the client's life. These people are crucial to the defense and need to be treated with respect and honesty. Most of them have never testified before and will be extremely frightened about their having to testify in front of many people. These witnesses need special attention. Keeping them informed and maintaining a good rapport will reduce potential dangers if they must testify without adequate

preparation. The mitigation specialist can answer questions about the legal process, advise them about proper court attire, and inform them about important areas of information they should stress during their testimony as well as those areas that will not be helpful to the defense. The mitigation specialist can also lend them emotional support and encouragement before and after their testimony.

**Potential Problems and Problem Management**

Since attorneys do not usually share the management of their cases, the team approach in death penalty cases may make an attorney uneasy, feeling s/he has lost control of the case. On the contrary, the attorney is still the chief administrator of the case; it is only the administration of case preparation that has changed. Because death cases are different, it is in the attorney's and client's best interests for the attorney to delegate some authority and duties to other team members for more effective and efficient management of the case.

Another problem that can develop centers around the fact that attorneys and social workers have had a history of strained relationships throughout the years. The only experience may have been in juvenile court where the social worker, with little experience, may have recommended a disposition that the lawyer felt was absurd. The lawyer's comments may have brought on a heated debate with the social worker that did little for the relation between the two.

The social worker's view of client determination (we know what is best for Johnny) and confidentiality can be different than that of the lawyer. Early discussions about these conflicts, continued dialogue when specific problems arise, and a constant awareness of the ultimate goal–keeping the client alive-- should keep team members focused.

Another consideration is whether the mitigation specialist should testify at the mitigation phase. Although the idea might sound attractive, there are some serious drawbacks. The first problem deals with qualifying the mitigation specialist to testify and the scope that testimony will be allowed to encompass. The second concern is one of interference with other obligations. If the mitigation specialist is preparing for her own testimony, she will be limited physically and mentally, not only in her abilities to help prepare other witnesses (client, expert, and lay), but also in her abilities to lend support to other witnesses and attorneys and to provide coordination throughout mitigation.

One solution to these problems is to use lay witnesses, psychologists, psychiatrists and any other experts to testify, about all the information the mitigation specialist could have contributed. The lay witnesses can testify from their own personal knowledge and the experts can testify and give opinions based on information upon which they customarily rely in forming those opinions, i.e., the evidence gathered by the mitigation specialist. This strategy allows the mitigation specialist to fulfill all the roles and responsibilities previously detailed. This is obviously not the only answer, and may not be the preferred courser for all attorneys or mitigation specialists; this issue needs to be discussed by team members at the onset of the team's formation, always keeping the client's best interest in mind.

**Conclusion**

What should be remembered above and beyond all else is that, in order to have the best opportunity to save your client's life, *preparation for mitigation should be started as soon as possible.* Experience in capital litigation has shown us that one of the earliest tasks that needs to be performed is the assembling of a defense team which consists of a variety of professionals who will work towards a life verdict.. The mitigation specialist is a professional who should be included in the defense team. Some judges will need to be educated to the value that this member provides to the defense. Obviously, there are no guarantees that verdict less than death, will be returned by the jury. However, proper utilization of the team approach will greatly increase the likelihood of a successful mitigation presentation and a life sentence.

# Petitioner's Exhibit 10

Declaration of Sharon Crump

STATE OF TEXAS )
)
COUNTY OF HUNT )

### Declaration of Sharon Crump

1.  My name is Sharon Crump. I am over the age of eighteen years and am otherwise competent to make this declaration.

2.  I first met Adam Ward about nineteen or twenty years ago. I worked with his mother, Nancy Hyde Ward. We worked in the same office and our desks were close enough together that we could talk to each other while sitting at our desks. I would see Adam when he came to her office after school.

3.  Though I often observed situations for which I thought Adam needed to be disciplined, I never saw Nancy discipline her son. Nancy worried that disciplining her son would upset him. Nancy told me that there were days when Adam's dad would allow Adam to stay asleep in bed because he didn't want to upset Adam by waking him up.

4.  When Adam was growing up Nancy blamed Adam's teachers for his problems. She would say that the teachers should not have talked to Adam the way that they did or that they should not have tried to stop him from doing something he wanted to do. Ralph and Nancy should have admitted that Adam had problems and needed help at school. Instead, they blamed everyone who tried to help. It was always someone else's fault.

5.  Adam learned from his parents and he, too, blamed everyone else for his troubles.

6.  Nancy was very protective of Adam and was always worried that something someone said to Adam would set him off. Because of that, she sheltered him from things and didn't allow him to do things. Adam did not get his driver's license until he was 19 or 20 years old because Nancy was afraid she would lose all control of Adam if he had a driver's license.

7.  Adam was not allowed to participate in activities at school. The only activity he was allowed to participate in was Boy Scouts. He was allowed to be in the Boy Scouts because his father, Ralph Ward, was a scout leader and could, therefore, always be near Adam during activities with the Boy Scouts. Nancy was worried that Adam would be devastated when he was asked not to be in the Boy Scouts because scouting was all he had.

8.  Because his parents were not planning on hosting a graduation party for him, I hosted a party for Adam Ward when he graduated from high school. When I asked Nancy for a list of people to invite to the party, she could not think of anyone other than her parents to invite. Adam had no friends to invite to the party. I forced members of my family to attend the party so that Adam would not be alone at his own party. At the party, members of my family gave Adam gifts. He did not know how to react to this and acted



shy and embarrassed. I believe the only people that had ever given gifts to Adam before the graduation party were members of his family.

9.  Adam really loved animals. He talked about his dogs like they were his best friends. He would never abuse an animal and couldn't stand to hear about animal abuse.

10. Ralph was unemployed most of the time and would do odd jobs for people to earn some money. Ralph stayed home and took care of Adam. It was not an option for Nancy to stay home with Adam because Ralph said Nancy was "too stupid." Ralph said he was the only person that could help Adam.

11. Nancy worked to support the whole family. Though she was the only one with a steady job, Nancy would go home every day to fix lunch for Ralph and Adam. Because Nancy's paycheck had to support the family, money was tight. Nancy would only have $50 left from a pay check after she paid bills, and that $50 would have to last the family until Nancy's next payday. Nancy's parents often bought groceries for the family.

12. Though money was tight, Ralph would spend a lot of money on things the family did not need. One day, about ten years ago, I spent the day with Nancy. After she left, Adam called asking for her. He told me that Nancy was going to be upset because he and Ralph and spent $3000.00 buying a large scale and other items at a jewelry store sale. The scale was too large to be stored at the Ward's home, so I let them store it in my shed. The scale remains in my shed today. Nancy told me that at one time she had over $50,000 in credit card debt because she allowed Ralph and Adam to charge things.

13. Ralph would call Nancy at work very frequently. On some days, he would call once an hour. If Nancy didn't pick up her phone when Ralph called, Ralph would throw a fit. From my desk, I could overhear Ralph yelling things at Nancy – calling her a stupid bitch and fat and using a lot of profanity. Ralph would repeat the same things over and over. He would keep yelling at Nancy and would complain about everything that was upsetting him whether it was citations issued by the city with regard to their house, Adam's teachers, or anything else. When Nancy would tell Ralph that she needed to hang up the phone because she was at work, he would continue talking. I never saw Nancy disagree with Ralph.

14. Ralph was demeaning to Nancy. Almost anything would cause Ralph to belittle Nancy and yell at her; disagreeing with him, voicing her opinion, or making a suggestion. I could often hear him saying things like "you god damned mother fucker." Ralph spoke to Nancy that way every day. Adam would also call Nancy at work and would also go on and on complaining about whatever was upsetting him. Adam repeated the things Ralph said and treated Nancy like Ralph treated her. It was obvious that Adam learned to act this way from watching his father.



15. If Nancy asked Ralph a question, he would usually either grunt or ignore him. He was very demeaning to Nancy. If she disagreed with him, he would call her names and cuss at her. If she did not understand something that he had said, he would call her a "stupid bitch."

16. One afternoon when I was at the Ward's house, Ralph's sock drawer was open and I was able to see inside of it. All of the socks were folded in pairs with a rubber band precisely wrapped around them. Each pair of socks was carefully lined up in the drawer. Ralph did his own laundry because he thought that Nancy was too stupid to do it correctly.

17. I am the only friend of Nancy's who has been in the Ward's house. They isolated themselves and were a very closed off family.

18. Adam always wore his hair like his father's hair. Adam was late to school almost every day because he was trying to get his hair to look perfect.

19. Adam always had his shirt tucked in, his boots were clean, and was always spic-n-span. His car had to be spotless, and he spent a lot of time cleaning it.

20. On many occasions when he was going to Paris Junior College, Adam told me he would not turn in his assignment in his jewelry making classes because he didn't think they were perfect. Adam was not able to hand things in until they were perfectly done.

21. Ralph was very controlling. Ralph did not like Nancy to do things on her own. If Nancy went out to lunch, he would complain about it. Everything she did that Ralph wasn't in control of, he would complain. One night after work, I highlighted Nancy's hair. Nancy was afraid to go home and said that Ralph would throw a fit and would be really mad because she changed her hair.

22. I visited the Ward's home while Nancy lived there on a couple of occasions. There were thousands of antiques in the house. Boxes were everywhere and in every room. The boxes were all stacked and labeled. The inside of the house was packed with stuff. The kitchen table only had room for three people to eat because the rest of the table was covered with stacks of stuff. Ralph acted like he knew where everything was and would not allow Nancy to move anything in the house. Nancy told me that the house was "their house" and not hers – meaning it was Ralph and Adam's house. Nancy told me that Ralph and Adam would have a fit if she moved anything or threw anything away so eventually she stopped doing anything around the house. Ralph and Nancy never sold anything.

23. After the shooting, I told Nancy that she should sell everything in the house to help pay for Adam's defense. Nancy made up a variety of excuses for why they couldn't sell anything. She told me that selling the stuff in the house would be too traumatic for Ralph.



24.    Nancy and Ralph both have licenses to carry concealed handguns. Nancy keeps a gun in her car and in her purse.

25.    Ralph and Adam used to practice shooting by a creek outside Commerce. They also used to go out to my house and shoot guns but I didn't think it was safe and asked them to stop.

26.    No one from Adam's defense teams has contacted me prior to September 2011. If they had, I would have told them everything in this declaration.

I have read the above 26 paragraphs and I declare under penalty of perjury that the foregoing is true and correct.

Executed this   3   day of   October   , 2011.

Sharon Crump

# Petitioner's Exhibit 11

Declaration of Sharon Vice

STATE OF TEXAS     )
                     )
COUNTY OF HUNT    )

### Declaration of Sharon Vice

1.  My name is Sharon Vice. I am over the age of eighteen years and am otherwise competent to make this declaration.

2.  I am a friend of Nancy Hyde Ward, Adam Ward's mother. We worked together at Texas A&M Commerce. I have been her friend for about eleven years.

3.  The space that Nancy and I worked in was not very large. Mine and Nancy's offices were in the same general area. For a while, my office was directly across from Nancy's. After that, my office was catty-corner to Nancy's. I often had to go into Nancy's office to get files.

4.  Sometimes Nancy would go home in the middle of the day when she knew Ralph and Adam were fighting, and she didn't want them to come to the University where we . Sometimes, when I or others at the office thought Ralph might be coming to the University, we would call the University Police to let them know that Ralph was coming and we were afraid of what he might do.

5.  Nancy would stay late at work to avoid going home. There were nights when she would stay until 8:00 or 9:00 night. She would tell me that she worked late to avoid going home.

6.  Ralph Ward called Nancy every day. Some days, Ralph and Adam would call Nancy at work several times. I could hear Ralph and Adam screaming at Nancy over the phone whether I was in Nancy's office or my own office. I would overhear Ralph yelling things such as "you god-damned stupid motherfucking idiot" or some combination of those words. There were days when Nancy would leave the office and go home because she didn't want them to continue calling her.

7.  Ralph would call the office and would overhear Ralph telling Nancy that she was "too stupid" to do things. For example, Nancy was "too stupid" to do the laundry correctly and as a result, Ralph did his own laundry. I heard Ralph yell other things at Nancy like "you can't even wash a glass… you can't cook right… you're so stupid."

8.  Because the family could not afford one, Nancy didn't have a dishwasher. Nancy told me that, instead of listening to Ralph tell her that she was too stupid to do dishes by hand, Nancy used paper plates and plastic utensils.

9.  I remember one occasion when Nancy had cooked something for Ralph that he did not like. He called her at work, yelled at her, and cussed her out. Nancy told us not to worry about it -- that that kind of thing happened all the time.



10. Nancy told me that Ralph was still in love with his ex-wife and that he was never in love with Nancy. Ralph even went back to Colorado to visit his ex-wife.

11. The Ward family struggled financially. Nancy paid all the bills, and most of the time she was the only person who worked. Nancy told me that this was because Ralph had to stay home and watch Adam. Nancy made about $1700-1800 a month. Nancy's paycheck is all the family of three had to live on. Nancy also told me that it was too expensive to use the air conditioner in their house. Nancy kept an envelope with money in it and would say that the money in the envelope was the only money there was to feed the family. Nancy's parents paid for Ralph and Nancy's cars. Nancy's parents helped the family significantly.

12. Nancy had a lot of credit card debt. Nancy told me the high balance on the credit card was because Ralph and Adam bought things at pawn shops and antique stores using her credit card. I don't think Nancy had a say in the things Ralph and Adam bought.

13. The women that worked in our office often went out to lunch together. Nancy would rarely go because she could not afford to eat out and went home to fix lunch for Ralph and Adam every day. On many occasions, one of us in the office would offer to buy Nancy's lunch if she would go out to eat with us. Even when we offered to buy, Nancy would go home to make lunch for Ralph because he wanted her there to cook his meals.

14. There was one time that Nancy went with us to lunch at Molina's in Commerce. Before we left to go to lunch, Nancy tried to call Ralph to let him know that she was going out to lunch with us instead of going home to fix lunch, but she was not able to get reach him. While we were eating, Ralph came into the restaurant, made a scene, and yelled at Nancy, saying "you care more about your friends than me." As soon as he left the restaurant, Nancy packed up her things and left as well. She told us that everything was fine and that she was going home to check on Ralph. You could tell she was humiliated.

15. I once went with to Nancy's mother's house. Her mother spoke very harshly to both Nancy and Nancy's father. Mrs. Hyde (Nancy's mother) controlled everything that Nancy and her father did. The way I heard her mother talking to her and controlling her that day was very similar to the way I would hear Ralph talking to her.

16. Ralph also tried to control Adam. Nancy told me that Ralph wouldn't allow anyone to tell him how to treat his own child. Nancy did not argue with Ralph about this. Her attitude was complacent and lackadaisical.

17. After Adam graduated from high school, he attended Paris Junior College which was about forty miles from where the Wards lived in Commerce. Because Adam didn't have a driver's license, Ralph drove him to school. Some days, Ralph would sit in the parking lot and wait for Adam to finish class. Adam told me that, other days, Ralph would go into the classroom, confront Adam's teachers, and tell them that they were being unfair to Adam and that Adam's work was superior to other students' work. There were times

when Adam's professors would teach Adam something that Ralph disagreed with. Ralph would go into Adam's school and argue with the professors and tell them that they were wrong. When Adam told me about this, I could tell he didn't think there was anything wrong with his dad's behavior.

18.  Nancy has a harsh personality and can be blunt. Nancy didn't really talk to Adam but instead talked more at Adam. She didn't have a good relationship with Adam.

19.  About fifteen years ago, I asked Adam to help me clean out my garage and told him I would pay him to help out. While we were cleaning, Adam would find little things and ask me if he could keep them. For example, he wanted to keep a pimento jar that I thought was junk. He was ecstatic when I told him he could take it home. When we finished cleaning the garage, Adam stayed until very and wouldn't leave. My husband finally told him he should go home. It seemed like Adam didn't want to go home because was desperate for attention.

20.  Adam never had any friends. I cannot recall him ever spending the night at another child's house, having other children spend the night at his house, going to the prom, or hanging out with friends.

21.  Adam loved his dogs. His dogs were his closest friends. Adam would never do anything to hurt an animal.

22.  Adam repeated everything Ralph would say. It didn't matter what the subject was, if it was a citation from the city or a disagreement a neighbor, Adam would say the exact same things Ralph had said using the exact same words.

23.  Prior to September 2011, I was never contacted by anyone on Adam's defense team. If I had been contacted, I would have told them everything in this declaration.

I have read the above 23 paragraphs and I declare under penalty of perjury that the foregoing is true and correct. Executed this _____2nd_____ day of ___October___, 2011.

_Sharon Vice_

Sharon Vice

# Petitioner's Exhibit 12

Declaration of Billy Hyde

STATE OF TEXAS )
)
COUNTY OF COLLIN )

### Declaration of William Hyde

1. My name is William Franklin Hyde, III. I am over the age of 18 and otherwise competent to give this declaration.

2. I am Adam Ward's uncle. His mother, Nancy Ward is my older sister. Because I only lived about an hour from Ralph and Nancy, I saw Adam a lot when he was growing up.

3. Adam started having behavior problems when he was about two. When he was two, he latched onto my neck and I almost couldn't get him to let go.

4. Adam was diagnosed with bipolar disorder at a very young age. I've always wondered if Ralph is bipolar as well and Adam inherited if from him. Ralph had an aunt who was mentally ill as well, but the family almost never talked about her.

5. Adam had a lot going against him from the beginning of his life. He never had any school friends and Nancy told me that he didn't know how to interact with girls. Because he was in special education, girls were even more reluctant to talk to him. It was so bad that one time when Adam was in high school Nancy joked to that she was going to buy Adam a hooker just to get him laid.

6. Throughout Adam's life, Ralph was always buying antiques, like clocks, old furniture, jewelry, books, anything he thought might be worth something someday. Ralph told me that he would buy them so he could eventually sell them to have money for his retirement. But I don't think he will ever really sell any of it. After Adam was arrested, Nancy told me that Ralph wasn't willing to sell any of the stuff to help pay for Adam's defense.

7. Most of the rooms in their house were filled with boxes of the antiques Ralph bought. It looked more like a warehouse. There was a little path through the boxes, but other than that, most rooms were full. You couldn't use those rooms. There were boxes, or furniture stacked on top of furniture, stacks of old magazines and books, and knick knacks everywhere.

8. I'm not sure how he ever paid for all the stuff he bought. Ralph never really held down a steady job during Adam's childhood. He was a professional student. His last real job was at Brass Craft. That lasted about 9 months, or a year. Since then, he has done substitute teaching and worked at the bookstore at Texas A&M Commerce.

WFH

9. Before Ralph and Nancy were married, Nancy went to Six Flags with one of our male cousins. Ralph found out and came over to the house and threw a fit. He was yelling and furious that Nancy had gone to Six Flags with "another man." Everyone in our family thought Ralph was being ridiculous. We all laughed at him behind his back for being so possessive and juvenile.

10. Nancy seemed miserable in her marriage. One time, around 1986 or 1987, I went out with her on New Year's Eve. She told me "Don't ever get married."

11. Ralph would often yell at Nancy and talk to her condescendingly, even in front of me and the rest of her family. Sometimes it would happen all of a sudden. One minute he would be asking for her opinion normally, then the next he'd be yelling "God Dammit, Nancy."

12. Nancy was afraid of Ralph most of the time, and would do what she was told. They would get into fights if she asserted any independence at all. Ralph only wanted her to go to work and to cook all of the meals for the family.

13. Before Adam was born, Nancy got fed up with Ralph and decided she wanted a divorce. One of our cousins agreed to pay for the divorce. Nancy never went through with it, though.

14. Ralph was never affectionate with Adam. I never saw him hug Adam. He never showed outward affection for Adam.

15. Ralph was paranoid and didn't trust the government. He raised Adam to think that everyone was against the family, especially the school district and the city of Commerce. Adam grew up being told that the city or the police would come and take the house from the family. Ralph would tell him things like "They're trying to take our house!" Ralph always told Adam that something with the city was going to come to a head. Ralph insinuated that if someone came into their house unannounced he'd shoot them.

16. Ralph had an entire room in their house devoted to guns. There were probably 45-50 guns in the house at any given time. Ralph told me he kept the guns in the house for self-defense. The gun room was upstairs, across from Adam's room.

17. Ralph and Nancy each kept loaded .38s on their sides of the bed. There were just out on the nightstands. They also kept at least three other guns in their bedroom closet. At least two of them were loaded rifles, and there were another 15 or 20 handguns. There were also other guns hidden throughout the house.

18. The space under the stairs in Ralph's house was filled with gunpowder.

19. Ralph and Nancy both had concealed handgun licenses. Ralph would carry a knife and one or two guns in his car.



20. After Adam got in trouble with the police at his grandmother's house, Nancy started carrying a .38 and a little .22 mini revolver with her all the time. She'd carry both of them at the same time. She carried one in her purse and one in her car.

21. When Ralph worked at Brass Craft, he used the machines at work to make a silencer for one of his rifles. When Adam was a baby, Ralph and I were in the gun room and he was telling me about the silencer, showing it off. While he was holding baby Adam, Ralph shot the gun out of the window and hit a trashcan down the street. Ralph would brag about shooting dogs in the street from that window if they went through his yard or trash. He said that if the dog was furry enough, no one would be able to tell what killed the dog, because the .22 makes such a small hole.

22. No one from Adam's trial team ever interviewed me before his trial. If I had I would have told them everything in this declaration.

I have read the above 22 paragraphs and I declare under penalty of perjury that the foregoing is true and correct. Executed this _ 01 _____ day of _ October _____, 2011.

William F. Hyde
~~Billy Hyde~~
William F. Hyde, III
W7H

# Petitioner's Exhibit 13

Declaration of Ken Hindman

**STATE OF TEXAS**          )
                           )
**COUNTY OF HUNT**          )

### Declaration of Ken Hindman

1.    My name is Ken Hindman. I am over the age of eighteen years and am otherwise competent to make this declaration.

2.    I live a block away from the Ward's residence in Commerce, TX and became friends with Adam after he graduated from high school.

3.    I am in my fifties and believe at the time I was Adam's friend, I was his only friend. He told me that he had friends in other towns, but I never met any of these people. I'm sure he was just lying to me about that to impress me, though. There were other kids in the neighborhood Adam's age, but none of them were friends with Adam, either. I thought it was amazing that he didn't have any friends.

4.    I would pay Adam to paint my house and mow my yard. I thought that if he had some pocket money, he'd be able to do things around the town with kids his age, but he never did.

5.    One day Adam's father Ralph drove by my house and rolled down his car window to talk to me. He said something about the "nigger drug dealers" who lived in the rental property next door to him. Ralph said he was going to go home and "blow up their fucking house." When I asked Ralph how he thought he was going to do it, Ralph said "I've got ways" and drove off.

6.    One time Adam came over to my house and showed off his dad's gun that he had brought over. It was a .45 ACP. He said his dad always kept it loaded and handy. It was the same gun he used to shoot Pee-Wee.

7.    I was invited into the Ward's house twice. There were three dogs inside and the place was very cluttered. The main room in the house looked like a storage facility. There were boxes stacked up all over the place. It looked like they only used two rooms in the house to live in. All the other rooms were cluttered with stuff.

8.    I remember one time when Ralph bought 150 chairs from the University because he thought he could make some money off of them. I also remember a time when Ralph bought a bunch of 55 gallon drums. I'm not sure what Ralph did with all that stuff, but you can tell he doesn't get rid of much of it because the inside and outside are packed with stuff.

9.    After knowing Adam for a while and talking with him, I got the impression that Ralph treated Nancy like he was the person in charge of the house and she should have no input.

K.W.H.

Sometimes, when talking about his mother, Adam would say things like "she's a stupid ass," "she's supposed to do what my dad says," and "she thinks she's got rights." I think Adam was just repeating what he had heard Ralph say..

10.    Adam would say things like "My dad and I think the US government isgetting too big" and "My dad and I think the government should stay out of people's lives." It was obvious that Adam didn't have his own ideas. He just repeated his dad..

11.    One night Adam came over to my house and wasn't wearing a shirt. He told me that he was "tired of putting up with his dad's shit."I could tell Adam was upset because he was breathing heavy and talking fast. Adam had a red hand print on his arm or shoulder that night. Another time when Adam came to my house after an argument, he had a red hand print on his face.

12.    I don't think Adam had the ability to live on his own. He didn't have any friends and if he moved out, he'd be all alone. Adam told me his mother did all of his laundry and cooked all of his food. I think his parents told him what to do all the time. Adam seemed to need someone to tell him what to do. He seemed to me to be a follower.

13.    Adam thought that Ralph was disappointed in him. Adam told me that his father would tell him to do things that if he couldn't do them, Ralph would get mad. Adam told me about one time when Ralph got mad because he told Adam to move some 55 gallon drums from one side of the yard to the other side. Adam wasn't strong enough to move the drums and didn't have a drum dolly or anything to help him. When Ralph got home he tipped one of the drums over and rolled it across the yard. Adam told me that Ralph mocked him and made fun of him for not figuring out how to move the drums. Adam seemed embarrassed because he didn't know how to do it.

14.    Adam had mixed emotions about his self-worth. One day, Adam would tell me he would be able to fix something at my house and the very next day he'd turn around and have no confidence in his ability to do what he said he could do the day before.

15.    Before September 2011, I was never contacted by anyone working on Adam's defense. If anyone had contacted me, I would have told them everything in this declaration.

I have read the above 15 paragraphs and I declare under penalty of perjury that the foregoing is true and correct. Executed this _____4th_____ day of _____OCTOBER_____, 2011.

_Kw1L_

Ken Hindman

_Kw. H._

# Petitioner's Exhibit 14

Declaration of Trish King

STATE OF TEXAS          )
                        )
COUNTY OF HUNT          )

### Declaration of Trish King

1. My name is Trish King. I am over the age of 18 and otherwise competent to give this declaration.

2. I was principal of Commerce High School during the years that Adam Ward attended. My daughter Kate went to school with Adam for several years.

3. I've known Ralph Ward, Adam's father since we were children. We went to high school together. He was a grade ahead of me.

4. Ralph didn't have many friends when he was growing up. Back then, he didn't get in trouble, or get angry, and people weren't afraid of him. They just didn't choose to be around him.

5. I went to High School with Ralph. I remember in biology class, everyone was pricking their fingers so they could test their blood in class and Ralph passed out when he saw his blood. He fell off of his lab stool and everyone in class laughed at him. When he came to, he sat up, hit his head on the lower shelf of the table, and knocked himself out again. No one even tried to help him. I think that's a good example of how people felt about Ralph. They weren't afraid of him, but they certainly like didn't like him either. He was a misfit.

6. When he was growing up, Adam didn't have any friends. He was a lot like his dad was when he was a kid in this way. Adam seemed like he didn't know how to interact with children his own age. He seemed alienated from everyone. He was usually very quiet unless someone bothered him. You wouldn't even know he was there.

7. Adam was often picked on and bullied by other students.

8. Adam was very needy. People were reluctant to interact with him, though, because he was so hard to deal with. He would talk everyone's ear off, about whatever he wanted and never seemed to care if you were interested in the conversation. His dad does the same thing.

9. I think adults at the school were the closest thing Adam had to friends. Sometimes he would ask to leave class and come down to the office just so he could talk to them. Even then, I think the adults only tolerated him. They didn't really enjoy his company. Teachers would often say things like "Oh God, I got stuck talking to Adam Ward again."

10. Ralph didn't see Adam as being emotionally disturbed like the school did. He never wanted to think there was anything wrong with Adam and would make excuses for him. He'd say things like "He just has a bad temper, but we're doing everything we can."

11. Ralph never wanted anyone at the school to say anything to Adam about his behavior or discipline him because Ralph was afraid someone would upset Adam. But, school officials thought Adam should take responsibility for his own actions.

12. Ralph blamed the school system for many things that went wrong with Adam. Ralph kept looking for signs of normalcy, instead of accepting that Adam was sick.

13. Ralph would always take Adam's side and stand up for him, even in the face of overwhelming proof. After Adam stabbed that boy in the bathroom, Ralph said "You can't find the knife, can you? You don't have any evidence!"

14. Most of Adam's ARD meetings would last for 6 or 7 hours at a time. ARD meetings for other students would usually last about thirty minutes. Adam's ARD meetings took so long because of Adam's parents. Mr. Ward was belligerent in the meetings and fought everything the school suggested to help Adam.

15. Nancy Ward wouldn't say much at the meetings, but she would come in looking angry and would sit with her arms crossed and her glasses down on her nose.

16. The school administration wanted Adam to be in classes that would meet his academic needs. Ralph wanted Adam in regular classes and regardless, Ralph did Adam's homework for Adam.

17. Adam was in the agriculture program and Future Farmers of America in high school. He did well in these programs because he was interested in them and he was good at them. He started to be more independent, and things were looking better for him. He wasn't picked on as much as in 7th and 8th grade.

18. I always wonder what would have happen if Adam had been socialized and raised in a normal home. I think that things might have been different if Adam's parents had been realistic about his disabilities and allowed him to get the treatment he needed.

19. Prior to September 2011, I was never contacted by anyone on Adam's defense team. If I had been contacted, I would have told them everything in this declaration.

I have read the above 19 paragraphs. I declare under penalty of perjury that the foregoing is true and correct. Executed this _____03_____ day of ___·October_____, 2011.


_____
Trish King

1K