IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ADAM KELLY WARD, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-2101-N |
| | § | |
| WILLIAM STEPHENS,[1] | § | |
| | § | |
| Respondent. | § | |

**ORDER AND OPINION ON PETITION FOR WRIT OF HABEAS CORPUS**

Adam Kelly Ward petitions the Court for a writ of habeas corpus, contending that his conviction and death sentence are unconstitutional because he received ineffective assistance of trial counsel, was not tried by an impartial jury, and is severely mentally ill. Having reviewed the record and supplemental material tendered by Ward, the Court denies the requested relief.

**I.  PROCEDURAL BACKGROUND**

In 2007, Ward was convicted and sentenced to death for the capital murder of Michael Walker, a city code enforcement officer acting in the scope of his employment at the Ward family home. *State v. Ward*, Cause No. 23,182 (354th Jud. Dist. Ct., Hunt Co., Tex. June 26, 2007). The Texas Court of Criminal Appeals ("CCA") unanimously

---

[1]The previously named respondent in this action was Rick Thaler. On June 1, 2013, William Stephens succeeded Rick Thaler as the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice. Under Rule 25(d) of the Federal Rules of Civil Procedure, he "is automatically substituted as a party."

affirmed the conviction in an unpublished opinion on appeal. *Ward v. State*, No. AP-75,750, 2010 WL 454980 (Tex. Crim. App. Feb. 10, 2010). The Court takes the following recitation of facts from that opinion:

> Ward's family was cited numerous times for failing to comply with Commerce City's housing and zoning codes. At one time, a "demolish order" was issued on the Wards' home, but the Wards eventually agreed to comply with the codes governing their property. As a result of the most recent violation – the presence of unsheltered storage – the City imposed a clean-up deadline of June 11, 2005, or a non-compliance case would be filed with the municipal court. The Wards did not comply with the notice letter.

> At 10:00 a.m. on June 13, 2005, Walker, a City of Commerce Code Enforcement Officer, went to the Ward property to record the continuing violation. Walker wore his City of Commerce work shirt and drove a marked City of Commerce truck. Walker was unarmed, carrying only his digital camera. Ward was washing his car in the driveway when Walker arrived.

> After parking his truck, Walker walked the perimeter of the Ward property and took pictures. At some point, Walker and Ward began arguing. Ward's father came outside and attempted to calm the men down. Ward then sprayed Walker with water from the hose that he was using to wash his car. Walker used his cell phone to call his office and request an officer's assistance. Ward's father tried to reason with Walker and told him, "We need to sit down and talk about this." But Ward's father became concerned when he noticed that Ward was no longer outside and advised Walker that it might be "best if he left the property." Ward's father then ran to look for Ward, as he believed that Ward had a gun in his room. Ward's father did not warn Walker about this fact.

> Walker put his camera in the back of his truck and waited for the officer dispatched to assist him. However, before Ward's father could intervene, Ward, armed with a .45-caliber pistol, ran out of the house toward Walker and fired at him. Walker tried to use his truck as cover but Ward pursued him, chasing him around the truck at least twice, firing the gun again. Walker then ran back towards the Ward home. While in pursuit, Ward shot Walker several times. Walker finally fell across the sidewalk, and Ward shot him again at close range. The medical examiner later determined that Walker sustained nine gunshot wounds. After Walker fell down, Ward's father was able to take possession of the gun from Ward along with the empty magazine and another fully-loaded clip.

ORDER AND OPINION – PAGE 2

In his confession, Ward stated that he believed that the "City" was after his family and that he had previously been beaten up by the local police. He believed that the police would kill him if he were arrested again. When Walker arrived, Ward thought that Walker was a "bad ass, hot head," and he believed that Walker and the former Code Enforcement Director, Fred Eaton, had "threatened to tear down our house." While Walker was taking pictures, Ward said that he and Walker got into an argument about how Walker had parked his truck on the street. Ward stated that Walker then started walking up to him "showing attitude," so Ward sprayed him with the hose. Ward claimed that, after he sprayed Walker with the hose, he was in fear of Walker, "just the way he was walking up. He threatened to call the cops and have – press charges on me and all." Ward stated that he was in fear for his life because, if the cops showed up to arrest him, he would probably end up dead. Ward said he got his gun for "self defense" and initially just meant to scare Walker, but he admitted that he knew he "emptied a magazine" at him. He confessed that he "overreacted" to the situation. There was no evidence presented confirming Ward's claims that he had ever been beaten by the police.[2]

*Ward*, 2010 WL 454980, at *1.

While the appeal was pending, Ward's habeas counsel petitioned the convicting court for a writ of habeas corpus.   The trial judge recommended that the CCA deny habeas relief and adopted the State's proposed findings of fact and conclusions of law.   6 SHR 817, 829.[3]   The CCA adopted some, but not all, of the trial court's findings and

---

[2] Ward testified at punishment about a series of events surrounding his arrest on November 29, 2000 which he described as "having about four cops beat the hell out of me."   44 RR 35-38, 91.   The police officers involved testified otherwise.   41 RR 76-83; 43 RR 82-85, 92-93.

[3] The 6-volume state habeas record is cited "SHR" and is preceded by the volume number and followed by page number.   The 66-volume trial court reporter's record is cited "RR."   The 41-volume clerk's record is cited "CR."   Trial exhibits are cited as CX, DX, SX for the trial court, defense, and State, respectively.   Where possible, the exhibits are cited by the digital page number on which they appear in the .pdf format of the reporter's record.

conclusions and denied habeas relief. *Ex parte Ward*, No. WR-70,651-02, 2010 WL 3910075 (Tex. Crim. App. Oct. 6, 2010).

One year later, through new counsel, Ward filed his original federal habeas corpus petition [doc. 24]. Ward filed his first amended habeas petition in this Court on January 4, 2012 ("Petition") [33]. The State filed its answer on March 16, 2012 ("Answer") [37], and Ward filed a reply on April 16, 2012 ("Reply") [39]. The State filed a surreply on May 9, 2012 ("Surreply") [42]. At the Court's request, both parties later filed supplemental briefing [45, 46] addressing the Supreme Court's opinion in *Trevino v. Thaler,* 133 S. Ct. 1911 (2013) (holding that *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) applies to Texas inmates).[4]

Ward's petition is subject to the amendments of the Antiterrorism and Effective Death Penalty Act of 1996 in 28 U.S.C. § 2254(d) ("AEDPA").[5] The Court will address the well-known AEDPA standards of review where specifically pertinent to issues raised. Ward asserts five claims: (1) he was denied the right to be tried by an impartial jury when a person affiliated with the prosecution engaged in *ex parte* contact with jurors during trial, (2) trial counsel failed to conduct a reasonable sentencing investigation and psychosocial history report, (3) his execution violates the Eighth Amendment because he is severely mentally ill, (4) he was denied the right to a fair trial because extensive pretrial publicity made it impossible to seat an impartial jury, and (5) trial counsel rendered ineffective assistance by failing to move for a change of venue to remedy the pretrial publicity.

---

[4]In a curious point of agreement, both parties advocated against further exhaustion in state court.

[5]All subsequent citations to § 2254 are to 28 U.S.C. § 2254.

## II. IMPROPER JURY CONTACT (CLAIM 1)

Ward first argues that the prosecution violated his Sixth Amendment right to an impartial jury when an alleged member of the prosecution team, Paul Zelhart, ate lunch and talked with the jury during a lunch break.   Respondent asserts that the state court properly rejected this issue because Zelhart was not a member of the prosecution team, Zelhart did not engage in any inappropriate contact with the jury, there is no evidence that any juror was actually or impliedly biased, and there is no evidence Ward was prejudiced.

### A. *Trial Court Proceedings*

On the second day of the punishment phase of trial, Ward's counsel informed the judge that he had been in discussions with the prosecutor about an individual, Zelhart, who had been seen sitting and talking with the jurors during lunch.   Counsel wanted to know whether Zelhart was a member of the prosecution team.   42 RR 80-81.   The district attorney responded that Zelhart was not a consultant for the State but a personal friend, a long-time resident, professor at the university, and husband of the City's mayor.[6]   42 RR 80-81.   The judge denied counsel's motions for a mistrial and a new trial.   42 RR 81.

### B. *State Habeas Proceedings*

Ward raised the Sixth Amendment claim in his state habeas application supported by handwritten notes made during trial and a post-trial affidavit from family friend, Randy Cannon, the man who had originally brought the matter to trial counsel's attention.   2

---

[6]The District Attorney added that Zelhart was a personal friend of the victim's father, but this assertion was apparently in error.   Zelhart later refuted it, and the District Attorney's social history report lists Zelhart as a "working contact" due to his long-time friendship with Ward's mother.   DX 1K (63 RR 227); 4 SHR 599.

SHR 261; 3 SHR 330.   According to Cannon, Zelhart took notes during the trial and discussed his notes with the District Attorney.   Cannon saw Zelhart "sitting beside the foreman and talking with him and other jurors" at lunch.   2 SHR 265.   Ward also presented an affidavit from a café waitress whom Cannon directed to make a mental note of Zelhart sitting with the jurors.   2 SHR 269.   Her affidavit indicates that she did not know Zelhart, was busy working, and did not hear what Zelhart and the jurors said at the table.   2 SHR 269.   Ward presented a timesheet from the District Attorney's investigator, which indicated that he had reviewed "Dr. Zelhart's E-Mail" on June 28, 2005 and interviewed Zelhart on June 29, 2005, about two years before Ward's trial.   2 SHR 271.

Ward also presented the affidavit of a woman whose son was arrested for an unrelated capital murder about a year after the verdict in this case, stating that Zelhart had called her on behalf of Hunt County prosecutor's office.   2 SHR 286.   Although Ward did not rely on them for his Sixth Amendment claim, he also provided two juror affidavits to the state habeas court.   One affidavit makes no mention of the incident at the café.   1 SHR 124.   The other states that there was a man taking notes in the trial all the time, and the jury assumed he was a reporter.   This juror said that, one day at lunch, a few jurors saw "the reporter" and joked with him about how they should not eat near each other.[7]   1 SHR 131.

The State presented an affidavit from Zelhart.   4 SHR 599.   Zelhart's affidavit states that he was a friend of the District Attorney and a university researcher and

---

[7]Ward obtained a third affidavit from an alternate juror, but she left after the guilty verdict and presumably had no information regarding the contact with Zelhart, which occurred during sentencing.   1 SHR 127; 40 RR 34-35.

administrator, not a clinical or consulting psychologist.   He did not consult for the District

Attorney during Ward's trial and had never even attended a jury trial before Ward's.

Zelhart was aware of Ward's "severe problems" because his children attended the same

schools as Ward, and he was friends with some of the teachers.   Zelhart further stated that

he does not support the death penalty and had suggested that the District Attorney not seek

the death penalty against Ward.   This triggered a visit from the DA's investigator, whom

Zelhart directed to the Tri-County Cooperative for educational information on Ward.

Zelhart said he worked with Ward's mother and had a favorable opinion of her.   On the

day in question, Zelhart was eating lunch alone at a crowded café when some jurors asked

if they could share a long, communal table with him.   He agreed and added in jest, "As

long as you don't talk about the trial."   Zelhart stated that they did not discuss the trial,

although one juror asked about his interest in the trial, and Zelhart replied, "I thought we

were not going to talk about the trial."   No other exchange with the jurors took place, and

Zelhart left while they were still seated.   Zelhart stated that, when he heard of Cannon's

allegations during the trial, he related the circumstances of what had happened in the café

to a prosecutor in the case.   4 SHR 599.

Zelhart further stated that, a year or so after the Ward trial, he was ready to retire and

entertained the idea of being a trial consultant.   Toward this end, he joined the Association

of Trial Consultants, did some *pro bono* work with the District Attorney's office involving

jury selection, and prepared social histories for two murder trials in 2008 and 2009.   He

then moved to Arizona and let his membership in the Association lapse.   4 SHR 599.

### C. AEDPA Standard of Review

The state habeas court adjudicated this claim. Under AEDPA, a claim adjudicated on the merits in state court is barred in federal court unless it (1) is "contrary to" federal law then clearly established in the holdings of the Supreme Court or "involved an unreasonable application of" such law, or (2) "is based on an unreasonable determination of the facts" in light of the record before the state court. *See* § 2254(d)(1), (d)(2); *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). This review ultimately entails only the state court's "'decision' and not the written opinion explaining that decision." *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (quoting *Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) (en banc)). It is also limited to the record that was before the state court that adjudicated the claim on the merits. § 2254(d); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Congress meant these conditions to be difficult to meet and they stop just short of imposing a complete bar on the relitigation of claims already rejected in state proceedings. *Richter*, 131 S. Ct. at 786. The state prisoner must show that the state court ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786.

In reviewing claims of legal error, a state court decision is "contrary to" Supreme Court precedent if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite

result.  *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).   A state court's application of law is "unreasonable" when the state court identifies the correct governing legal principle but applies that principle to the facts of the case in an objectively unreasonable manner. *Id.* (quoting *Young v. Dretke*, 356 F.3d 616, 623 (5th Cir. 2004)).   An unreasonable application may also occur if the state court either unreasonably extends a legal principle to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.   *Id.* at 787-88.   It is not, however, an unreasonable application of clearly established federal law for a state court to "decline to apply a specific legal rule that has not been squarely established" by the Supreme Court. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (internal quotation marks omitted).

When challenging the factual basis of the state court's decision, petitioner bears the burden of rebutting the state court's factual findings by clear and convincing evidence. § 2254(e)(1);   *Burt v. Titlow*, 82 U.S.L.W. 4007 (Nov. 5, 2013).   A "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."   *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).   A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."   *Wood v. Allen*, 558 U.S. 290, 301 (2010).   A presumption of correctness attaches to explicit findings of fact as well as "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."   *Pippin*, 434 F.3d at 788 (citing *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)).

### D.   Analysis

The state habeas court ruled that no Sixth Amendment violation occurred.   It found that Zelhart did not engage in impermissible contact with the jurors and was not an agent of the State, and that no juror misconduct occurred.   6 SHR 825.   The state court also concluded that any alleged jury misconduct did not harm Ward, that trial counsel properly investigated the allegation of jury impropriety, and that a hearing was unnecessary.   6 SHR 825-26.   Ward alleges generally that these rulings are contrary to clearly established federal law and based on an unreasonable determination of the facts in light of the evidence presented in state court.   *See* § 2254(d).   He also complains that the trial court and the state habeas court erred in failing to hold an evidentiary hearing on the claim.

The Supreme Court "has clearly established a constitutional rule forbidding a jury from being exposed to an external influence."   *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008).   When a criminal defendant alleges that an outside intrusion improperly influenced the jury, the jury's verdict will be set aside only if the intrusion affected the jury's deliberations and, thereby, its verdict.   *See United States v. Olano*, 507 U.S. 725, 739 (1993).   The *Olano* opinion summarizes "jury intrusion" law as follows:

> Due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . It is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.   Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Olano*, 507 U.S. at 738 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

Ward asserts that this Court must impute bias to the jurors who were in the café with Zelhart.  He argues that when an improper influence comes from outside the jury rather than from the jurors' own actions, there is a presumption of prejudice in his favor.  He relies primarily on a Supreme Court opinion predating *Olano* and *Phillips*, which holds:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during trial about the matter pending before the jury is, for obvious reasons deemed presumptively prejudicial. . . . The presumption is not conclusive but the burden rests heavily upon the government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer v. United States*, 347 U.S. 227, 229 (1954).  Ward also relies on Fifth Circuit precedent.  *See United States v. Forrest*, 620 F.2d 446, 457 (5th Cir. 1980) (stating that any off-the-record contact with jury is presumptively prejudicial and government bears heavy burden to prove such contact did not affect jury); *United States v. Webster*, 750 F.2d 307, 338 (5th Cir. 1984) (citing *Remmer* and *Forrest*).

The *Remmer* opinion held that a rebuttable presumption existed for any "private communication, contact, or tampering, directly or indirectly, with a juror during a trial *about the matter pending before the jury.*"  *Remmer*, 347 U.S. at 229 (emphasis added). There is no evidence in this record that Zelhart communicated with the jury about the pending trial.  Zelhart's affidavit shows there was no communication about the trial. Thus, the record factually does not support Ward's reliance on the *Remmer* presumption.

Moreover, courts must read the presumption of prejudice established in *Remmer* in conjunction with the Supreme Court's subsequent opinions in *Olano* and *Phillips*.  The *Olano* opinion states that "there may be cases where an intrusion should be presumed

prejudicial" but that the ultimate inquiry is whether the intrusion affected the jury's deliberations and thereby its verdict. *Olano*, 507 U.S. at 739. The *Phillips* opinion reversed a grant of habeas relief based on imputed juror bias, stating that it "has long held that the remedy for allegations of juror partiality is a hearing in which *the defendant* has the opportunity *to prove* actual bias." *See Phillips*, 455 U.S. at 215 (emphasis added). Because *Olano* and *Phillips* can be read to modify *Remmer*, the circuit courts debate the vitality of the *Remmer* presumption. *Compare Hall v. Zenk*, 692 F.3d 793, 802 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 1805 (2013) (holding that conclusions in other circuits that the presumption no longer exists are an unreasonable interpretation of Supreme Court law) *with United States v. Tejeda*, 481 F.3d 44, 51 (1st Cir. 2007) (rejecting argument that *Remmer* presumption applies to all claims of juror bias resulting from extraneous contacts). The jurisprudence within this circuit is also mixed. *See Webster*, 750 F.2d at 338 (1984) (holding that *Remmer* presumption arises in all cases where jury has been tainted with outside influence); *United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998) (holding that *Remmer* presumption cannot survive *Olano* and *Phillips*); *United States v. Smith*, 354 F.3d 390, 395 (5th Cir. 2003) (holding that "it is no longer the case that any intrusion on the jury, no matter how slight, creates a rebuttable presumption of prejudice to the defendant"); *Brooks v. Dretke*, 444 F.3d 328, 330-32 (5th Cir. 2006) (on reh'g) (holding that *Remmer's* "implied bias" doctrine is clearly established federal law for purposes of AEDPA); *Oliver*, 541 F.3d at 341 (concluding that trial court may apply *Remmer* presumption where prejudice is "likely" from the jury's consultation of an external influence).

The Court rejects Ward's complaint that the state court's decision runs afoul of the *Remmer* presumption.   No Supreme Court case squarely addresses the issue of when, if ever, the *Remmer* presumption applies.   The Supreme Court cases read together give no clear answer, as indicated by the disagreement among circuits and within the Fifth Circuit. Ward even acknowledged this unsettled state of the law in his state habeas application.   1 SHR 104-05.   Because the law is unsettled, the state court's decision cannot be an unreasonable application of federal law.   *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam) (rejecting habeas claim under § 2254(d)(1) where Supreme Court cases give no clear answer to the question presented, let alone one in petitioner's favor).

Ward also argues that Zelhart was a *de facto* member of the prosecution team or at least a witness and close friend of the prosecutor, such that an irrebuttable presumption of prejudice should apply.   Petition at 10; Reply at 9-10.   In doing so, Ward compares his case to *Turner v. Louisiana*, a Supreme Court opinion that does not rely on or cite to *Remmer*.   *Turner v. Louisiana*, 379 U.S. 466 (1965).   In *Turner*, two deputy sheriffs in charge of the jury during their sequestration also testified as principal witnesses for the prosecution.   *Id.* at 467-68.   The Supreme Court reversed, emphasizing that the credibility the jury would attach to the attending deputy/witnesses' testimony would inevitably determine Turner's sentence.   *Id.* at 473.   Even though the deputies had never talked to the jurors about the case itself, the Court reasoned,

> [I]it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution.   *We deal here not with a brief encounter,* but with a continuous and intimate association throughout a three-day trial—an association which gave these witnesses an opportunity. . .

to renew old friendships and make new acquaintances among the members
of the jury.

*Turner*, 379 U.S. at 473 (emphasis added).

Zelhart's association with the jury in this case does not come close to the extreme

circumstances in *Turner*.  Zelhart was not a testifying witness whose credibility was at

stake.  His contact with the jurors was a brief, chance encounter at a crowded café.

Zelhart left before the jurors had finished their lunch.   4 SHR 599.   These facts are far

removed from the realm of a testifying witness who performs double duty as the bailiff.

*See also Gonzales v. Beto*, 405 U.S. 1052 (1972) (Stewart, J., concurring) (concurring in

reversal of the denial of habeas relief where deputy who obtained defendant's confession

also testified and acted as bailiff in one-day trial).   Ward fails to show that the state court

erred, much less erred unreasonably, in its failure to grant relief based on *Turner*.

Accordingly, Ward does not satisfy the conditions for federal habeas review in §

2254(d)(1).

Ward's contention that the state court based its decision an unreasonable

determination of the facts fares no better.   *See* § 2254(d)(2).   As noted, the state court

found that Zelhart did not engage in impermissible contact with the jurors, was not an agent

of the State, and that no juror misconduct occurred.   These findings are reasonably

supported by the assertions in Zelhart's affidavit that, although he was a friend of the

district attorney, he was also a coworker of Ward's mother, had never before seen a jury

trial, and did not speak to the jurors about the trial.   A juror affidavit tends to confirm

Zelhart's version of what happened, suggesting that the jury simply thought Zelhart was a

reporter.   The affidavits of Cannon, the waitress, and the mother of the capital murder defendant do not contradict Zelhart's version of events.   Furthermore, courts presume that jurors follow their instructions.   *Nieto*, 721 F.3d at 371.   The trial court here instructed the jurors daily not to discuss the case or allow anyone to discuss it with them.   *See* 36 RR 209; 37 RR 131; 38 RR 128; 39 RR 123; 40 RR 36; 41 RR 115; 42 RR 215; 43 RR 203; 44 RR 201; 45 RR 38.   The record contains no suggestion that the jury did not follow these instructions.

In short, the evidence only cuts one way; there is no evidence, let alone "clear and convincing" evidence, contradicting the state court's determination.   *See Oliver*, 541 F.3d at 343-44 (upholding state court ruling that outside influence did not affect jury's verdict, even though the evidence "cut both ways").   Ward's petition does not refute this state of the evidence or even acknowledge it.   In fact, the main piece of evidence, Zelhart's affidavit, gets only a passing reference in a footnote to Ward's Reply.   Reply at 10 n.6. Ward has not shown that the state court's adjudication was based on an unreasonable determination of the facts in light of the record before the state court.   *See* § 2254(d)(2).

Finally, Ward asserts that both the trial court and the state habeas court wrongly denied him a hearing on this claim.   Ward raised his complaint about the lack of a hearing at trial before the state habeas court, which rejected it.   1 SHR 104-05; 6 SHR 825-26. He fails to demonstrate that this decision was unreasonable in law or fact, as required for federal review.   *See* § 2254(d).

Ward complains that the trial court erroneously refused to hold a hearing simply because Ward did not present evidence that Zelhart was a member of the prosecution team,

ORDER AND OPINION – PAGE 15

evidence he could not produce without a hearing.   Petition at 11.   The record shows that Ward's counsel voiced his concern about Zelhart in open court; the judge heard the State's oral response and inquired into Zelhart's status with the prosecution.   42 RR 79-81.   The judge said he would require some evidence that Zelhart discussed the case, and Ward's counsel allowed that he did not have such evidence.   42 RR 81.   By way of explanation, counsel had been in discussions with the District Attorney before they approached the bench, 42 RR 79-80, and Zelhart had told prosecutor Tittle his version of the events at the café.   4 SHR 599.   Thus, it is not unreasonable to conclude that Ward's counsel knew Zelhart's testimony would defeat a Sixth Amendment claim and was simply making a record for appeal.   For whatever reason, Ward's counsel did not ask the trial court to call Zelhart as a witness.   In any event, the trial court denied Ward's motions for mistrial and for a new trial because he did not think there was "any evidence of any impropriety at this time."   42 RR 81.   This record refutes Ward's assertion that the trial court did not hold a hearing.

"The remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."   *Phillips*, 455 U.S. at 215.   In this circuit, a trial court is not obligated to conduct a full-blown evidentiary hearing every time a defendant raises an allegation of jury tampering.   *Sylvester*, 143 F.3d at 932 n.5.   The procedures used to investigate allegations of an extrinsic influence on the jury, and the decision to hold an evidentiary hearing, are matters within the sound discretion of the trial court.   *United States v. Kelley*, 140 F.3d 596, 608 (5th Cir. 1998).   "The court must balance the harm resulting from the emphasis [a hearing] would place upon the misconduct and the

disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by the misconduct."   *Sylvester*, 143 F.3d at 932 n.5 (quoting *United States v. Chiantese*, 582 F.2d 974, 980 (5th Cir. 1978)).   Under the circumstances here, where the trial court had no reason to believe the jury had a meaningful exposure to an outside influence, a full-blown evidentiary hearing is not required.   *See Smith*, 354 F.3d at 394 (holding that trial court is not required to conduct investigation into claims of juror exposure that are merely speculative).   Ward provides no controlling authority to the contrary.   For the foregoing reasons, Ward does not show that the state court's rejection of his "no-hearing" claim involved on an unreasonable determination of the facts or an unreasonable application of clearly established federal law.

The same trial judge presided over the state habeas proceedings.   Although Ward obtained five affidavits, including affidavits from two jurors, he again failed to present any evidence that Zelhart discussed the case with jurors.   Ward now argues that the state habeas court erroneously denied him a "full and fair hearing," but he again presents no authority that the Constitution requires live evidentiary hearings in this situation.   Alleged infirmities in state habeas proceedings cannot serve as a basis for setting aside a conviction because such claims attack a proceeding collateral to the petitioner's detention and not the detention itself.   *See Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995).   As such, this contention does not present a ground for federal habeas relief.   *See id.*; *see also Rudd v. Johnson,* 256 F.3d 317, 319 (5th Cir. 2001) (noting "long line" of cases from this Circuit holding that "infirmities in state habeas proceedings do not constitute grounds for relief in federal court").

ORDER AND OPINION – PAGE 17

Ward has had two opportunities to develop evidence of his jury intrusion claim.[8] The record contains no evidence that Zelhart spoke about the pending trial or that his mere presence affected any juror's verdict.   The Court concludes that the state court's adjudication did not involve an unreasonable application of clearly established federal law or an unreasonable determination of the facts.   *See* § 2254(d).   The Court denies claim 1.

### III.   COUNSEL'S MITIGATION INVESTIGATION (CLAIM 2)

Ward's second claim alleges ineffective assistance of trial counsel ("IATC"). Specifically, Ward contends that the psychosocial history report prepared by the defense team was deficient in various ways, which led to an incorrect diagnosis of antisocial personality disorder ("ASPD") and prevented the jury from hearing evidence of Ward's impoverished, isolated, violent, and otherwise unfortunate childhood.   Respondent contends the claim is unexhausted, procedurally barred, and without merit.

### A.   *Exhaustion & Procedural Default*

As a threshold matter, the Court must consider the State's argument that this claim is unexhausted and procedurally defaulted because Ward did not raise it in the state habeas proceedings.   Under the exhaustion requirement, a federal court may not grant habeas relief unless it appears that the applicant has exhausted the remedies available in the courts of the state.   *See* § 2254(b)(1)(A); *Richter*, 131 S. Ct. at 787.   This requirement is satisfied when a petitioner fairly presents the substance of the federal habeas claim to the

---

[8]Ward's federal habeas counsel has also contacted the jury foreman, whom Cannon specifically identified as a juror who sat and talked with Zelhart.   While federal counsel has filed the foreman's affidavit with this Court, it makes no mention of the lunch incident with Zelhart.   *Ex.* 15.

highest state court.   *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (quoting *Mercadel v. Cain*, 179 F.3d. 271, 275 (5th Cir. 1999)) *abrogated in part, Lewis v. Thaler*, 701 F.3d 783, 790 (5th Cir. 2012), *cert. denied,* 133 S. Ct. 1739 (2013).

In state habeas court, Ward challenged trial counsel's mitigation investigation under *Strickland v. Washington*, 466 U.S. 668 (1984), *Wiggins v. Smith*, 539 U.S. 510 (2003), the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, and the State Bar of Texas Guidelines and Standards for Texas Capital Counsel.   1 SHR 97d-101.   The state petition asserted that trial counsel's mitigation investigation was not thorough and that these deficiencies led to the inaccurate diagnosis of "shared delusional disorder" and the failure to locate important mitigation witnesses.   1 SHR 97e-99, 100. The state claim relied on the following new witnesses:   school psychologist Steven Ball, Commerce residents Judy and Michael Fane, school secretary Patricia Neal, Ward's best friend and fellow Boy Scout Charles Sleeman, and neighbors Leon and Loretta Harrison. *See* 1 SHR 100-101; 2 SHR 159-60; 4 SHR 465, 476, 489-508.

In this Court, Ward again challenges trial counsel's mitigation investigation under *Strickland, Wiggins,* and the guidelines of the American Bar Association and the State Bar of Texas.   Petition at 12-30.   Ward again contends that the psychosocial history did not meet prevailing professional standards, that the mitigation investigation was not thorough, and that the mitigation investigator did minimal work.   Petition at 31-35.   In a slight federal variation on his state habeas theme, Ward here contends this led to an incorrect diagnosis of ASPD (rather than an incorrect diagnosis of shared delusional disorder, as he

argued in his state habeas proceeding) and a failure to present mitigating evidence about his childhood.   Petition at 40-51.   Ward relies on the following new evidence:

- An affidavit of Buddy Jones, Ward's former elementary school principal and neighbor of the Wards.   *Ex.* 4.

- A paper about the "team concept" in defending capital cases presented by the Texas Defender Service at a seminar in 2001.   *Ex.* 9.

- A declaration of Sharon Crump, coworker of Ward's mother, who described the Ward family and Nancy Ward's difficult marriage.   *Ex.* 10.

- A declaration by Sharon Vice, another coworker of Nancy Ward.   *Ex.* 11.

- A declaration by Ward's uncle, Billy Hyde, who described Ward's childhood and the Wards' life together.   *Ex.* 12.

- A declaration by Ken Hindman, an older neighbor who befriended Ward when he was young and paid him to do yard work.   *Ex.* 13.

- A declaration from Trish King, the principal of Ward's high school and a classmate of Ward's father, who described the father and son as similar "misfits."   *Ex.* 14.

Ward argues that he exhausted his federal claim because it simply focuses on persons that trial counsel failed to interview in addition to those already mentioned in his state petition.[9]   Reply at 11-12.   Citing *Anderson v. Johnson*, he asserts that the new affidavits merely supplement but do not fundamentally alter the claim presented in state court.   *Anderson v. Johnson*, 338 F.3d 382, 386-87 (5th Cir. 2003).   After the issuance of the Supreme Court's opinion in *Cullen v. Pinholster*, however, federal habeas courts no longer examine new evidence under the exhaustion rubric.   *Clark v. Thaler*, 673 F.3d 410, 416-17 (5th Cir.), *cert. denied*, 133 S. Ct. 179 (2012); *see Lewis*, 701 F.3d at 791 (explicitly rejecting the former rule that, where new affidavits supplement rather than fundamentally

---

[9]In the wake of *Martinez* and *Trevino*, the parties perhaps wish they could swap positions on exhaustion.

alter state-court claim, they may be admissible for review under § 2254(d)).   *But see Sells v. Stephens*, ___ F. App'x ___, 2013 WL 3784348, at *7 (5th Cir. July 22, 2013) (applying *Anderson* analysis to hold that new evidence rendered IATC claim unexhausted).   This is because this Court reviews the state court's adjudication based only on the evidence before the state court.   *See Pinholster*, 131 S. Ct. at 1398; § 2254(d)(2).

Therefore, the controlling question is simply whether the petitioner fairly presented the substance of the federal habeas claim to the state court.   Claims made under *Strickland* and *Wiggins* challenge "counsel's decision to limit the scope of their investigation into potential mitigating evidence" and focus on the adequacy of the investigation supporting counsel's strategic decisions to direct their limited resources for further investigation and trial preparation.   *See Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 673, 699-700. Although Ward's federal Petition contends his trial counsel overlooked additional evidence, it alleges the same deficiencies and necessarily challenges the same strategic decisions challenged in his state habeas proceeding based on the same investigation conducted by trial counsel up to that point.   As demonstrated at considerable length below, *see infra* Part III.B, Ward fairly presented the substance of the claim in state court and it is exhausted.[10]

---

[10]In his Reply, Ward argued alternatively that, if this claim is unexhausted, it is not procedurally barred because state habeas counsel also provided ineffective assistance. *See Martinez,* 132 S. Ct. 1309.   But his contention that state habeas counsel's investigation did not "come near" to fulfilling what the ABA guidelines require directly contradicts his previous argument in a motion for funds that state habeas counsel's investigation "clearly established" the ineffectiveness of the trial team.   Reply at 18; Motion at 7-8 [31].   The allegation against habeas counsel is also at odds with the record, which shows that she raised the IATC claim, conducted an entirely new mitigation

investigation, and even initiated mandamus proceedings to remove Ward's appellate counsel on the grounds that he was not on the approved list of attorneys qualified to handle death penalty appeals and that his brief was inadequate.  *In re Ward*, No. WR-70651-01 (Tex. Crim. App. Nov. 19, 2008) (orig. proceeding); *Ward v. State*, No. AP-75,750 (Tex. Crim. App. Nov. 19, 2008).  Nevertheless, Ward asserted in his Reply that he would soon move the Court to reconsider the denial of funding of the IATC claim in light of habeas counsel's ineffectiveness under *Martinez*.  Reply at 6 n.5, 12 n.7, 19 n.9.  Ward never filed a motion to reconsider the funding, however.

On August 5, 2013, this Court ordered supplemental briefing regarding the impact of *Trevino v. Thaler* on the case.  In his letter brief, Ward suggested that, if this claim is considered unexhausted, the Court should reconsider its previous denial of funds, grant funding, and allow Ward to present any new evidence in a second amended petition. *Supp. Letter Brief* at 4-5.  The unacknowledged purpose of such funding is to render a properly exhausted and reviewable IATC claim into an unexhausted one, reviewable only if *Martinez* is satisfied, and the very satisfaction of which in turn propels Ward's request for funds.  The Court disapproves of this attempt to use *Martinez* to bootstrap factual development in federal court in a search for unexhausted claims.  Such a procedure would encourage sandbagging in state court to obtain *de novo* review of a petitioner's "real" claim in federal court.  *See Dickens v. Ryan*, No. 08-99017, 2014 WL 241871, at *21 (9th Cir. Jan. 23, 2014) (en banc) (Callahan, J., concurring and dissenting) (reasoning that *Martinez* should not apply to IATC claims that petitioner did not seek to raise in state court).  Using *Martinez* in this way also conflicts with the principles of the AEDPA as enunciated in *Pinholster*, that it was Congress' "intent to channel prisoners' claims first to the state courts" and that it would be "contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo."  *Pinholster*, 131 S. Ct. at 1398-99; *see Dickens*, 2014 WL 243717, at *20.

Regardless of *Martinez*'s application to this case, the Court concludes that it properly denied funding because the claim is exhausted.  Ward must therefore overcome the limitations in § 2254(d) on the record that was before the state court.  *Pinholster*, 131 S. Ct. at 1398.  As discussed below, Ward fails to overcome the limitations in § 2254(d) and therefore cannot show that his requested funds for the development of new evidence would be reasonably necessary.  *E.g., Caudill v. Conover*, 871 F. Supp. 2d 639, 650 (E.D. Ky 2012); *Soto Fong v. Ryan*, No. CV 04-68-TUC-DCB, 2011 WL 3439237, at *15 (D. Ariz. Aug. 5, 2011) (denying requests for discovery, expansion of the record, and evidentiary hearing because petitioner failed to satisfy either prong of § 2254(d)).

### B.  *Factual Background*

*1.  Competency Trial.* —  During jury selection, defense counsel requested a trial to determine Ward's competency to stand trial, and the trial court held a competency trial before a jury.  18 RR 6; 21 RR 1; *see* TEX. CODE CRIM. PROC. ANN. art. 46B.051 (West 2006).   Although competency is not an issue in this proceeding, the testimony and expert reports from the competency trial are pertinent to this Court's (and the state habeas court's) assessment of trial counsel's mental health investigation and preparation for the criminal trial.   A summary of the competency trial testimony is therefore appropriate.

Defense psychiatrist, Heidi Vermette, and psychologist, Kristi Compton, both reviewed Ward's medical, school, and jail records, evaluated Ward, interviewed his parents, Nancy and Ralph, and reviewed Ward's and his father's statements to the Texas Rangers.   DX 7 (64 RR 57, Compton's Report); CX 1 (47 RR 6, Vermette's Report).   Together, their testimony described Ward's behavioral problems beginning at age three, when his parents sought healthcare locally before having him admitted to Children's Medical Center in Dallas, where the doctors diagnosed him with bipolar disorder at the age of four.   21 RR 50-56; 22 RR 104-06.   They described a number of tests performed on Ward over the years, various medications prescribed (Depakote, lithium, Haldol, Ritalin, Elavil, Thorazine, Respiradol, Dicertarin), and multiple diagnoses made, including bipolar disorder, personality disorder, schizoaffective disorder, depression, oppositional-defiant

disorder, neuropsychological disorder, and "behavioral allergies."[11]   21 RR 51-52, 68; 22 RR 111-13.

Ward's intelligence was above average, but he had dyslexia, a common learning disability.   21 RR 54, 64, 116.   As a child, he was aggressive towards fellow students, oppositional to extreme degrees, and diagnosed with a "parent-child problem with dysfunctional family" and oppositional-defiant disorder in the first grade.   21 RR 58-59; 22 RR 108.   Ward was a loner who had difficulty forming friendships and was unable to feel empathy.   21 RR 61, 66.   By sixth grade, Ward was suspected of having delusional tendencies and was diagnosed with depressive disorder and personality disorder with narcissistic features.   21 RR 61.   School psychologist Stephen Ball stated that Ward modeled the family dynamics and predicted that his delusional tendencies would become stronger and more entrenched as Ward aged.   22 RR 109.   Although doctors had recommended that Ward's parents seek individual therapy and family therapy, they did not do so.   21 RR 55, 64; 22 RR 106.

Neuropsychological testing at age thirteen and fourteen indicated that Ward had tunnel vision and got "stuck" on certain things and had very low frustration tolerance.   21 RR 63-64.   He spent most of his time with his father and did not date or go to parties.   22 RR 104.   By age fifteen, he had problems with short-term memory and a narcissistic personality, which led to a low regard for others and inadequate reality testing "whenever his tenuous self-representation [was] confronted by others, especially those in authority."   22 RR 109; DX 7, p. 8 (64 RR 64).   He interpreted neutral things as a threat or personal

---

[11]This apparently refers to behavioral issues caused by allergies.

attack.   21 RR 64.   Ward's parents believed he was not getting appropriate school services due to a vendetta against the family, and health examiners thought that his parents' derogatory statements fueled Ward's lack of respect for the school.   21 RR 64.   By eighth grade, Ward used degrading and vulgar language with teachers and peers, he went to class late and left early, and when his behavior was out of control, it required three male staff to restrain him.   He was verbally and physically abusive to his mother when she picked him up from school.   21 RR 65.   At this time, Dr. Douglas Keene observed Ward to be "frankly psychotic."   21 RR 66; CX 1, p. 8 (47 RR 13); 22 RR 111.   Ward's aggression escalated in ninth grade when he had a fight with one of his teachers.   21 RR 70.   In tenth grade, he had problems with his neighbors that resulted in a criminal mischief charge, and by eleventh grade, he was accused of stabbing another student in the leg.   CX 1 (47 RR 14); 21 RR 72.   After this, he was homeschooled until graduation.   21 RR 76.   At age eighteen, he was charged with assault on a public servant and resisting arrest and search. 21 RR 73.   By this time, he was diagnosed with bipolar disorder, depression, learning disorders, and attention deficit hyperactivity disorder, and was taking Depakote and lithium.   21 RR 73-74.

Ward attempted college but dropped out because he butted heads with the instructors, whom he described as deceitful and political.   21 RR 75.   About three years later, Ward's father gave him a mild concussion by hitting him on the head with the butt of a revolver to keep him from going next door and killing the neighbors.   21 RR 75-76. Ward was never able to keep a full-time job.   21 RR 76.   A jail screening upon his arrest in 2005 described Ward as depressed and hostile, with very little facial expression and

tangential thinking.   21 RR 77.   He had difficulty with impulse control, bad judgment, poor insight, trouble sleeping and eating, mood swings, and bizarre behaviors.   21 RR 78. While awaiting trial, Ward had "a myriad of jail incidents."   21 RR 78.

Ward had an unusually close relationship with his father, Ralph, who visited him practically every day in the jail.   21 RR 79.   Ralph had been Ward's primary caretaker and had quit working when Ward was eight, leaving mother Nancy to support the family. 22 RR 103.   Ralph was dominant, demeaning, and abusive to Nancy.   21 RR 79; 22 RR 101-02.   Ward's parents did not teach him to be responsible for his actions and blamed the school when something happened.   22 RR 103-04.   Drs. Compton and Vermette believed that Ralph and his son suffered from similar delusions, one of which was that there was a conspiracy in the town against the family, that the school district was mixed up in the government and the court system, and that they were trying to harm the whole family.   21 RR 80-81, 104-05; 22 RR 95-97, 101, 114.

Dr. Compton's primary diagnosis was shared psychotic disorder, whereby Ralph possessed delusional or odd beliefs that he imposed on his son.   22 RR 114-15.   Her additional diagnoses included delusional disorder (persecutory type), bipolar disorder by history, learning disorder, and personality disorder with "strong signs of narcissistic, obsessive compulsive, and antisocial features."   22 RR 116-17; DX 7, p. 12 (64 RR 68). Dr. Vermette diagnosed Ward with psychotic disorder, obsessive compulsive personality disorder, and ASPD.   21 RR 101.   Dr. Vermette relied on a competency evaluation by Dr. Michael Pittman, the trial court's expert, who diagnosed Ward in 2005 with bipolar disorder and a personality disorder with "paranoid, antisocial, and narcissistic traits."   21

RR 126, 158; DX 4; 2 CR 170.   Dr. Vermette also relied on a 2007 neuropsychological evaluation by Dr. Randy Price, another defense expert, who found Ward's clinical picture consistent with "delusional disorder, bipolar mood disorder, obsessive-compulsive and narcissistic personality traits, severe learning disabilities, and antisocial behaviors."   21 RR 81, 165-68; DX 6 (63 RR 122).   Dr. Price also believed that Ward's symptoms were similar to those of his father and "constitute a shared delusional type psychosis." 64 RR 122.

   *2. Criminal Trial.*   —   Counsel's strategy at the guilt phase was to demonstrate that Ward's upbringing had caused a delusional mental state of distrust towards the city, the school district, and the police department that prevented him from committing the aggravating offense of retaliation that was required for the alleged capital murder.   36 RR 29-33; 40 RR 23-25.   In addition to testimony from Dr. Vermette and Ralph Ward, counsel offered into evidence all of the records of city code violations at the Ward home dating back to 1993.   39 RR 5.   These included photographs of the house Ward grew up in, written communications between Ralph and the city, and references to illegal rubbish, a dilapidated house in disrepair, and demolition of the home.   DX 1F, 1H (63 RR 126).

   At sentencing, the State introduced testimony from: the victim's surviving son and father; four jail detention officers who described multiple incidents of Ward's threatening, aggressive behavior and the hoarding of contraband; a former high school classmate whom Ward stabbed in the leg; a sheriff's deputy who described Ward's 2000 arrest for assault and resisting arrest; a former Boy Scout whom Ward tried to cut with a knife on a camping trip; and the architect who designed a "timeout" box that was used to discipline Ward in

elementary school.   41 RR 7-91, 101-114; 43 RR 7-8; 44 RR 138-41.   The State also played recordings of Ward's profanity-laced phone calls from jail to his mother and father. 41 RR 97-98; SX 600.   These calls demonstrated a disrespect and lack of sympathy for the victim and his family, continued threats toward others, and insulting behavior towards his mother when she tried to warn him against smiling at the victim's father in court and told him that his lawyers "are the ones that went to law school."   46 RR 7-13; *see also* 44 RR 97, 134.

The defense strategy emphasized that Ward was sick from an extremely young age and that his parents exacerbated his problems and did not follow up on needed therapy.   42 RR 6-12; 46 RR 18-20.   Counsel presented testimony from Ward's parents, school and special education personnel, law enforcement personnel, and people who were acquainted with the Wards socially.   In short, counsel brought to light much of the information documented in the medical and educational records that the defense experts reviewed prior to the competency trial.   These records and more came into evidence.   42 RR 44; DX A (Children's Medical Center); DX B (Commerce ISD); DX C (Tri-County Cooperative); DX D (teacher's records).

Nancy Ward described her family life in a big, old house full of junk, guns, and ammunition, where Ward slept in his parents' bedroom until he was six or seven years old. 42 RR 18-22.   Nancy said Ralph was a loner growing up, she was a loner growing up, and their son was a loner.   They did not socialize.   42 RR 29.   She earned a bachelor of education degree and worked at Texas A&M University–Commerce.   42 RR 15-16.   She described Ralph's sporadic work history and instances of his controlling, demeaning, and

abusive behavior that occurred daily in front of their son.   42 RR 22-34.   Nancy described

Ward's unusual rages beginning around two years of age and having to leave his daycare.

42 RR 36-37, 39.   She identified various medications that he had taken and named

multiple healthcare providers (including psychologists, psychiatrists, a play therapist, a

neurologist, and neuropsychologists) that they had seen, such as Drs. Cardwell,

Funderburk, Weinberg, Graham, Emslie, Pole, Manjunath, Stavinoha, Ball, Keene, and

Stinnett.   She acknowledged the family's failure to seek recommended therapy and attend

parent programs at Children's Medical Center.   42 RR 39-66, 85-87; DX A; DX 20A.

She said they met regularly with the school to formulate their son's education plan for the

year, but as Ward reached second grade, they began to disagree with the school's

methodology.   42 RR 90-93.   They filed, and won, a complaint with the Texas Education

Agency ("TEA") over the use of a timeout room for discipline.   42 RR 95-103, 106-07.

Nancy admitted she had fought hard to keep the school from punishing Ward for his

actions in school.   42 RR 120-21.

Ralph testified about his education, including a master's degree and a doctor of

education degree.   43 RR 103-05, 154.   He said he had sacrificed his education and

degrees to stay at home and protect his son from society and society from his son.   43 RR

119-20.   Ralph confirmed his interest in the "Illuminati," an apocryphal secret society of

enlightened individuals who control the majority of government, such as bankers,

businessmen, and money people.   43 RR 194.   Ralph believed the police did not treat his

son fairly; he "absolutely" did not believe the schools properly handled his son's

education; and he felt the city singled out and picked on his home.   43 RR 182-85.

Specifically, he believed the head of code enforcement was connected with the city council, which was connected with the school district, and the school district was "scared to death" of a lawsuit he had threatened to file.   43 RR 195.

Ralph related Ward's behavioral and mental health history and described early family therapy sessions as discouraging, saying it was difficult to seek family therapy.   43 RR 106-124.   He said he generally disagreed with the school on the matter of discipline, particularly the use of the timeout box after sixth grade.   43 RR 130-38, 151.   Ralph said Ward improved academically in middle school but that the school personnel retaliated against Ward because he was doing so well without their punitive disciplinary policies in effect.   43 RR 137, 141.   During this time, Ralph filed a complaint and stopped the school from enforcing a new law against Ward that separates a student from the normal classroom when there is a criminal charge pending against them.   43 RR 140-42.   Ralph admitted he got "pretty vocal" at some of the special education meetings with the school.   43 RR 149. Ralph said that he taught his son to obey traffic and parking laws and that Ward is irritated when other people do not do likewise.   43 RR 122.   Ralph also agreed on cross-examination that Ward had "triggers" that caused him to be highly agitated, one of which was authority figures abusing their authority.   43 RR 181.

Ward's former daycare teacher testified that Ward attended her daycare until he was not able to be with the other children due to his aggressive nature and outbursts.   42 RR 157-161.   The director of Tri-County Cooperative, an agency that delivered special education services to Ward's school district, testified that Ward was labeled seriously emotionally disturbed and did not read at grade level.   42 RR 164.   She said Ward's

parents were not satisfied with the behavioral management programs that the Cooperative generated for Ward, even after the Cooperative had run the gamut of educational plans, attended numerous conferences, and brought in behavioral consultants from a university. 42 RR 165-67.

Ward's special education teacher for kindergarten, first, and third grades testified. 42 RR 181. She brought a box of records to court that she had kept for fifteen years because Ralph threatened her more than once and she felt she needed to protect herself from lawsuits. 42 RR 184-85; DX D. She testified that, as a child, Ward would attack her, and he choked, bit, hit, and kicked the other children every week. 42 RR 187, 199. She said Ward could control his behavior when he wanted to, and she described the disciplinary procedures she used, including a timeout room that the school built just for him. 42 RR 187-192. Her records contained a 1992 report by psychologist Dr. Hutton that said Ward's parents noticed a problem in their son when he was between eighteen and twenty-four months of age. DX D (60 RR 141).

A diagnostician with Tri-County Cooperative also testified at length. 43 RR 24. She described Ralph as very confrontational, bulldozing, loud, demanding, and difficult to compromise with. 43 RR 29-30. She related an occasion where Ward hurt a teacher, and Ralph showed up at her office threatening her because he did not want his son punished. 43 RR 31-33. She explained the Cooperative's efforts to obtain counseling and a neuropsychological evaluation of Ward, which Ralph initially resisted. 43 RR 36-38, 39. She said the Wards regularly declined extended-year services from the school district. 43 RR 44-45. Ralph often threatened her job, threatened to sue the school district, and

threatened to call the Texas Education Agency.   43 RR 38-39.   The district eventually

feared litigation so much that it instructed her to take a lawyer with her to every meeting

with the Wards.   43 RR 40-41.   At some point, Ralph demanded that she start calling him

"Dr. Ward" because he had a Ph.D.   He was constantly telling her she did not know the

law.   43 RR 47.   Ralph blamed the school personnel for Ward's behavior, saying they

should not get in his face when they know he is escalating.   43 RR 41.   She said the first

behavior management plan for Ward provided no consequences for his misbehavior and

that the only thing the school could do was call the parents.   43 RR 43-44.   She

summarized that the Wards were interested in their son's education but were in opposition

throughout, and Ward used this to manipulate school personnel by threatening to call his

parents.   43 RR 59-60.

A neighbor of Ward's grandmother, who was also an educational psychologist,

testified that he had known Ward since the age of five.   43 RR 19.   He said Ward

occasionally mowed his yard and raked his leaves and was always polite, respectful, and

did not curse.   43 RR 19-20.   His wife gave similar testimony.   43 RR 21-22.   Defense

counsel put on testimony from three jailers who said that Ward was not disrespectful

towards them.   42 RR 69, 72, 76.   Counsel also introduced Ward's probation records and

presented testimony that Ward had received early termination of his probation in 2003

because he satisfied all the conditions ordered by the court.   43 RR 66; DX I (63 RR 2).

Defense counsel presented testimony from two police officers involved in Ward's 2000

arrest, showing that what began as a parking dispute between Ward and his grandmother's

neighbors ended with Ward being injured while in police custody and hospitalized.    43 RR 81-83, 92-93.

Counsel also presented testimony highlighting the behavior and personality of Ward's father.  For example, the mother of one of Ward's former baseball teammates testified.  43 RR 199.   She described an unusual occasion when a young Ward was upset and grumbling about losing a game, and Ralph wanted to control Ward's behavior, so he quickly brought Ward to the ground and held him down for about five minutes.   43 RR 200-01.   She and the other parents did not feel that Ralph's reaction was justified, and they awkwardly shuffled away.   43 RR 201-02.   The Wards' next-door neighbor described an occasion when Ralph confronted her about her son's behavior after Ward had walked off with her son's bicycle.   She also said Ralph had a dog that barked all the time, would shoot blackbirds with a pellet gun and leave them dead in her yard, and used an air horn to call Ward home.   42 RR 172-75.   A former police officer for the city testified that in 1973 (nine years before Ward was born), Ralph had summoned police to his residence because cars were parked illegally on his street.   42 RR 177-79.   Counsel presented testimony from two additional Commerce police officers who testified that in 2006 (after the murder but before trial), they were dispatched to stand by while a city worker read meters on the Wards' street.   43 RR 95-97.   They testified that Ralph came out of his house and spoke to one of them, then got in his car and backed out of his driveway.   As he drove past a city work crew, Ralph extended his hand toward them in a gun-shaped gesture and simulated firing it.   43 RR 99, 101.

Ward testified against his attorney's advice.  44 RR 5.  He described extensive injuries from the timeout box and harassment that he received from school board officials because of his learning disability.  44 RR 20-28.  He described his version of the events that led to his arrest and hospitalization in 2000.  44 RR 29-38.  He also provided his version of the Boy Scout campout incident and the school bathroom stabbing.  44 RR 38-46.  He described harassment by a police officer who would periodically follow him around town.  44 RR 46-48.  Ward related the circumstances that led to Walker's shooting, beginning with Walker illegally parking his truck in the street.  44 RR 49-53, 92. Ward agreed that the head of code enforcement taunted and harassed his family and has "a little vendetta thing" due to small town politics, but he said that had nothing to do with his shooting Walker.  44 RR 70-72.  Regarding the town conspiracy, Ward said he believed the school board wanted retribution against his parents and summarized:  "the superintendent runs the school board, the school board runs city council, and city council runs everybody else."  44 RR 73.  He said other families have been conspired against, but most of them had enough sense to get out of town and "scatter to the wind."  44 RR 74-75.

Ward described his relationship with his parents as a little dysfunctional, said they did not live a regular lifestyle, and believed he was caught in the middle of his parent's problems.  44 RR 84-85.  When discussing his father's testimony, Ward said he had no idea where some of his testimony came from and that maybe his own father needed to have a psychological exam.  44 RR 99.

Dr. Price testified in detail about his neuropsychological evaluation of Ward, saying Ward often went off on tangents about his "delusions of paranoia," specifically that the

system, his attorneys, and everybody in Commerce was against him and that he was not responsible for any of his problems.  44 RR 177-89.  Dr. Price observed that Ward had poor insight into what his problems are and that this was apparent in his testimony before the jury.  44 RR 180.  Dr. Price concluded that Ward had impaired attention, concentration, academic ability, and complex thinking ability.  44 RR 189-90.  He also had a long-term behavioral pattern of opposition, aggression, hyperactivity, and bipolar disturbance.  44 RR 194-95.  Ward has at least average intelligence, and a clinical picture consistent with (1) delusional disorder, (2) bipolar mood disorder, (3) obsessive, compulsive, and narcissistic personality traits, (4) several learning disabilities, and (5) an antisocial personality.  44 RR 195-96.  Dr. Price concluded that Ward's paranoid, conspiratorial delusions were similar to his father's.  44 RR 197.  He agreed that there is no treatment or medication for personality disorders, but that people can age out of antisocial beliefs after about the age of forty.  44 RR 198-99.

The final witness for the defense testified about Ward's prison classification status if the jury gave him a life sentence.  45 RR 27-31.  He said that an inmate such as Ward would be screened by psychiatric personnel and permitted to see counselors or psychologists.  45 RR 32-34.  The witness described four or five prison units that deal specifically with mental health issues and one in particular for "high risk, assaultive, discipline problem, mental health issues."  45 RR 36-37.

The State argued to the jury that Ward deserved a death sentence given his past acts of violence which had escalated to murder, his multiple disciplinary violations in the jail, his continued threats towards others, failure to admit responsibility, his attitude towards the

victim, and treatment of his own mother.   46 RR 4-8.   The prosecutor argued that Ward had educated parents who fought for him throughout his life, that the violence in the Ward home was minimal, and that Ward could perform well when he wanted to.   46 RR 8-16. He argued that Ward did not learn to assault and kill people from his father because his father had never been accused of assault.   46 RR 38, 45.   The prosecutor pointed out that there are countless individuals with learning disabilities and mental illness who do not commit crimes and that Ward's behavior is caused by ASPD, which cannot be treated or cured and makes him more dangerous.   46 RR 38-39, 42-45.   During the prosecutor's final statements to the jury, Ward blurted, "You're the cowardly piece of shit."   46 RR 48.

Defense counsel argued that Ward has been sick since the age of two and multiple evaluations over the years correctly predicted he would end up in the courtroom.   46 RR 17.   Counsel pointed out that Ward has never been made to own up to anything, but that the jury did so when they found him guilty.   46 RR 18.   Counsel pointed out that Ward can comply with probation and he has not attacked anybody in jail while awaiting trial for two years.   46 RR 18-19.   He asked that the jury be his surrogate parents and place him in prison where he will get the mental health treatment he has never had, with appropriate medication and follow up.   46 RR 19-20.   Counsel emphasized that Ward modeled himself after his father, who had severe control issues.   46 RR 24-27.   He stressed that Ward's problems began in infancy and it should have been obvious that something needed to be done, but his parents did not meet his needs.   46 RR 27-33.   He pointed out that Ward would burn out of the ASPD diagnosis in a structured environment after twenty years and that a life sentence in Texas is a minimum of forty years.   46 RR 33-36.

*3.  State Habeas Proceedings*.  —  As previously noted, Ward's state application challenged trial counsel's mitigation investigation and argued that the deficiencies led to the inaccurate diagnosis of "shared delusional disorder" and the failure to locate certain mitigation witnesses.   1 SHR 97e-99, 100.   The habeas mitigation specialist, Toni Knox, interviewed Ward, his parents, and nineteen other people, and considered school records, special education records, mental health records, police records, hospital records, jail records, social security records, a family genogram, tape recordings of Ward's confession and jail conversations, 911 tapes, the District Attorney's social history report, and notes of the fact investigator, mitigation investigator, and consulting psychologist at trial.   1 SHR 137-150; 2 SHR 151-229.   The state claim also relied on the following new information:

- An affidavit from school psychologist Steven Ball regarding his desire to testify at the trial about his "long-standing professional understanding" of Ward.[12]   4 SHR 489-508.

- Affidavits from Judy and Michael Fane who said that the victim had been hostile and inappropriate about city code issues several days before his death.   4 SHR 464, 467.

- An affidavit from Patricia Neal, a secretary at Ward's middle school, who felt sorry for Ward as a boy, felt that the school's disciplinary methods were somewhat barbaric, and was upset by Ward's trial and sentence.   4 SHR 465.

- An affidavit from Charles Sleeman, a fellow Boy Scout who considered Ward to be his best friend and said Ward was bullied by students and picked on by teachers his whole life, but had a strong spirit and stood up for others.   4 SHR 476.

- An interview with Leon and Loretta Harrison, neighbors of the Wards, who treated Ward as their adopted son.   Leon acted as Ward's spiritual advisor and had been

---

[12] Dr. Ball was sworn as a witness but never testified because trial counsel discovered that the Texas State Board of Medical Examiners of Psychologists sanctioned him in 2006, and Dr. Ball confirmed that the Board substantiated the allegations against him.   Trial counsel also believed that Ward's parents unduly influenced Dr. Ball's early diagnosis of Ward.   5 SHR 604.

approached to testify on Ward's behalf but did not do so and later regretted it.   2
SHR 159-60.

1 SHR 100-101.

In rejecting Ward's claim, the state habeas court found that trial counsel conducted a thorough mitigation investigation and psychosocial history, that defense experts furnished an accurate mental health diagnosis, and that counsel made effective decisions concerning which mitigation witnesses would testify.   6 SHR 823-24.   The state court concluded that trial counsel's mitigation investigation was constitutionally adequate and that there was no reasonable probability that, but for the alleged deficiencies, the trial outcome would have been different.   6 SHR 824-25, ¶ 92, 103.   The Court now turns to whether the state court's denial of relief was unreasonable under § 2254(d).

## C.  Applicable Law

The clearly established federal law governing claims of ineffective assistance of trial counsel is *Strickland v. Washington*, 466 U.S. 668 (1984).   *See Williams v. Taylor*, 529 U.S. 362, 398-99 (2000).   Under *Strickland,* Ward must first demonstrate that counsel's representation fell below an objective standard of reasonableness.   *Strickland*, 466 U.S. at 688.   The objective standard of reasonable representation is defined by prevailing professional norms and is necessarily a general standard.   *See Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam).   Restatements of professional standards, such as the American Bar Association guidelines, are "only guides" to what is reasonable and are properly considered only to the extent they describe the prevailing professional norms and standard practice, and are not so detailed that they "interfere with the constitutionally

protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id*. at 8-9 n.1.   The Constitution imposes "one general requirement:   that counsel make objectively reasonable choices."   *Id*. at 9.   Counsel are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 690)).   This standard not only gives trial counsel the benefit of the doubt, but affirmatively entertains the range of possible reasons counsel may have had for proceeding as they did.   *Id.* at 1407.   Regarding counsel's duty to investigate, strategic decisions made by counsel following a thorough investigation are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.   "[S]trategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.   *Id*. at 691.

Next, Ward must demonstrate that there is a reasonable probability that prejudice, sufficient to undermine confidence in the trial outcome, resulted from counsel's deficiency.   *See Strickland*, 466 U.S. at 694.   A "reasonable probability" of prejudice requires a substantial, not just a conceivable, likelihood of a different outcome. *Pinholster*, 131 S. Ct. at 1403.   For claims that challenge counsel's sentencing investigation, the reviewing court reweighs the evidence in aggravation against the totality of available mitigating evidence and determines whether there is a probability, sufficient to undermine confidence in the outcome, that the jury would have assessed a life sentence. *See Wiggins*, 539 U.S. at 534.

"The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," not whether defense counsel's performance fell below *Strickland*'s standard.   *Richter*, 131 S. Ct. at 785.   The review is "doubly deferential" and gives both the state court and the defense attorney the benefit of the doubt.   *Burt v. Titlow*, 187 L. Ed. 2d 348, 353 (2013).   Here, Ward must demonstrate that it was necessarily unreasonable for the CCA to conclude (1) that he did not overcome the strong presumption of counsel's competence and (2) that he failed to undermine confidence in the jury's sentence of death.   *See Pinholster*, 131 S. Ct. at 1403.

### D.   Analysis

Ward does not specify how the state court's decision was unreasonable, but simply reasserts his argument that trial counsel's representation fell short of *Strickland* and avers generally that § 2254(d)(1) and (d)(2) are satisfied.   *See* Petition at 52.   Therefore, the Court will address all of Ward's claims in light of the record that was before the state habeas court.

Ward asserts that the psychosocial history report prepared for trial did not meet prevailing professional standards because (1) the mitigation investigator met with Ward's parents only three times, (2) the defense team did not gather most records on their own but relied upon discovery from the prosecution, (3) the bulk of witness interviews were done by the fact investigator rather than the trained mitigation investigator, (4) the investigation did not include all of the people necessary to compile an adequate psychosocial history and overlooked unnamed mental health providers and members of Ward's extended family. Petition at 31-35.   He argues that this deficient investigation prejudiced his defense

because (1) it led to Dr. Price's incorrect diagnosis of ASPD, and (2) the jury did not hear evidence of his (a) impoverished childhood, (b) being raised in isolation and taught that the rest of the world intended to harm him, (c) seeking his parents' approval, but being unable to find it, (d) being raised in a violent home, (e) being raised in a home that was an arsenal, and (f) having parents who ignored doctors' recommendations for family counseling.

   *1.  General Deficiencies in Counsel's Representation.*  —  Initially, Ward takes issue with the way trial team members carried out their duties, i.e., the use of a fact investigator to interview mitigation witnesses, the number of interviews conducted, the reliance on discovery, and the use of telephone interviews and "couple" interviews.   But there are countless ways to effectively represent a capital defendant.   *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*).   These arguments, which attempt to establish rules for witness interviews or prohibit reliance on discovery, would interfere with the constitutionally protected independence of counsel and the wide latitude counsel has in making tactical decisions.   *Van Hook*, 558 U.S. at 8-9 n.1; *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.4 cmt., p. 1003 (2003) (noting that counsel is free to allocate duties imposed by Guidelines to appropriate members of the defense team, with two exceptions that do not apply here).   Accordingly, Ward has not shown that the state court's decision was an unreasonable application of *Strickland* in this regard.

   This general challenge to the way the defense team carried out their duties also fails to demonstrate an unreasonable determination of facts by the state court.   The record shows that the trial court allocated more than $136,000 for Ward's counsel to retain a

psychologist, a psychiatrist, a neuropsychologist, a fact investigator, and a mitigation specialist.[13]   Ward does not argue that his trial team was inadequately funded or staffed. Much of the defense investigation occurred well in advance of the trial, in connection with the competency trial.   And while an attorney may be deficient in relying *solely* upon an open file, that was not the situation here.   The prosecution provided a copy of its entire file to Ward's counsel, but counsel also issued over forty subpoenas, and independently subpoenaed the records of Commerce ISD, Tri-County Cooperative, the individual doctors connected with Children's Medical Center, as well as Baylor University Medical Center, Stephen Ball, Milton Cardwell, M.D., Dr. Keene Consulting, Cook Behavioral Health Services, Commerce Police Department, several of Ward's teachers, Ward's probation officers, and Hunt County jail.   3 CR 328; DX 1G (65A RR 3).   Ward's complaint about the number of times his mitigation specialist met with his parents likewise overlooks the extent of defense efforts as demonstrated in the record.   In May 2007 alone, lead counsel met with Ralph and Nancy Ward for an hour, met with Dr. Compton and Nancy for two and a half hours, had three phone calls with Ralph or Nancy, and received a three-page fax

---

[13]Mitigation specialist Shelli Schade billed $14,199.51 for her work at trial.   1 CR 78; 5 SHR 713-730.   Consulting psychologist Dr. Compton billed $17,925.   1 CR 129; 5 SHR 732-39.   Psychiatrist Dr. Vermette billed $20,625.   7 CR 1014; 5 SHR 741-42. The trial court authorized $19,500 for neuropsychologist Randy Price.   2 CR 234.   Fact investigator Randi Ray billed over $64,000 for his work.   1 CR 92; 5 SHR 743-750; 6 SHR 751-772.

In addition to these experts, the trial court authorized $11,250 for an expert psychologist on insanity, $2,800 for a forensic pathologist, $6,000 for a crime scene reconstruction expert, $210 for an EEG expert, $628.90 for an EEG examination, and $1,791.80 for an MRI test.   1 CR 128; 2 CR 207, 219; 16 CR 2368, 2371, 2382; 24 CR 3525.

from Nancy.   21 CR 3169-3172.   Given this record, Ward fails to demonstrate clearly and convincingly that the state court based its decision on an unreasonable determination of the facts.

*2.   Counsel's Mental Health Investigation*.   —   Ward next asserts that the deficient psychosocial history overlooked necessary witnesses, in particular, mental health providers and members of the extended family who could have informed a more accurate (and different) diagnosis than ASPD and underscored the hereditary nature of Ward's impairment.

*a. The ASPD Diagnosis.*   —   Initially, Ward's argues that his trial team could not have properly diagnosed ASPD because "the defense team and experts were not aware of the characteristics displayed by Mr. Ward prior to his fifteenth birthday;" the record flatly contradicts that position.   Dr. Compton's and Dr. Vermette's reports discussed Ward's behavioral problems in infancy, reports from his preschool, school incidents or law enforcement contacts throughout all grade levels, and evaluations, notes, or testing by doctors in 1985, 1986, 1987, 1989, 1990, 1992-1993, 1994, 1995, 1996, 1997-1998, and 2001.[14]   DX 3G (65A RR 29-33); CX 1 (47 RR 9-15).   Compton's report also refers to a summary of Ward's "voluminous" special education records that the mitigation investigator prepared.   65A RR 34.   Counsel possessed Dr. Ball's diagnosis of oppositional-defiant disorder at age eight, the precursor diagnosis associated with the conduct disorder that Ward exhibited in adolescence.   65A RR 31; DX 1D (60 RR 142).

---

[14] Ward was born in 1982.   21 RR 44.

In her report to counsel, Dr. Compton predicted (correctly) that the State would assert that Ward's difficulties are associated with ASPD.   She further advised,

> *In order for this diagnosis [ASPD] to be made, he must first have been diagnosed with conduct disorder prior to the age of 15.   Adam fully met the criteria for conduct disorder during his adolescence,* but much of his behavior could be attributed to his developing delusions of persecution. This is not to intimate that Adam did not have severe behavioral problems, but is offered as a partial explanatory variable to account for some of his behavior.

65A RR 40 (emphasis added); *see also* 47 RR 25 (Dr. Vermette's report on Ward's symptoms of conduct disorder before age fifteen).   Dr. Compton concluded that the ASPD diagnosis was correct, but weak and "quite limiting."   65A RR 40.   In addition to Dr. Compton's expert opinion, trial counsel elicited further detailed evidence of Ward's childhood behavior through the testimony of Ward's parents, particularly his mother, Ward's special education teacher of three years, his daycare teacher, and the diagnostician with Tri-County Cooperative.   Over 3,000 pages of documents recorded Ward's life during his formative years.   This record indicates without question that counsel's experts knew the proper criteria for ASPD and possessed data on Ward's behavior prior to age fifteen.   It also shows that counsel was prepared to soften the ASPD diagnosis by showing that years of "programming" by his father caused Ward's difficulties.   65A RR 40.   The state habeas court could easily conclude on this record that Ward's trial counsel's mental health investigation was not ineffective; Ward fails to show that determination was unreasonable.

Next, even if Ward's challenge to the ASPD diagnosis were factually sound, the law does not hold counsel ineffective simply because a qualified expert diagnosed his client

unfavorably.   When counsel recognizes the possible issues regarding a client's mental capacity and the need for expert assistance and employs an expert at trial, counsel is not ineffective for failing to canvass the field to find a more favorable expert.   *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000), *abrogated on other grounds*, *Lewis,* 701 F.3d at 790; *see also Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997) (concluding counsel is not deficient in failing to locate an expert to testify that his client was retarded or mentally ill when initial expert concluded otherwise, especially when counsel knows of the state's ability to rebut any such evidence with its own experts).   *Accord Hinton v. Alabama*, No. 13-6440, ___ U.S. ___, 2014 WL 684015 (Feb. 24, 2014) (per curiam) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)).   This Circuit has held, "Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome [i.e., conviction] creates, and rule that his performance was substandard for doing so."   *Smith v. Cockrell*, 311 F.3d 661, 676 (5th Cir. 2002), *overruled on other grounds*, *Tennard v. Dretke*, 542 U.S. 274 (2004).   The mere fact that Ward's federal habeas counsel can find an expert whose opinion differs from that of the expert retained by his trial counsel does not make his trial counsel ineffective (or his trial expert wrong).   Accordingly, Ward's argument that counsel failed to investigate Ward's mental health history prior to the age of fifteen does not undermine the reasonableness of the state habeas court's rejection of his *Strickland* claim.

Finally, even if Ward could show that his trial counsel's investigation were deficient in this regard, Ward fails to show that the state habeas court's conclusion of no prejudice was unreasonable.   First, Ward has never disputed the ASPD diagnosis until now.   Dr. Price was one of six doctors who found Ward possessed antisocial personality traits.   The two court psychiatrists, all three defense experts (psychologist, neuropsychologist, and psychiatrist), and the state's expert agreed on this diagnosis.   2 CR 170 (Pittman); 21 RR 202; 25 RR 3737 (Clayton); 64 RR 35 (Price); 47 RR 24; 21 RR 101; 39 RR 103 (Vermette); DX 7, p. 12 (65A RR 39) (Compton); 22 RR 33; SX 9 (47 RR 55) (Murphy). So assuming Ward could locate an expert with the opinion that ASPD was an incorrect diagnosis, it would, at best, have initiated a losing battle of the experts on that point.   *See Jennings v. Stephens*, No. 12-70018, 2013 WL 3787589, *7 (5th Cir. 2013) (holding that the opinions of dueling experts who would have provided conflicting evidence concerning defendant's mental capacity do not establish prejudice).

Second, Ward's mental health picture was not limited to ASPD.   He had a vast array of diagnoses that complicated his mental health picture, including bipolar disorder, delusional disorder, schizoaffective disorder, psychosis, obsessive-compulsive personality disorder, narcissistic personality disorder, paranoid personality disorder, depression, oppositional-defiant disorder, neuropsychological disorder, behavioral allergies, and severe learning disorders.   An expert opinion contradicting the ASPD diagnosis would be relevant to only a portion of the total mental health picture presented to the jury.

Third, regardless of the formal diagnosis, the jury received evidence of Ward's behavior consistent with ASPD.   Specifically, ASPD is a personality disorder that

describes a person who thinks the rules do not apply to him, who lacks empathy, and who believes others should give him special treatment.   44 RR 198.   The jury heard a large body of evidence regarding Ward's verbal abuse of detention officers, resisting arrest and fighting the police, stabbing a high school classmate, degrading and vulgar language directed at his mother, aggressive behavior and uncontrollable rages as a child, kicking and hitting other children and teachers, trying to stab a Boy Scout, taking a neighbor's bike, and attempts to blame the murder on the victim.   The jury heard testimony regarding his parents' efforts to keep the school from punishing him, thus reinforcing the notion that he was special.   So regardless whether ASPD is a correct diagnosis, the jury received undisputed evidence that makes the formal diagnosis superfluous.   Ward's allegations regarding an incorrect diagnosis of ASPD do not demonstrate that the state habeas court's ruling of no prejudice was unreasonable.

*b. Extended Family.* — Ward next contends that trial counsel's mental health investigation overlooked members of his extended family who could have underscored the hereditary nature of Ward's mental impairment.   Dr. Vermette's report indicates, however, that Ralph described Nancy as having a tendency to get depressed, that Ward's maternal fourth cousin had Wilson's disease (a chromosomal abnormality with symptoms that resemble those of schizophrenia or bipolar disorder), that his maternal grandfather has major depression and Alzheimer's disease, and that his paternal grandfather took an overdose.   CX 1 (47 RR 9, 25).   According to family friend, Ralph Cannon, Ralph and Nancy's refusal to cooperate with counsel's request for a release hindered obtaining additional family history evidence.   2 SHR 264.   This record belies Ward's assertions

that his trial counsel overlooked the history of his extended family.   It was, therefore, not unreasonable for the CCA to find Ward's trial counsel was not ineffective in investigating Ward's extended family.

In any case, because Ward did not debate his mental state at trial, additional information about Ward's extended family would serve little purpose, if any.   While many death penalty defendants have experienced mental illness in the course of their lifetime, rarely is a case as well-documented as Ward's in this regard.   Dr. Compton's report digested all of this information and advised counsel that such an early onset of problems suggests a genetic/biological component in addition to "years of programming" by his father.   DX 3G (65A RR 30, 40).   Counsel presented testimony from Dr. Price that Ward's father had similar mental health problems, and the similarity of their beliefs is apparent in the testimony of father and son.   Thus, the issue argued to the jury was not whether or how Ward became mentally ill, but whether mental illness caused him to commit the offense.   Given the information already before the jury, additional information proving the hereditary nature of his impairment would not place the case in a different light such as to undermine confidence in the verdict.   In fact, such evidence could negatively impact Ward's defense by emphasizing the existence of mentally ill relatives who have *not* committed murder.   *See Charles*, 2013 WL 6062528, *9 (noting that failure to pursue investigations that would be fruitless or even harmful may not be challenged as unreasonable).   Ward fails to show that the state habeas court's determination was unreasonable.

In short, Ward has not shown on this record that the CCA decision was necessarily unreasonable with respect to the investigation of Ward's mental health prior to age 15 or the investigation into his extended family.   Ward also fails to show that the CCA decision was necessarily unreasonable with respect to the prejudice resulting from those alleged deficiencies.

*3. Counsel's Investigation into Childhood Circumstances.* — Ward next contends that his trial counsel's investigation overlooked witnesses who could have provided mitigating evidence of (a) an impoverished childhood, (b) being raised in isolation and taught that the rest of the world intended to harm him, (c) seeking his parents' approval but being unable to find it, (d) being raised in a violent home, (e) being raised in a home that was an arsenal, and (f) having parents who ignored doctors' recommendations for family counseling.   Again, the record below flatly contradicts this argument.[15]

Ward and his mother testified that money was tight and they could not afford counseling services, medical care, or insurance.   42 RR 30, 51; 44 RR 26.   The jury knew from city records that the family home was in disrepair and under a demolition order.   DX 1H (63 RR 145, 159).   Ward's parents both testified that Ralph did not work full-time and that Nancy was the sole breadwinner by the time Ward was eight.   42 RR 22, 33-34; 43 RR 118-19.   Nancy and Ralph testified that, despite doctors' recommendations, they did

---

[15]In fact, several of the "overlooked" witnesses offered by Ward in support of this claim are not new at all.   Buddy Jones was subpoenaed for trial by both the state and defense counsel.   DX 1G (65A RR 3); 17 CR 2428, 2438; 24 CR 3491.   Sharon Crump is a listed reference on Ward's probation records, which counsel introduced into evidence. DX I (63 RR 99).   Trish King was subpoenaed by the State, and Billy Hyde was included on the State's witness list.   11 CR 1626, 1629; 17 CR 2428, 2438.

not go to family counseling.   42 RR 51-53, 65-66;  43 RR 115-16, 147-48.   The Tri-County Cooperative diagnostician also testified that Ralph thought counseling was a waste of time.   43 RR 38, 39.   Ralph did not like Dr. Manjunath in particular because she was very intrusive with respect to an affair Ralph was having at the time.   42 RR 54-55. Ward and his parents testified that they were loners and did not socialize like most people. 42 RR 29; 43 RR 120; 44 RR 85.   Ralph testified that Ward was homeschooled his last two years of high school.   43 RR 177-78.   Ward's mother described detailed instances of domestic violence and verbal abuse from her husband and her son, and Ralph agreed he had been physically abusive.   42 RR 25-32; 43 RR 159-60.   The jury heard jail tapes of Ward insulting his mother, which Nancy identified as a "carbon copy" of her husband.   42 RR 112-13.   Nancy and Ralph both testified about going to gun shows, the large number of guns in their home, Ralph's ammunition hobby, and their concealed handgun licenses. 42 RR 19, 30, 136; 43 RR 125-26.   Ralph testified that Ward was "a good shot."   43 RR 173-74.   In his own testimony, Ward described his relationship with his parents as a "little dysfunctional," and said he was caught in the middle of his parent's problems.   44 RR 84-85.   A neighbor described the father and son playing catch in the yard as "instructional," not playful.   42 RR 175.   Both father and son testified about their beliefs in a conspiracy among the governing bodies in Commerce.   42 RR 70-74; 43 RR 181-85, 195.   A large body of evidence from school personnel described the Ward family's difficult relationship with the school, their desire to avoid consequences for their son, and Ralph's threatening and offensive behavior in particular.   Thus, Ward's trial counsel developed ample evidence of Ward's family environment.

ORDER AND OPINION – PAGE 50

To the extent Ward now argues that counsel should have presented more or different evidence of these childhood circumstances, this argument comes down to a matter of degrees.   Courts must be "particularly wary of arguments that essentially come down to a matter of degrees.   Did counsel investigate enough?   Did counsel present enough mitigating evidence?   Those questions are even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt*, 230 F.3d at 743).   Ward's trial counsel in fact recognized, developed, and presented evidence of the childhood issues that Ward now claims counsel overlooked. The Court will not second guess counsel's decisions regarding how many witnesses he should call on these matters or whether he should have further developed the evidence. Ward fails to show on this record that the CCA unreasonably denied his claims challenging counsel's investigation into his childhood.

### E.   Conclusion

The record demonstrates that Ward's trial counsel's mitigation investigation was wide-ranging, well-funded, supported by qualified experts, and enhanced by the prosecution's open file policy.   The jury was aware of Ward's mental state and childhood circumstances, and counsel formulated an objectively reasonable strategy for obtaining a life sentence.   The claim that counsel's investigation was deficient simply disagrees with counsel's chosen tactics, belies the wealth of contrary evidence in the record, or is a matter of degrees that this Court will not second-guess.   Ward has failed to demonstrate that it was unreasonable for the state court to conclude (1) that he did not overcome the strong

presumption of counsel's competence, and (2) that he failed to undermine confidence in the jury's sentence of death.   *See* § 2254(d).   The Court denies claim 2.

## IV.   MENTAL ILLNESS AS A BAR TO EXECUTION (CLAIM 3)

In his third claim for relief, Ward contends the Eighth Amendment bars his execution because he is severely mentally ill.   Respondent argues that the claim is unexhausted, procedurally barred, without merit, and *Teague*-barred.

Ward agrees the claim is unexhausted.   Reply at 24.   He argues that this Court should excuse any procedural default because the Court's failure to address the claim on the merits would constitute a fundamental miscarriage of justice if he shows that his mental illness renders him ineligible for the death penalty.   *See Sawyer v. Whitley*, 505 U.S. 333, 346-47 (1992) (holding that federal habeas court may reach merits of procedurally defaulted claim when petitioner shows "actual innocence" of the death penalty by clear and convincing evidence).   Ward also argues that the claim is not *Teague*-barred because the new rule he seeks to establish would place a certain class of individuals beyond the state's power to punish by death, which is a recognized exception to *Teague*.   *See Penry v. Lynaugh*, 492 U.S. 302, 329 (1989) (explaining *Teague v. Lane*, 489 U.S. 288 (1989)).

As Ward's argument implies, the Supreme Court has never held that the Eighth Amendment bars the execution of mentally ill defendants.   Rather, Ward argues that the Supreme Court's reasoning for barring the execution of defendants under age eighteen and defendants who are intellectually disabled should apply with equal force to the mentally ill. *See* Petition at 53-62; *see Atkins v. Virginia*, 536 U.S. 304 (2002); *Roper v. Simmons*, 543 U.S. 551 (2005).   But Ward's assertions that his claim is not procedurally barred and not

*Teague*-barred, presuppose the existence of such a rule banning the execution of mentally

ill defendants.   The Fifth Circuit has clearly rejected the argument that *Atkins* and *Roper*

apply to defendants with mental illness.   *Turner v. Epps*, 460 F. App'x 322, 328 (5th Cir.

2012); *Shisinday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007); *In re Neville*, 440 F.3d

220 (2006).   Accordingly, the Court denies claim 3 on the merits.   *See* § 2254(b)(2).

## V. Pretrial Publicity and Trial Counsel's Failure to Move for Change of Venue (Claims 4 & 5)

In claim 4, Ward asserts that the trial court denied his Sixth Amendment right to a

fair trial because extensive pretrial publicity made it impossible to seat an impartial jury.

Ward states that six jurors had admitted during general voir dire examination or in their

questionnaires that they had been exposed to pretrial publicity.   Petition at 69-70.   He

also asserts that his counsel had to use six peremptory strikes to remove other venire

members exposed to pretrial publicity and, lacking additional peremptory strikes, he was

forced to accept a juror who had been exposed to media about the case.   In claim 5, Ward

contends that trial counsel's failure to move for a change of venue on the basis of pretrial

publicity constituted ineffective assistance of trial counsel.   Respondent argues that both

claims are unexhausted, procedurally defaulted, and without merit.

In his Reply, Ward seeks to excuse his procedural default of the IATC claim (claim

5) under *Martinez v. Ryan* on the ground that state habeas counsel was ineffective for

failing to raise it in state habeas proceedings.   Reply at 27; *Martinez*, 132 S. Ct. at 1320;

s*ee Trevino*, 133 S. Ct. 1921 (applying *Martinez* exception to federal habeas petitions

arising from Texas convictions).   Respondent counters that trial counsel was not

ineffective because the jury was not biased or prejudiced due to pretrial publicity. Respondent also argues that *Martinez* does not excuse the procedural default because the claim is plainly meritless and because Ward cannot demonstrate his state habeas counsel was ineffective.   Surreply at 22-23.

The Sixth Amendment demands a change of venue under circumstances where continued, adverse publicity has caused a pattern of deep and bitter prejudice throughout the community such that the trial court cannot seat an impartial jury.   *Irvin v. Dowd*, 366 U.S. 717, 727 (1961).   Whether trial counsel was ineffective for failing to move for a change of venue (claim 5) depends on the viability of the Sixth Amendment claim (claim 4).   And the *Martinez* inquiry also requires this Court to examine whether the IATC claim (claim 5) has some merit.   *See Martinez*, 132 S. Ct. at 1318.   Ward did not request to expand the record on these issues; the Court can thus consider them de novo on the current factual record.   Because the Court finds that the pretrial publicity claim has no merit, *see* § 2254(b)(2) (court can deny unexhausted claim on the merits), it is unnecessary to reach Ward's various related ineffective assistance of counsel arguments.

## A.   Applicable Law

A petitioner seeking to challenge his conviction on the ground that he was denied a fair trial before an impartial jury because of adverse pretrial publicity ordinarily must demonstrate an actual, identifiable prejudice attributable to that publicity on the part of members of his jury.   *See Mayola v. Alabama*, 623 F.2d 992, 996 (5th Cir. 1980) (citing

*Irvin*, 366 U.S at 723).[16]   The constitutional standard for ensuring a fair trial in the face of prejudicial pretrial publicity can usually be satisfied through voir dire that ferrets out such prejudice.   *United States v. Lipscomb*, 299 F.3d 303, 344 (5th Cir. 2002).   "Prominence does not necessarily produce prejudice, and *juror impartiality* . . . does not require *ignorance*."   *Skilling v. United States*, 130 S. Ct. 2896, 2914-15 (2010) (emphasis in original).   The Constitution is satisfied if "the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court."   *See Irvin*, 366 U.S. at 723. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard."   *Id.*

### B.   Background Facts

*1.   The Gag Order.*   —   Ward shot and killed Walker on June 13, 2005 in Commerce, Texas.   On September 23, 2005, Ward's counsel filed a motion to limit pretrial publicity, asking the trial court to seal the court file and enter a gag order.   1 CR 34.   The trial judge entered a gag order on October 17, 2005 prohibiting the District

---

[16]There are circumstances, such as media interference in the courtroom during trial or the repeated airing of a videotaped confession, that warrant a presumption of prejudice without any examination of the voir dire transcript for actual juror prejudice.   *E.g., Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723 (1963).   While Ward identifies these presumption-of-prejudice cases in his boilerplate recitation of the law, Petition at 63, he does not apply them to his facts and does not make an argument for presumptive prejudice.   *See* Petition at 70-71.   Furthermore, the Court does not find any factual support for such a presumption.   *See Skilling*, 130 S. Ct. at 2915 (holding that a presumption of prejudice attends only the extreme case); *Murphy v. Florida*, 421 U.S. 794, 798 (1975) (characterizing the reversals in *Irvin*, *Rideau*, *Estes*, and *Sheppard* as based on a "trial atmosphere that had been utterly corrupted by press coverage").

Attorney, his agents, law enforcement, investigators, the defendant, and defense counsel from communicating with the media about the facts or evidence.   The order allowed Ward to file sensitive motions *in camera* so that the court could determine whether they should be sealed.   1 CR 53.   On July 30, 2007, the court unsealed the trial court file, noting that "The Court has previously sealed this case from public viewing and certain records in this case from the State."   41 RR 6145.

2.   *Jury Selection*.   —   Trial proceedings began almost two years after the murder at the Hunt County courthouse in Greenville, Texas.   On April 2, 2007, the trial judge qualified a panel of 143 potential jurors.   11 RR 11, 27.   The judge and prosecutor both questioned the panel about whether they may have heard something about the case.   11 RR 32, 46.   Thirty-eight potential jurors responded in the affirmative.   11 RR 32-39, 46.   The panel was then given a questionnaire to fill out and return the next day.   11 RR 91, 121.   They were instructed "from now forward until the jury is selected" not to read any articles or listen to any radio programs about the case.   11 RR 122.   Of the thirty-eight, three became jurors.   12 RR 106 (Scruggs); 16 RR 91 (Forbes); 30 RR 185 (Morris).   According to Ward, three additional jurors had stated in their questionnaire that they either had seen an article in the newspaper that same day but did not read it or had been exposed to media about the case before trial.   *See* Petition at 69-70.[17]   On May 18, 2007, the judge swore in a second panel of 75 potential jurors.   34 RR 3; 16 CR 2324.   Eighteen on the panel indicated they may have seen some publicity on the case.   34 RR

---

[17] The actual questionnaires are not part of the trial court clerk's record, but the Court will assume, for purposes of the Sixth Amendment claim, that Ward's assertions are accurate.

21-24.   Although two alternates were picked from this second panel, neither of them actually sat on the jury.   35 RR 75, 92.

Of the three jurors who initially stated that they had seen pretrial media about the case, there is no indication that they had formed an opinion about guilt.   11 RR 32; 12 RR 91, 103 (Scruggs); 11 RR 33-34, 51; 16 RR 86-87 (Forbes); 11 RR 37, 53; 30 RR 160-86 (Morris).   The same is true with respect to the three jurors who had stated in their questionnaires that they had seen pretrial media coverage.   13 RR 81-103 (Bryant); 31 RR 83-84 (Prince); 33 RR 31-72 (Robinson).   After their selection, the trial court admonished the jurors individually to avoid media coverage and conversation about the case at all costs because it could disqualify them.   12 RR 106-07; 13 RR 104; 16 RR 92, 121; 24 RR 43; 26 RR 32; 28 RR 47-48, 75; 30 RR 83, 186; 31 RR 94; 33 RR 72.

On the first day of trial, defense counsel mentioned a "big spread" in the paper about the trial and a golf tournament benefit for the deceased.   He asked the judge to poll and admonish the jury.   36 RR 18-19.   The judge admonished the jurors "not to read any newspaper articles, listen to any radio or TV coverage of this trial."   36 RR 20.   The judge polled the jurors on whether they had seen the article in the previous day's newspaper, and no juror raised their hand.   The judge explained that it was the jury's province to decide the case, not the newspaper's.   36 RR 20-21.   At the end of the first day, the judge again admonished the jury to take care not to read the newspaper, listen to the radio, or let friends or family members tell them about media reports.   He repeated this admonishment at the end of every day of trial.   36 RR 209; 37 RR 131; 38 RR 128; 39 RR 123; 40 RR 36; 41 RR 115; 42 RR 215; 43 RR 203; 44 RR 201; 45 RR 38.

3.   *The Newspaper Articles*.   — Under its authority to assess the merits of a claim for purposes of *Martinez* and to deny an unexhausted claim on the merits, this Court has reviewed photocopies of the newspaper articles filed by Ward with his Reply.   Exhibit to Reply 2, 3, 4; § 2254(b)(2).   These articles fall into two general categories.   The first category contains information about the criminal case against Ward, the decision to seek the death penalty, Ward's status as a suspect, his scheduled court appearances, the gag order, Ward's criminal history (including two felony charges, no prison time, and a successful probation period), and basic information from the criminal complaint.   Later articles summarize and compare the daily trial developments, including testimony from both sides, the strategies of both parties, the trial procedure, and the verdicts, and they observe that there had not been a death penalty assessed in Hunt County since 2000.   A second category of articles focuses on the victim and his family.   They address how his death impacted the community and the City where he worked, and include a "thank you" message from his father and surviving children to friends and supporters, as well as a notice about a golf tournament fundraiser for the family's benefit.   An additional article printed the week prior to trial discusses a wrongful death suit filed by the victim's family against Ward and his father, alleging they were negligent in causing the events which led to the victim's alleged murder and that Ward's father, Ralph, "provoked and provided direction" to his son prior to the shooting.

## C.   Analysis

Ward argues that Hunt County was "saturated with inflammatory reports" in the media and that the newspaper articles were "designed to inflame individuals in the

community, convince the community that capital murder was the correct charge, and rally the community together against" Ward.  *See* Petition at 69.   The trial judge's initial screening of the two jury panels revealed that 38 out of 143 (27%) and 18 out of 75 (24%) had heard about the case.   This does not indicate a saturation of the jury pool that would necessarily prevent the selection of an impartial jury.   *Cf. Beck v. Washington,* 369 U.S. 541, 556 (1962) (rejecting impartial jury claim where, among other things, only 14 out of 52 of persons in venire, or 27%, admitted possible bias).   Ward also overstates the prejudicial nature of the articles.   The articles contain fact-based reporting on Ward's criminal history, the trial events, and the allegations against him without assuming guilt. None of the articles contains a confession or other blatantly prejudicial information of the type readers "could not reasonably be expected to shut from sight."   *Skilling*, 130 S. Ct. at 2916; *see Beck*, 369 U.S. at 556 (contrasting "straight news stories" with "invidious articles which would tend to arouse ill will and vindictiveness").   And while the information about Ward's criminal history and the sympathetic articles about the victim and his family touch on subjects that a jury should not consider in determining guilt, this is far from saying that the media coverage was inflammatory or vindictive.

Ward's main argument is that some seated jurors had been *exposed* to media reports, but this alone does not make them partial:   "juror *impartiality* . . . does not require *ignorance*."   *Skilling*, 130 S. Ct. at 2914-15 (emphasis in original).   There is no evidence that any of the seated jurors had formed an opinion about the case before trial.   Counsel obtained a gag order within three months of the offense and a sealing order to prevent pretrial publicity, and the trial court examined the venire to eliminate those who had

formed any opinion based on media exposure.   The trial court instructed the jurors upon selection and at the end of every day of trial to avoid media coverage and conversation about the case.   Immediately prior to the start of trial, the court polled the jurors to assess any media exposure in the period of time between selection and the trial date.   *Cf. United States v. Aragon*, 962 F.2d 439, 441 (5th Cir. 1992) (finding that trial court abused its discretion in denying request to poll jurors on media exposure at the commencement of trial).   The trial judge did everything possible to ensure that it seated qualified jurors and that they did not subsequently disqualify themselves.

Ward attempts to establish prejudice by asserting that he was forced to use six peremptory strikes against jurors who had been exposed to pretrial publicity and, once out of strikes, he was forced to accept an objectionable juror, Robinson.   While Ward cites to places in the record where counsel exercised peremptory strikes, the record does not reflect counsel's reasons for the strikes.   *See* Petition at 67.   Moreover, one of the strikes cited by Ward appears not to be a peremptory strike, but a challenge for cause based on the fact that the venire person's neglect of her employment would prevent her from being fair and impartial.   12 RR 39.

Additionally, as can be seen from counsel's remarks, the request for an extra peremptory strike to remove Robinson was tied to the trial court's denial of a challenge for cause to panel member Petty three days earlier, not to Robinson's – or anyone else's – exposure to pretrial publicity.   30 RR 156; 33 RR 71.   Counsel had unsuccessfully challenged Petty for cause because Petty would automatically vote for the death penalty. 30 RR 154-56.   To preserve that ruling for appeal, Texas law required counsel to request

an additional peremptory strike when he used up his statutorily allotted amount and to demonstrate that he was forced to accept an objectionable juror. *See Gonzales v. State*, 353 S.W.3d 826, 831 (Tex. Crim. App. 2011) (noting that harm from the erroneous denial of a defendant's challenge for cause focuses on whether a peremptory challenge was "wrongfully taken" from the defendant). The trial record does not support Ward's assertion that he was forced to accept an objectionable juror due to pretrial publicity. Even if it were supported, however, he provides no authority for the proposition that the Constitution is offended when a defendant uses peremptory strikes, if he did, to remove jurors who are exposed to media coverage but nonetheless not challengeable for cause.

In short, the record shows only that some jurors were exposed to pretrial publicity. Ward cannot show that any seated jurors had a preconceived notion against him, let alone a preconceived notion that they could not lay aside. *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (upholding state court's denial of a pretrial publicity claim based on media coverage alone where voir dire did not demonstrate constitutional unfairness as to the method of jury selection or as to the character of the jurors selected).

Ward's claim that a change of venue was required due to extensive pretrial publicity likewise has no merit. *See Andrews v. Collins*, 21 F.3d 612, 632 (5th Cir. 1994) (finding no error in the denial of a venue change where publicity concerning the murder was largely factual in nature and defendant failed to uncover deep or widespread prejudice against him during voir dire). As such, trial counsel was not ineffective for failing to move for a change of venue. *See Koch*, 907 F.2d at 527 (counsel is not required to make futile motions or objections); *United States v. Parker*, 877 F.2d 327, 330 (5th Cir. 1989) (holding

that a change of venue should not be granted on the mere showing of widespread publicity).   This being the case, habeas counsel did not render ineffective assistance by failing to challenge trial counsel's representation.   Claims 4 and 5 are unexhausted, procedurally barred, and not subject to the exception in *Martinez* because the claims have no merit.   Furthermore, because the record is sufficient to do so, the Court denies claims 4 and 5 on the merits.   *See* § 2254(b)(2).

## VI.   REQUEST FOR HEARING

Ward has requested an evidentiary hearing "if necessary to resolve disputed factual issues."   Petition at 72.   This Court has discretion to grant an evidentiary hearing if one is not barred under § 2254(e)(2).   *Schriro v. Landrigan,* 550 U.S. 465, 468 (2007).   In exercising that discretion, the Court considers whether a hearing could enable petitioner to prove the petition's factual allegations which, if true, would entitle him to relief. *Landrigan*, 550 U.S. at 474.   The Court also must consider the deferential standards in § 2254(d), which limit the Court's ability to grant habeas relief.   *Id*.   In practical effect, if the state court record precludes habeas relief under § 2254(d), a district court is not required to hold an evidentiary hearing.   *Id*.; *Pinholster*, 131 S. Ct. at 1399.

Ward has failed to demonstrate that the state court rulings on claims 1 and 2 were unreasonable.   Habeas relief is therefore precluded by § 2254(d), rendering a hearing on those claims unnecessary.   *See Pinholster*, 131 S. Ct. at 1400-01.   Claim 3 is legally foreclosed by circuit precedent so there are no facts that would entitle him to relief on that claim, and claims 4 and 5 are unexhausted, procedurally barred, and have no merit.

Therefore, a hearing would be inappropriate for these claims as well.   § 2254(b)(1), (e)(2). The Court denies the request for a hearing.

## VII.   CONCLUSION

The Court denies Ward's petition for a writ of habeas corpus.

In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), and after considering the record in this case, the Court denies Ward a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right.   *See Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); 28 U.S.C. § 2253(c)(2).   If Ward files a notice of appeal, he may proceed in forma pauperis on appeal.

Signed March 6, 2014.

David C. Godbey
United States District Judge