# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-70015

United States Court of Appeals
Fifth Circuit

**FILED**

January 22, 2015

Lyle W. Cayce
Clerk

ADAM KELLY WARD,

Petitioner–Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent–Appellee

Appeals from the United States District Court
for the Northern District of Texas

Before JONES, CLEMENT, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Petitioner–Appellant Adam Kelly Ward has been afflicted with mental illness his entire life. He was diagnosed with bipolar disorder and placed on lithium as early as age four. Ward's aggressive and antisocial behavior continued and escalated through adolescence and into adulthood, culminating in him fatally shooting Code Enforcement Officer Michael Walker on June 13, 2005. A Texas jury found Ward guilty of capital murder and—after considering extensive lay and expert testimony about Ward's complicated mental-health history—sentenced him to death. The record shows that, in his criminal trial, Ward's defense had the benefit of appointed counsel and more than $136,000

No. 14-70015

in court-allocated funds to retain the assistance of investigators, expert witnesses, and consultants.

After availing himself of state postconviction remedies, Ward filed a petition for federal habeas relief under 28 U.S.C. § 2254. Ward claims that he was deprived of effective assistance of counsel at sentencing, that he was denied his right to trial by impartial jury due to an improper third-party contact, and that he was sentenced to death in violation of the Eighth Amendment because he is severely mentally ill. In a thorough opinion, the district court denied his petition. Ward now seeks a certificate of appealability (COA) under 28 U.S.C. § 2253(c)(2). After careful consideration, we deny his application.

## I.     BACKGROUND

Ward was convicted of capital murder for an incident involving a code citation for unsheltered storage that went tragically and horribly wrong. Ward was living with his father Ralph at the time. Ward had an unusually close relationship with his father, and, according to expert trial testimony, they suffered from similar shared delusions. They apparently believed that there was a conspiracy among the governing bodies in the City of Commerce against their family, and that the "Illuminati," an apocryphal secret society of enlightened individuals, essentially controlled the majority of government. The record indicates that the Ward family hoarded rubbish inside and outside their home, together with an arsenal of guns and ammunition.

The Ward family was cited numerous times for failing to comply with the City of Commerce's housing and zoning codes. Michael Walker, a City of Commerce Code Enforcement Officer, went to the Ward home to record a continuing violation for unsheltered storage on June 13, 2005. Wearing his City of Commerce work shirt and driving a marked truck, Walker approached

No. 14-70015

the residence unarmed and carrying only his digital camera. When Walker arrived, Ward was washing his car in the driveway.

After Walker walked the perimeter of the property taking pictures, Walker and Ward began to argue. Ward's father came outside and attempted to calm the men down. Ward then sprayed Walker with water from the hose that he was using to wash his car. Walker then used his cell phone to call his office to request officer assistance. When Ward's father noticed that Ward was no longer outside, he advised Walker that it might be "best if he left the property." Ward's father then ran to look for Ward, believing that Ward kept a gun in his room. Ward's father did not warn Walker about this. Walker remained near the property waiting in the back of his truck for officer assistance to arrive.

Before Ward's father could intervene, Ward ran out of the house toward Walker and fired a .45 caliber pistol at him. Despite Walker's attempts to escape, Ward shot Walker several times. After Walker fell, Ward shot him again at close range. Walker sustained nine gunshot wounds in total and died.

Ward confessed to killing Walker shortly thereafter, explaining that he believed "the City" was after his family. He believed that Walker and the former Code Enforcement Director had threatened to tear down the family home. He claimed that he feared for his life because Walker had "threatened to call the cops," and to believe that, if the cops showed up to arrest him, he would probably end up dead. Ward believed this because he claimed to have been beaten up by the local police previously—though, there was no evidence to substantiate this claim.

In 2007, a jury convicted Ward of capital murder and sentenced him to death. His conviction and sentence were affirmed on direct appeal by the Texas Court of Criminal Appeals (CCA). *Ward v. State*, No. AP-75750, 2010 WL 454980, at *1 (Tex. Crim. App. Feb. 10, 2010). While his direct appeal was

No. 14-70015

pending, Ward sought state habeas relief.  The state trial court issued a report
and findings recommending denial of habeas relief without an evidentiary
hearing.  *Ex parte Ward*, No. WR-70651-02, 2010 WL 3910075, at *1 (Tex.
Crim. App. Oct. 6, 2010).  The CCA adopted the trial judge's findings and
conclusions in part, and denied Ward's habeas petition in an unpublished
decision.  *Id.*

   One year later, Ward filed the instant federal habeas corpus petition in
federal district court.  Ward asserted five federal claims for habeas relief.  The
district court denied his petition in its entirety and denied his request for a
certificate of appealability.  Ward now seeks our permission to appeal three of
the five claims that the district court rejected.

## II.    JURISDICTION AND STANDARD OF REVIEW

   To appeal the district court's denial of his habeas petition, Ward must
first obtain a COA pursuant to 28 U.S.C. § 2253(c)(1).  *See Miller–El v. Cockrell*,
537 U.S. 322, 335–36 (2003).  Because the district court did not grant a COA
on any of Ward's claims, we have jurisdiction at this juncture only to consider
whether a COA should issue, and not the ultimate merits of his claims.  *E.g.*,
28 U.S.C. § 2253(c); *Miller–El*, 537 U.S. at 335–36.

   A COA may issue "only if the applicant has made a substantial showing
of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner
satisfies this standard by demonstrating that jurists of reason could disagree
with the district court's resolution of his constitutional claims or that jurists
could conclude the issues presented are adequate to deserve encouragement to
proceed further."  *Miller–El*, 537 U.S. at 327.

   Specifically, "the petitioner must demonstrate that reasonable jurists
would find the district court's assessment of the constitutional claims
debatable or wrong."  *Feldman v. Thaler*, 695 F.3d 372, 377 (5th Cir. 2012)
(alteration omitted) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  The

No. 14-70015

issue is "the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller–El*, 537 U.S. at 342. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Thus, this Court's examination is a "threshold inquiry [that] does not require full consideration of the factual or legal bases adduced in support of the claims," but rather "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 336. In death-penalty cases, "any doubts as to whether the COA should issue are resolved in favor of the petitioner." *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008).

"[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000). Section 2254(d) provides that a state prisoner's application for a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim":

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' clearly established federal law if 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially

No. 14-70015

indistinguishable facts.'" *Hoffman v. Cain*, 752 F.3d 430, 437 (5th Cir. 2014) (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). By contrast, "[a] state court's decision involves an 'unreasonable application' of clearly established federal law if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 437 (alterations in original) (quoting *Williams*, 529 U.S. at 413). As to this latter inquiry, "we focus on 'the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence.'" *Id.* (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (per curiam)). To determine whether the state court unreasonably applied a Supreme Court decision, a federal habeas court "must determine what arguments or theories supported or . . . could have supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

In addition to challenging the legal basis of the state court's decision, Ward challenges the state court's factual finding that the jury was not improperly influenced by a third party under § 2254(e)(1).[1] "[A] determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Section 2254(e)(1) is the 'arguably more deferential standard.'" *Hoffman*, 752 F.3d at 437 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). A factual determination

---

[1] *See infra* Part III(B).

No. 14-70015

is "not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 558 U.S. at 301.

Overall, § 2254(d) establishes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citation and internal quotation marks omitted). Indeed, state courts are presumed to "know and follow the law." *Id.* The petitioner has the burden of showing that "there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

The standard of review we apply depends on the state court's treatment of the federal claim.[2] If the claim was adjudicated on the merits, we apply § 2254(d)'s deferential standard of review. "For claims that are not adjudicated on the merits in the state court," however, we do not apply the deferential scheme laid out in § 2254(d) and instead "apply a *de novo* standard of review." *Hoffman*, 752 F.3d at 437.

## III.   DISCUSSION

Ward seeks a certificate to appeal three issues: (1) whether Ward received ineffective assistance of counsel (IAC) at sentencing because counsel failed to conduct a reasonable investigation into mitigation evidence, (2) whether Ward was denied his right to an impartial jury because a third party made ex parte contact with the jury, and (3) whether Ward's death sentence violates the Eighth Amendment because of his severe mental illness. The applicable legal standards and the facts pertaining to these claims are recited in greater detail in the discussion below.

---

[2] The parties contend Ward has not exhausted his state court remedies with respect to his ineffective-assistance claim, and Ward argues cause and prejudice excuse his default such that our review is de novo. *See infra* Part III(A)(1).

No. 14-70015

## A.     Ineffective Assistance at Sentencing

Ward argues that his trial counsel was ineffective because, "despite [Ward's] obvious signs of mental illness, trial counsel neither located nor interviewed numerous witnesses who could have testified about the depth and severity of that mental illness" and witnesses who could have explained "to a jury why mental illness . . . [was] not an aggravating factor."  Ward also argues that the district court deprived him of his statutory right to investigation funding by its erroneous decision denying his funding application.  Respondent–Appellee William Stephens, in his capacity as Director of Texas Corrections ("Texas"), opposes the COA and argues that this claim is unexhausted and, alternatively, that the district court properly rejected the claim as meritless.  We address the exhaustion issue first before addressing the merits of Ward's IAC claim and Ward's funding argument.

### 1.     *Exhaustion*

We must decide as a threshold matter whether Ward has exhausted his state-court remedies as required by 28 U.S.C. § 2254(b)(1).  This is a question of law that we review de novo.  *Conner v. Quarterman*, 477 F.3d 287, 291 (5th Cir. 2007).  The procedural posture of this question is somewhat unique because the parties agreed before the district court—and agree on appeal—that Ward's IAC claim is unexhausted.  The district court, however, disagreed with the parties and found that Ward fairly presented this claim to the state court and thereby exhausted his state-court remedies.[3]

_____

[3] A party cannot waive, concede, or abandon the applicable standard of review.  *See Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) (holding that "the standard of review under AEDPA cannot be waived by the parties"); *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003) (noting that AEDPA § 2254(d) "contains unequivocally mandatory language" and thus that "if the [state court] adjudicated [a] claim on the merits, we must apply AEDPA deference"); *Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001) ("[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived."); *see also Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1022 n.4 (9th Cir. 1997) (en banc) (O'Scannlain,

No. 14-70015

Under 28 U.S.C. § 2254(b)(1), federal habeas petitioners must fully exhaust remedies available in state court before proceeding in federal court. To satisfy this requirement, "a habeas petitioner must have fairly presented the substance of his claim to the state courts." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). "A habeas petitioner fails to exhaust state remedies 'when he presents material additional evidentiary support to the federal court that was not presented to the state court.'" *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003) (quoting *Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996)).

Texas argues, and Ward agrees, that Ward's federal habeas petition relies on new evidence from expert and lay witness affidavits that were not presented to the state courts and that, therefore, Ward's ineffective assistance claim is not exhausted. We disagree.

As the district court correctly observed, Ward fairly presented the substance of his federal claim to the state courts. The Fifth Circuit has held that a claim is not fairly presented "if the additional evidence in federal court

---

J., concurring in part and dissenting in part) ("[A] party cannot, by waiver or estoppel, change the applicable standard of review."). We are therefore obligated to decide whether Ward exhausted this claim such that § 2254's deferential standard of review applies, regardless of the parties' positions on the matter. *See Brown v. Smith*, 551 F.3d 424, 428 & n.2 (6th Cir. 2008) (deciding whether AEDPA deference applies, even though this issue was not raised below, because "a party cannot 'waive' the proper standard of review by failing to argue it"), *overruled on other grounds by Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

As the district court noted, Ward may have strategically conceded his IAC claim was unexhausted to obtain de novo review and funding to investigate, *see infra* Part III(A)(3), after showing cause and prejudice under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013); or as the district court put it, "to use *Martinez* to bootstrap factual development in federal court in search of unexhausted claims." ROA.1101 n.10. The district court noted that such a procedure would "encourage sandbagging in state court to obtain *de novo* review of a petitioner's 'real' claim in federal court." *Id.* (citing *Dickens v. Ryan*, 740 F.3d 1302, 1328 (9th Cir. 2014) (en banc) (Callahan, J., concurring in part and dissenting in part) (noting that this "approach encourages state defendants to concoct 'new' IAC claims that are nothing more than fleshed-out versions of their old claims supplemented with 'new' evidence" and observing that "[t]his cannot have been the Supreme Court's intention, nor is it an unintended but inherent consequence of the Supreme Court's opinions in *Martinez* and *Pinholster*")).

No. 14-70015

puts the claim in a 'significantly different and stronger position' than in state court." *Conner*, 477 F.3d at 292 (quoting *Kunkle*, 352 F.3d at 988). Merely putting a claim "in a 'stronger evidentiary posture'" is not enough, *id.* (quoting *Anderson v. Johnson*, 338 F.3d 382, 388 (5th Cir. 2003)); the new evidence must be so significant that it "fundamentally alter[s] the legal claim" such that, in fairness, the claim ought to be "remitted to state court for consideration of that evidence." *Id.* (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)) (internal quotation marks omitted).

For example, in *Anderson*, we held that an affidavit from an eyewitness in which the witness averred that the habeas petitioner was not the shooter—evidence that had not been presented to the state court—did not "fundamentally alter" the petitioner's claim that counsel was ineffective for not calling this witness at trial. 338 F.3d at 388. We explained that Anderson had argued diligently in state court that his attorneys were constitutionally ineffective for failing to investigate and interview this eyewitness, and that had he been called to testify, the witness would have exonerated Anderson. *Id.* Although this affidavit "unquestionably" placed Anderson's habeas claim in a comparatively much "stronger evidentiary position" than in state court, it did not "place the claims in a significantly different legal posture." *Id.* (internal quotation marks omitted). We held the IAC claims were exhausted as a matter of law. *Id.*

Here, as in *Anderson*, the new evidence that Ward presented to the district court supplemented and duplicated evidence that had already been presented to the state court; it does not fundamentally alter Ward's IAC claims. As discussed in greater detail below,[4] Ward claims his trial counsel was ineffective during the penalty phase by failing to adequately investigate and

---

[4] *See infra* Part III(A)(2)(a).

No. 14-70015

present testimony concerning Ward's mental illness and family life. The affidavits aver that Ward was inaccurately diagnosed with antisocial personality disorder; that Ward was raised in poverty and in an abusive family environment; and that his parents had failed to pursue proper treatment, ignoring the recommendations of mental-health professionals. Ward contends this evidence was not presented to the jury or to the state courts on habeas review. But as the district court accurately observed, the jury heard extensive testimony about Ward's mental-illness history and family during the penalty phase. And in state habeas court, Ward challenged his trial counsel's mitigation investigation under *Strickland v. Washington*, 466 U.S. 668 (1984), and *Wiggins v. Smith*, 539 U.S. 510 (2003). In his state habeas petition, Ward asserted that his trial counsel's cursory investigation failed to locate mitigation witnesses and led to an inaccurate diagnosis of shared delusional disorder. Ward relied on the affidavits of a school psychologist, his best friend, and his neighbors as new witnesses.

Ward's argument on federal habeas varies only slightly. Ward argues again that the mitigation investigation was not thorough. But rather than claiming he was inaccurately diagnosed with "shared delusional disorder," this time Ward argues he was inaccurately diagnosed with "antisocial personality disorder." Ward supports his federal petition with affidavits and declarations from additional new witnesses: family friends, family members, and Ward's mother's coworkers (who describe Nancy Ward's difficult marriage). The evidence he presents on this issue arguably places his IAC claim in a stronger evidentiary position, but it does not place the claim in a "significantly different legal posture." *See Anderson*, 338 F.3d at 388. Thus, this claim is exhausted.

## 2. *Merits of Ward's IAC-at-Sentencing Claim*

Ward asserts a COA should issue because the district court's resolution of his IAC claim presents a question debatable among reasoned jurists.

11

No. 14-70015

Specifically, Ward contends his trial counsel was ineffective because counsel relied on inaccurate and incomplete medical diagnoses of Ward's mental illness, which prejudiced the penalty phase of his trial. As discussed above, we evaluate the COA application "through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes*, 221 F.3d at 772. This deferential standard of review has particular bite in evaluating the appealability of ineffective assistance claims—the Supreme Court requires that federal courts "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013).

### a. *Factual Background*

Ward's history of mental illness was a central issue throughout his criminal trial and appeal. On state habeas review, Ward challenged his trial counsel's mitigation investigation. Ultimately, the CCA rejected this claim and held that Ward's counsel was not unconstitutionally deficient. Because we review the reasonableness of the state court's decision denying Ward habeas relief to determine its appealability, we summarize the factual record on which the CCA made its decision below.

### i. *Criminal trial*

Initially, defense counsel challenged Ward's competency to stand trial. The testimony and expert reports from the competency proceedings pertain to the state habeas court's assessment of trial counsel's mental-health investigation. Defense psychiatrist Dr. Heidi Vermette and psychologist Dr. Kristi Compton reviewed Ward's medical, school, and prison records; evaluated Ward; and interviewed his parents. They testified that Ward first exhibited behavioral problems, specifically uncontrollable rage, beginning at age three. He was admitted to the Children's Medical Center in Dallas, where doctors diagnosed him with bipolar disorder at age four. Dr. Vermette and Dr.

No. 14-70015

Compton described the myriad medications prescribed (including Depakote, lithium, Haldol, Ritalin, Elavil, Thorazine, Respiradol, and Dicertarin) and the numerous diagnoses (including bipolar disorder, personality disorder, schizoaffective disorder, depression, and oppositional-defiant disorder). They also noted that Ward's intelligence was above average and that he had dyslexia. The court found Ward competent to stand trial.

Counsel's strategy at the guilt phase was to argue that Ward's childhood and family caused a delusional mental state toward the City of Commerce that precluded the required intent for capital murder—retaliation. Dr. Vermette testified to this effect and stated that, in her opinion, Ward's symptoms are consistent with a "psychotic disorder" and that he has "paranoid delusions." This conclusion was supported by Ward's father's testimony about, and records of, the city-code violations at the Ward home dating back to 1993—including photographs of the Ward home and references to illegal rubbish and to the demolition of the home. The jury considered this evidence and found Ward guilty of capital murder.

At the penalty phase, defense counsel emphasized that Ward was mentally ill from an extremely young age and that his parents exacerbated his illness and did not follow up on needed therapy. The defense introduced school and medical records and testimony indicating that Ward was aggressive in elementary school toward his fellow students, had difficulty forming friendships, and was unable to feel empathy. By sixth grade, Ward was diagnosed with depressive disorder and a personality disorder "with narcissistic features." Although doctors repeatedly recommended that Ward's parents seek individual and family therapy, they did not do so.

Ward's parents believed Ward was not getting appropriate school services because of school officials' vendetta against the family. For their part, health examiners believed that his parents' derogatory statements toward the

13

No. 14-70015

school contributed to Ward's disrespect for school authorities. By eighth grade, Ward used vulgar language with teachers and peers, arrived to class late and left early, and, when his behavior was out of control, it took three male staff members to restrain him. At this time, Dr. Douglas Keene observed Ward to be "frankly psychotic." In ninth grade, Ward's aggression escalated when he fought one of his teachers. In eleventh grade, he was accused of stabbing another student in the leg. After this incident, he was homeschooled until graduation. At age eighteen, he was charged with assault on a public servant and resisting arrest. By this time, experts testified that Ward had been diagnosed with bipolar disorder, depression, learning disorder, and attention deficit hyperactivity disorder, and he was taking Depakote and lithium.

Ward briefly attended college but dropped out, citing disagreements with instructors whom he described as deceitful and political. When he was twenty-one, Ward's father hit him in the head with the butt of a revolver to keep him from going next door and killing his neighbors, giving Ward a mild concussion.

In his federal habeas petition, Ward primarily challenges counsel's effectiveness by attacking the diagnoses of Dr. Compton, Dr. Vermette, and Dr. Randall Price. Ward contends these diagnoses were inaccurate and based on counsel's insufficient investigation, which prejudiced his defense.

Dr. Compton testified at trial that her primary diagnosis was that Ward had shared psychotic disorder. As discussed above, Ward had an unusually close relationship with his father. Dr. Compton believed that Ward and his father suffered from similar delusions that there was a conspiracy in the town against the family that included the school district, government, and court system. Dr. Compton testified that Ward's father possessed delusional, odd beliefs that he imposed on his son. She also diagnosed Ward with delusional disorder (persecutory type), bipolar disorder by history, learning disorder, and

No. 14-70015

personality disorder with "strong signs of narcissistic, obsessive compulsive, and antisocial features."

Dr. Vermette relied on a competency evaluation by Dr. Michael Pittman (the trial court's expert), who diagnosed Ward with bipolar disorder and a personality disorder with "paranoid, antisocial, and narcissistic traits." Dr. Vermette also relied on a 2007 neuropsychological evaluation by Dr. Price, another defense expert, that found Ward's clinical picture consistent with "delusional disorder, bipolar mood disorder, obsessive-compulsive and narcissistic personality traits, severe learning disabilities, and antisocial behaviors." Dr. Price also believed that Ward and his father suffered from similar delusions that constituted "a shared delusional type psychosis."

The jury also heard testimony from Ward's special-education teachers and service providers detailing the Ward family's opposition to various mental-health interventions. The director of the agency that delivered special-education services to Ward's school district testified that Ward was labeled seriously emotionally disturbed. The agency brought in behavioral consultants from a university and developed a behavioral-management program for Ward that his parents rejected. Ward's special-education teacher for kindergarten through first grade brought a box of records to court that she had kept for fifteen years out of fear that Ward's parents would sue her—Ward's father had apparently threatened her more than once. She testified that Ward would attack her, and he choked, bit, hit, and kicked other children every week. Her records contained a 1992 report by a psychologist that said Ward's parents noticed a problem in their son when he was between eighteen and twenty-four months of age. A diagnostician with the special-education-service agency testified that Ward's father was confrontational and difficult to work with. She testified about an incident when, after Ward had hurt a teacher, Ward's father showed up at her office and threatened her because he did not want his son

15

No. 14-70015

punished.  She explained that the Wards regularly declined extended-year services from the school district, and that Ward's father often threatened her job and threatened to sue the school district.  The school district feared litigation so much so that it instructed her to take a lawyer with her to every meeting with the Wards.  She summarized that the Wards opposed their son's special education, and that Ward used this to manipulate school personnel by threatening to call his parents.

Ward's defense counsel also presented testimony further illustrating the background, behavior, and personality of Adam Ward's father, Ralph.  Ralph Ward testified about his education, which included a master's degree in manufacturing engineering technology and a doctor of education degree.  At the time of Adam Ward's trial, Ralph Ward was unemployed and had been "for some time."  He believed he had sacrificed his professional aspirations, education, and degrees to stay at home to protect his son from society and society from his son.  He confirmed his interest in the "Illuminati" and his belief that the city singled out and picked on his home  Specifically, he believed that the head of code enforcement was connected with the city council, which was connected with the school district, and the school district was "scared to death" of a lawsuit he had threatened to file.

The mother of one of Ward's former youth-baseball teammates also testified about a memorable incident involving Ralph and Adam Ward.  She recalled an occasion when, after a young Adam Ward was upset about losing a baseball game, Ralph Ward abruptly brought his son to the ground and held him down for about five minutes.

Two Commerce police officers testified about another incident in 2006 (after the murder but before the trial), when they were dispatched to the Wards' street to stand by while a city worker read meters.  They testified that Ralph Ward backed his car out of his driveway, and, when he drove past the

16

No. 14-70015

city crew working on a sewer line across the street, he extended his hand out of the window in a gun-shaped gesture and simulated firing it at the city workers.

Adam Ward also testified against his attorney's advice during the penalty phase. Ward said he believed the school board wanted retribution against his parents and summarized: "[t]he superintendent runs the school board. The school board runs city council. The city council runs everybody else." He claimed other families had been conspired against, but most had the sense to get out of town and "scatter to the wind," though he could not think of specific examples.

The defense's expert forensic psychologist, Dr. Price, testified at the penalty phase about his neuropsychological evaluation of Ward. Dr. Price explained that Ward exhibited paranoia during his evaluation interview: "He was very paranoid, thought the system and everybody was against him and he was not responsible for any of his problems." Dr. Price testified that Ward "thought everybody in the system, that the Commerce Schools . . . , all of the police in Commerce, all authorities were somehow conspiring against him and his family to get them, to catch them, to persecute them." Dr. Price characterized Ward as delusional, but noted that his delusions were "moderate" and "very fixed," explaining: "I've seen worse. I've seen a lot more – more – more – more severe and pervasive delusional thinking but he's – he's quite delusional and . . . narcissistic." Dr. Price also observed that Ward's "elevated sense of mood" during his interview "were all consistent with a bipolar kind of disorder in a manic phase." On cross-examination, Dr. Price acknowledged that there is no treatment effective in reversing the trends of an antisocial personality disorder, though he noted on redirect that people can age out of antisocial personality tendencies in a structured environment (such as prison), particularly after they reach age forty.

17

No. 14-70015

After considering extensive mitigation evidence during the penalty phase, the jury sentenced Ward to death.  In total, the trial court allocated more than $136,000 for Ward's counsel to retain various experts to testify during the competency, guilt, and penalty phases of the trial including: a psychologist, a psychiatrist, a neuro-psychologist, a fact investigator, and a mitigation specialist.

During closing argument in the penalty phase, defense counsel focused his argument on Ward's mental illness.  Defense counsel noted that Ward has been mentally ill since the age of two and that multiple evaluations over the years correctly predicted he would end up in a courtroom.  Counsel discussed Ward's childhood and family life, and observed that Ward has not received proper mental-health treatment.  Counsel noted that the Wards had been continually told by medical professionals to "get him some help" and to get "family counseling," but they did not do so.  Counsel stressed that, if given a life sentence, Ward would have proper "continuing mental health treatment which he's never had before."  Counsel also underscored Dr. Price's testimony that antisocial personality disorders "burn out after about 20 years."

*ii.      State habeas proceedings*

As noted above, Ward's state habeas application challenged trial counsel's mitigation investigation and argued that these deficiencies led to the inaccurate diagnosis of "Shared Delusional Disorder."  The habeas mitigation specialist interviewed Ward, his parents, and nineteen other people, and reviewed relevant records including the notes and reports of a mitigation investigator and consulting psychologists.

The state habeas IAC claim also relied on the following new evidence from witnesses who ostensibly could have testified as mitigation witnesses during the penalty phase of Ward's trial:

No. 14-70015

- An affidavit from university psychologist Steven Ball regarding his desire to testify at the trial about his "long-standing professional understanding" of Ward.

- Affidavits from Commerce residents Judy and Michael Fane who said that Code Officer Walker had been hostile and inappropriate about city-code issues several days before his death.

- An affidavit from a secretary at Ward's middle school who felt sorry for Ward as a boy, felt that the school's disciplinary methods were somewhat barbaric, and was upset by Ward's trial and sentence.

- An affidavit from Charles Sleeman, a fellow Boy Scout who considered Ward to be his best friend and said Ward was bullied by students and picked on by teachers his whole life, but had a strong spirit and stood up for others.

- An interview with Leon and Loretta Harrison, neighbors of the Wards, who treated Ward as their adopted son. Leon acted as Ward's spiritual advisor and had been approached to testify on Ward's behalf but did not do so and later regretted it.

The state habeas court found that Ward's trial counsel conducted a thorough and constitutionally adequate mitigation investigation. The state habeas court also concluded that there was no reasonable probability that, but for the alleged deficiencies, the outcome of the penalty phase would have been different.

We must now decide whether the district court's decision—that the state court's resolution of Ward's IAC claim was not unreasonable under § 2254(d)—presents a question debatable among reasoned jurists sufficient to warrant a COA.

### b.    *Applicable Law*

In evaluating Ward's petition for a COA to appeal his IAC claim under § 2254, we look to "clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). For IAC claims, "the 'clearly established federal law' against which we measure the state court's

No. 14-70015

denial of relief is the standard set forth in *Strickland v. Washington*," 466 U.S. 668 (1984). *Clark v. Thaler*, 673 F.3d 410, 417 (5th Cir.), *cert. denied*, 133 S. Ct. 179 (2012). To prevail under *Strickland*, Ward must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Hoffman*, 752 F.3d at 439. "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made and by giving a heavy measure of deference to counsel's judgments." *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (citations and internal quotation marks omitted). Review of a petition for a COA to appeal an IAC claim "under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

In the habeas context, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 131 S. Ct. at 788 (citations omitted). Moreover, because the "*Strickland* standard is a general one," "the range of reasonable applications is substantial." *Id.* In short, IAC habeas claims are subject to two layers of deference, and state courts are granted substantial leeway. *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### c.    *Analysis*

Ward argues that his trial attorneys failed to conduct a complete investigation into Ward's past and that this failure led to an incomplete psychosocial history on which Dr. Price rendered his inaccurate medical diagnosis. Specifically, Ward contends Dr. Price misdiagnosed him with antisocial personality disorder and that trial counsel unreasonably relied on a

No. 14-70015

fact investigator—rather than a mitigation specialist—to conduct the mitigation investigation. Texas counters that Ward has not presented evidence that the defense experts' antisocial-personality-disorder diagnoses were wrong, and the mitigation evidence that Ward claims his trial counsel failed to present was, in fact, presented to the jury.

We agree with Texas that Ward's application for a COA does not demonstrate that the state court's rejection of his IAC claim—viewed through the lens of § 2254's deferential standard of review—is debatable among reasoned jurists. Several defense experts diagnosed Ward with antisocial personality disorder. Ward does not direct this Court to evidence in the record indicating this diagnosis was wrong, and we are aware of none. Ward instead finds fault with the extent of defense counsel's mitigation investigation on which these diagnoses were rendered. But the "Supreme Court has emphasized that 'counsel has wide latitude in deciding how best to represent a client . . . .'" *Clark*, 673 F.3d at 427 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003)). Further this general challenge fails to demonstrate that the state court unreasonably found, as a factual matter, that Ward's trial counsel was effective. After all, as the district court observed, the trial court allocated more than $136,000 for Ward's counsel to retain expert assistance.

That trial counsel decided to use its time and resources on mental-health experts, rather than on a professional mitigation specialist or further investigation into Ward's past, may very well reflect counsel's reasonable strategic decision "to balance limited resources" and to focus on expensive clinical psychologists and forensic experts rather than on investigators. *See Richter*, 131 S. Ct. at 789 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."). Moreover, as the district court correctly observed, Ward's argument that his trial team was "not aware of the

No. 14-70015

characteristics displayed by Mr. Ward prior to his fifteenth birthday" is flatly contradicted by the record.  The medical and school records, experts' reports, and trial testimony all discuss Ward's significant behavioral problems throughout childhood and adolescence.  The state habeas court could therefore reasonably conclude on this record that Ward's trial counsel's metal-health investigation was not constitutionally ineffective.  *Cf. Hinton v. Alabama,* 134 S. Ct. 1081, 1089 (2014) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" (alterations in original) (quoting *Strickland*, 466 U.S. at 690)).

This is not a case in which defense counsel was aware of a mental illness that counsel had completely failed to present to the jury—and even if it were, we have denied a COA application in such circumstances.  For instance, in *Feldman v. Thaler*, the petitioner sought a COA to appeal the denial of his IAC habeas claim in a death-penalty case.  695 F.3d 372, 376 (5th Cir. 2012).  Feldman shot and killed three people following an incident of road rage.  *Id.* at 375.  In the state-court habeas proceedings, Feldman submitted evidence to the CCA that he had been diagnosed with bipolar II disorder one year before the murders.  *Id.* at 379.  Trial defense counsel was apparently aware of this, but did not present expert witnesses on this point, instead relying on "vague appeals to circumstantial evidence." *Id.* at 378–79.  The prosecution seized on this, arguing at trial that "if Feldman truly suffered from a mental disorder, [the defense attorney] would have presented expert testimony." *Id.* at 378.  Additionally, Feldman's habeas counsel later obtained a postconviction diagnosis of bipolar I. *Id.* at 379.  We denied Feldman's application for a COA on his ineffective assistance claim. *Id.* at 381.  Giving defense counsel "the benefit of the doubt," we explained that the CCA "was plainly justified in concluding that Feldman failed to overcome *Strickland*'s 'strong presumption'

No. 14-70015

that [defense counsel's] omission 'might be considered sound trial strategy.'"
*Id.* at 380, 382 (quoting *Strickland*, 466 U.S. at 689). In contrast, here, the
jury heard extensive testimony from expert and lay witnesses about Ward's
mental illnesses, making this an even stronger case for denial of a COA.

In sum, perhaps Ward's trial counsel could have investigated more, hired
different experts, or presented more mitigating witnesses. But as we have said
previously, courts "must be particularly wary of arguments that essentially
come down to a matter of degrees. Did counsel investigate enough? Did
counsel present enough mitigating evidence? Those questions are even less
susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214,
220 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir.
2000)) (internal quotation marks omitted). In this case, we cannot say the state
court's decision rejecting this claim was unreasonable, or that our conclusion
is debatable among reasoned jurists, particularly in light of the "'doubly
deferential' standard of review that gives both the state court and the defense
attorney the benefit of the doubt." *Burt*, 134 S. Ct. at 13. Because jurists of
reason could not debate the district court's decision, we deny Ward's
application for a COA on his IAC claim.

### 3.   *Funding Application*

Ward challenges the district court's denial of his funding application for
investigative and expert assistance to develop his IAC claim under 18 U.S.C.
§ 3599. The district court initially found that Ward was not entitled to funding
because his application for funds "lacks specificity and overlooks the factual
development of [the IAC] issue in the state habeas court." Later, after the
Supreme Court decided *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino
v. Thaler*, 133 S. Ct. 1911 (2013), Ward renewed his request. This time the
district court found that, in part because his IAC claim had been exhausted,

No. 14-70015

Ward "cannot show that his requested funds for the development of new evidence would be reasonably necessary."

We note that, though Ward challenges the district court's funding decision in his COA application, "a COA is not necessary to appeal the denial of funds for expert assistance." *Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005). Accordingly, we review funding-request denials for abuse of discretion. *Id.*

We hold that the district court did not abuse its discretion in denying Ward's funding application. Section 3599 provides that a district court may authorize a defendant's attorneys to obtain investigative, expert, or other services upon a finding that such services "are reasonably necessary for the representation of the defendant." 18 U.S.C. § 3599(f). Reasonably necessary in this context means "that a petitioner must demonstrate 'a substantial need' for the requested assistance." *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004) (quoting *Clark v. Johnson*, 202 F.3d 760, 768 (5th Cir. 2000)). The denial of funding will be upheld when it would only support a meritless claim, when it would only supplement prior evidence,[5] or when the constitutional claim is procedurally barred. *Woodward v. Epps*, 580 F.3d 318, 334 (5th Cir. 2009).

Here, in light of our above holdings that Ward's IAC claim was exhausted and that the merits do not present a debatable question, and in light of the ample record containing extensive expert testimony and Ward's mental-health history, the district court did not abuse its discretion. The district court reasonably determined that the sought-after funding would have supported a meritless claim or would only supplement prior evidence. *See Smith*, 422 F.3d at 288.

---

[5] In assessing the denial of Ward's funding application, we ordinarily confine our review to the record developed in the state court proceedings. *See Pinholster*, 131 S. Ct. at 1398.

No. 14-70015

## B.   Jury-Contact Claim

Ward contends that reasonable jurists could debate whether his Sixth Amendment right to an impartial jury was violated when a person believed to be associated with the prosecution ate lunch with the jury.  We disagree.

### 1.   *Background*

It is undisputed that a man named Dr. Paul Zelhart ate lunch with and talked to the jury during a lunch break during the trial.  On the second day of the penalty phase of the trial, Ward's defense attorney informed the judge that he believed an individual consulting for the prosecution was sitting with the jurors at lunch time.  The prosecutor explained that Zelhart was a personal friend of the prosecutor and that he was not a consultant for the state. Zelhart's wife was the mayor of Commerce, and he was, according to the prosecutor, "just someone who lives in Commerce and has been a professor at the University for many, many years.  But he's not part of [the State's] team." The prosecutor also mentioned that Zelhart "is a personal friend of Dick Walker," the victim's father, though Zelhart later clarified that this assertion was in error.

Based on this information, Ward orally moved for a mistrial and a new trial.  Both motions were denied "because [the trial court did not] think there's any evidence of any impropriety at this time."

Zelhart's contact with the jury was a central issue in Ward's application for state habeas relief, and the state and Ward disagreed sharply about Zelhart's role in the trial.

Ward supported his habeas application with several exhibits and affidavits which tended to show that Zelhart assisted the prosecution with the trial.  Ward's application attached a time sheet from an investigator with the district attorney's office as Exhibit E.  The time sheet indicates that the investigator "[w]ent over case information and Dr. Zelhart's E-Mail" on June

No. 14-70015

28, 2005 and met with "Paul Zelhart PH[D] at Texas A&M-Commerce" the following day. Ward's application also contained an attached affidavit from Lawanda Phelps, the mother of a man who was arrested for an unrelated capital murder about one year after Ward was convicted. She averred that, after her son was arrested, she "received a phone call from a man identifying himself as Paul Zelhart," who said "that he was working with the district attorney's office to obtain social history information concerning [her] son." Her son's attorney advised her to "not talk with Mr. Zelhart again."

Texas submitted an affidavit from Zelhart that contradicts Ward's theory—that Zelhart was part of the prosecution team during Ward's criminal trial. Therein, Zelhart unequivocally avers he "had no role as a consultant to the District Attorney's Office during the trial of Adam Ward." He describes the incident in which he had lunch with the jurors as follows:

> I was at Ruby's café. It was crowded. There were no unoccupied small tables or booths. There was a long "communal" table. I sat there and ordered my lunch. I was alone. Five or six members of the jury entered the café. They asked if they could sit at the table. I recognized them as jurors. I said they could, but in jest I added, "As long as you don't talk about the trial." They laughed and said they would not. They talked among themselves. At some point one of the jurors said he had seen me in court and wondered about my interest in the trial. I said, "I thought we were not going to talk about the trial." He said, "fair enough". There was no other exchange between the jurors and me. When I finished my lunch and left the jurors were still seated.

Zelhart explains that a "year or so *after* the Ward trial, [he] was getting ready to retire from the university and entertained the idea of being a trial consultant." Only after Ward's trial, Zelhart explains, did he receive training to work as a trial consultant. Regarding the district attorney's investigator's time sheet, Zelhart explains that the prosecutor "sent his investigator to see me and I suggested he speak with the personnel at the Tri-County Cooperative

26

No. 14-70015

[the special-education-services provider for Ward's school district] about Adam Ward." Zelhart also offers: "I am not a supporter of the death penalty." He also claims to have contacted the district attorney about Ward—based on Zelhart's personal friendship with the prosecutor and Zelhart's familiarity with Ward's history because his children attended the same school—to suggest that "because of Adam Ward's history [the district attorney] might not want to seek the death penalty."

The state habeas court rejected Ward's jury-contact claim. In the portion of the trial court's findings of fact that were adopted by the CCA,[6] the court found that Dr. Zelhart was not an agent of the state and did not engage in impermissible contact with the jurors.

### 2.   *Applicable Law*

The Sixth Amendment guarantees that "the accused shall enjoy the right to a . . . trial, by an impartial jury . . . [and] to be confronted with the witnesses against him." U.S. Const. amend VI. "[T]he Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence." *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008). Ordinarily, private contact or communication with a juror during a trial about the matter pending before the jury is "deemed presumptively prejudicial," and the burden is on the government to prove the contact was harmless. *See Remmer v. United States*, 347 U.S. 227, 229 (1954). But in the habeas context, we defer to a state court's factual finding that there was no improper jury contact unless the petitioner "presents 'clear and convincing' evidence to the contrary." *Oliver*, 541 F.3d at 342 (quoting 28 U.S.C. § 2254(e)(1)). Put another

---

[6] The CCA declined to adopt some of the trial court's findings of fact. *Ex parte Ward*, 2010 WL 3910075, at *1 (declining to adopt "findings paragraphs 12, 14, 15, 18, 20, 34, 55, 58, 66, 69, 95, and 96"). Those findings that the CCA declined to adopt are not pertinent to Ward's improper-jury-contact claim.

No. 14-70015

way, habeas petitioners are not entitled to relief based on an improper third-party contact with the jury "unless the error 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 341 (alteration in original) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

### 3.    *Analysis*

Ward has failed to demonstrate that the state court's finding that Zelhart did not influence the jury "lacks 'even fair support in the record.'" *See id.* (quoting *Rushen v. Spain*, 464 U.S. 114, 120 (1983) (per curiam)). Zelhart's relationship with the district attorney's office—particularly the prosecutor's investigator's time sheet showing a meeting with Zelhart—and his presence during the proceedings certainly raise suspicions. But we are constrained from second-guessing the state court's factual finding on this question absent clear and convincing contrary evidence. As summarized above, Zelhart averred that he did not discuss the then-ongoing trial with any of the jurors. Of the three juror affidavits submitted by Ward, only one addresses the incident at Ruby's café, and it is not contrary to Zelhart's description of a brief, chance encounter of little moment. Thus, we cannot say the state court's finding that Zelhart did not influence the jury lacks fair support in the record. *See id.*

Ward's argument—that Zelhart's brief contact with the jury somehow triggered a mandatory constitutional requirement that the trial court hold an evidentiary hearing—is unavailing. Fifth Circuit case law requires district judges, "when confronted with credible allegations of jury tampering, to notify counsel for both sides and hold a hearing with all parties participating." *United States v. Sylvester*, 143 F.3d 923, 932 (5th Cir. 1998). This does not require the district court "to conduct a full-blown evidentiary hearing every time an allegation of jury tampering is raised." *Id.* at 932 n.5. In this case, the trial court addressed Ward's allegation of improper jury contact on the record in the presence of counsel for both sides, entertained argument from both sides,

No. 14-70015

and denied Ward's motions for a mistrial and for a new trial.  Ward does not direct this Court to federal case law—let alone clearly established federal law as determined by the Supreme Court—requiring anything more, and we are aware of none.

Therefore, reasonable jurists could not debate whether Ward's Sixth Amendment right to an impartial jury was violated when Zelhart ate lunch with the jury, and we deny his application for a COA on this issue.

## C.    Eighth Amendment Claim

Ward seeks a COA to appeal his claim that the Eighth Amendment prohibits the execution of the severely mentally ill.  Ward argues the rationale articulated by the Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), prohibiting the execution of the intellectually disabled, "applies with equal force to persons with severe mental illness, such as Ward."  Because this argument is foreclosed by Fifth Circuit precedent, *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014), reasonable jurists could not debate whether Ward's death sentence violates the Eighth Amendment, and we deny his application for a COA on this issue.

## IV.    CONCLUSION

For the foregoing reasons, Ward's application for a certificate of appealability is DENIED.[7]

**Certified as a true copy and issued as the mandate on Jan 22, 2015**

Attest: *Jyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

---

[7] Oral argument being unnecessary to decision on Ward's application for a COA, Ward's motion for oral argument is DENIED.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

January 22, 2015

Ms. Karen S. Mitchell
Northern District of Texas, Dallas
United States District Court
1100 Commerce Street
Earle Cabell Federal Building
Room 1452
Dallas, TX 75242

     No. 14-70015     Adam Ward v. William Stephens, Director
               USDC No. 3:10-CV-2101

Dear Ms. Mitchell,

Enclosed is a certified copy of an opinion-order entered on 01/22/2015. We have closed the case in this court.

We are not forwarding the record on appeal as it is an electronic copy.

            Sincerely,

            LYLE W. CAYCE, Clerk

            By: _____
            Joseph M. Armato, Deputy Clerk

Enclosure(s)

cc:
     Mr. Jefferson David Clendenin
     Mr. David R. Dow
     Mr. Phillip Carl Umphres